**Dakota Imaging, Inc. v. Sandeep Goel and Pradeep Goel.**

**EXHIBIT A**

**To**

**COMPLAINT**

EXECUTION COPY

## EMPLOYMENT AGREEMENT

EMPLOYMENT AGREEMENT (the "Agreement") dated as of April 5, 2004, by and between Dakota Imaging, Inc., a Maryland corporation (the "Company"), and Sandeep Goel ("Employee").

WHEREAS, simultaneously with the execution of this Agreement, the Company has entered into an Agreement and Plan of Merger, dated as of April 5, 2004 (the "Merger Agreement"), by and among WebMD Corporation ("WebMD"), Envoy Corporation ("Envoy"), Raven Merger Sub, Inc., the Company, Pradeep Goel, the Employee and the other parties thereto; and

WHEREAS, the Company desires to employ Employee on the terms described herein and Employee desires to be so employed by the Company as of the Effective Time (as defined in the Merger Agreement);

NOW, THEREFORE, in consideration of the premises and mutual covenants contained herein (including, without limitation, the Company's employment of Employee and the advantages and benefits thereby inuring to Employee) and for other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged by each party hereto, the parties hereby agree as follows:

1. <u>Employment by the Company</u>. (a) The Company hereby employs Employee as of the Effective Time (the "Effective Date") as President of the Company and Employee hereby accepts such employment with the Company on the terms set forth in this Agreement as of the Effective Date. Employee shall initially report to, and perform such duties and services for the Company and its subsidiaries and affiliates (such subsidiaries and affiliates, collectively, "Affiliates") as may be designated from time to time by the President of Envoy or such other officer as may be designated by the Company. During his employment, Employee shall devote his full business time and attention to his employment under this Agreement, and in furtherance thereof shall use his best and most diligent efforts to promote the interests of the Company and its Affiliates, provided that (i) the Company shall not require Employee to devote a substantial portion of his professional time to matters not involving the Company, and (ii) the Company shall not move its base of operations (and the base of Employee's work) more than forty (40) miles from its present location. The Employee acknowledges that he shall be required to travel on business in connection with the performance of his duties hereunder, but that his base will be the Company's location.

(b) In the event that the closing of the transaction contemplated by the Merger Agreement does not occur, this Agreement shall be null, void and of no further force and effect.

Exhibit A

2.    Compensation and Benefits.

2.1    Salary. The Company shall pay Employee for services during his employment under this Agreement a base salary of no less than the annual rate of $225,000 ("Base Salary"). Any and all increases to Employee's Base Salary shall be determined by the Company, in its sole discretion. Such Base Salary shall be payable in equal installments, no less frequently than monthly, pursuant to the Company's customary payroll policies in force at the time of payment, less any required or authorized payroll deductions.

2.2    Bonus. Employee shall be eligible for an annual bonus of up to 40% of his Base Salary, the amount of which to be determined by the Company in its sole discretion and payable at such time as bonuses are paid to employees generally in accordance with the policy of the Company.

2.3    Benefits. During the Employment Period, Employee shall be entitled to participate, on the same basis and at the same level as other similarly situated executives of the Company, in any group insurance, hospitalization, medical, health and accident, disability, fringe benefit and tax-qualified retirement plans or programs of the Company now existing or hereafter established to the extent that he is eligible under the general provisions thereof. Employee shall be entitled to vacation time consistent with the Company's policies. The date or dates of such vacations shall be selected by Employee having reasonable regard to the business needs of the Company. Employee shall be permitted to continue to have use of the Company car in accordance with Company policy.

2.4    WebMD Stock Option. Subject to the approval of the Compensation Committee of the Board of Directors of WebMD and in consideration of the contribution Employee shall make to the Company, Employee shall be granted, on the Effective Date, a nonqualified option (the "WebMD Option") to purchase 500,000 shares of WebMD common stock, par value $0.001 (the "Common Stock"), at an exercise price equal to the closing price of the Common Stock on the Effective Date. The WebMD Option shall vest and become exercisable in full on the fourth anniversary of the Effective Date subject to Employee's continued employment on such date; provided however that if at the end of each year of the Earnout Period (as defined in the Merger Agreement), the Company's EBITDA (as defined in the Merger Agreement) exceeded the Earnout-Cap (as defined in the Merger Agreement) by 20% or more, 25% of the Option shall be deemed vested on the date of such determination (such determination to be made in accordance with Section 1.7 of the Merger Agreement). The WebMD Option shall be granted pursuant to, and subject to, WebMD's stock option plan and a stock option agreement to be entered into between WebMD and Employee, which agreement (the "Stock Option Agreement") shall contain WebMD's standard terms (except as set forth in this Agreement). The WebMD Option will have a term of ten (10) years subject to earlier expiration in the event of the termination of Employee's employment, as set forth in the Stock Option Agreement.

2.5    Expenses. Pursuant to the Company's customary policies in force at the time of payment, Employee shall be promptly reimbursed, against presentation of vouchers or receipts therefor, for all authorized expenses properly and reasonably incurred by Employee on

2

behalf of the Company or any of its Affiliates in the performance of Employee's duties hereunder.

3.    Employment Period. Employee's employment under this Agreement shall commence as of the Effective Date, and shall terminate on the fifth (5th) anniversary thereof, unless terminated earlier pursuant to Section 4 (the "Initial Employment Period"). Unless written notice of either party's desire to terminate this Agreement has been given to the other party prior to the expiration of the Initial Employment Period (or any one month renewal thereof contemplated by this sentence), the term of this Agreement shall be automatically renewed for successive one month periods (as it may be extended, the "Employment Period").

4.    Termination and Forfeiture of Payments and Benefits.

4.1    Termination by the Company for Cause. Employee's employment with the Company may be terminated at any time by the Company for Cause. Upon such a termination, the Company shall have no obligation to Employee other than the payment of Employee's earned and unpaid Base Salary under Section 2.1 to the effective date of such termination. In accordance with the Stock Option Agreement, the Option would be forfeited (the vested and unvested portion).

For purposes of this Agreement, the term "Cause" shall mean any of the following:

(i)     Employee's engagement in an intentional act or intentional failure to act which was performed in bad faith and which is injurious to, or contrary to, the best interests of the Company, monetarily or otherwise;

(ii)    Employee's material breach of a policy of the Company or any of its Affiliates, which breach is not remedied (if susceptible to remedy) following written notice by the Company detailing the specific breach and a thirty (30) day period of time to remedy such breach;

(iii)   Conduct on the part of the Employee which constitutes illegal, fraudulent, dishonest, unethical or disloyal dealings with the Company, its clients, customers and/or vendors or a crime of moral turpitude involving the Company or any of its Affiliates, or which could reasonably be considered to reflect negatively upon the Company or any of its Affiliates or otherwise impair or impede its operations;

(iv)    Employee's failure to achieve agreed upon performance goals, or materially incompetent performance or substantial and continuing inattention to or neglect of duties and responsibilities assigned to Employee, and which are not cured within 30 days of written notice of such incompetence, inattention or neglect to Employee by Company;

(v)     Employee's willful failure to communicate with the Board or its designee regarding the business of the Company, or the willful failure to properly

3

respond to and comply (to the best of his ability) with express and lawful directives of the Board or its designee;

(vi)    The existence of any conflict between the interests of Employee and the Company or any of its Affiliates that is not disclosed in writing by Employee to WebMD and approved in writing by the authority of WebMD; or

(vii)   Any other breach or breaches of this Agreement by Employee, or acts or omissions, which breaches, acts or omissions are, singularly or in the aggregate, material, and which are not cured within 30 days of written notice of such breach or breaches to Employee from the Company or WebMD.

4.2    Permanent Disability. If during his employment with the Company, (i) Employee shall become ill, mentally or physically disabled, or otherwise incapacitated so as to be unable regularly to perform the duties of his position for a period in excess of 90 consecutive days or more than 180 days in any consecutive 12-month period, or (ii) a qualified independent physician determines that Employee is mentally or physically disabled so as to be unable to regularly perform the duties of his position and such condition is expected to be of a permanent duration (a "Permanent Disability"), then the Company shall have the right to terminate Employee's employment with the Company upon written notice to Employee. Upon such a termination, the Company shall have no obligation to Employee other than the payment of Employee's earned and unpaid Base Salary under Section 2.1 to the effective date of such termination. Any options that have not vested as of the date of termination shall be forfeited on the date of termination and any vested options shall remain outstanding for the post-termination exercise period specified in the Stock Option Agreement.

4.3    Death. Employee's employment with the Company shall be deemed terminated by the Company upon the death of Employee and the Company shall have no obligation to Employee or Employee's estate other than the payment of Employee's earned and unpaid Base Salary under Section 2.1 to the effective date of such termination. In accordance with the terms of the Stock Option Agreement, any options that have not vested as of the date of termination shall be forfeited on the date of termination and any vested options shall remain outstanding for the post-termination exercise period specified in the Stock Option Agreement.

4.4    Termination by the Company Without Cause. Employee's employment with the Company may be terminated at any time after the expiration of the "Earnout Period" described in the Merger Agreement by the Company without Cause (which for purposes of clarity shall not include the Company's failure to renew this Agreement). In the event that Employee's employment with the Company is so terminated by the Company without Cause, the Company shall have no obligation to Employee other than: (i) the payment of Employee's earned and unpaid Base Salary under Section 2.1 to the effective date of such termination, and (ii) subject to Employee's continued compliance with his obligations under Section 5 of this Agreement, a continuation of Employee's Base Salary (at the rate in effect at the time of such termination) for a period commencing on the date of termination and ending one (1) year from the date of termination. In accordance with the terms of the Stock Option Agreement, any

4

options that have not vested as of the date of termination shall be forfeited on the date of termination and any vested options shall remain outstanding for the post-termination exercise period specified in the Stock Option Agreement.

4.5    Termination by Employee. Employee may voluntarily resign from his employment with the Company, provided that Employee shall provide the Company with ninety (90) days' advance written notice (which notice requirement may be waived, in whole or in part, by the Company in its sole discretion) of his intent to terminate. Upon such a termination, the Company shall have no obligation other than the payment of Employee's earned but unpaid Base Salary under Section 2.1 to the effective date of such termination. In accordance with the terms of the Stock Option Agreement, any options that have not vested as of the date of termination shall be forfeited on the date of termination and any vested options shall remain outstanding for the post-termination exercise period specified in the Stock Option Agreement.

4.6    Release of Claims. As a condition to receiving the payments and benefits set forth in Section 4.4 upon termination by the Company without Cause, Employee shall be required to execute and not revoke a waiver and release of claims, in a form provided by the Company.

5.    Covenants.

5.1    Confidentiality.

(a)    Proprietary Information. Employee understands and acknowledges that, during the course of his employment with the Company, Employee shall be granted access to valuable information relating to the business of the Company and its Affiliates that provides the Company and its Affiliates with a competitive advantage (or that could be used to the disadvantage of the Company or its Affiliates by a Competitive Business (as defined herein), which is not generally known by, nor easily learned or determined by, persons outside the Company (collectively referred to herein as "Proprietary Information") including, but not limited to: (a) specifications, manuals, software in various stages of development, and other technical data; (b) customer and prospect lists, details of agreements and communications with customers and prospects, and other customer information; (c) sales plans and projections, product pricing information, protocols, acquisition, expansion, marketing, financial and other business information and existing and future products and business plans and strategies of the Company or its Affiliates; (d) sales proposals, demonstrations systems, sales material; (e) research and development; (f) software systems, computer programs and source codes; (g) sources of supply; (h) identity of specialized consultants and contractors and Proprietary Information developed by them for the Company or its Affiliates; (i) purchasing, operating and other cost data; (j) special customer needs, cost and pricing data; (k) clinical procedures and guidelines; and (l) employee information (including, but not limited to, personnel, payroll, compensation and benefit data and plans), including all such information recorded in manuals, memoranda, projections, reports, minutes, plans, drawings, sketches, designs, formula books, data, specifications, software programs and records, whether or not legended or otherwise identified by the Company or its Affiliates as Proprietary Information, as well as such information that is the subject of meetings and discussions and not recorded. Proprietary Information shall not include such information that Employee can demonstrate (i) is generally available to the public (other than as a result of a

5

disclosure by Employee), or (ii) was disclosed to Employee by a third party not known (or reasonably should not have known by Employee) by the Employee to have an obligation to keep such information confidential. Proprietary Information shall include Proprietary Information of the Company known by Employee prior to the Effective Date.

(b)  Duty of Confidentiality.  Employee agrees at all times, both during and after Employee's employment with the Company, to hold all of the Proprietary Information in a fiduciary capacity for the benefit of the Company. Employee also agrees that he will not, directly or indirectly, disclose any such Proprietary Information to, or use such Proprietary Information for the benefit of, any third person or entity outside the Company, except as may be necessary in the good faith performance of Employee's duties for the Company. Employee further agrees that, in addition to enforcing this restriction, the Company may have other rights and remedies under the common law or applicable statutory laws relating to the protection of trade secrets. Notwithstanding anything in this Agreement to the contrary, Employee understands that he may disclose the Proprietary Information to the extent required by applicable laws or governmental regulations or judicial or regulatory process, provided that, Employee gives the Company prompt notice of any and all such requests for disclosure so that it has opportunity to take all necessary or desired action, to avoid disclosure.

(c)  Investors, Other Third-Parties, and Goodwill.  Employee acknowledges that all third-parties that Employee services or proposes to service in his capacity as an employee of the Company are doing business with the Company and not with Employee personally, and that, in the course of dealing with such third-parties, the Company establishes goodwill with respect to each such third-party that is created and maintained at the Company's expense ("Third-Party Goodwill"). Employee also acknowledges that, by virtue of his employment with the Company, he has gained or will gain knowledge of the business needs of, and other information concerning, third-parties, and that Employee will inevitably have to draw on such information were Employee to solicit or service any of the third-parties on his own behalf or on behalf of a Competitive Business.

(d)  Nondisparagement.  Employee agrees that at no time during his employment by the Company or thereafter, shall he make, or cause or assist any other person to make, any statement or other communication to any third party which impugns or attacks, or is otherwise critical of, the reputation, business or character of the Company or any of its Affiliates or any of their respective directors, officers or employees.

5.2  Restrictions on Solicitation.

(a)  During the period beginning on the Effective Date and ending on the second anniversary of the date of termination of Employee's employment by the Company or Employee for any reason whatsoever (the "Restricted Period"), Employee shall not, without the prior written approval of the Company, directly or indirectly, solicit, induce or attempt to induce any employees, agents or consultants of the Company, Envoy, WebMD or those of the Company's Affiliates with which the Employee had substantial contact during the term of his employment (the "Restricted Entities"), to do anything from which Employee is restricted by reason of this Agreement nor shall Employee solicit, induce, hire or engage or aid others to solicit, induce, hire or engage any employees, agents or consultants of the Company or the Restricted Entities

6

BOSTON 1618176v6

(including any person who was employed by the Company or any such Restricted Entities during the 6 month period prior to the date of termination) to terminate their employment with the Company or any of the Related Entities or to enter into an employment, agency or consultancy relationship with the Employee or any other person or entity with whom Employee is affiliated. The preceding sentence shall not apply to Pradeep Goel so long as Employee and such individual are otherwise in full compliance with this Agreement.

(b)     During the Restricted Period, Employee shall not, directly or indirectly, without the prior written approval of the Company, solicit or contact any customer or potential customer of the Company or any of its Affiliates for the purpose of:  (i) any commercial pursuit which is in competition with the Company or any of the Restricted Entities, including any Competitive Business, (ii) providing such customer or potential customer products or services that are the same as or substantially similar to those provided or offered to be provided by the Company or any of the Restricted Entities or (iii) taking away or interfering or attempting to interfere with any custom, trade, business or patronage of the Company or any of its Affiliates.

### 5.3    Restrictions on Competitive Employment.

(a)     Employee acknowledges that the business of the Company and its Affiliates is national in scope, that their products and services are marketed throughout the entire United States, that the Company and its Affiliates compete in nearly all of their business activities with other individuals or entities that are, or could be, located in nearly any part of the United States and that the nature of Employee's services, position, and expertise are such that Employee is capable of competing with the Company and its Affiliates from nearly any location in the United States.

(b)     Accordingly, in order to protect the Proprietary Information and Third-Party Goodwill, Employee acknowledges and agrees that during the Restricted Period, Employee will not, without the Company's express written consent, directly or indirectly (including through the Internet), own, control, manage, operate, participate in, be employed by, or act for or on behalf of, any Competitive Business conducting business anywhere within the geographic boundaries of the United States.  Nothing in this Section 5.3(b) shall prevent the Employee from owning an interest of less than 1% in any publicly traded company engaged in a Competitive Business.

(c)     For purposes of this Agreement, "Competitive Business" shall mean: (i) the business of the Company as currently conducted and as conducted during the Employment Period; (ii) any enterprise engaged in establishing electronic linkages between individual healthcare providers, patients, and payors (including, without limitation, insurance companies, HMO's, government payors, and/or self-insured employer groups) for the purpose of facilitating or conducting financial, administrative and clinical communication and/or transactions; (iii) any enterprise engaged in developing, selling or providing a consumer, dental or physician Internet healthcare portal; (iv) any enterprise engaged in developing, marketing or providing healthcare information and/or management systems (including, without limitation, electronic medical and/or dental records software; physician practice management, dental practice management and/or other healthcare practice management software systems; and other financial, administrative and/or clinical systems for use in the healthcare industry) and/or services related thereto (including, without limitation, software support and maintenance services, hardware

7

support and maintenance services and training services); and (v) any enterprise engaged in any other type of business in which the Company or one of its affiliates is also engaged, or plans to be engaged; to the extent, with respect to clauses (ii), (iii), (iv) or (v), that Employee is involved in such business or planned business on behalf of the Company or one of the Restricted Entities. For purposes of this Agreement, a product is "planned" for development, or a business is "planned" to be conducted, if the Company (or the relevant Affiliate, as the case may be) has taken affirmative actions and applied any resources (financial or otherwise) towards the development of such product or conduct of such business.

(d)    Employee agrees that the Restricted Period and the geographical areas encompassed by such covenant are necessary and reasonable in order to protect the Company and its Affiliates in the conduct of their businesses. The parties intend that the foregoing covenant of Employee shall be construed as a series of separate covenants, one for each county and state of the United States. Except for geographic coverage, each such separate covenant shall be deemed identical in terms to the covenant set forth in paragraph (b) above. To the extent that the foregoing covenant or any provision of this Section 5.3 shall be deemed illegal or unenforceable by a court or other tribunal of competent jurisdiction with respect to (i) any geographic area, (ii) any part of the time period covered by such covenant, (iii) any activity or capacity covered by such covenant or (iv) any other term or provision of such covenant, such determination shall not affect such covenant with respect to any other geographic area, time period, activity or other term or provision covered by or included in such covenant. The Restricted Period shall be extended by any period in which Employee is in breach of this Section 5.

5.4    Assignment of Developments.

(a)    Employee acknowledges that all developments, including, without limitation, the creation of new products, conferences, training/seminars, publications, programs, methods of organizing information, inventions, discoveries, concepts, ideas, improvements, patents, trademarks, trade names, copyrights, trade secrets, designs, works, reports, computer software or systems, flow charts, diagrams, procedures, data, documentation, and writings and applications thereof relating to the past, present, or future business of the Company and the Restricted Entities that Employee, alone or jointly with others, may have discovered, suggested, conceived, created, made, developed, reduced to practice, or acquired during Employee's employment with or as a result of Employee's employment with the Company or any of its Affiliates (collectively, "Developments") are works made for hire and shall remain the sole and exclusive property of the Company and its Affiliates, free of any reserved or other rights of any kind on Employee's part. Employee hereby assigns to the Company all of his rights, titles and interest in and to all such Developments, if any. Employee agrees to disclose to the Company promptly and fully all future Developments and, at any time upon request and at the expense of the Company, to execute, acknowledge and deliver to the Company all instruments that the Company shall prepare, to give evidence, and to take any and all other actions (including, among other things, the execution and delivery under oath of patent or copyright applications and instruments of assignment) that are necessary or desirable in the reasonable opinion of the Company to enable the Company to file and prosecute applications for, and to acquire, maintain, and enforce, all letters patent, trademark registrations, or copyrights covering the Developments in all countries in which the same are deemed necessary by the Company. All data, memoranda,

8

notes, lists, drawings, records, files, investor and client/customer lists, supplier lists, and other documentation (and all copies thereof) made or compiled by Employee or made available to Employee concerning the Developments or otherwise concerning the past, present, or planned business of the Company and the Restricted Entities are the property of the Company, and will be delivered to the Company immediately upon the termination of Employee's employment with the Company.

(b)   If a patent application or copyright registration is filed by Employee or on Employee's behalf during Employee's employment with the Company or within one (1) year after Employee's leaving the Company's employ, describing a Development within the scope of Employee's work for the Company or which otherwise relates to a portion of the business of the Company and the Restricted Entities of which Employee had knowledge during Employee's employment with the Company, it is to be conclusively presumed that the Development was conceived by Employee during the period of such employment.

5.5   Remedies.   Employee acknowledges that the Company has a compelling business interest in preventing unfair competition stemming from the intentional or inadvertent use or disclosure of the Company's Proprietary Information. Employee further acknowledges and agrees that damages for a breach or threatened breach of any of the covenants set forth in this Section 5 will be difficult to determine and will not afford a full and adequate remedy, and therefore agrees that the Company, in addition to seeking actual damages in connection therewith and the termination of the Company's obligations in Section 4.4, may seek specific enforcement of any such covenant in any court of competent jurisdiction, including, without limitation, by the issuance of a temporary or permanent injunction without the necessity of showing any actual damages or posting any bond or furnishing any other security, and that the specific enforcement of the provisions of this Agreement will not diminish Employee's ability to earn a livelihood or create or impose upon Employee any undue hardship. Employee also agrees that any request for such relief by the Company shall be in addition to, and without prejudice to, any claim for monetary damages that the Company may elect to assert.

5.6   Rights to Materials and Return of Materials.   All papers, files, notes, correspondence, lists, software, software code, memoranda, e-mails, price lists, plans, sketches, documents, reports, records, data, research, proposals, specifications, technical information, models, flow charts, schematics, tapes, printouts, designs, graphics, drawings, photographs, abstracts, summaries, charts, graphs, notebooks, investor lists, customer/client lists, information on the use, development and integration of software and all other compilations of information, regardless of how such information may be recorded and whether in printed form or on a computer or magnetic disk or in any other medium (together with all copies of such documents and things) relating to the business of the Company and its Affiliates or containing Proprietary Information and/or Developments, which Employee shall use or prepare or come in contact with in the course of, or as a result of, Employee's employment by the Company shall, as between the parties to this Agreement, remain the sole property of the Company. Laptop computers, other computers, software and related data, information and things provided to Employee by the Company or obtained by Employee, directly or indirectly, from the Company and its Affiliates, also shall remain the sole property of the Company. Upon the termination of Employee's employment or upon the prior demand of the Company, Employee shall immediately return all such materials and things to the Company and shall not retain any copies or remove or

9

participate in removing any such materials or things from the premises of the Company after termination or the Company's request for return.

      6.   Notices.  Any notice or communication given by either party hereto to the other shall be in writing and personally delivered or mailed by registered or certified mail, return receipt requested, postage prepaid, to the following addresses:

      if to the Company:

      Dakota Imaging, Inc.
      c/o WebMD Corporation
      669 River Drive, Center 2
      Elmwood Park, New Jersey 07407
      Attention:  General Counsel

      With a copy to:

      WebMD Corporation
      669 River Drive, Center 2
      Elmwood Park, New Jersey 07407
      Attention:  General Counsel

      if to Employee:

      Sandeep Goel
      [ADDRESS]

      Any notice shall be deemed given when actually delivered to such address, or two days after such notice has been mailed or sent by Federal Express, whichever comes earliest. Any person entitled to receive notice may designate in writing, by notice to the other, such other address to which notices to such person shall thereafter be sent.

      7.   Miscellaneous.

      7.1   Representations and Covenants.  In order to induce the Company to enter into this Agreement, Employee makes the following representations and covenants to the Company and acknowledges that the Company is relying upon such representations and covenants:

      (a)   No agreements or obligations exist to which the Employee is a party or otherwise bound, in writing or otherwise, that in any way interfere with, impede or preclude him from fulfilling all of the terms and conditions of this Agreement.

      (b)   Employee, during his employment, shall use his best efforts to disclose to the President of Envoy and General Counsel in writing or by other effective method any bona fide information known by him and he reasonably believes is not known to such persons that he

10

reasonably believes would have any material negative impact on the Company or any of its Affiliates.

      7.2   <u>Entire Agreement</u>. This Agreement contains the entire understanding of the parties in respect of their subject matter and supersede upon their effectiveness all other prior agreements and understandings between the parties and between the Employee and the Company or its Affiliates with respect to such subject matter. Notwithstanding the foregoing, the covenants and obligations of the Employee are separate and independent from the covenants and obligations of the Employee in the Merger Agreement.

      7.3   <u>Amendment; Waiver</u>. This Agreement may not be amended, supplemented, canceled or discharged, except by written instrument executed by the party against whom enforcement is sought. No failure to exercise, and no delay in exercising, any right, power or privilege hereunder shall operate as a waiver thereof. No waiver of any breach of any provision of this Agreement shall be deemed to be a waiver of any preceding or succeeding breach of the same or any other provision.

      7.4   <u>Binding Effect; Assignment</u>. The rights and obligations of this Agreement shall bind and inure to the benefit of any successor of the Company by reorganization, merger or consolidation, or any assignee of all or substantially all of the Company's business and properties. The Company may assign its rights and obligations under this Agreement to any of its Affiliates without the consent of the Employee. Employee's rights or obligations under this Agreement may not be assigned by Employee.

      7.5   <u>Headings</u>. The headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

      7.6   <u>Governing Law; Interpretation</u>. This Agreement shall be construed in accordance with and governed for all purposes by the laws and public policy (other than conflict of laws principles) of the State of Maryland applicable to contracts executed and to be wholly performed within such State.

      7.7   <u>Further Assurances</u>. Each of the parties agrees to execute, acknowledge, deliver and perform, and cause to be executed, acknowledged, delivered and performed, at any time and from time to time, as the case may be, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney and assurances as may be reasonably necessary to carry out the provisions or intent of this Agreement.

      7.8   <u>Severability</u>. The parties have carefully reviewed the provisions of this Agreement and agree that they are fair and equitable. However, in light of the possibility of differing interpretations of law and changes in circumstances, the parties agree that if any one or more of the provisions of this Agreement shall be determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions of this Agreement shall, to the extent permitted by law, remain in full force and effect and shall in no way be affected, impaired or invalidated. Moreover, if any of the provisions contained in this Agreement are determined by a court of competent jurisdiction to be excessively broad as to duration, activity, geographic application or subject, it shall be construed, by limiting or reducing

11

04/04/2004  15:00    4103813114              DAKOTA IMAGING                PAGE  04/04

7.9   Withholding Taxes. All payments hereunder shall be subject to any and all applicable federal, state, local and foreign withholding taxes.

IN WITNESS WHEREOF, the parties hereto have executed this Employment Agreement as of the day and year first above written.

DAKOTA IMAGING, INC.

By: _____

Name: Pradeep Goel
Title: Senior Vice President

EMPLOYEE

_____

Sandeep Goel

7.9    Withholding Taxes. All payments hereunder shall be subject to any and all applicable federal, state, local and foreign withholding taxes.

IN WITNESS WHEREOF, the parties hereto have executed this Employment Agreement as of the day and year first above written.

DAKOTA IMAGING, INC.

By:_____
        Name: Pradeep Goel
        Title: Senior Vice President


EMPLOYEE

_Sandeep Goel_
Sandeep Goel

Dakota Imaging, Inc. v. Sandeep Goel and Pradeep Goel.

EXHIBIT B

To

COMPLAINT

EXECUTION COPY

## EMPLOYMENT AGREEMENT

EMPLOYMENT AGREEMENT (the "Agreement") dated as of April 5, 2004, by and between Dakota Imaging, Inc., a Maryland corporation (the "Company"), and Pradeep Goel ("Employee").

WHEREAS, simultaneously with the execution of this Agreement, the Company has entered into an Agreement and Plan of Merger, dated as of April 5, 2004 (the "Merger Agreement"), by and among WebMD Corporation ("WebMD"), Envoy Corporation ("Envoy"), Raven Merger Sub, Inc., the Company, Sandeep Goel, the Employee and the other parties thereto; and

WHEREAS, the Company desires to employ Employee on the terms described herein and Employee desires to be so employed by the Company as of the Effective Time (as defined in the Merger Agreement);

NOW, THEREFORE, in consideration of the premises and mutual covenants contained herein (including, without limitation, the Company's employment of Employee and the advantages and benefits thereby inuring to Employee) and for other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged by each party hereto, the parties hereby agree as follows:

1. Employment by the Company. (a) The Company hereby employs Employee as of the Effective Time (the "Effective Date") as SVP, Chief Technology Officer and Chief Operating Officer of the Company and Employee hereby accepts such employment with the Company on the terms set forth in this Agreement as of the Effective Date. Employee shall initially report to, and perform such duties and services for the Company and its subsidiaries and affiliates (such subsidiaries and affiliates, collectively, "Affiliates") as may be designated from time to time by the President of the Company or such other officer as may be designated by the Company. During his employment, Employee shall devote his full business time and attention to his employment under this Agreement, and in furtherance thereof shall use his best and most diligent efforts to promote the interests of the Company and its Affiliates, provided that (i) the Company shall not require Employee to devote a substantial portion of his professional time to matters not involving the Company, and (ii) the Company shall not move its base of operations (and the base of Employee's work) more than forty (40) miles from its present location. The Employee acknowledges that he shall be required to travel on business in connection with the performance of his duties hereunder; but that his base will be the Company's location. (b) In the event that the closing of the transaction contemplated by the Merger Agreement does not occur, this Agreement shall be null, void and of no further force and effect.

Exhibit B

2.    Compensation and Benefits.

2.1    Salary. The Company shall pay Employee for services during his employment under this Agreement a base salary of no less than the annual rate of $225,000 ("Base Salary"). Any and all increases to Employee's Base Salary shall be determined by the Company, in its sole discretion. Such Base Salary shall be payable in equal installments, no less frequently than monthly, pursuant to the Company's customary payroll policies in force at the time of payment, less any required or authorized payroll deductions.

2.2    Bonus. Employee shall be eligible for an annual bonus of up to 40% of his Base Salary, the amount of which to be determined by the Company in its sole discretion and payable at such time as bonuses are paid to employees generally in accordance with the policy of the Company.

2.3    Benefits. During the Employment Period, Employee shall be entitled to participate, on the same basis and at the same level as other similarly situated executives of the Company, in any group insurance, hospitalization, medical, health and accident, disability, fringe benefit and tax-qualified retirement plans or programs of the Company now existing or hereafter established to the extent that he is eligible under the general provisions thereof. Employee shall be entitled to vacation time consistent with the Company's policies. The date or dates of such vacations shall be selected by Employee having reasonable regard to the business needs of the Company. Employee shall be permitted to continue to have use of the Company car in accordance with Company policy.

2.4    WebMD Stock Option. Subject to the approval of the Compensation Committee of the Board of Directors of WebMD and in consideration of the contribution Employee shall make to the Company, Employee shall be granted, on the Effective Date, a nonqualified option (the "WebMD Option") to purchase 500,000 shares of WebMD common stock, par value $0.001 (the "Common Stock"), at an exercise price equal to the closing price of the Common Stock on the Effective Date. The WebMD Option shall vest and become exercisable in full on the fourth anniversary of the Effective Date subject to Employee's continued employment on such date; provided however that if at the end of each year of the Earnout Period (as defined in the Merger Agreement), the Company's EBITDA (as defined in the Merger Agreement) exceeded the Earnout-Cap (as defined in the Merger Agreement) by 20% or more, 25% of the Option shall be deemed vested on the date of such determination (such determination to be made in accordance with Section 1.7 of the Merger Agreement). The WebMD Option shall be granted pursuant to, and subject to, WebMD's stock option plan and a stock option agreement to be entered into between WebMD and Employee, which agreement (the "Stock Option Agreement") shall contain WebMD's standard terms (except as set forth in this Agreement). The WebMD Option will have a term of ten (10) years subject to earlier expiration in the event of the termination of Employee's employment, as set forth in the Stock Option Agreement.

2.5    Expenses. Pursuant to the Company's customary policies in force at the time of payment, Employee shall be promptly reimbursed, against presentation of vouchers or receipts therefor, for all authorized expenses properly and reasonably incurred by Employee on

2

behalf of the Company or any of its Affiliates in the performance of Employee's duties hereunder.

3.    Employment Period.  Employee's employment under this Agreement shall commence as of the Effective Date, and shall terminate on the fifth (5th) anniversary thereof, unless terminated earlier pursuant to Section 4 (the "Initial Employment Period"). Unless written notice of either party's desire to terminate this Agreement has been given to the other party prior to the expiration of the Initial Employment Period (or any one month renewal thereof contemplated by this sentence), the term of this Agreement shall be automatically renewed for successive one month periods (as it may be extended, the "Employment Period").

4.    Termination and Forfeiture of Payments and Benefits.

4.1    Termination by the Company for Cause.  Employee's employment with the Company may be terminated at any time by the Company for Cause. Upon such a termination, the Company shall have no obligation to Employee other than the payment of Employee's earned and unpaid Base Salary under Section 2.1 to the effective date of such termination. In accordance with the Stock Option Agreement, the Option would be forfeited (the vested and unvested portion).

For purposes of this Agreement, the term "Cause" shall mean any of the following:

(i)     Employee's engagement in an intentional act or intentional failure to act which was performed in bad faith and which is injurious to, or contrary to, the best interests of the Company, monetarily or otherwise;

(ii)    Employee's material breach of a policy of the Company or any of its Affiliates, which breach is not remedied (if susceptible to remedy) following written notice by the Company detailing the specific breach and a thirty (30) day period of time to remedy such breach;

(iii)   Conduct on the part of the Employee which constitutes illegal, fraudulent, dishonest, unethical or disloyal dealings with the Company, its clients, customers and/or vendors or a crime of moral turpitude involving the Company or any of its Affiliates, or which could reasonably be considered to reflect negatively upon the Company or any of its Affiliates or otherwise impair or impede its operations;

(iv)    Employee's failure to achieve agreed upon performance goals, or materially incompetent performance or substantial and continuing inattention to or neglect of duties and responsibilities assigned to Employee, and which are not cured within 30 days of written notice of such incompetence, inattention or neglect to Employee by Company;

(v)     Employee's willful failure to communicate with the Board or its designee regarding the business of the Company, or the willful failure to properly

3

respond to and comply (to the best of his ability) with express and lawful directives of the Board or its designee;

(vi)    The existence of any conflict between the interests of Employee and the Company or any of its Affiliates that is not disclosed in writing by Employee to WebMD and approved in writing by the authority of WebMD; or

(vii)    Any other breach or breaches of this Agreement by Employee, or acts or omissions, which breaches, acts or omissions are, singularly or in the aggregate, material, and which are not cured within 30 days of written notice of such breach or breaches to Employee from the Company or WebMD.

4.2   Permanent Disability. If during his employment with the Company, (i) Employee shall become ill, mentally or physically disabled, or otherwise incapacitated so as to be unable regularly to perform the duties of his position for a period in excess of 90 consecutive days or more than 180 days in any consecutive 12-month period, or (ii) a qualified independent physician determines that Employee is mentally or physically disabled so as to be unable to regularly perform the duties of his position and such condition is expected to be of a permanent duration (a "Permanent Disability"), then the Company shall have the right to terminate Employee's employment with the Company upon written notice to Employee. Upon such a termination, the Company shall have no obligation to Employee other than the payment of Employee's earned and unpaid Base Salary under Section 2.1 to the effective date of such termination. Any options that have not vested as of the date of termination shall be forfeited on the date of termination and any vested options shall remain outstanding for the post-termination exercise period specified in the Stock Option Agreement.

4.3   Death. Employee's employment with the Company shall be deemed terminated by the Company upon the death of Employee and the Company shall have no obligation to Employee or Employee's estate other than the payment of Employee's earned and unpaid Base Salary under Section 2.1 to the effective date of such termination. In accordance with the terms of the Stock Option Agreement, any options that have not vested as of the date of termination shall be forfeited on the date of termination and any vested options shall remain outstanding for the post-termination exercise period specified in the Stock Option Agreement.

4.4   Termination by the Company Without Cause. Employee's employment with the Company may be terminated at any time after the expiration of the "Earnout Period" described in the Merger Agreement by the Company without Cause (which for purposes of clarity shall not include the Company's failure to renew this Agreement). In the event that Employee's employment with the Company is so terminated by the Company without Cause, the Company shall have no obligation to Employee other than: (i) the payment of Employee's earned and unpaid Base Salary under Section 2.1 to the effective date of such termination, and (ii) subject to Employee's continued compliance with his obligations under Section 5 of this Agreement, a continuation of Employee's Base Salary (at the rate in effect at the time of such termination) for a period commencing on the date of termination and ending one (1) year from the date of termination  In accordance with the terms of the Stock Option Agreement, any

4

options that have not vested as of the date of termination shall be forfeited on the date of termination and any vested options shall remain outstanding for the post-termination exercise period specified in the Stock Option Agreement.

    4.5   <u>Termination by Employee</u>. Employee may voluntarily resign from his employment with the Company, provided that Employee shall provide the Company with ninety (90) days' advance written notice (which notice requirement may be waived, in whole or in part, by the Company in its sole discretion) of his intent to terminate. Upon such a termination, the Company shall have no obligation other than the payment of Employee's earned but unpaid Base Salary under Section 2.1 to the effective date of such termination. In accordance with the terms of the Stock Option Agreement, any options that have not vested as of the date of termination shall be forfeited on the date of termination and any vested options shall remain outstanding for the post-termination exercise period specified in the Stock Option Agreement.

    4.6   <u>Release of Claims</u>. As a condition to receiving the payments and benefits set forth in Section 4.4 upon termination by the Company without Cause, Employee shall be required to execute and not revoke a waiver and release of claims, in a form provided by the Company.

    5.   <u>Covenants</u>.

    5.1   <u>Confidentiality</u>.

    (a)   <u>Proprietary Information</u>. Employee understands and acknowledges that, during the course of his employment with the Company, Employee shall be granted access to valuable information relating to the business of the Company and its Affiliates that provides the Company and its Affiliates with a competitive advantage (or that could be used to the disadvantage of the Company or its Affiliates by a Competitive Business (as defined herein), which is not generally known by, nor easily learned or determined by, persons outside the Company (collectively referred to herein as "<u>Proprietary Information</u>") including, but not limited to: (a) specifications, manuals, software in various stages of development, and other technical data; (b) customer and prospect lists, details of agreements and communications with customers and prospects, and other customer information; (c) sales plans and projections, product pricing information, protocols, acquisition, expansion, marketing, financial and other business information and existing and future products and business plans and strategies of the Company or its Affiliates; (d) sales proposals, demonstrations systems, sales material; (e) research and development; (f) software systems, computer programs and source codes; (g) sources of supply; (h) identity of specialized consultants and contractors and Proprietary Information developed by them for the Company or its Affiliates; (i) purchasing, operating and other cost data; (j) special customer needs, cost and pricing data; (k) clinical procedures and guidelines; and (l) employee information (including, but not limited to, personnel, payroll, compensation and benefit data and plans), including all such information recorded in manuals, memoranda, projections, reports, minutes, plans, drawings, sketches, designs, formula books, data, specifications, software programs and records, whether or not legended or otherwise identified by the Company or its Affiliates as Proprietary Information, as well as such information that is the subject of meetings and discussions and not recorded. Proprietary Information shall not include such information that Employee can demonstrate (i) is generally available to the public (other than as a result of a

5

disclosure by Employee), or (ii) was disclosed to Employee by a third party not known (or reasonably should not have known by Employee) by the Employee to have an obligation to keep such information confidential. Proprietary Information shall include Proprietary Information of the Company known by Employee prior to the Effective Date.

(b)   Duty of Confidentiality.  Employee agrees at all times, both during and after Employee's employment with the Company, to hold all of the Proprietary Information in a fiduciary capacity for the benefit of the Company. Employee also agrees that he will not, directly or indirectly, disclose any such Proprietary Information to, or use such Proprietary Information for the benefit of, any third person or entity outside the Company, except as may be necessary in the good faith performance of Employee's duties for the Company. Employee further agrees that, in addition to enforcing this restriction, the Company may have other rights and remedies under the common law or applicable statutory laws relating to the protection of trade secrets. Notwithstanding anything in this Agreement to the contrary, Employee understands that he may disclose the Proprietary Information to the extent required by applicable laws or governmental regulations or judicial or regulatory process, provided that, Employee gives the Company prompt notice of any and all such requests for disclosure so that it has opportunity to take all necessary or desired action, to avoid disclosure.

(c)   Investors, Other Third-Parties, and Goodwill.  Employee acknowledges that all third-parties that Employee services or proposes to service in his capacity as an employee of the Company are doing business with the Company and not with Employee personally, and that, in the course of dealing with such third-parties, the Company establishes goodwill with respect to each such third-party that is created and maintained at the Company's expense ("Third-Party Goodwill"). Employee also acknowledges that, by virtue of his employment with the Company, he has gained or will gain knowledge of the business needs of, and other information concerning, third-parties, and that Employee will inevitably have to draw on such information were Employee to solicit or service any of the third-parties on his own behalf or on behalf of a Competitive Business.

(d)   Nondisparagement.  Employee agrees that at no time during his employment by the Company or thereafter, shall he make, or cause or assist any other person to make, any statement or other communication to any third party which impugns or attacks, or is otherwise critical of, the reputation, business or character of the Company or any of its Affiliates or any of their respective directors, officers or employees.

5.2   Restrictions on Solicitation.

(a)   During the period beginning on the Effective Date and ending on the second anniversary of the date of termination of Employee's employment by the Company or Employee for any reason whatsoever (the "Restricted Period"), Employee shall not, without the prior written approval of the Company, directly or indirectly, solicit, induce or attempt to induce any employees, agents or consultants of the Company, Envoy, WebMD or those of the Company's Affiliates with which the Employee had substantial contact during the term of his employment (the "Restricted Entities"), to do anything from which Employee is restricted by reason of this Agreement nor shall Employee solicit, induce, hire or engage or aid others to solicit, induce, hire or engage any employees, agents or consultants of the Company or the Restricted Entities

6

(including any person who was employed by the Company or any such Restricted Entities during the 6 month period prior to the date of termination) to terminate their employment with the Company or any of the Related Entities or to enter into an employment, agency or consultancy relationship with the Employee or any other person or entity with whom Employee is affiliated. The preceding sentence shall not apply to Sandeep Goel so long as Employee and such individual are otherwise in full compliance with this Agreement.

(b)     During the Restricted Period, Employee shall not, directly or indirectly, without the prior written approval of the Company, solicit or contact any customer or potential customer of the Company or any of its Affiliates for the purpose of: (i) any commercial pursuit which is in competition with the Company or any of the Restricted Entities, including any Competitive Business, (ii) providing such customer or potential customer products or services that are the same as or substantially similar to those provided or offered to be provided by the Company or any of the Restricted Entities or (iii) taking away or interfering or attempting to interfere with any custom, trade, business or patronage of the Company or any of its Affiliates.

5.3    Restrictions on Competitive Employment.

(a)    Employee acknowledges that the business of the Company and its Affiliates is national in scope, that their products and services are marketed throughout the entire United States, that the Company and its Affiliates compete in nearly all of their business activities with other individuals or entities that are, or could be, located in nearly any part of the United States and that the nature of Employee's services, position, and expertise are such that Employee is capable of competing with the Company and its Affiliates from nearly any location in the United States.

(b)    Accordingly, in order to protect the Proprietary Information and Third-Party Goodwill, Employee acknowledges and agrees that during the Restricted Period, Employee will not, without the Company's express written consent, directly or indirectly (including through the Internet), own, control, manage, operate, participate in, be employed by, or act for or on behalf of, any Competitive Business conducting business anywhere within the geographic boundaries of the United States. Nothing in this Section 5.3(b) shall prevent the Employee from owning an interest of less than 1% in any publicly traded company engaged in a Competitive Business.

(c)    For purposes of this Agreement, "Competitive Business" shall mean: (i) the business of the Company as currently conducted and as conducted during the Employment Period; (ii) any enterprise engaged in establishing electronic linkages between individual healthcare providers, patients, and payors (including, without limitation, insurance companies, HMO's, government payors, and/or self-insured employer groups) for the purpose of facilitating or conducting financial, administrative and clinical communication and/or transactions; (iii) any enterprise engaged in developing, selling or providing a consumer, dental or physician Internet healthcare portal; (iv) any enterprise engaged in developing, marketing or providing healthcare information and/or management systems (including, without limitation, electronic medical and/or dental records software; physician practice management, dental practice management and/or other healthcare practice management software systems; and other financial, administrative and/or clinical systems for use in the healthcare industry) and/or services related thereto (including, without limitation, software support and maintenance services, hardware

7

support and maintenance services and training services); and (v) any enterprise engaged in any other type of business in which the Company or one of its affiliates is also engaged, or plans to be engaged; to the extent, with respect to clauses (ii), (iii), (iv) or (v), that Employee is involved in such business or planned business on behalf of the Company or one of the Restricted Entities. For purposes of this Agreement, a product is "planned" for development, or a business is "planned" to be conducted, if the Company (or the relevant Affiliate, as the case may be) has taken affirmative actions and applied any resources (financial or otherwise) towards the development of such product or conduct of such business.

(d)    Employee agrees that the Restricted Period and the geographical areas encompassed by such covenant are necessary and reasonable in order to protect the Company and its Affiliates in the conduct of their businesses. The parties intend that the foregoing covenant of Employee shall be construed as a series of separate covenants, one for each county and state of the United States. Except for geographic coverage, each such separate covenant shall be deemed identical in terms to the covenant set forth in paragraph (b) above. To the extent that the foregoing covenant or any provision of this Section 5.3 shall be deemed illegal or unenforceable by a court or other tribunal of competent jurisdiction with respect to (i) any geographic area, (ii) any part of the time period covered by such covenant, (iii) any activity or capacity covered by such covenant or (iv) any other term or provision of such covenant, such determination shall not affect such covenant with respect to any other geographic area, time period, activity or other term or provision covered by or included in such covenant. The Restricted Period shall be extended by any period in which Employee is in breach of this Section 5.

5.4    Assignment of Developments.

(a)    Employee acknowledges that all developments, including, without limitation, the creation of new products, conferences, training/seminars, publications, programs, methods of organizing information, inventions, discoveries, concepts, ideas, improvements, patents, trademarks, trade names, copyrights, trade secrets, designs, works, reports, computer software or systems, flow charts, diagrams, procedures, data, documentation, and writings and applications thereof relating to the past, present, or future business of the Company and the Restricted Entities that Employee, alone or jointly with others, may have discovered, suggested, conceived, created, made, developed, reduced to practice, or acquired during Employee's employment with or as a result of Employee's employment with the Company or any of its Affiliates (collectively, "Developments") are works made for hire and shall remain the sole and exclusive property of the Company and its Affiliates, free of any reserved or other rights of any kind on Employee's part. Employee hereby assigns to the Company all of his rights, titles and interest in and to all such Developments, if any. Employee agrees to disclose to the Company promptly and fully all future Developments and, at any time upon request and at the expense of the Company, to execute, acknowledge and deliver to the Company all instruments that the Company shall prepare, to give evidence, and to take any and all other actions (including, among other things, the execution and delivery under oath of patent or copyright applications and instruments of assignment) that are necessary or desirable in the reasonable opinion of the Company to enable the Company to file and prosecute applications for, and to acquire, maintain, and enforce, all letters patent, trademark registrations, or copyrights covering the Developments in all countries in which the same are deemed necessary by the Company. All data, memoranda,

8

notes, lists, drawings, records, files, investor and client/customer lists, supplier lists, and other documentation (and all copies thereof) made or compiled by Employee or made available to Employee concerning the Developments or otherwise concerning the past, present, or planned business of the Company and the Restricted Entities are the property of the Company, and will be delivered to the Company immediately upon the termination of Employee's employment with the Company.

(b)    If a patent application or copyright registration is filed by Employee or on Employee's behalf during Employee's employment with the Company or within one (1) year after Employee's leaving the Company's employ, describing a Development within the scope of Employee's work for the Company or which otherwise relates to a portion of the business of the Company and the Restricted Entities of which Employee had knowledge during Employee's employment with the Company, it is to be conclusively presumed that the Development was conceived by Employee during the period of such employment.

5.5    Remedies.  Employee acknowledges that the Company has a compelling business interest in preventing unfair competition stemming from the intentional or inadvertent use or disclosure of the Company's Proprietary Information.  Employee further acknowledges and agrees that damages for a breach or threatened breach of any of the covenants set forth in this Section 5 will be difficult to determine and will not afford a full and adequate remedy, and therefore agrees that the Company, in addition to seeking actual damages in connection therewith and the termination of the Company's obligations in Section 4.4, may seek specific enforcement of any such covenant in any court of competent jurisdiction, including, without limitation, by the issuance of a temporary or permanent injunction without the necessity of showing any actual damages or posting any bond or furnishing any other security, and that the specific enforcement of the provisions of this Agreement will not diminish Employee's ability to earn a livelihood or create or impose upon Employee any undue hardship.  Employee also agrees that any request for such relief by the Company shall be in addition to, and without prejudice to, any claim for monetary damages that the Company may elect to assert.

5.6    Rights to Materials and Return of Materials.  All papers, files, notes, correspondence, lists, software, software code, memoranda, e-mails, price lists, plans, sketches, documents, reports, records, data, research, proposals, specifications, technical information, models, flow charts, schematics, tapes, printouts, designs, graphics, drawings, photographs, abstracts, summaries, charts, graphs, notebooks, investor lists, customer/client lists, information on the use, development and integration of software and all other compilations of information, regardless of how such information may be recorded and whether in printed form or on a computer or magnetic disk or in any other medium (together with all copies of such documents and things) relating to the business of the Company and its Affiliates or containing Proprietary Information and/or Developments, which Employee shall use or prepare or come in contact with in the course of, or as a result of, Employee's employment by the Company shall, as between the parties to this Agreement, remain the sole property of the Company.  Laptop computers, other computers, software and related data, information and things provided to Employee by the Company or obtained by Employee, directly or indirectly, from the Company and its Affiliates, also shall remain the sole property of the Company.  Upon the termination of Employee's employment or upon the prior demand of the Company, Employee shall immediately return all such materials and things to the Company and shall not retain any copies or remove or

9

participate in removing any such materials or things from the premises of the Company after termination or the Company's request for return.

  6. <u>Notices</u>. Any notice or communication given by either party hereto to the other shall be in writing and personally delivered or mailed by registered or certified mail, return receipt requested, postage prepaid, to the following addresses:

   if to the Company:

   Dakota Imaging, Inc.
   c/o WebMD Corporation
   669 River Drive, Center 2
   Elmwood Park, New Jersey 07407
   Attention: General Counsel

   With a copy to:

   WebMD Corporation
   669 River Drive, Center 2
   Elmwood Park, New Jersey 07407
   Attention: General Counsel

   if to Employee:

   Pradeep Goel
   [ADDRESS]

  Any notice shall be deemed given when actually delivered to such address, or two days after such notice has been mailed or sent by Federal Express, whichever comes earliest. Any person entitled to receive notice may designate in writing, by notice to the other, such other address to which notices to such person shall thereafter be sent.

  7. <u>Miscellaneous</u>.

  7.1 <u>Representations and Covenants</u>. In order to induce the Company to enter into this Agreement, Employee makes the following representations and covenants to the Company and acknowledges that the Company is relying upon such representations and covenants:

  (a) No agreements or obligations exist to which the Employee is a party or otherwise bound, in writing or otherwise, that in any way interfere with, impede or preclude him from fulfilling all of the terms and conditions of this Agreement.

  (b) Employee, during his employment, shall use his best efforts to disclose to the President of Envoy and General Counsel in writing or by other effective method any bona fide information known by him and he reasonably believes is not known to such persons that he

10

reasonably believes would have any material negative impact on the Company or any of its Affiliates.

    7.2  Entire Agreement. This Agreement contains the entire understanding of the parties in respect of their subject matter and supersede upon their effectiveness all other prior agreements and understandings between the parties and between the Employee and the Company or its Affiliates with respect to such subject matter. Notwithstanding the foregoing, the covenants and obligations of the Employee are separate and independent from the covenants and obligations of the Employee in the Merger Agreement.

    7.3  Amendment; Waiver. This Agreement may not be amended, supplemented, canceled or discharged, except by written instrument executed by the party against whom enforcement is sought. No failure to exercise, and no delay in exercising, any right, power or privilege hereunder shall operate as a waiver thereof. No waiver of any breach of any provision of this Agreement shall be deemed to be a waiver of any preceding or succeeding breach of the same or any other provision.

    7.4  Binding Effect; Assignment. The rights and obligations of this Agreement shall bind and inure to the benefit of any successor of the Company by reorganization, merger or consolidation, or any assignee of all or substantially all of the Company's business and properties. The Company may assign its rights and obligations under this Agreement to any of its Affiliates without the consent of the Employee. Employee's rights or obligations under this Agreement may not be assigned by Employee.

    7.5  Headings. The headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

    7.6  Governing Law; Interpretation. This Agreement shall be construed in accordance with and governed for all purposes by the laws and public policy (other than conflict of laws principles) of the State of Maryland applicable to contracts executed and to be wholly performed within such State.

    7.7  Further Assurances. Each of the parties agrees to execute, acknowledge, deliver and perform, and cause to be executed, acknowledged, delivered and performed, at any time and from time to time, as the case may be, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney and assurances as may be reasonably necessary to carry out the provisions or intent of this Agreement.

    7.8  Severability. The parties have carefully reviewed the provisions of this Agreement and agree that they are fair and equitable. However, in light of the possibility of differing interpretations of law and changes in circumstances, the parties agree that if any one or more of the provisions of this Agreement shall be determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions of this Agreement shall, to the extent permitted by law, remain in full force and effect and shall in no way be affected, impaired or invalidated. Moreover, if any of the provisions contained in this Agreement are determined by a court of competent jurisdiction to be excessively broad as to duration, activity, geographic application or subject, it shall be construed, by limiting or reducing

11

7.9    <u>Withholding Taxes</u>. All payments hereunder shall be subject to any and all applicable federal, state, local and foreign withholding taxes.

IN WITNESS WHEREOF, the parties hereto have executed this Employment Agreement as of the day and year first above written.

DAKOTA IMAGING, INC.

By:    Sandeep Goel

    Name:  Sandeep Goel
    Title: President

EMPLOYEE

Pradeep Goel

04/04/2004  15:00    4183813114          DAKOTA IMAGING                    PAGE  03/04

7.9    Withholding Taxes. All payments hereunder shall be subject to any and all applicable federal, state, local and foreign withholding taxes.

IN WITNESS WHEREOF, the parties hereto have executed this Employment Agreement as of the day and year first above written.

DAKOTA IMAGING, INC.

By:_____
   Name:  Sandeep Goel
   Title: President


EMPLOYEE

*Pradeep Goel*
_____
Pradeep Goel

**Dakota Imaging, Inc. v. Sandeep Goel and Pradeep Goel.**

**EXHIBIT C**

**To**

**COMPLAINT**

Dakota Imaging, Inc.

April 6, 2005

**By Hand**

Sandeep Goel, President
Dakota Imaging, Inc.
7130 Minstrel Way - Suite 130
Columbia, MD 21045

Dear Mr. Goel:

Please be advised that the Board of Directors of Dakota Imaging, Inc. ("Dakota" or the "Company") has voted to terminate your Employment Agreement for cause, effective immediately, pursuant to Sections 4.1(i), (iii) and (v) of the Agreement. Without limiting the Company's right to assert other grounds for termination, the Company hereby notifies you that the termination is based on the following misconduct:

1. In March 2005, you instructed Dakota employees to make copies of certain financial information in the computer hard drives of Ronald Diegelman, the former SVP and Chief Financial Officer of Dakota, and Susan Lawson, the former controller of Dakota, for you and then delete such information from such hard drives. You told at least one such employee that you did not want WebMD to obtain such financial information.

2. On or about March 14, 2005, Pradeep Goel ("Pradeep"), with your knowledge, arranged for Ed Odjaghian to instruct that a copy be made of Dakota's confidential source code for a software product soon to be released. The Board has concluded that you and Pradeep had no legitimate business reason to do so.

3. On or about March 28, 2005, you directed Dakota's purchasing personnel to violate Company policy by purchasing almost $150,000 in equipment for a potential software customer without prior execution of a customer contract and without Envoy approval. You told the purchasing personnel specifically not to tell WebMD about the purchases.

4. You repeatedly sought to undermine the authority and/or directives of the Board and Envoy's President as to Dakota by, among other things, criticizing Envoy's business decisions, refusing to carry out Envoy's reassignment of certain employees (in particular Mr. Diegelman), and failing to carry out Envoy's sales directives.

5. You failed to disclose to Envoy or the Board that you had decided to discontinue backup protection for Dakota's software and BPO products. As a consequence, when Dakota experienced a computer crash in March 2005, it also suffered a resulting loss of customer data which cost substantial loss of good will with customers, as well as substantial and continuing out-of-pocket and indirect costs.

Exhibit C

SANDEEP GOEL
APRIL 6, 2005
PAGE 2

    6.  You made misrepresentations to key customers regarding the backup security system.

    Dakota, as a subsidiary of WebMD, a public company, cannot tolerate a President who deliberately withholds critical information from WebMD and engages in other wrongful conduct.

    You shall receive your base salary through today and payment for any accrued, but not taken, vacation on the next scheduled payday in accordance with the Company's practices. In addition, you shall receive under separate cover from the applicable plan administrators information regarding your ability to continue your health coverage pursuant to COBRA and information regarding WebMD's 401(k) Plan (if applicable).

    Upon the termination of your Employment Agreement, you are required to immediately return any Company keys, computers and documents, including all Proprietary Information as defined in Section 5.1(a) of the Employment Agreement. In addition, you are not to return to the Dakota offices. Of course, you will be entitled to identify personal items in the office, which we will collect and return to you. Pursuant to Section 4.1 of the Employment Agreement, your stock options are forfeited.

    Furthermore, you are not permitted to:

- Disclose any Proprietary Information as defined in Section 5.1(a) of your Employment Agreement (See Section 5.1(b));

- Make, or cause or assist any other person to make, any statement which impugns or attacks the reputation, business or character of Dakota, Envoy, WebMD or its directors, officers or employees (See Section 5.1(d));

- Solicit any employees, agents or consultants of Dakota, Envoy, WebMD or other affiliates (See Section 5.2(a));

- Contact or solicit customers of Dakota, Envoy, WebMD or other affiliates (See Section 5.2(b)); or

- Compete against Dakota, Envoy, WebMD or other affiliates in violation of Section 5.3 of the Agreement.

    Dakota intends to strictly enforce its rights and your obligations pursuant to the Employment Agreement.

SANDEEP GOEL
APRIL 6, 2005
PAGE 3

Jenny Morgan
Chairman of the Board

cc:    Richard Alston, Director
       Robert Draughon, Director

**Dakota Imaging, Inc. v. Sandeep Goel and Pradeep Goel.**

## EXHIBIT D

## To

## COMPLAINT

Dakota Imaging, Inc.

April 6, 2005

**By Hand**

Pradeep Goel, Chief Operating Officer
and Chief Technology Officer
Dakota Imaging, Inc.
7130 Minstrel Way - Suite 130
Columbia, MD 21045

Dear Mr. Goel:

Please be advised that the Board of Directors of Dakota Imaging, Inc. ("Dakota" or the "Company") has voted to terminate your Employment Agreement for cause, effective immediately, pursuant to Sections 4.1(i), (iii) and (v) of the Agreement. Without limiting the Company's right to assert other grounds for termination, the Company hereby notifies you that the termination is based on the following misconduct:

1.  In March 2005, Sandeep Goel ("Sandeep"), with your knowledge, instructed Dakota employees to make copies of certain financial information in the computer hard drives of Ronald Diegelman, the former SVP and Chief Financial Officer of Dakota, and Susan Lawson, the former controller of Dakota, for you and then delete such information from such hard drives. Sandeep told at least one such employee that he did not want WebMD to obtain such financial information.

2.  On or about March 14, 2005, you, with the knowledge of Sandeep, arranged for Ed Odjaghian to instruct that a copy be made of Dakota's confidential source code for a software product soon to be released. The Board has concluded that you and Sandeep had no legitimate business reason to do so.

3.  On or about March 28, 2005, you participated in a conversation in which Sandeep directed Dakota's purchasing personnel to violate Company policy by purchasing almost $150,000 in equipment for a potential software customer without prior execution of a customer contract and without prior Envoy approval. Sandeep, with your collaboration, told the purchasing personnel specifically not to tell WebMD about the purchases.

4.  You repeatedly sought to undermine the authority and/or directives of the Board and Envoy's President as to Dakota by, among other things, criticizing Envoy's business decisions, refusing to carry out Envoy's reassignment of certain employees (in particular Mr. Diegelman), and failing to carry out Envoy's sales directions.

5.  You failed to disclose to Envoy or the Board that you had decided to discontinue backup protection for Dakota's software and BPO products. As a consequence, when Dakota experienced a computer crash in March 2005, it also suffered a resulting loss

PRADEEP GOEL, CHIEF OPERATING OFFICER
AND CHIEF TECHNOLOGY OFFICER
APRIL 6, 2005
PAGE 2

of customer data which cost substantial loss of good will with customers, as well as substantial out-of-pocket and indirect costs.

6.  You made misrepresentations to key customers regarding the backup security system.

Dakota, as a subsidiary of WebMD, a public company, cannot tolerate a chief operating officer and chief technology officer who withholds critical information and engages in other improper conduct.

You shall receive your base salary through today and payment for any accrued, but not taken, vacation on the next scheduled payday in accordance with the Company's practices. In addition, you shall receive under separate cover from the applicable plan administrators information regarding your ability to continue your health coverage pursuant to COBRA and information regarding WebMD's 401(k) Plan (if applicable).

Upon the termination of your Employment Agreement, you are required to immediately return any Company keys, computers and documents, including all Proprietary Information as defined in Section 5.1(a) of the Employment Agreement. In addition, you are not to return to the Dakota offices. Of course, you will be entitled to identify personal items in the office, which we will collect and return to you. Pursuant to Section 4.1 of the Employment Agreement, your stock options are forfeited.

Furthermore, you are not permitted to:

- Disclose any Proprietary Information as defined in Section 5.1(a) of your Employment Agreement (See Section 5.1(b));

- Make, or cause or assist any other person to make, any statement which impugns or attacks the reputation, business or character of Dakota, Envoy, WebMD or its directors, officers or employees (See Section 5.1(d));

- Solicit any employees, agents or consultants of Dakota, Envoy, WebMD or other affiliates (See Section 5.2(a));

- Contact or solicit customers of Dakota, Envoy, WebMD or other affiliates (See Section 5.2(b)); or

- Compete against Dakota, Envoy, WebMD or other affiliates in violation of Section 5.3 of the Agreement.

Dakota intends to strictly enforce its rights and your obligations pursuant to the Employment Agreement.

PRADEEP GOEL, CHIEF OPERATING OFFICER
AND CHIEF TECHNOLOGY OFFICER
APRIL 6, 2005
PAGE 3

Jenny Morgan
Chairman of the Board

cc:    Richard Alston, Director
       Robert Draughon, Director