# Exhibit C

EFiled: May 9 2005 5:14PM EDT
Filing ID 5778731

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| DAKOTA IMAGING, INC., | ) |
| Plaintiff, | ) ) ) |
| Vs. | ) Civil Action No. 1232-N |
| SANDEEP GOEL and PRADEEP GOEL, | ) ) ) ) |
| Defendants. | ) ) |

## ANSWER AND COUNTERCLAIM

Defendants, Sandeep Goel and Pradeep Goel ("Goels" or "Defendants"), in answer to Plaintiff's Complaint, state as follows:

1. The introductory paragraph contains no allegations of fact or law that require an answer. To the extent that such an answer is required, Defendants deny the allegations contained in Paragraph 1.

2. Defendants admit the allegations contained in Paragraph 2.

3. Defendants admit the allegations contained in Paragraph 3.

4. Defendants deny the allegations contained in Paragraph 4.

5. Defendants admit the allegations contained in Paragraph 5.

6. Defendants admit that Section 10.8(b) of the Agreement and Plan of Merger ("Merger Agreement") provides that "all actions and proceedings arising out of or relating to this Agreement" should be brought in the federal or state courts of Delaware and that Plaintiff's claims against Goels in Count III are based on said Merger Agreement. Defendants deny, however, all of the remaining allegations contained in Paragraph 6.

7. Defendants admit the allegations contained in Paragraph 7.

8. Defendants admit the allegations contained in Paragraph 8.

9. Defendants admit that they provided financial and customer information to Envoy and Web MD, as was requested, but deny the remaining allegations contained in Paragraph 9.

10. Defendants admit that on April 5, 2004, the Agreement was executed and that such document speaks for itself. Defendants deny the remaining allegations contained in Paragraph 10 to the extent that they are inconsistent with the express language of the Merger Agreement.

11. Defendants admit that under the terms of the Merger Agreement, the Goels would continue to serve as officers of Dakota after the merger, but deny the remaining allegations contained in Paragraph 11 to the extent that they are inconsistent with the express language of the Merger Agreement.

12. Defendants admit that the Merger Agreement contains provisions dealing with the resolution of certain disputes, but deny the remaining allegations contained in Paragraph 12 to the extent that they are inconsistent with the express language of the Merger Agreement.

13. Defendants admit that on April 5, 2004, they executed Employment Agreements and that Sandeep Goel would remain as President of Dakota and Pradeep Goel would remain as COO and CTO. Defendants deny the remaining allegations contained in Paragraph 13 to the extent they are inconsistent with the express language contained in the Employment Agreements or the Merger Agreement.

14. Defendants admit that as part of the overall sale of Dakota, Defendants provided documents, including financial documents, for Web MD and Envoy to review, but deny the remaining allegations contained in Paragraph 14.

15. Defendants admit that Web MD and Envoy acquired the stock of Dakota, but are without sufficient knowledge or information to form a belief as to the remaining allegations contained in Paragraph 15.

16. Defendants admit the allegations contained in Paragraph 16.

17. Defendants admit that after the acquisition of Dakota by Envoy, Sandeep Goel continued as President and Pradeep Goel continued as COO and CTO of Dakota. Defendants deny the remaining allegations contained in Paragraph 17 to the extent they are inconsistent with the express language of the written Employment Agreements for Sandeep and Pradeep Goel.

18. Defendants deny the allegations contained in Paragraph 18.

19. Defendants deny the allegations contained in Paragraph 19.

20. Defendants deny the allegations contained in Paragraph 20.

21. Defendants deny the allegations contained in Paragraph 21.

22. Defendants deny the allegations contained in Paragraph 22.

23. Defendants deny the allegations contained in Paragraph 23.

24. Defendants admit that *Exhibits C and D* are copies of the Termination Letters that were given to them by Dakota.

## COUNT I
## BREACH OF EMPLOYMENT AGREEMENTS

25. To the extent that Defendants have already admitted the allegations contained in Paragraphs 1 through 24, they are admitted; to the extent those allegations have already been denied, they are denied.

26. Defendants deny the allegations contained in Paragraph 26.

27. Defendants deny the allegations contained in Paragraph 27.

28. Defendants deny the allegations contained in Paragraph 28.

29.  Defendants deny the allegations contained in Paragraph 29.

30.  Defendants deny the allegations contained in Paragraph 30, and specifically deny that Plaintiff is entitled to any of the requested injunctive relief.

## COUNT II
## BREACH OF FIDUCIARY DUTY

31.  To the extent that Defendants have already admitted the allegations contained in Paragraphs 1 through 24 [sic], they are admitted; to the extent those allegations have already been denied, they are denied.

32.  Defendants admit the allegations contained in Paragraph 32.

33.  Defendants deny the allegations contained in Paragraph 33.

34.  Defendants deny the allegations contained in Paragraph 34.

35.  Defendants deny the allegations contained in Paragraph 35, and specifically deny that Plaintiff is entitled to any damages or the requested injunctive relief.

## COUNT III
## ENFORCEMENT OF MERGER COVENANTS

36.  To the extent that Defendants have already admitted the allegations contained in Paragraphs 1 through 24 [sic], they are admitted; to the extent those allegations have already been denied, they are denied.

37.  Defendants acknowledge that the Merger Agreement contains Section 4.8 and that the document speaks for itself. To the extent that the allegations contained in Paragraph 37 are inconsistent with the Merger Agreement, they are denied.

38.  Defendants acknowledge that the Merger Agreement contains Section 4.10 and that the document speaks for itself. To the extent that the allegations contained in Paragraph 38 are inconsistent with the Merger Agreement, they are denied.

39. Defendants deny that the Plaintiff is entitled to any damages or the requested injunctive relief.

## COUNT IV
## THREATENED MISAPPROPRIATION OF TRADE SECRETS

40. To the extent that Defendants have already admitted the allegations contained in Paragraphs 1 through 24 [sic], they are admitted; to the extent those allegations have already been denied, they are denied.

41. Defendants deny the allegations contained in Paragraph 41.

42. Defendants deny the allegations contained in Paragraph 42.

43. Defendants deny the allegations contained in Paragraph 43.

44. Defendants deny the allegations contained in Paragraph 44.

45. Defendants deny the allegations contained in Paragraph 45.

46. Defendants deny the allegations contained in Paragraph 46, and specifically deny that Plaintiff is entitled to any of the requested damages or injunctive relief prayed for in its Complaint.

### AFFIRMATIVE DEFENSES

### FIRST DEFENSE

The Complaint fails to state a claim upon which relief may be granted.

### SECOND DEFENSE

None of the extraordinary relief requested by Plaintiff is appropriate in this case because Defendants have not breached any of their obligations under their Employment Agreements or the Merger Agreement, nor can Plaintiff establish that it has been irreparably harmed by the alleged acts of the Defendants.

### THIRD DEFENSE

Plaintiff's claim that Defendants misappropriated trade secrets pursuant to the Maryland Uniform Trade Secrets Act, Maryland Code, Commercial Law, Section 11-1201, *et sec.*, has been made in bad faith, warranting award of attorneys' fees.

### FOURTH DEFENSE

The restrictive covenants that Plaintiff seeks to enforce against the Defendants are overbroad in both scope and duration, and are unenforceable under Maryland law.

### FIFTH DEFENSE

Any allegation of the Complaint that has not been expressly admitted here and above is denied.

WHEREFORE, Defendants having fully answered, they respectfully request that this action be dismissed with prejudice and that Defendants be granted their costs.

### COUNTERCLAIMS

Pursuant to the Delaware Rules of Procedure, Sandeep Goel and Pradeep Goel ("Goels" or "Counter-Plaintiffs") herein, counterclaim against Dakota Imaging, Inc., and its parent, WebMD, and wholly-owned subsidiary Envoy Corporation (collectively "Dakota" or "Counter-Defendant"), and in support, respectfully represent:

1. Sandeep Goel formed the predecessor to Dakota Imaging, Inc. in 1989 while he was in college. Pradeep Goel joined his brother in the company in 1991 and developed the software now called Transform, which has been Dakota's primary revenue producing product throughout its existence. Transform is automated document processing software that has exceptional utility in the medical insurance market for processing medical claims.

2. By 1993, Dakota acquired its first Blue Cross customer, Blue Cross Blue Shield of North Dakota ("Noridian"). Dakota, led by the Goels, and Noridian formed a strong and effective relationship that remains in place today.

3. Dakota focused on the healthcare insurance claims processing market and over the years built a reputation in the Blue Cross Blue Shield market for innovation and personal service. With a focus on continuous technology innovation and personal service, Dakota became the industry leader in paper healthcare claims processing software market.

4. Throughout the 1990s until 2004, Dakota grew from a very small company with few employees in addition to the Goels into one of the most successful document processing software company in the medical claims processing field.

5. By 2004, approximately twenty five of the fifty states in the United States were using Dakota software for processing Medicare claims. Approximately twenty-four of the forty-two Blue Cross companies were using the Dakota software for processing their paper and/or electronic claims. Dakota was clearly the industry leader, with approximately $20 million in revenue and over one hundred employees.

6. WebMD, attracted by Dakota's success, the strong relationship Dakota had with Blue Cross Blue Shield plans and similar customers, and the potential for expansion of the market for Dakota's products, approached Dakota to begin acquisition discussions in September of 2003. Those discussions culminated with the Merger Agreement and Employments Agreements, which were executed in April of 2004.

7. On April 5, 2004, the Goels signed Employment Agreements with Dakota; such Agreements are attached as *Exhibits A and B* to Plaintiff's Complaint.

8. Under the express terms of those Employment Agreements, both Sandeep Goel and Pradeep Goel were to be employed for an initial employment period of five years.

9. The Employment Agreements also contained specific provisions delineating under what circumstances the Goels could be terminated by Dakota for cause (*see Paragraphs 4.1 and 4.4*) and without cause, following the expiration of the "earnout period" described in the Merger Agreement. (*See Exhibit 1,* attached hereto.)

10. By its express terms, the Employment Agreements did not permit Dakota to terminate either Sandeep Goel or Pradeep Goel without cause until the earnout period had expired. Under Section 1.7 of the Merger Agreement, executed by the Goels and Dakota on April 5, 2004, the earnout period is defined as three successive 12-month periods ending March 31 following the closing date. Thus, the earnout period continues for three years following the closing date or until March 31, 2007.

11. On April 5, 2004, the same day that the Goels executed their Employment Agreements with Dakota, the Goels and two other Dakota shareholders executed the Merger Agreement. Under the terms of the Merger Agreement, Dakota was sold by the Goels and the other shareholders to WebMD and Envoy Corporation for $40,000,000, with certain adjustments, plus up to an additional $25,000,000 based on increases in Dakota's earnings during a three-year "earnout" period following the closing.

12. The Merger Agreement and the Employment Agreements provide that the Goels would continue to serve as officers of Dakota after the merger, Sandeep Goel as President and Pradeep Goel as Chief Operating Officer and Chief Technology Officer, respectively. (*Merger Agreement, Section 5.1(j), (k).*)

13. In accordance with the Merger Agreement, Section 1.7(a), Dakota promised to pay the Goels and other Dakota shareholders an earnout payment equal to the product of (i) five times (ii) incremental EBITDA; provided, however, the cumulative amount of earnout payments paid would not exceed $8,333,333 on account of the first earnout period (ended March 31, 2005); $16,666,666 on account of the first two earnout periods; or $25,000,000 on account of all of the earnout periods.

14. Under that same provision in the Merger Agreement, Envoy, Dakota's parent company, is required, "as soon as reasonably practicable" following Envoy's determination of the earnout payments, to deliver a statement that includes each element of the calculation of the earnout payment and a certificate by Envoy's Chief Financial Officer certifying that the calculations of the earnout payment were made in accordance with the terms of the Merger Agreement.

15. However, shortly after the merger was completed, WebMD management started taking a series of actions that seriously undermined the ability of the Goels to achieve the EBITDA targets necessary to achieve the "earnout."

16. During the "due diligence" process and at all times thereafter, WebMD management acknowledged and commented on the excellent customer relationships that existed between Dakota and its software customers.

17. Despite acknowledging that software sales and services were the backbone of revenue and EBITDA, WebMD management ordered the Dakota sales team to stop selling software to new prospects.

18. The Goels have always played a critical role in Dakota's success in developing products, marketing them and maintaining customer relations. Since the April 5, 2004, merger,

the Goels continued working diligently to make Dakota a success despite the active interference of WebMD. WebMD wanted Dakota to miss its earnout targets so that Envoy could avoid paying the earnout.

19. Much of Dakota's success was due to two software license contracts with Noridian worth approximately $7,350,000. Noridian first became a customer of Dakota through the efforts of the Goels in 1993. Since then, Noridian has continued to do business with Dakota to this date.

20. During the final stages of negotiations of a very large software sale to Noridian, WebMD senior management orchestrated at least one phone call to this customer where they disparaged the service Dakota was providing to its customers. Noridian management expressed their satisfaction with Dakota service during this call and continued to pursue the software license negotiations with Dakota management.

21. Subsequently, WebMD senior management engineered a series of objections on the date of the signing of the contract with the intent to delay or prevent the sale of software license to Noridian. Although the senior officers at WebMD took several steps to attempt to delay the execution of this contract with Noridian, the contracts with Noridian were executed on March 29 and 30, 2005, and the software that was the subject of the contracts was delivered that same day. Thus the contracts were signed and finalized prior to March 31, 2005.

22. Beginning in the summer of 2004, WebMD began taking actions that undermined the ability of the Goels to perform their duties for Dakota. WebMD dismantled Dakota's management team. In January 2005, WebMD caused Dakota to summarily terminate Ronald Diegleman, who had served as Senior Vice President and Chief Financial Officer for Dakota prior to the acquisition and continuing as Senior Vice President up to his termination. This

action was taken despite the objection of the Goels who considered Diegelman key to the operation of Dakota. Diegelman was replaced by John McCrae, who knew virtually nothing about Dakota's business. Although McCrae ostensibly reported to Pradeep Goel, he in fact reported directly to WebMD personnel and commented to employees that he had the authority to override the Goels, which disrupted and demoralized the Dakota workforce.

23. Other management changes were also instituted, again over the objection of the Goels. Jenny Morgan was made Executive Vice President of a division of WebMD, requiring Sandeep Goel to report to Morgan. Previously, Goel reported to Tony Holcomb at WebMD. In addition, the Goels were advised that the Board of Directors of Dakota was being reactivated with Morgan as Chairman.

24. WebMD interfered with Dakota's business in ways that were intended to affect Dakota's performance so that the earnout would not have to be paid to Dakota's former stockholders. For example, WebMD required Dakota to provide its software to WebMD Business Services (Envoy) for HIPPA Compliance, at considerable time, effort and cost to Dakota. WebMD promised to pay Dakota for its software and services, but rushed Dakota into the project on an emergency basis and said it would work the details out later. When Dakota completed the project, WebMD informed the Goels that Dakota would get no credit for the software (which was worth $6.5 to $8 million) and threatened the Goels to drop the issue because WebMD had more resources and attorneys than the Goels would have if the matter were litigated.

25. WebMD personnel communicated with key Dakota customers and disparaged Dakota in order to interfere with customer relations and prevent Dakota from achieving financial results that would require the earnout to be paid. When Dakota was attempting to complete the

sale to Noridian in March of 2005, WebMD delayed the approval of the contracts for contrived reasons and otherwise attempted to interfere with the sale. At one point, Daniel Cortez, an in-house attorney of WebMD, directed Dakota to inform Noridian that it did not have the right to sell the software to it. Dakota did have the right to sell the software to Noridian and, fortunately for Dakota's results, it completed the sale.

26. On April 6, 2005, Dakota summarily terminated Edward Odjaghian, Vice President for Product Development and Customer Service. Odjaghian had worked with the Goels at Dakota for a number of years prior to the acquisition by WebMD.

27. On April 6, 2005, the Goels were requested to attend what was described as a meeting of Dakota's Board of Directors. When they arrived, they were both summarily discharged and handed almost identical termination letters, copies of which are attached to Plaintiff's Complaint, *Exhibits C and D*.

28. The reasons for the Goels' termination, as described in the termination letters, are false and Dakota knew that they were false when it terminated the Goels.

29. At no time during their employment with Dakota did the Goels breach any of the terms of their Employment Agreements with Dakota, their obligations in the Merger Agreement, or their common law responsibilities as employees of Dakota. At no time during their employment did the Goels commit any intentional acts or intentionally fail to act or otherwise perform their duties in bad faith, which were injurious or contrary to the best interests of Dakota. Moreover, at no time during their employment with Dakota did the Goels ever fraudulently, dishonestly, unethically or disloyally deal with Dakota or otherwise willfully fail to communicate with Dakota's Board of Directors regarding Dakota's business.

30. Upon information and belief, Dakota summarily removed Ronald Diegleman, Edward Odjaghian and the Goels, undercut the Goels' authority at Dakota and ultimately terminated them for false reasons as part of a scheme to remove the Goels from Dakota, in violation of their Employment Agreements; and further, to preclude, the Goels from recovering their earnout payments of up to $25,000,000, which are scheduled to be paid over a three-year period.

31. Following this summary termination on April 6, 2005, Dakota has denied the Goels access to their offices to retrieve personal documents and property and has failed and refused to return to the Goels all of their personal property. Upon information and belief, Dakota is taking this action to restrict the Goels' efforts to defend themselves against Dakota's false claims and further, to inhibit the Goels' ability to recover the full earnout payment provided for in the Merger Agreement.

## COUNT I
## BREACH OF EMPLOYMENT AGREEMENT

32. The Goels incorporate by reference the allegations contained in Paragraphs 1 through 31 above as if fully set forth herein.

33. Under the terms of the Goels' Employment Agreement with Dakota, they were to be employed for an initial period of five years from April 5, 2004, or until April 5, 2009, unless properly terminated for cause, permanent disability or death. *(See Section 4 of Employment Agreements, Attachments A and B to Dakota's Complaint.)*

34. Section 4.4 of the Employment Agreements expressly provides that the Goels could not have been terminated without cause prior to the expiration of the three-year earnout period, or before March 31, 2007.

35. Section 4.1 of the Employment Agreements provides seven discrete basis for establishing cause sufficient to terminate the employment of the Goels.

36. At no time during their employment did the Goels commit any actions or otherwise act in a manner that would establish cause, as that term is defined in Section 4.1 of the Employment Agreements.

37. At all times during their employment at Dakota, the Goels faithfully and competently performed their duties and responsibilities as employees of Dakota.

38. Notwithstanding that, on April 6, 2005, Dakota summarily terminated the Goels, based on false allegations which, upon information and belief, Dakota knew were false at the time they were made.

39. As a consequence of Dakota's wrongful acts, the Goels have been significantly damaged in an amount to be determined at trial. In particular, the Goels have been deprived of their salary, employment benefits, stock options, bonuses, and ability to successfully manage Dakota to exceed the targets for the earnout period. The specific amount of the damages suffered by the Goels as a result of Dakota's wrongful actions will be more precisely determined following discovery, but are, at a minimum, in excess of $450,000.

## COUNT II
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

40. Defendants incorporate by reference the allegations contained in Paragraphs 1 though 39 as if fully set forth herein.

41. As set forth above, the Goels were signatories to both Employment Agreements with Dakota, as well as the Merger Agreement. Those contracts provide for various rights, benefits and obligations to be performed by both the Goels, as well as Dakota, its parent, Envoy, and Envoy's parent, WebMD.

42. Under Maryland law, there exists in every contract an implied covenant that the parties will act in good faith and deal fairly with each other. This covenant means that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

43. Indeed, in Paragraph 1.7(d)(i) of the Merger Agreement, Envoy specifically agreed that it will "not take any action in bad faith in order to reduce the amount or delay the payments, if any, to the constituents pursuant Subsection (a) of this Section 1.7."

44. Notwithstanding that provision and Maryland law, Dakota has acted in direct violation of those principles and the express terms of the Merger Agreement by engaging in a carefully orchestrated scheme to undermine the ability of the Goels to fully perform their duties for Dakota by causing the summary termination of Ronald Diegleman as Senior Vice President for Dakota, changing the reporting relationship for Sandeep Goel, reconstituting the Board of Directors for Dakota, causing the summary termination of Edward Odjaghian, and, ultimately causing the termination of the Goels without any legal or factual justification, in clear violation of the covenants made in the Merger Agreement.

45. Dakota has intentionally engaged in this carefully planned scheme with the sole purpose of interfering with the Goels' ability to fully and competently perform as senior employees for Dakota, designed to prevent the Goels, and others, from recovering their earnout payments of up to $25,000,000.

46. By taking these actions, Dakota not only violated specific provisions of the Merger Agreement and the Employment Agreements, Dakota has also breached its implied covenant of good faith and fair dealing with regard to the Goels.

47.  As a direct result of Dakota's wrongful actions, the Goels have been deprived of their salary, employment benefits, stock options, bonuses, and ability to successfully manage Dakota to exceed the targets for the earnout period. The specific amount of the damages suffered by the Goels as a result of Dakota's wrongful actions will be more precisely determined following discovery, but are, at a minimum, in excess of $25,000,000.

## COUNT III
## ANTICIPATORY BREACH OF MERGER AGREEMENT

48.  The Goels incorporate by reference the allegations contained in Paragraphs 1 through 47 above as if fully set forth herein.

49.  As set forth above, on April 5, 2004, the Goels, along with others, executed the Merger Agreement with Dakota, its parent, Envoy and Envoy's parent, WebMD.

50.  Section 1.7 of the Merger Agreement provides that the Goels and others are entitled to receive earnout payments over the next three years totaling a maximum of $25,000,000. During the first fiscal year, which ended March 31, 2005, the Goels and others are eligible to receive up to $8,333,333 provided that they meet the target set the Merger Agreement.

51.  Despite numerous attempts by Dakota to prevent and otherwise interfere with the Goels' ability to meet the earnout payment figure of five times incremental EBITDA, that figure was met by March 31, 2005, thereby entitling the Goels and others to the first earnout payment.

52.  Under the terms of the Merger Agreement, Section 1.7(a), Envoy is required "as soon as reasonably practicable following its determination of the earnout payment" to deliver to Goel and others a statement that includes each element of the calculation of the earnout payment and a certificate of Dakota's Chief Financial Officer certifying on its behalf that the calculations of the earnout payment was made in accordance with the terms of the Merger Agreement.

53.    Based on Dakota's, Envoy's, and WebMD's actions to date, by intentionally interfering with and obstructing the Goels in the performance of their duties for Dakota, by summarily removing two top officers of Dakota for no legitimate reason and, then, summarily dismissing Sandeep Goel and Pradeep Goel in violation of their Employment Agreement, and taking other such actions, Dakota demonstrated that it has no intention of honoring its obligations under the Merger Agreement to make any of the earnout payments to the Goels and others.

54.    Indeed, even though the Goels exceeded the target set forth in the Merger Agreement for the first year's earnout payment, by taking the various improper actions described herein, Dakota, Envoy and WebMD have clearly demonstrated that they do not intend to make the first earnout payment and, by dismantling Dakota's senior management with the removal of the two founders, Sandeep Goel and Pradeep Goel, as well as Ronald Diegleman and Edward Odjaghian, two other senior officers, and other actions, such as the failure and refusal to pay employee bonuses that had been paid in the past and refusing to give proper revenue credit to Dakota for using its Transform software at another WebMD business unit. Dakota, Envoy, and WebMD have, in effect, repudiated their promise and legal obligation not to take any action in bad faith in order to reduce the amount or delay the earnout payments provided for in the Merger Agreement, and required by Maryland law.

55.    As a direct result of Dakota's wrongful actions, the Goels, and others, have suffered significant damages, including but not limited to the loss of their salary, employment benefits, stock options, bonuses and ability to successfully manage Dakota to exceed the targets for the earnout period. The specific amount of the damages suffered by the Goels as a result of Dakota's wrongful actions will be more precisely determined following discovery, but are, at a

minimum, in excess of $25,000,000 (or whatever percentage the Goels would recover from the total earnout).

WHEREFORE, the Goels request that this Court enter judgment in the Goels' favor against Dakota, award the Goels damages in amounts to be determined by the Court, plus interest, costs and reasonable attorneys' fees, and grant such other relief as the Court deems just and proper.

Respectfully submitted,

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*Michael Stafford by MPB/*
Michael P. Stafford, Esquire (No. 4461)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6553
Facsimile: (302) 576-3461

Attorneys for Defendants

OF COUNSEL:
Ward B. Coe III, Esquire
Kevin C. McCormick, Esquire
WHITEFORD, TAYLOR & PRESTON
Seven Saint Paul Street, Suite 1400
Baltimore, Maryland 21202
(410) 347-8779

Dated: May 9, 2005