**EFiled: May 9 2005 5:14PM EDT**
**Filing ID 5778731**

# Exhibit 1

# AGREEMENT AND PLAN OF MERGER

## BY AND AMONG

### WEBMD CORPORATION

### ENVOY CORPORATION

### RAVEN MERGER SUB, INC.

### DAKOTA IMAGING, INC.

### SANDEEP GOEL AND PRADEEP GOEL

## AND

## CAROL GUPTA AND THE EAC INVESTMENT LIMITED PARTNERSHIP

April 5, 2004

Exhibit 1

TABLE OF CONTENTS

Page

TABLE OF CONTENTS...................................................................................i

AGREEMENT AND PLAN OF MERGER ......................................................1

ARTICLE 1 THE MERGER.............................................................................2
  1.1     The Merger...................................................................................2
  1.2     The Closing..................................................................................3
  1.3     Actions at the Closing..................................................................3
  1.4     Additional Action.........................................................................7
  1.5     Conversion of Shares, Options and Warrants................................7
  1.6     Post-Closing Adjustment............................................................13
  1.7     Earnout Payments......................................................................20
  1.8     Escrow.......................................................................................38
  1.9     Dissenting Shares.......................................................................39
  1.10    Articles of Incorporation and By-laws........................................43
  1.11    No Further Rights.......................................................................44
  1.12    Stockholder Releases.................................................................44
  1.13    Company Closing Expenses........................................................47
  1.14    Appointment of Stockholder Representatives..............................47
  1.15    Nature of Payments; Withholding..............................................51

ARTICLE II REPRESENTATIONS AND WARRANTIES OF THE COMPANY AND THE
PRINCIPAL STOCKHOLDERS ....................................................................52
  2.1     Organization, Qualification and Corporate Power........................55
  2.2     Capitalization.............................................................................56
  2.3     Authorization of Transaction......................................................61
  2.4     Noncontravention.......................................................................62
  2.5     Subsidiaries................................................................................65
  2.6     Financial Statements..................................................................66
  2.7     Absence of Certain Changes......................................................68
  2.8     Undisclosed Liabilities...............................................................72
  2.9     Taxes.........................................................................................72
  2.10    Assets........................................................................................86
  2.11    Owned Real Property..................................................................88
  2.12    Real Property Leases..................................................................88
  2.13    Intellectual Property...................................................................91
  2.14    Contracts....................................................................................98
  2.15    Accounts Receivable.................................................................108
  2.16    Powers of Attorney...................................................................110
  2.17    Insurance..................................................................................110
  2.18    Litigation..................................................................................112
  2.19    Warranties................................................................................113

2.20   Employees....................................................................................114
2.21   Employee Benefits...........................................................................116
2.22   Environmental Matters......................................................................125
2.23   Legal Compliance...........................................................................127
2.24   Customers and Suppliers...................................................................130
2.25   Permits......................................................................................131
2.26   Certain Business Relationships With Affiliates.........................................132
2.27   Brokers' Fees...............................................................................133
2.28   Books and Records..........................................................................133
2.29   Stockholders Representations.............................................................135
2.30   Hart-Scott-Rodino Act.....................................................................135
2.31   Compliance with Healthcare Laws and Regulations....................................137
2.32   Disclosure..................................................................................140

ARTICLE III  REPRESENTATIONS AND WARRANTIES OF THE BUYER AND THE
TRANSITORY SUBSIDIARY..................................................................142
3.1    Organization and Corporate Power.......................................................142
3.2    Authorization of Transaction.............................................................143
3.3    Noncontravention...........................................................................143
3.4    Litigation....................................................................................145
3.5    Investment Intent...........................................................................146
3.6    Financial Capacity..........................................................................146

ARTICLE IV  PRE-CLOSING AND POST-CLOSING COVENANTS.........................147
4.1    Closing Efforts.............................................................................147
4.2    Governmental and Third-Party Notices and Consents................................147
4.3    Operation of Business......................................................................149
4.4    Access to Information......................................................................155
4.5    Notice of Breaches.........................................................................156
4.6    Exclusivity.................................................................................157
4.7    Expenses...................................................................................159
4.8    Proprietary Information...................................................................160
4.9    Solicitation and Hiring....................................................................160
4.10   Non-Competition...........................................................................161
4.11   Options and Warrants.....................................................................165
4.12   Audited Financial Statements.............................................................166
4.13   Voting of Shares...........................................................................166
4.14   Coverage in the Buyer Benefit Plans....................................................169
4.15   Stockholder Approval......................................................................170
4.16   280G Covenant.............................................................................172

ARTICLE V  CONDITIONS TO CONSUMMATION OF MERGER..........................173
5.1    Conditions to Obligations of the Buyer and the Transitory Subsidiary...173
5.2    Conditions to Obligations of the Company..............................................181

ARTICLE VI  INDEMNIFICATION............................................................184
6.1    Indemnification by the Stockholders....................................................184

|       |      |                                                      |     |
|-------|------|------------------------------------------------------|-----|
|       | 6.2  | Indemnification by the Buyer                         | 187 |
|       | 6.3  | Indemnification Claims                                | 188 |
|       | 6.4  | Survival of Representations and Warranties           | 197 |
|       | 6.5  | Limitations                                           | 201 |
|       | 6.6  | Treatment of Indemnity Payments                       | 207 |
|       | 6.7  | Insurance                                             | 207 |
|       | 6.8  | Exclusive Remedy                                      | 207 |

ARTICLE VII  TAX MATTERS ............................................................................209
|       | 7.1  | Tax Indemnification                                   | 209 |
|       | 7.2  | Allocation of Certain Taxes                            | 211 |
|       | 7.3  | Preparation and Filing of Tax Returns; Payment of Taxes | 212 |
|       | 7.4  | Audits, Assessments, Etc                              | 216 |
|       | 7.5  | Termination of Tax Sharing Agreements                 | 218 |
|       | 7.6  | Scope of Article VII                                  | 218 |
|       | 7.7  | Dispute Resolution                                    | 223 |

ARTICLE VIII  TERMINATION ........................................................................225
|       | 8.1  | Termination of Agreement                              | 225 |
|       | 8.2  | Effect of Termination                                | 228 |

ARTICLE IX  DEFINITIONS ............................................................................228

ARTICLE X  MISCELLANEOUS ......................................................................279
|       | 10.1  | Press Releases and Announcements                     | 279 |
|       | 10.2  | No Third Party Beneficiaries                          | 279 |
|       | 10.3  | Entire Agreement                                     | 280 |
|       | 10.4  | Succession and Assignment                            | 280 |
|       | 10.5  | Counterparts and Facsimile Signature                 | 281 |
|       | 10.6  | Headings                                              | 281 |
|       | 10.7  | Notices                                               | 281 |
|       | 10.8  | Governing Law; Consent to Jurisdiction and Venue     | 287 |
|       | 10.9  | Amendments and Waivers                               | 288 |
|       | 10.10 | Severability                                          | 289 |
|       | 10.11 | Construction                                          | 290 |
|       | 10.12 | Parent Guaranty                                      | 291 |

Disclosure Schedule

| Exhibit A   | Form of Opinion of Counsel to the Company and the Stockholders |
| Exhibit B   | Form of Employment Agreement with Sandeep Goel |
| Exhibit C   | Form of Employment Agreement with Pradeep Goel |
| Exhibit D   | Form of Stockholder Transmittal Letter |
| Exhibit E   | Form of Opinion of Counsel to the Buyer and Transitory Subsidiary |
| Exhibit F   | Accounting Policies |
| Exhibit G   | Form of Escrow Agreement |
| Exhibit H-1 | Form of Option Termination Agreement |

| Exhibit H-2 | Form of Warrant Termination Agreement |
|---|---|
| Exhibit I | Example Calculation of Distribution to Constituents |
| Exhibit J | Calculations of Assumed Distributions to Constituents |
| Exhibit K | Example of Bundled Offering Adjustment |
| Exhibit L | Form of Exemption Certificate |

## AGREEMENT AND PLAN OF MERGER

This Agreement and Plan of Merger (this "Agreement") is entered into as of April 5, 2004 by and among (i) ENVOY CORPORATION, a Delaware corporation (the "Buyer") and a wholly-owned subsidiary of WEBMD CORPORATION, a Delaware corporation (the "Parent"), (ii) RAVEN MERGER SUB, INC., a Maryland corporation and a wholly-owned subsidiary of the Buyer (the "Transitory Subsidiary"), (iii) DAKOTA IMAGING, INC., a Maryland corporation (the "Company"), and (iv) Sandeep Goel and Pradeep Goel (each a "Principal Stockholder" and collectively, the "Principal Stockholders"), and Carol Gupta and The EAC Investment Limited Partnership, a Georgia limited partnership (each an "Additional Principal Stockholder" and collectively with the Principal Stockholders, the "Additional Indemnifying Stockholders").

This Agreement contemplates a merger of the Transitory Subsidiary into the Company. In such merger, the stockholders of the Company will receive cash in exchange for their capital stock of the Company.

Now, therefore, in consideration of the representations, warranties and covenants herein contained, the Parties agree as follows.

## ARTICLE I
## THE MERGER

1.1    The Merger. Upon and subject to the terms and conditions of this Agreement, the Transitory Subsidiary shall merge with and into the Company at the Effective Time. From and after the Effective Time, the separate corporate existence of the Transitory Subsidiary shall cease and the Company shall continue as the Surviving Corporation. The Merger shall have the effects set forth in Section 3-114 of the Maryland General Corporation Law (the "MGCL").

1.2    The Closing. The Closing shall take place at the offices of Hale and Dorr LLP in Washington, D.C., or at such other place as the Parties may mutually agree in writing, commencing at 9:00 a.m. local time on the Closing Date.

1.3    Actions at the Closing.

(a)    At the Closing:

(i)    the Company shall deliver to the Buyer and the Transitory Subsidiary the various certificates, instruments and documents referred to in Section 5.1 of this Agreement;

(ii)    the Buyer and the Transitory Subsidiary shall deliver to the Company the various certificates, instruments and documents referred to in Section 5.2 of this Agreement;

(iii)    the Surviving Corporation and the Transitory Subsidiary shall file with the Maryland State Department of Assessments and Taxation the Articles of Merger;

(iv)     the Company and the Principal Stockholders shall have delivered to the Buyer documents evidencing the release or termination of all Security Interests on the assets of the Company and the Company Shares, and copies of filed UCC termination statements with respect to all UCC financing statements evidencing Security Interests; and

(v)     the Buyer, the Stockholder Representatives and the Escrow Agent shall execute and deliver the Escrow Agreement.

(b)     Upon confirmation from the Maryland State Department of Assessments and Taxation that the Articles of Merger have been filed and accepted:

(i)     each Company Stockholder, other than holders of Dissenting Shares, shall deliver to the Buyer for cancellation the certificate(s) representing his/her Company Shares, together with a Stockholder Transmittal Letter;

(ii)     each holder of Options and Warrants shall deliver to the Buyer for cancellation the agreements and/or instruments evidencing his/her Options or Warrants, together with an acknowledgment of termination thereof, substantially in the form attached hereto as Exhibit H-1 and Exhibit H-2, respectively (collectively, the "Option and Warrant Termination Agreements");

(iii)     subject to Section 1.5(e) hereof, the Buyer shall pay (by check or by wire transfer) to each Constituent the Closing Payment into which his or her Company Shares, Options or Warrants, as the case may be, are converted or exchanged pursuant to Section 1.5(a);

(iv)     subject to Section 1.5(e) hereof, the Buyer shall pay (by check or wire transfer) to each holder of Preferred Shares the Preferred Stock Per Share Preference into which his or her Preferred Shares are converted pursuant to Section 1.5(b);

(v)     the Buyer or the Transitory Subsidiary shall deposit the Escrow Amount with the Escrow Agent in accordance with Section 1.8;

(vi)     the Buyer shall pay the MCG Debt (by check or by wire transfer) in accordance with the reasonable instructions of MCG; and

(vii)     the Buyer shall deliver $3,500,000 (the "Bonus Pool") to an account specified by the Company and in the name of the Company to be payable to those employees and in such amounts as are set forth in Section 1.3(b) of the Disclosure Schedule in accordance with the terms and conditions set forth in the Company's Incentive Bonus Plan dated December 31, 2003 (the "Bonus Plan").

1.4     Additional Action. The Surviving Corporation may, at any time after the Effective Time, take any action, including executing and delivering any document, in the name and on behalf of either the Company or the Transitory Subsidiary, in order to consummate the transactions contemplated by this Agreement.

1.5    Conversion of Shares, Options and Warrants. At the Effective Time, by virtue of the Merger and the Option and Warrant Termination Agreements and without any further action on the part of any Party or the holder of any of the Company Shares or the holder of any Option or Warrant to purchase Common Shares:

(a)    Each Common Share, Option and Warrant shall be converted, in accordance with the formula set forth in Exhibit I attached hereto, into the right to receive a portion (which may, in the case of some Options and Warrants, be zero) of the Aggregate Merger Consideration which shall be payable, without interest, at any time in which a portion of the Aggregate Merger Consideration is distributed in accordance with the provisions of this Agreement or the Escrow Agreement (each a "Payment Date") as follows:

(i)    to each Company Stockholder for each Common Share held by him, her or it as of the Effective Time (other than Dissenting Shares), an amount equal to the Final Revised Cumulative Price minus any amounts previously paid to such Company Stockholder for such Common Share pursuant to this Section 1.5(a); and

(ii)    to each holder of an In-the-Money-Option or In-the-Money-Warrant, an amount equal to (x) the product of (i) the Final Revised Cumulative Price, and (ii) the number of Common Shares issuable upon exercise of In-the-Money-Options and In-the-Money-Warrants held by such holder, minus (y) the aggregate exercise price for such In-the-Money Options and In-the-Money Warrants, minus (z) any amounts previously paid for such In-the-Money-Options and In-the-Money-Warrants pursuant to this Section 1.5(a) (ignoring any reductions required for tax withholding).

(b)    Each Preferred Share not otherwise converted into Common Shares issued and outstanding immediately prior to the Effective Time (other than Dissenting Shares) shall be converted into and represent the right to receive the Preferred Stock Per Share Preference, without any interest thereon.

(c)    Whenever payments are due by Buyer under this Agreement, Buyer shall pay (at the discretion of the Buyer, by (i) check or (ii) wire transfer of immediately available funds) to the holders of Company Shares, Options and Warrants, the amount determined in accordance with the preceding provisions of Section 1.5(a) or Section 1.5(b), as the case may be, less any withholding applicable to such payment.

(d)    Each share of common stock, $0.01 par value per share, of the Transitory Subsidiary issued and outstanding immediately prior to the Effective Time shall be converted into and thereafter evidence one share of common stock, $0.01 par value per share, of the Surviving Corporation.

(e)    Notwithstanding anything contained herein to the contrary, the Buyer shall not be obligated to pay any portion of the Aggregate Merger Consideration or the Preferred Stock Per Share Preference to any holder of Company Shares, Options or Warrants unless and until such holder shall have delivered to the Buyer an executed Stockholder Transmittal Letter or Option and Warrant Termination Agreement, as applicable.

(f)    For illustrative purposes only, an example spreadsheet showing the calculations for the assumed distributions to each Constituent is set forth on Exhibit J attached hereto.

(g)    The Parties hereby agree that the amounts of the Aggregate Merger Consideration to which the Constituents are entitled to receive upon release from the Escrow Fund and pursuant to Sections 1.6 and 1.7 hereof by reason and operation of the Merger are contingent upon the absence of circumstances giving rise to Buyer's right to reduce and retain portions of the Aggregate Merger Consideration as contemplated under Articles VI and VII hereof. Therefore, the Constituents shall only become entitled to receive payments of the Aggregate Merger Consideration following the Effective Time upon release from the Escrow Fund and pursuant to Sections 1.6 and 1.7 hereof if, and to the extent, that, at the applicable Payment Date, the Buyer has not properly reduced the portion of the Aggregate Merger Consideration otherwise payable in accordance with the terms of the Escrow Agreement, Sections 1.6, 1.7 and 1.9(c) and Articles VI and VII hereof.

1.6    Post-Closing Adjustment.

(a)    Closing Payment Adjustment. Subject to the provisions of Section 6.5(c) hereof, within five Business Days after the final determination of the Final Balance Sheet pursuant to Section 1.6(b) of this Agreement, the Closing Payment will be adjusted (the amount of any such adjustment, the "Closing Payment Adjustment") and the Buyer or the Constituents, as the case may be, will make whatever payments to each other as are necessary, if any, such that the Closing Payment is what it would have been had (i) the Estimated Net Debt equaled the Net Debt reflected on such Final Balance Sheet; and (ii) the Estimated Working Capital equaled the Closing Date Working Capital reflected on such Final Balance Sheet. In the event a Closing Payment Adjustment becomes payable to the Buyer hereunder, the Buyer shall seek such payment (i) out of the Escrow Fund, (ii) to the extent the Escrow Fund is insufficient to pay in full such Closing Payment Adjustment, out of any other amounts of the Aggregate Merger Consideration payable to the Constituents hereunder, whether by right of setoff (as contemplated under Section 6.5(c) and Section 7.8) or otherwise, or (iii) from the Additional Indemnifying Stockholders.

(b)    Adjustment Procedures. The adjustments described in Section 1.6(a) will be implemented as follows:

(i)    Within 45 days after the Closing Date, the Buyer shall prepare, in accordance with GAAP, and deliver to the Stockholder Representatives a balance sheet of the Company as of the Closing Date (the "Final Balance Sheet"). The parties acknowledge and agree that for purposes of determining the Closing Payment Adjustment pursuant to this Section 1.6(b)(i) the Final Balance Sheet shall be prepared on a basis consistent with and utilizing the same principles, practices and policies of the Company as those used in preparing the Most Recent Balance Sheet.

(ii)    The Stockholder Representatives and their accountants shall have the right to review the Surviving Corporation's books and records relating to, and the work papers of the Buyer and its advisors utilized in preparing the Final Balance Sheet. The Final

- 4 -

Balance Sheet shall be binding unless the Stockholder Representatives present to the Buyer within 15 Business Days after receipt of the Final Balance Sheet from the Buyer written notice of disagreement specifying in reasonable detail the nature and extent of the disagreement.

(iii)    If the Stockholder Representatives deliver a timely notice of disagreement, the Buyer and the Stockholder Representatives shall attempt in good faith during the 30 days immediately following the Buyer's receipt of timely notice of disagreement to resolve any disagreement with respect to the Final Balance Sheet. If, at the conclusion of such 30-day period, the Buyer and the Stockholder Representatives have not resolved their disagreements regarding the Final Balance Sheet, the Buyer and the Stockholder Representatives shall refer the items of disagreement for final determination to the Washington office of BDO Seidman, LLP (the "Independent Accountants"). However, if the Washington, D.C. office of BDO Seidman, LLP is unwilling to so serve, or, if any of the Stockholder Representatives, the Buyer, or the Parent has used the services of such office within twelve (12) months prior to the notice of disagreement, the Buyer shall deliver to the Stockholder Representatives a list of two nationally recognized independent accounting firms that are not auditors, tax advisors or other consultants to the Buyer or the Stockholder Representatives, and the Stockholder Representatives shall select one of such two firms to be the Independent Accountants within 5 Business Days. The Buyer and the Stockholder Representatives shall be reasonably available for such firm, and shall instruct such firm to render a final determination within the 20 days immediately following the referral to the Independent Accountants. The Final Balance Sheet shall be deemed to be conclusive and binding on the Buyer and the Constituents upon (A) the failure of the Stockholder Representatives to deliver to the Buyer a notice of disagreement within 15 Business Days of their receipt of the Final Balance Sheet prepared by the Buyer, (B) resolution of any disagreement by mutual agreement of the Buyer and the Stockholder Representatives after a timely notice of disagreement has been delivered to the Buyer, or (C) notification by the Independent Accountants of their final determination of the items of disagreement submitted to them.

(iv)    The fees and disbursements of the Independent Accountants under this Section 1.6(b) shall be borne exclusively by the Constituents unless the adjustments to the Final Balance Sheet resulting from the Stockholder Representatives' notice of disagreement caused an increase in the Closing Payment of fifty thousand dollars ($50,000) or more, in which case such fees and disbursements shall be borne exclusively by the Buyer. In the event the Constituents are obligated to pay the fees and disbursements of the Independent Accountants hereunder, the Buyer shall seek such payment (i) out of the Escrow Fund, (ii) to the extent the Escrow Fund is insufficient to pay in full such fees and disbursements, out of any other amounts of the Aggregate Merger Consideration payable to the Constituents hereunder, whether by right of setoff (as contemplated under Section 6.5(c) and Section 7.8) or otherwise, or (iii) from the Additional Indemnifying Stockholders.

(v)    The Company and the Principal Stockholders hereby represent and warrant that none of the Company or the Principal Stockholders has had any prior business relationship with the Independent Accountants prior to the date hereof.

1.7    Earnout Payments.

(a)    Subject to the provisions of Section 6.5(c) hereof, within 90 days after each of the first three twelve month periods ended March 31 following the Closing Date (each twelve-month period ending on each such date, an "Earnout Period"), the Buyer will determine a contingent payment for such Earnout Period (each, an "Earnout Payment"). Such Earnout Payment will be an amount equal to the product of (i) five times (ii) Incremental EBITDA; provided, however, that notwithstanding anything to the contrary contained in this Agreement, the cumulative amount of Earnout Payments paid will not exceed Eight Million Three Hundred Thirty-Three Thousand Three Hundred Thirty-Three Dollars ($8,333,333) on account of the first Earnout Period (ended March 31, 2005); Sixteen Million Six Hundred Sixty-Six Thousand Six Hundred Sixty-Six Dollars ($16,666,666) on account of the first two Earnout Periods; or Twenty-Five Million dollars ($25,000,000) on account of all of the Earnout Periods (each, an "Earnout Cap"). The Parties hereto understand and agree that 0.75% of each Earnout Payment shall be payable to the Consultant at the same time as such Earnout Payment is actually made and paid to the Constituents (the "Consultant Contingent Payment") and shall reduce the aggregate Earnout Payment then payable to the Constituents. As soon as reasonably practicable following Buyer's determination of the Earnout Payment, Buyer will deliver to the Stockholder Representatives (A) a statement that includes each element of the calculation of the Earnout Payment; and (B) a certificate of the Buyer's Chief Financial Officer certifying on behalf of the Buyer that the calculation of the Earnout Payment was made in accordance with the terms of this Section 1.7 (such statement and certificate being referred to as the "Earnout Certificate"). The Stockholder Representatives and their professional advisors will be given reasonable access to the books and records of the Surviving Corporation that are necessary to confirm the calculation of the Earnout Payment. All information obtained by the Stockholder Representatives shall be deemed to be Confidential Information of the Buyer subject to the restrictions of Section 4.8. Notwithstanding anything contained herein to the contrary, in the event the Additional Indemnifying Stockholders have paid or are required to pay all or a portion of the Additional Indemnity, any subsequent Earnout Payment shall initially be distributed to the Additional Indemnifying Stockholders to reimburse that portion of the Additional Indemnity paid or required to be paid by such Additional Indemnifying Stockholders pursuant to Section 6.5(a) hereof which is in excess of their pro rata share (based on the Aggregate Merger Consideration paid to all Indemnifying Stockholders) of such Additional Indemnity. Thereafter, the balance of such Earnout Payment, if any, shall be paid first, to the Consultant, in an amount equal to the Consultant Contingent Payment, and then to the Constituents, as contemplated under Section 1.5.

(b)    Manner of Computation. For purposes of this Agreement, "EBITDA" shall mean, for any period, the net income of the Surviving Corporation, as determined in accordance with GAAP, plus interest, income taxes, depreciation and amortization for such period of the Surviving Corporation; provided, however, that for purposes of calculating EBITDA:

(i)    such calculations shall be determined in a manner consistent with the Accounting Policies;

(ii)    any other extraordinary gain or loss (as defined under APB Opinion No. 30 or SFAS No. 144) shall be excluded;

- 6 -

(iii)    the effect of any change in GAAP during the Earnout Periods shall be excluded; and

(iv)    the Surviving Corporation shall be credited with any Bundled Offering Adjustment. An illustrative example of a Bundled Offering Adjustment is set forth on Exhibit K attached hereto.

For purposes of clarification, in determining EBITDA, the following expenses will be included among the expenses of the Surviving Corporation: expenses, such as selling, general and administrative, incurred by Buyer or any of its Affiliates with respect to the Surviving Corporation, its operations and/or its employees (*e.g.*, salary, bonuses and related employment expenses for any personnel of Buyer or its Affiliates attributable to the Surviving Corporation, and the insurance coverage obtained with respect to the Surviving Corporation under policies maintained by Buyer or any of its Affiliates), except for general corporate overhead which will be allocated in accordance with the Accounting Policies.

(c)    Dispute Resolution.

(i)    The amount of any Earnout Payment set forth in the Earnout Certificate shall be binding on the Constituents unless the Stockholder Representatives present to the Buyer within 15 Business Days after receipt of such Earnout Certificate written notice of disagreement specifying in reasonable detail the nature and extent of the disagreement; provided, however, that the only basis of such disagreement shall be that the calculation of the Earnout Payment is not in accordance with the terms of Section 1.7 of this Agreement. The Buyer and the Stockholder Representatives shall attempt in good faith during the 30 days immediately following the Buyer's receipt of the Stockholder Representatives' timely notice of disagreement to resolve any disagreement with respect to such Earnout Payment.

(ii)    If, at the end of the 30-day period referenced in subsection (i) above, Buyer and the Stockholder Representatives have not resolved all disagreements with respect to whether the calculation of the Earnout Payment is in accordance with the terms of Section 1.7 of this Agreement, Buyer and the Stockholder Representatives will refer the items of disagreement for determination to the Independent Accountants, and the parties will be reasonably available and work diligently to facilitate the Independent Accountants to render a determination within the 20-day period immediately following the referral to them. A determination by the Independent Accountants with respect to any item of disagreement submitted to them will be binding on Buyer and the Constituents except to the extent the disagreement also constitutes a disagreement subject to subsection (iii) below. The Independent Accountants, Buyer and Stockholder Representatives will enter into such engagement letters as required by the Independent Accountants to perform under this Section 1.7(c)(ii). The fees and disbursements of the Independent Accountants under this Section 1.7(c)(ii) will be deducted from the Earnout Payments, if any (and borne by the Stockholder Representatives if there are no Earnout Payments), unless it is determined that (A) the Earnout Certificate understated the applicable Earnout Payment by $10,000 or more or (B) Buyer acted in bad faith with respect to such understatement, in either which case such fees and disbursements will be borne exclusively by Buyer.

(iii)    If, at the end of the 30-day period referenced in subsection (i) above or within 30 days after the date of the Independent Accountants' determination pursuant to subsection (ii) above, as applicable, Buyer and the Stockholder Representatives have not resolved all disagreements not resolved by the determination of the Independent Accountants with respect to whether the calculation of the Earnout Payment is in accordance with the terms of Section 1.7 of this Agreement, any such remaining disagreement, regardless of the legal theory upon which it is based, will be settled by final, binding arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, in accordance with the applicable rules of the American Arbitration Association ("AAA") in effect at such time, which will be the sole and exclusive procedures for any such disagreement. The arbitration will be heard before a sole neutral arbitrator mutually agreed upon by Buyer and the Stockholder Representatives. If Buyer and the Stockholder Representatives cannot agree upon such an arbitrator within 10 Business Days after the date referenced in the first sentence of this subsection (iii), AAA will appoint an arbitrator with expertise in the general industry of the business engaged in by the Company. All arbitration proceedings will take place in Wilmington, Delaware. If the arbitrator finds in favor of the Constituents, the arbitrator will have no authority to award amounts to the Constituents in excess of the amounts the Constituents would have been entitled to receive for any Earnout Payment (plus interest as provided for in subsection (iv) below) in the absence of the actions taken by Buyer and determined by the arbitrator to be in violation of Section 1.7. Without limiting the generality of the foregoing, the arbitrator will have no authority to award any special, punitive, exemplary, consequential, incidental or indirect losses or Damages. Judgment upon any award granted in a proceeding brought pursuant to this subsection (iii) may be entered in any court of competent jurisdiction. Should it become necessary to resort or respond to court proceedings to enforce a Party's compliance with this Section 1.7(c), such proceedings will be brought only in the federal or state courts located in Wilmington, Delaware, which will have exclusive jurisdiction to resolve any disputes with respect to this Section 1.7(c), with each Party irrevocably consenting to the jurisdiction thereof.

(iv)    If the dispute provisions of Section 1.7(c) are invoked by the Stockholder Representatives and the Constituents are thereafter entitled to receive any additional Earnout Payment not previously delivered to the Constituents (the "Unpaid Earnout Payment"), each Constituent also will receive from Buyer interest at the prime rate, accruing from the date upon which the applicable Earnout Payment is made or, if no Earnout Payment was made, the latest date upon which the Earnout Payment should have been made, on any Unpaid Earnout Payment.

(d)    Conduct of Business.

(i)    The Buyer intends to manage and operate the Surviving Corporation in a commercially reasonable manner and with a view toward the long-term growth of the Surviving Corporation. The Constituents understand, acknowledge and agree (as evidenced by, in the case of the Company Stockholders, the adoption of this Agreement and the approval of the Merger by such Company Stockholders and, in the case of the holders of Options and Warrants, the execution and delivery of the Option and Warrant Termination Agreements by such holders of Options and Warrants) that the Buyer is entitled to manage and operate the Surviving Corporation and its businesses in its sole and absolute discretion. The Constituents further agree that the Constituents shall have no claim against the Buyer or its Affiliates, and the

- 8 -

Buyer will have no liability to the Constituents, with respect to the management and operation of the Surviving Corporation, including any impact thereof on the payments, if any, to the Constituents pursuant to subsection (a) of this Section 1.7. Notwithstanding the foregoing, the Buyer will not take any action in bad faith in order to reduce the amount or delay the payments, if any, to the Constituents pursuant to subsection (a) of this Section 1.7. Each Principal Stockholder acknowledges that he is not authorized to, and will not, take (and will not attempt to cause the Surviving Corporation or any of its other employees to take) any action in bad faith in order to increase the amount or accelerate the payments, if any, pursuant to subsection (a) under this Section 1.7.

(ii)    The Parties acknowledge and agree that, unless otherwise agreed to by each of Buyer and the Principal Stockholders, in its and their sole discretion, during the Earnout Periods, Buyer will not (A) conduct a business substantially identical to the Business except (1) through the Surviving Corporation, and (2) to the extent Buyer or an Affiliate acquires or combines with any Acquired Person with respect to which an amendment to this Agreement is not entered into pursuant to Section 1.7(e); provided, however, that in the event that Buyer or an Affiliate acquires or combines with any Acquired Person with respect to which an amendment to this Agreement is not entered into pursuant to Section 1.7(e), then, in such event, Buyer will not and will not permit the Acquired Person or any other of its Affiliates other than the Surviving Corporation to solicit any customers, or identified prospects, of the Surviving Corporation, for the provision of services that both (x) fall within the scope of the definition of "Business" and (y) are actually provided, or proposed to be provided, by the Surviving Corporation to such customer, or identified prospects, or (B) cause to be operated through the Surviving Corporation any business other than the Business and such other activities, if any, conducted by the Surviving Corporation as of the Closing Date. An "identified prospect" is a potential customer of the Surviving Corporation to which the Company or the Surviving Corporation has made a written proposal or solicitation within the twelve (12) month period prior to the delivery of the Acquisition Notice (as defined below) to the Principal Stockholders.

(iii)    Buyer will maintain or cause to be maintained separate or otherwise identifiable (e.g., in the case of a shared general ledger) books and records for the Surviving Corporation at all times during the Earnout Periods in a manner reasonably necessary for the financial statements of the Surviving Corporation to be prepared in accordance with GAAP (and in a manner consistent with the Accounting Policies).

(e)    Potential Acquired Persons. Buyer will notify the Principal Stockholders in writing if it intends, or intends to cause the Surviving Corporation or any of its Affiliates, to acquire or otherwise combine with any potential Acquired Person prior to the end of the Contingent Payment Period. Any such notice (an "Acquisition Notice") will include the terms (including price and structure) of the proposed acquisition and the terms upon which Buyer would be willing to amend this Agreement (taking into consideration the matters described below in this Section 1.7(e)). Buyer will also promptly provide to the Principal Stockholders such other information as may be reasonably requested by them relating to the proposed acquisition. If, within 15 days of the Acquisition Notice, Buyer and the Principal Stockholders have entered into an amendment to this Agreement with respect to the treatment of such potential Acquired Person for purposes of calculating EBITDA for any remaining Earnout Payments, and the acquisition of or combination with the potential Acquired Person is consummated, the

income, gain, loss, expense, and other financial results of, or otherwise relating to, such Acquired Person will be included in the calculation of EBITDA on the terms set forth in such amendment. The Parties intend that any such amendment will include provisions relating to the manner in which the pre-tax income of such Acquired Person will be calculated and its impact on the Minimum EBITDA Hurdle, as well as adjustments to such pre-tax income, including the impact of cost of capital, transaction costs, and changes results from the structure of the acquisition. If Buyer and the Principal Stockholders do not enter into an amendment to this Agreement with respect to the treatment of such potential Acquired Person within 15 days of the Acquisition Notice, such potential Acquired Person may be acquired by Buyer in its sole and absolute discretion but any income, gain, loss, expense, and other financial results of, or otherwise relating to, such Acquired Person will not be included in calculation of EBITDA. The Parties acknowledge and agree that the operation of the business of any such Acquired Person will not be deemed to be a breach of the restrictions of Section 1.7(d)(ii). Further, nothing in this Section 1.7(e) will be deemed to confer upon the Company or the Principal Stockholders, any approval over the acquisition of or combination with any Person, it being understood and agreed that the decision to consummate the acquisition of or combination with any Person will be in Buyer's sole and absolute discretion.

    1.8    <u>Escrow</u>.

    (a)    On the Closing Date, the Buyer or the Transitory Subsidiary shall deposit with the Escrow Agent the Escrow Amount. The Escrow Amount shall represent contingent Aggregate Merger Consideration payable to the Constituents hereunder to the extent the Escrow Amount has not been reduced by operation of Sections 1.6 and 1.9(c) and Articles VI and VII hereof or in accordance with the Escrow Agreement. The Escrow Fund shall be held by the Escrow Agent under the Escrow Agreement pursuant to the terms thereof. The Escrow Fund shall be held for eighteen (18) months as a trust fund and shall not be subject to any lien, attachment, trustee process or any other judicial process of any creditor of any party, and shall be held and disbursed solely for the purposes and in accordance with the terms of the Escrow Agreement.

    (b)    The adoption of this Agreement and the approval of the Merger by the Indemnifying Stockholders shall constitute approval of the Escrow Agreement and of all of the arrangements relating thereto, including the placement of the Escrow Fund in escrow and the appointment of the Stockholder Representatives to act on behalf of the Indemnifying Stockholders.

    1.9    <u>Dissenting Shares</u>.

    (a)    Dissenting Shares shall not be converted into or represent the right to receive any portion of the Aggregate Merger Consideration or Preferred Stock Aggregate Preference, as the case may be, unless such Company Stockholder shall have forfeited his, her or its right to appraisal under the MGCL or properly withdrawn his, her or its demand for appraisal. Until such time, any portion of the Aggregate Merger Consideration or Preferred Stock Aggregate Preference, as the case may be, that would have otherwise been payable to such Company Stockholder shall be held in a separate bank account maintained by the Buyer (the "<u>Dissenting Share Consideration</u>"). If such Company Stockholder has so forfeited or withdrawn

his, her or its right to appraisal of Dissenting Shares, then, (i) as of the occurrence of such event, such holder's Dissenting Shares shall cease to be Dissenting Shares and shall be converted into and represent the right to receive the Aggregate Merger Consideration or Preferred Stock Aggregate Preference, as the case may be, payable in respect of such Company Shares pursuant to Section 1.5, as adjusted pursuant to Sections 1.6 and 1.7, if applicable, and (ii) promptly following the occurrence of such event, the Buyer or the Surviving Corporation shall deliver to such Company Stockholder, a payment representing the Closing Payment to which such holder is entitled pursuant to Section 1.5. Unless otherwise paid to a dissenting Company Stockholder as set forth herein, the Dissenting Share Consideration shall remain the property of the Buyer.

(b)     The Company shall give the Buyer (i) prompt notice, but in no event later than two (2) days, of any written demands for appraisal of any Company Shares, withdrawals of such demands, and any other instruments that relate to such demands received by the Company and (ii) the opportunity to direct all negotiations and proceedings with respect to demands for appraisal under the MGCL. The Company shall not, except with the prior written consent of the Buyer, make any payment with respect to any demands for appraisal of Company Shares or offer to settle or settle any such demands.

(c)     In the event the Buyer becomes obligated to make any payment with respect to any demands for appraisal of Company Shares, such payment shall be satisfied first by payment of the Dissenting Share Consideration to the dissenting Company Stockholders. For amounts payable to such dissenting Company Stockholders in excess of the Dissenting Share Consideration, the Buyer shall seek such payment (i) out of the Escrow Fund, (ii) to the extent the Escrow Fund is insufficient to pay in full such amounts in excess of the Dissenting Share Consideration, out of any other amounts of the Aggregate Merger Consideration payable to the Constituents hereunder, whether by right of setoff (as contemplated under Section 6.5(c) and Section 7.8) or otherwise, or (iii) from the Additional Indemnifying Stockholders.

1.10    Articles of Incorporation and By-laws.

(a)     The Articles of Incorporation of the Surviving Corporation immediately following the Effective Time shall be the same as the Articles of Incorporation of the Transitory Subsidiary immediately prior to the Effective Time, except that (i) the name of the corporation set forth therein shall be changed to the name of the Company and (ii) the identity of the incorporator shall be deleted.

(b)     The By-laws of the Surviving Corporation immediately following the Effective Time shall be the same as the By-laws of the Transitory Subsidiary immediately prior to the Effective Time, except that the name of the corporation set forth therein shall be changed to the name of the Company.

1.11    No Further Rights. From and after the Effective Time, no Company Shares shall be deemed to be outstanding, and holders of certificates formerly representing Company Shares shall cease to have any rights with respect thereto except as provided herein or by law.

1.12    Stockholder Releases.

(a)    Effective as of the Closing, each Principal Stockholder and Additional Principal Stockholder agrees not to sue and fully releases and discharges the Company and its stockholders, directors, officers, assigns and successors, past and present (collectively, "Releasees"), with respect to and from any and all claims, issuances of Company's stock, notes or other securities, any demands, rights, liens, contracts, covenants, proceedings, causes of action, obligations, debts, and losses of whatever kind or nature in law, equity or otherwise, whether now known or unknown, and whether or not concealed or hidden, all of which each Principal Stockholder or Additional Principal Stockholder now owns or holds or has at any time owned or held against Releasees connected with or relating to any matter occurring on or prior to the Closing Date. Nothing in this Section 1.12 will be deemed to constitute a release by any Principal Stockholder or Additional Principal Stockholder of any right of such Principal Stockholder or Additional Principal Stockholder under this Agreement or any right to receive compensation or benefits under employee benefit plans attributable to the periods prior to the Closing Date.

(b)    It is the intention of each Principal Stockholder and Additional Principal Stockholder that such release be effective as a bar to each and every claim, demand and cause of action hereinabove specified. In furtherance of this intention each Principal Stockholder and Additional Principal Stockholder hereby expressly waives, effective as of the Closing, any and all rights and benefits conferred upon him by the provisions of applicable law, rule and regulation, including Section 1542 of the California Civil Code and expressly consents that this release will be given full force and effect according to each and all of its express terms and provisions, including as well, those related to unknown and unsuspected claims, demands and causes of action, if any, as those relating to any other claims, demands and causes of action hereinabove specified, but only to the extent such section is applicable to releases such as this. Section 1542 provides:

> "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

1.13    Company Closing Expenses. At the Closing, Buyer shall cause the payment of the Company Closing Expenses directly to those Persons designated in writing on Section 1.13 of the Disclosure Schedule by the Principal Stockholders as being entitled thereto. As soon as reasonably practicable prior to the Closing, the Principal Stockholders shall designate in writing the amounts payable to such Persons as Company Closing Expenses. The Company and the Principal Stockholders hereby represent and warrant that there will be no other Company Closing Expenses.

1.14    Appointment of Stockholder Representatives.

(a)    Upon the approval of the Merger by the Company Stockholders in accordance with the MGCL, the Company Stockholders irrevocably make, constitute and appoint up to two representatives to act as the Company Stockholders' representatives and agents for all purposes under this Agreement (collectively, the "Stockholder Representatives"). In

- 12 -

addition, prior to the Effective Time, the Company shall obtain an Option and Warrant Termination Agreement for each holder of Options or Warrants which shall designate and appoint the duly elected Stockholder Representatives (or their successors) as each such holder's duly appointed Stockholder Representative for all purposes under this Agreement. Upon election of the Stockholder Representatives and upon receipt of the Option and Warrant Termination Agreements, the Stockholder Representatives will be authorized to execute on behalf of each Constituent any and all documents and agreements referred to herein upon the Closing.

(b)      Should either Stockholder Representative or both Stockholder Representatives resign or be unable to serve, the Constituents having received a majority of the Aggregate Merger Consideration distributed as of the latest Payment Date shall appoint a single substitute agent to take on the responsibilities of such Stockholder Representative or Stockholder Representatives, whose appointment shall be effective on the date of the prior Stockholders Representative's resignation or incapacity.

(c)      By way of example only, and without limitation, the Stockholder Representatives shall have the authority to (i) execute on behalf of each Constituent, as fully as if the Constituents were acting on their own behalf, any and all documents and agreements referred to herein, including executing this Agreement and the Escrow Agreement as the Constituents' representative, (ii) give and receive notice or instructions permitted or required under this Agreement or the Escrow Agreement, (iii) authorize the release of the amounts held in the Escrow Fund to pay any Claimed Amount, or (iv) to undertake any actions with respect to the resolution of a Dispute or any disagreement with respect to the amount of any Earnout Payment, including partaking in any dispute resolution process.

(d)      Any notice, direction or communication received by Buyer, Transitory Subsidiary or the Surviving Corporation from the Stockholder Representatives, or delivered to the Stockholder Representatives by Buyer, Transitory Subsidiary or the Surviving Corporation, shall be binding upon the Constituents, and each of them. The Stockholder Representatives shall act in all matters on behalf of the Constituents and Buyer and Transitory Subsidiary and, after the Effective Time, the Surviving Corporation shall be entitled to rely on the actions of the Stockholder Representatives hereunder acting in concert or alone as the actions of the Constituents. Buyer, Transitory Subsidiary and the Surviving Corporation may deliver notices and communications to the Constituents hereunder through the Stockholder Representatives at the address set forth in this Agreement for notices, and such delivery shall be deemed to have been made to any or all of the Constituents. None of Buyer, Transitory Subsidiary nor the Surviving Company shall pay any costs or expenses incurred by the Stockholder Representatives in carrying out their obligations hereunder. Each of Buyer, Transitory Subsidiary and the Surviving Corporation consents to the appointment of the Stockholder Representatives to act as described hereunder.

1.15    Nature of Payments; Withholding. A portion of the Aggregate Merger Consideration shall be considered to be interest in accordance with Section 1274 of the Code and Treasury regulations promulgated thereunder and shall be taken into account in accordance with such provisions. The Buyer shall be entitled to deduct and withhold from any consideration payable or otherwise deliverable pursuant to this Agreement to any holder or former holder of

- 13 -

Common Shares, or any holder or former holder of any Option or Warrant to purchase Common Shares, such amounts as may be required to be deducted or withheld therefrom under the Code or under any provision of state, local or foreign Tax law or under any other applicable legal requirement. To the extent such amounts are so deducted or withheld, such amounts shall be treated for all purposes under this Agreement as having been paid to the person to whom such amounts would otherwise have been paid.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES OF THE COMPANY AND THE PRINCIPAL STOCKHOLDERS

The Company and each of the Principal Stockholders jointly and severally (except for Section 2.29 which is made severally and not jointly by each Principal Stockholder and Additional Principal Stockholder) represents and warrants to the Buyer that, except as set forth in the Disclosure Schedule, the statements contained in this Article II are true and correct as of the date of this Agreement and will be true and correct as of the Closing, except to the extent such representations and warranties are specifically made as of a particular date (in which case such representations and warranties will be true and correct as of such date). The Company and the Principal Stockholders shall have the right to supplement and update the Disclosure Schedule to reflect events that have occurred between the date of this Agreement and the Closing and could not have been disclosed at the date of this Agreement; provided, however, that no such supplemental or updated information shall be deemed to avoid or cure any misrepresentation or breach of warranty or constitute an amendment of any breach of representation or warranty made by the Company or the Principal Stockholders as of the date of this Agreement; and provided, further, however, that such right shall not be deemed in any way to waive, modify or amend the condition to Closing set forth in Section 5.1(q) hereof unless the Buyer expressly waives the condition in writing. The Disclosure Schedule shall be arranged in sections and subsections corresponding to the numbered and lettered sections and subsections contained in this Article II. The disclosures in any section or subsection of the Disclosure Schedule shall qualify any other sections and subsections in this Article II only to the extent it is clear from a reading of the disclosure that such disclosure is applicable to such other sections and subsections.

2.1    Organization, Qualification and Corporate Power. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Maryland. The Company is duly qualified to conduct business and is in good standing under the laws of each jurisdiction listed in Section 2.1 of the Disclosure Schedule, which jurisdictions constitute the only jurisdictions in which the nature of the Company's businesses or the ownership or leasing of its properties requires such qualification, except where the failure to be so authorized, qualified or licensed would not result in a Company Material Adverse Effect. The Company has all requisite corporate power and authority to carry on the businesses in which it is engaged and to own and use the properties owned and used by it. The Company has furnished to the Buyer complete and accurate copies of its Articles of Incorporation and By-laws. The Company is not in default under or in violation of any provision of its Articles of Incorporation or By-laws.

2.2    Capitalization.

(a)    The authorized capital stock of the Company consists of (i) 19,600,000 shares of common stock, $.01 par value per share, of which, as of the date of this Agreement, 9,501,460.50 shares were issued and outstanding and no shares were held in the treasury of the Company; (ii) 10,000 shares of Series A Preferred Stock, $.01 par value per share, of which, as of the date of this Agreement, no shares were issued and outstanding; and (iii) 6,000 shares of Redeemable Convertible Series B Preferred Stock, $.01 par value per share, of which, as of the date of this Agreement, 5,101 shares were issued and outstanding and no shares were held in the treasury of the Company.

(b)    Section 2.2(b)(i) of the Disclosure Schedule sets forth a complete and accurate list, as of the date of the Agreement, of the Company Stockholders, showing the number of shares of capital stock, and the class or series of such shares, held by each Company Stockholder. Section 2.2(b)(ii) of the Disclosure Schedule also indicates all outstanding Company Shares that constitute restricted stock or that are otherwise subject to a repurchase or redemption right, indicating the name of the applicable stockholder, the vesting schedule (including any acceleration provisions with respect thereto), and the repurchase price payable by the Company. All of the issued and outstanding shares of capital stock of the Company have been duly authorized and validly issued and are fully paid and nonassessable. All of the issued and outstanding securities of the Company have been offered, issued and sold by the Company in compliance with all applicable federal and state securities laws.

(c)    Section 2.2(c) of the Disclosure Schedule sets forth a complete and accurate list, as of the date of this Agreement of: (i) all Company Stock Plans, indicating for each Company Stock Plan the number of Common Shares issued to date under such Plan, the number of Common Shares subject to outstanding options under such Plan and the number of Common Shares reserved for future issuance under such Plan; (ii) all holders of outstanding Options, indicating with respect to each Option the Company Stock Plan under which it was granted, the number of Common Shares subject to such Option, the exercise price, the date of grant, the vesting schedule (including any acceleration provisions with respect thereto), and whether such Option was intended to qualify as an incentive stock option under Section 422 of the Code; and (iii) all holders of outstanding Warrants, indicating with respect to each Warrant the agreement or other document under which it was granted, the number of shares of capital stock, and the class or series of such shares, subject to such Warrant, the exercise price, the date of issuance and the expiration date thereof. The Company has provided to the Buyer complete and accurate copies of all Company Stock Plans, forms of all stock option agreements evidencing Options and all Warrants. All of the shares of capital stock of the Company subject to Options and Warrants will be, upon issuance pursuant to the exercise of such instruments, duly authorized, validly issued, fully paid and nonassessable.

(d)    Except as set forth in Section 2.2(d)(i) of the Disclosure Schedule, (i) no subscription, warrant, option, convertible security or other right (contingent or otherwise) to purchase or acquire any shares of capital stock of the Company is authorized or outstanding, (ii) the Company has no obligation (contingent or otherwise) to issue any subscription, warrant, option, convertible security or other such right, or to issue or distribute to holders of any shares of its capital stock any evidences of indebtedness or assets of the Company, and (iii) the Company has no obligation (contingent or otherwise) to purchase, redeem or otherwise acquire any shares of its capital stock or any interest therein or to pay any dividend or to make any other

- 15 -

distribution in respect thereof. Except as set forth in Section 2.2(d)(ii) of the Disclosure Schedule, there are no outstanding or authorized stock appreciation, phantom stock or similar rights with respect to the Company.

(e)    Except as set forth in Section 2.2(e) of the Disclosure Schedule, there is no outstanding agreement, written or oral, between the Company and any holder of its securities, or, to the best of the Company's Knowledge, among any holders of its securities, relating to the sale or transfer (including agreements relating to rights of first refusal, co-sale rights or "drag-along" rights), registration under the Securities Act, or voting, of the capital stock of the Company.

2.3    Authorization of Transaction. The Company has all requisite power, capacity and authority to execute and deliver this Agreement and to perform its obligations hereunder. Except as set forth in Section 2.3 of the Disclosure Schedule, the execution and delivery by the Company of this Agreement and the consummation by the Company of the transactions contemplated hereby have been duly and validly authorized by all necessary corporate action on the part of the Company, including the Requisite Stockholder Approval. This Agreement has been duly and validly executed and delivered by the Company, the Principal Stockholders and the Additional Principal Stockholders and constitutes a valid and binding obligation of the Company and each of the Principal Stockholders and the Additional Principal Stockholders, enforceable against the Company and each Principal Stockholder and each Additional Principal Stockholder in accordance with its terms.

2.4    Noncontravention. Subject to compliance with the applicable requirements of the Hart-Scott-Rodino Act, if applicable, and the filing of the Articles of Merger as required by the MGCL, neither the execution and delivery by the Company, the Principal Stockholders and the Additional Principal Stockholders of this Agreement, nor the consummation by the Company, the Principal Stockholders and the Additional Principal Stockholders of the transactions contemplated hereby, will (a) conflict with or violate any provision of the Articles of Incorporation or By-laws of the Company or the charter, By-laws or other organizational document of the Subsidiary, (b) require on the part of the Company, the Subsidiary, any Principal Stockholder or any Additional Principal Stockholders any notice to or filing with, or any permit, authorization, consent or approval of, any Governmental Entity, (c) except as set forth in Section 2.4(c) of the Disclosure Schedule, conflict with, result in a breach of, constitute (with or without due notice or lapse of time or both) a default under, result in the acceleration of obligations under, create in any party the right to terminate, modify or cancel, or require any notice, consent or waiver under, any contract or instrument to which the Company, the Subsidiary, any Principal Stockholder or any Additional Principal Stockholders is a party or by which the Company, the Subsidiary, any Principal Stockholder or any Additional Principal Stockholder is bound or to which any of their respective assets is subject, (d) result in the imposition of any Security Interest upon any assets of the Company, the Subsidiary, any Principal Stockholder or any Additional Principal Stockholder or (e) violate any order, writ, injunction, decree, statute, rule or regulation applicable to the Company, the Subsidiary, any Principal Stockholder or any Additional Principal Stockholder or any of its or his respective properties or assets.

2.5    Subsidiaries.

(a)    The Company's only subsidiary is Dakota Imaging, S.A., a company incorporated under the laws of Costa Rica (the "Subsidiary"). Except as set forth in Section 2.5(a) of the Disclosure Schedule, the Subsidiary has no assets or liabilities and has conducted no business since the date of its formation. The Subsidiary has been duly incorporated and is validly existing as a company and in good standing under the laws of the jurisdiction of its incorporation. The Subsidiary has all requisite power and authority to carry on the businesses in which it is engaged and to own and use the properties owned and used by it. The Company has delivered to the Buyer complete and accurate copies of the charter, by-laws or other organizational documents of the Subsidiary. The Subsidiary is not in default under or in violation of any provision of its charter, by-laws or other organizational documents. All of the issued shares of capital stock of the Subsidiary have been duly and validly issued, are fully paid and non-assessable and are owned directly by the Company, free and clear of all Security Interests. There are no outstanding securities convertible into or exchangeable for, or warrants, rights or options to purchase from the Company or the Subsidiary, or obligations of the Company or the Subsidiary to issue, any shares of capital stock or membership interests in the Subsidiary.

(b)    Except for the Subsidiary, the Company does not control directly or indirectly or have any direct or indirect equity participation or similar interest in any corporation, partnership, limited liability company, joint venture, trust or other business association or entity.

2.6    Financial Statements. The Company has provided to the Buyer the Financial Statements, copies of which are attached to Section 2.6 of the Disclosure Schedule. The Financial Statements have been prepared in accordance with GAAP applied on a consistent basis throughout the periods covered thereby, fairly present the consolidated financial condition, results of operations and cash flows of the Company and the Subsidiary as of the respective dates thereof and for the periods referred to therein and are consistent with the books and records of the Company and the Subsidiary; provided, however, that the Financial Statements referred to in clause (b) of the definition of such term are subject to normal recurring year-end adjustments (which will not be material) and do not include footnotes. Except as set forth in Section 2.6 of the Disclosure Schedule, there are no material differences from the information included in the footnotes to the audited Financial Statements that would be disclosed in footnotes to the unaudited Financial Statements if such footnotes had been prepared.

2.7    Absence of Certain Changes. Since the Most Recent Balance Sheet Date, the Company or the Subsidiary has operated its business only in the Ordinary Course of Business, and, except as set forth on Section 2.7 of the Disclosure Schedule:

(a)    neither the Company nor the Subsidiary has incurred any Debt;

(b)    neither the Company nor the Subsidiary has made any acquisition (by merger, consolidation, or acquisition of stock or assets or otherwise) of any other Person;

(c)    neither the Company nor the Subsidiary has created any Security Interest on any of its assets, tangible or intangible;

(d)     except for sales to customers of the Company's products and services in the Ordinary Course of Business, neither the Company nor the Subsidiary has sold, assigned or transferred any of its tangible assets;

(e)     neither the Company nor the Subsidiary has entered into or amended (i) any customer agreement with a Person that is or would be a Significant Person or (ii) any agreement, other than a customer agreement, that is or would be a Material Contract;

(f)     neither the Company nor the Subsidiary has (i) entered into or amended any employment or severance or similar agreement with any employee or any collective bargaining agreement, (ii) adopted or amended, or increased the payments to or benefits under, any profit sharing, bonus, thrift, stock option, deferred compensation, savings, insurance, restricted stock, pension, retirement, or other employee benefit plan for or with any of its directors, officers or employees or (iii) granted any increase in compensation payable or to become payable or the benefits provided to its directors, officers or employees;

(g)     neither the Company nor the Subsidiary has (i) made or changed any Tax election or (ii) made any material change in any method of accounting or accounting practice used by it, other than any such changes required by GAAP;

(h)     the Company and the Subsidiary has conducted and reflected in its books and records each transaction referenced in Section 2.26 of the Disclosure Schedule on an arm's-length basis;

(i)     there has been no change, event or development that has had or would be reasonably likely to have, individually or in the aggregate, a Company Material Adverse Effect;

(j)     there has not been any material casualty, loss, damage or destruction (whether or not covered by insurance);

(k)     neither the Company nor the Subsidiary has made any expenditure or commitment to purchase personal property or for additions to property, plant and equipment in excess of $5,000;

(l)     neither the Company nor the Subsidiary has issued, sold or otherwise disposed of any debenture, note, stock, or equity interest or modified or amended any right of any holder thereof;

(m)     neither the Company nor the Subsidiary has amended, terminated, waived, disposed of, or permitted to lapse, any material license or Permit; and

(n)     there has not been any amendment to the Articles of Incorporation or By-laws of the Company or the Subsidiary.

2.8     <u>Undisclosed Liabilities</u>. Neither the Company nor the Subsidiary has any liability (whether known or unknown, whether absolute or contingent, whether liquidated or unliquidated and whether due or to become due), except for (a) liabilities shown on the Most Recent Balance Sheet, (b) liabilities which have arisen since the Most Recent Balance Sheet Date in the Ordinary