EFiled: May 9 2005 5:14PM EDT
Filing ID 5778731

Course of Business and (c) contractual and other liabilities incurred in the Ordinary Course of
Business which are not required by GAAP to be reflected on a balance sheet or that would not
otherwise be required to be disclosed in the footnotes of the Company's financial statements if
such footnotes had been prepared.

2.9    Taxes.

(a)    Each of the Company and the Subsidiary has properly filed on a timely basis all Tax Returns that each is and was required to file, and all such Tax Returns were true, correct and complete in all respects. Except as set forth in Section 2.9(a) of the Disclosure Schedule, each of the Company and the Subsidiary has properly paid on a timely basis all Taxes, whether or not shown on any of its Tax Returns, that were due and payable. All Taxes that the Company and the Subsidiary are or were required by law to withhold or collect have been withheld or collected and, to the extent required, have been properly paid on a timely basis to the appropriate Governmental Entity. The Company and the Subsidiary have complied with all information reporting and back-up withholding requirements including maintenance of the required records with respect thereto, in connection with amounts paid to any employee, independent contractor, creditor or other third party.

(b)    The unpaid Taxes of the Company and the Subsidiary for periods through the date of the Most Recent Balance Sheet Date do not exceed the accruals and reserves for Taxes (excluding accruals and reserves for deferred Taxes established to reflect timing differences between book and Tax income) set forth on the Most Recent Balance Sheet. All Taxes attributable to the period from and after the Most Recent Balance Sheet Date and continuing through the Closing Date are, or will be, attributable to the conduct by the Company or the Subsidiary of its operations in the Ordinary Course of Business and are, or will be, consistent both as to type and amount with Taxes attributable to such comparable period in the immediately preceding year.

(c)    Neither the Company nor the Subsidiary is and has never been a member of any group of corporations with which it has filed (or been required to file) consolidated, combined, or unitary Tax Returns. Neither the Company nor the Subsidiary has any actual or potential liability under Treasury Regulation Section 1.1502-6 (or any comparable or similar provision of federal, state, local, or foreign law), or as a transferee or successor, by contract, or otherwise for any Taxes of any Person (including without limitation any affiliated, combined, or unitary group of corporations or other entities that included the Company and the Subsidiary during a prior Taxable period). Neither the Company nor the Subsidiary is a party to, bound by, or obligated under any Tax allocation, Tax sharing, Tax indemnity or similar agreement.

(d)    The Company has delivered to the Buyer (i) complete and correct copies of all income Tax Returns of the Company and the Subsidiary relating to Taxes for all Taxable periods for which the applicable statute of limitations has not yet expired and (ii) complete and correct copies of all private letter rulings, revenue agent reports, information document requests, notices of proposed deficiencies, deficiency notices, protests, petitions, closing agreements, settlement agreements, pending ruling requests and any similar documents submitted by, received by or agreed to by or on behalf of the Company or the Subsidiary relating to Taxes for all Taxable periods for which the applicable statute of limitations has not yet expired. The

income Tax Returns of the Company and the Subsidiary have been audited by the Internal Revenue Service or other applicable Governmental Entity or are closed by the applicable statute of limitations for all periods through and including the Taxable period specified in Section 2.9(d) of the Disclosure Schedule. The Company has delivered or made available to the Buyer complete and correct copies of all other Tax Returns of the Company relating to Taxes for all Taxable periods for which the applicable statute of limitations has not yet expired. No examination or audit of any Tax Return of the Company or the Subsidiary by any Governmental Entity is currently in progress or, to the Knowledge of the Company, threatened or contemplated, and the Company does not know of any basis upon which a Tax deficiency or assessment could reasonably be expected to be asserted against the Company or the Subsidiary. Neither the Company nor the Subsidiary has been informed by any jurisdiction that the jurisdiction believes that the Company or the Subsidiary was required to file any Tax Return that was not filed.

(e)     Neither the Company nor the Subsidiary has (i) waived any statute of limitations with respect to Taxes or agreed to extend the period for assessment or collection of any Taxes, (ii) requested any extension of time within which to file any Tax Return, which Tax Return has not yet been filed, or (iii) executed or filed any power of attorney relating to Taxes with any Governmental Entity.

(f)     Neither the Company nor the Subsidiary is a party to any Tax litigation. Neither the Company nor the Subsidiary is or has ever been a party to any specific transaction the main purpose of which has been to avoid, defer, or reduce Taxes. Neither the Company nor the Subsidiary is or has ever been a party to any transaction or agreement that is in conflict with the Tax rules on transfer pricing in any relevant jurisdiction. The Company and the Subsidiary have disclosed on their federal income Tax Returns all positions taken therein that could give rise to a substantial understatement of federal income Tax within the meaning of Section 6662 of the Code.

(g)     Except as set forth on Section 2.9(g) of the Disclosure Schedule, there are no Security Interests or other encumbrances with respect to Taxes upon any of the assets or properties of the Company or the Subsidiary, other than with respect to Taxes not yet due and payable.

(h)     Neither the Company nor the Subsidiary has been a United States real property holding corporation within the meaning of Section 897(c)(2) of the Code during the applicable period specified in Section 897(c)(l)(A)(ii) of the Code.

(i)     Except as set forth on Section 2.9(i) of the Disclosure Schedule, neither the Company nor the Subsidiary has made any payments, is obligated to make any payments, or is a party to any agreement, contract, arrangement, or plan that could obligate it to make any payments, that are or could be, separately or in the aggregate, "excess parachute payments" within the meaning of Section 280G of the Code (without regard to Sections 280G(b)(4) and 280G(b)(5) thereof). No excise Tax will be imposed upon the Company as a result of the acceleration of Options.

(j)     No Company Stockholder holds Shares that are non-transferable and subject to a substantial risk of forfeiture within the meaning of Section 83 of the Code with

respect to which a valid election under Section 83(b) of the Code has not been made, and no payment to any Company Stockholder of any portion of the consideration payable pursuant to this Agreement will result in compensation or other income to such Company Stockholder with respect to which the Buyer or the Company would be required to deduct or withhold any Taxes.

(k)     None of the assets of the Company or the Subsidiary (i) is property that is required to be treated as being owned by any other person pursuant to the provisions of former Section 168(f)(8) of the Internal Revenue Code of 1954, (ii) is "tax-exempt use property" within the meaning of Section 168(h) of the Code, (iii) directly or indirectly secures any debt the interest on which is tax exempt under Section 103(a) of the Code, or (iv) is subject to a lease under Section 7701(h) of the Code or under any predecessor section.

(l)     Neither the Company nor the Subsidiary will be required to include any item of income in, or exclude any item of deduction from, Taxable income for any Taxable period (or portion thereof) ending after the Closing Date as a result of any (i) change in method of accounting for a Taxable period ending on or prior to the Closing Date (or as a result of the transactions contemplated by this Agreement) under Section 481 of the Code (or any corresponding or similar provision of federal, state, local or foreign Tax law); (ii) "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of state, local or foreign Tax law) executed on or prior to the Closing Date; (iii) deferred intercompany gain or any excess loss account described in Treasury Regulations under Section 1502 of the Code (or any corresponding or similar provision of state, local or foreign Tax law); (iv) installment sale or open transaction disposition made on or prior to the Closing Date; or (v) prepaid amount received on or prior to the Closing Date. The Company currently utilizes (and the Subsidiary plans to utilize), the accrual method of accounting for income Tax purposes and such method of accounting has not changed in the past five (5) years.

(m)     Neither the Company nor the Subsidiary has participated in or cooperated with an international boycott within the meaning of Section 999 of the Code.

(n)     There is no limitation on the utilization by the Company of its net operating losses, built-in losses, Tax credits, or similar items under Sections 382, 383, or 384 of the Code or comparable provisions of foreign, state or local law (other than any such limitation arising as a result of the consummation of the transactions contemplated by this Agreement).

(o)     Neither the Company nor the Subsidiary has distributed to its Stockholders or security holders stock or securities of a controlled corporation, nor have stock or securities of the Company or the Subsidiary been distributed, in a transaction to which Section 355 or Section 361 of the Code applies.

(p)     Neither the Company nor the Subsidiary is and has never been required to make a basis reduction pursuant to Treasury Regulation Section 1.1502-20(b) or Treasury Regulation Section 1.337(d)-2(b).

(q)     Section 2.9(q) of the Disclosure Schedule sets forth each jurisdiction (other than United States federal) in which the Company or the Subsidiary files, or is required to file or has been required to file a Tax Return or is or has been liable for Taxes on a "nexus" basis

and each jurisdiction that has sent notices or communications of any kind requesting information relating to the Company's or the Subsidiary's nexus with such jurisdiction.

(r)    Neither the Company nor the Subsidiary is a "consenting corporation" within the meaning of Section 341(f) of the Code, and none of the assets of the Company or the Subsidiary are subject to an election under Section 341(f) of the Code.

(s)    To the Company's Knowledge, there is no basis for the assertion of any claim relating or attributable to Taxes, which, if adversely determined, would result in any Security Interest on the assets of the Company or the Subsidiary, or would reasonably be expected to have a material adverse effect on the Company.

2.10    Assets.

(a)    Except as set forth in Section 2.10(a) of the Disclosure Schedule, the Company or the Subsidiary, if applicable, is the true and lawful owner, and has good title to, all of the assets (tangible or intangible) purported to be owned by the Company or the Subsidiary, free and clear of all Security Interests. The Company and the Subsidiary owns or leases all tangible assets sufficient for the conduct of its businesses as presently conducted and as presently contemplated to be conducted by any business plans or projections delivered by the Company to the Buyer. Each such tangible asset is free from material defects, has been maintained in accordance with normal industry practice, is in good operating condition and repair (subject to normal wear and tear) and is suitable for the purposes for which it presently is used.

(b)    Section 2.10(b) of the Disclosure Schedule lists (i) all fixed assets (within the meaning of GAAP) of the Company or the Subsidiary having a book value greater than $1,000, indicating the cost, accumulated book depreciation (if any) and the net book value of each such fixed asset as of the Most Recent Balance Sheet Date, and (ii) all other assets of a tangible nature (other than inventories) of the Company or the Subsidiary whose book value exceeds $5,000.

(c)    Each item of equipment, motor vehicle and other asset that the Company or the Subsidiary has possession of pursuant to a lease agreement or other contractual arrangement is in such condition that, upon its return to its lessor or owner under the applicable lease or contract, the obligations of the Company or the Subsidiary to such lessor or owner to maintain such item will have been discharged in full.

2.11    Owned Real Property. The Company or the Subsidiary does not own, and has never owned, any real property.

2.12    Real Property Leases. Section 2.12 of the Disclosure Schedule lists all Leases and lists the term of such Lease, any extension and expansion options, and the rent payable thereunder. The Company or the Subsidiary has delivered to the Buyer complete and accurate copies of the Leases. With respect to each Lease:

(a)    such Lease is legal, valid, binding, enforceable and in full force and effect;

(b)    except as disclosed on Section 2.12 of the Disclosure Schedule, such Lease will continue to be legal, valid, binding, enforceable and in full force and effect immediately following the Closing in accordance with the terms thereof as in effect immediately prior to the Closing;

(c)    neither the Company nor the Subsidiary nor, to the Knowledge of the Company or the Subsidiary, any other party, is in breach or violation of, or default under, any such Lease, and no event has occurred, is pending or, to the Knowledge of the Company or the Subsidiary, is threatened, which, after the giving of notice, with lapse of time, or otherwise, would constitute a breach or default by the Company or the Subsidiary or, to the Knowledge of the Company or the Subsidiary, any other party under such Lease and to the Knowledge of the Company or the Subsidiary, each parcel of Leased Real Property is in compliance in all material respects with all applicable Laws and Governmental Orders. Except as set forth in Section 2.12(c) of the Disclosure Schedule, the Lease for each parcel of Leased Real Property is in full force and effect, there are no defaults under such leases by the Company or the Subsidiary, or, to the Knowledge of the Company or the Subsidiary, any other party to such leases;

(d)    there are no disputes, oral agreements or forbearance programs in effect as to such Lease;

(e)    neither the Company nor the Subsidiary has assigned, transferred, conveyed, mortgaged, deeded in trust or encumbered any interest in the leasehold or subleasehold;

(f)    to the Knowledge of the Company or the Subsidiary, all facilities leased or subleased thereunder are supplied with utilities and other services adequate for the operation of said facilities;

(g)    neither the Company nor the Subsidiary is aware of any Security Interest, easement, covenant or other restriction applicable to the real property subject to such lease which would reasonably be expected to materially impair the current uses or the occupancy by the Company or the Subsidiary of the property subject thereto; and

(h)    other than the rental payment amounts set forth in Section 2.12 of the Disclosure Schedule, to the Knowledge of the Company or the Subsidiary, no other amounts are owed or reasonably likely to be owed by the Company or the Subsidiary with respect to any parcel of Leased Real Property.

2.13    Intellectual Property.

(a)    Section 2.13(a) of the Disclosure Schedule lists (i) each patent, patent application, copyright registration or application therefor, mask work registration or application therefor, and trademark, service mark and domain name registration or application therefor of the Company or the Subsidiary and (ii) each Customer Deliverable of the Company or the Subsidiary.

(b)    The Company owns or has the right to all Company Intellectual Property necessary (i) to use, create, have made, sell, implement, market, reproduce and distribute the

Customer Deliverables as currently and contemplated and (ii) to operate the Internal Systems as currently and contemplated. Each item of Company Intellectual Property will be owned or available for use by the Surviving Corporation immediately following the Closing on substantially identical terms and conditions as it was owned or available for use by the Company immediately prior to the Closing, except as described in Section 2.13(b) of the Disclosure Schedule. The Company and the Subsidiary have taken all reasonable measures to protect the proprietary nature of each item of Company Intellectual Property, and to maintain in confidence all trade secrets and confidential information, that it owns or uses. No other Person has any rights to any of the Company Intellectual Property owned by the Company or the Subsidiary (except pursuant to agreements or licenses specified in Section 2.13(d) of the Disclosure Schedule), and, to the Knowledge of the Company, no other Person is infringing, violating or misappropriating any of the Company Intellectual Property, except as described in Section 2.13(b) of the Disclosure Schedule.

(c)     None of the Customer Deliverables, or the manufacturing, importation, sale, marketing, distribution, provision or use thereof, infringes or violates, or constitutes a misappropriation of, any Intellectual Property rights of any Person. None of the Internal Systems, or the use thereof, infringes or violates, or constitutes a misappropriation of, any Intellectual Property rights of any Person. Section 2.13(c) of the Disclosure Schedule lists any complaint, claim or notice, or written threat thereof, received by the Company or the Subsidiary alleging any such infringement, violation or misappropriation; and the Company has provided to the Buyer complete access to all written documentation in the possession of the Company relating to any such complaint, claim, notice or threat. The Company has provided to the Buyer complete access to all written documentation in the Company's possession relating to claims or disputes known to the Company or the Subsidiary concerning any Company Intellectual Property.

(d)     Section 2.13(d) of the Disclosure Schedule identifies each license or other agreement pursuant to which the Company or the Subsidiary has licensed, distributed or otherwise granted any rights to any third party with respect to, any Company Intellectual Property. Except as described in Section 2.13(d) of the Disclosure Schedule, neither the Company nor the Subsidiary has agreed to indemnify any Person against any infringement, violation or misappropriation of any Intellectual Property rights with respect to any Customer Deliverables.

(e)     Section 2.13(e) of the Disclosure Schedule identifies each item of Company Intellectual Property that is owned by a party other than the Company or the Subsidiary, and the license or agreement pursuant to which the Company or the Subsidiary uses it (excluding off-the-shelf software programs licensed by or to the Company or the Subsidiary pursuant to nonnegotiable standard form, mass market or "shrink wrap" licenses).

(f)     Neither the Company nor the Subsidiary has disclosed the source code for the Software or other confidential information constituting, embodied in or pertaining to the Software to any Person, except pursuant to the agreements listed in Section 2.13(f) of the Disclosure Schedule, and the Company and the Subsidiary have taken all reasonable measures to prevent disclosure of such source code.

(g)    Except as set forth in Section 2.13(g) of the Disclosure Schedule, all of the copyrightable materials (including Software, but excluding software created, developed or otherwise provided by a third party unless such software is modified by the employees of the Company) embedded in, or integrated in, incorporated in or bundled with the Customer Deliverables have been created by employees of the Company or the Subsidiary within the scope of their employment by the Company or the Subsidiary, or by independent contractors of the Company or the Subsidiary who have executed agreements expressly assigning all right, title and interest in such copyrightable materials to the Company or the Subsidiary. Except as set forth in Section 2.13(g) of the Disclosure Schedule, no portion of such copyrightable materials was jointly developed with any third party.

(h)    Except as set forth in Section 2.13(h) of the Disclosure Schedule, the Customer Deliverables, the Internal Systems, and the Company Intellectual Property are free from significant defects or programming errors and conform in all material respects to the written documentation and specifications therefor.

(i)    The Internal Systems, Customer Deliverables, and Company Intellectual Property currently used by the Company and/or the Subsidiary to provide products and services to their customers (i) are fully adequate for the business of the Company and Subsidiary as of the Effective Date, (ii) meet all of the requirements of customers under the customer contracts (including Holdover Agreements) of the Company and Subsidiary, (iii) will meet or are capable of being scaled to meet, all of the requirements of customers under the customer contracts (including Holdover Agreements), including increased volume requirements.

(j)    With respect to the above representations and warranties in Sections 2.13(c), (g) and (h), to the extent that any Company Intellectual Property is licensed from a third party, such representations and warranties are made to the Knowledge of the Company, except to the extent that such representations and warranties are provided to Company from such third parties.

2.14    Contracts.

(a)    Section 2.14 of the Disclosure Schedule lists the following agreements (written or oral) to which the Company or the Subsidiary is a party as of the date of this Agreement (each, a "Material Contract"):

(i)    any agreement (or group of related agreements) for the lease of personal property from or to third parties providing for lease payments in excess of $10,000 per annum or having a remaining term longer than six months;

(ii)    any agreement (or group of related agreements) with customers, including customers for its forms processing and automatic data capture products, or customers to which the Company or the Subsidiary is delivering services or contemplating delivering services;

(iii)    any agreement (or group of related agreements) with software vendors, distributors or sales agents allowing for the resale, marketing or distribution of the Company's or the Subsidiary services of products;

(iv)     any agreement concerning confidentiality or containing covenants restraining or limiting the freedom of the Company, the Subsidiary or any Company Stockholder to engage in any line of business or compete with any Person including, without limitation, by restraining or limiting the right to solicit customers or that could reasonably be expected, following the Closing, to restrain or limit the freedom of the Parent or any Affiliate thereof to engage in any line of business or compete with any Person;

(v)      any agreement containing a right of first refusal;

(vi)     any agreement (or group of related agreements) that is terminable upon or prohibits a change in ownership or control of the Company or the Subsidiary, or that requires consent in connection with a change in ownership or control of the Company or the Subsidiary;

(vii)    any agreement (or group of related agreements) that provides for the Company or the Subsidiary to be the exclusive or a preferred provider of any product or service to any Person or the exclusive or a preferred recipient of any product or service of any Person during any period of time or that otherwise involves the granting by any Person to the Company or the Subsidiary of exclusive or preferred rights of any kind;

(viii)   any agreement (or group of related agreements) that provides for any Person to be the exclusive or a preferred provider of any product or service to the Company or the Subsidiary, or the exclusive or a preferred recipient of any product or service of the Company or the Subsidiary during any period of time or that otherwise involves the granting by the Company or the Subsidiary to any Person of exclusive or preferred rights of any kind;

(ix)     any agreement (or group of related agreements) in which a party has agreed to purchase a minimum quantity of goods or services or that includes specific service level commitments;

(x)      any agreement (or group of related agreements) in which the Company or the Subsidiary has granted manufacturing rights, "most favored nation" or similar pricing provisions or marketing or distribution rights relating to any products or territory;

(xi)     any agreement (or group of related agreements) under which it has created, incurred, assumed or guaranteed (or may create, incur, assume or guarantee) Debt or under which it has imposed (or may impose) a Security Interest on any of its assets, tangible or intangible;

(xii)    any agreement for the disposition of any significant portion of the assets or business of the Company or the Subsidiary (other than sales of products in the Ordinary Course of Business) or any agreement for the acquisition of the assets or business of any other entity (other than purchases of inventory or components in the Ordinary Course of Business);

(xiii)   any employment or consulting agreement;

(xiv)    any agreement involving any current or former officer, director or stockholder of the Company or an Affiliate thereof;

- 26 -

(xv)    any agreements that, by their terms bind Affiliates of the Company or will bind Affiliates of the Surviving Corporation after the Closing;

(xvi)    any agreement under which the consequences of a default or termination would reasonably be expected to have a Company Material Adverse Effect;

(xvii)    any agreement which contains any provisions requiring the Company or the Subsidiary to indemnify any other party; and

(xviii)    any other agreement (or group of related agreements) either (A) involving more than $10,000, (B) not entered into in the Ordinary Course of Business or (C) that is otherwise material to the Company or the Subsidiary.

(b)    The Company has made available to the Buyer a complete and accurate copy of each agreement listed in Section 2.13 or Section 2.14 of the Disclosure Schedule, or with respect to each such unwritten agreement, the Company has provided a detailed description of the terms of such unwritten agreement. With respect to each agreement so listed: (i) the agreement is legal, valid, binding and enforceable and in full force and effect; (ii) the agreement will continue to be legal, valid, binding and enforceable and in full force and effect immediately following the Closing in accordance with the terms thereof as in effect immediately prior to the Closing; and (iii) except as set forth on Section 2.14(b)(iii) of the Disclosure Schedule, neither the Company, the Subsidiary nor, to the Knowledge of the Company, any other party, is in breach or violation of, or default under, any material provision of such agreement, and no event has occurred, is pending or, to the Knowledge of the Company, is threatened, which, after the giving of notice, with lapse of time, or otherwise, would constitute a breach or default of any material provision of such agreement by the Company, the Subsidiary or, to the Knowledge of the Company, of any other party under such agreement.

(c)    All amounts invoiced and collected in the last five (5) years for customer billings for service fees, software fees, hardware and software maintenance fees, Business Process Outsource fees and any other type of fees that the Company or the Subsidiary may have billed a customer have been calculated pursuant to (i) fully executed legally binding agreements mutually agreed upon by the Company or the Subsidiary and the applicable customer, or (ii) "Holdover Agreements" which shall mean those agreements that have expired by their terms, but for which extensions or replacements have not yet been negotiated, and the parties, on a holdover basis with respect to such agreements, have continued to operate under such agreements in accordance with their terms. Section 2.14(c) of the Disclosure Schedule sets forth (i) a list of the Holdover Agreements, and (ii) each occasion during the last three (3) years in which a customer of the Company or the Subsidiary has disputed its invoiced amount and such dispute resulted in a credit, concession and/or payment being made to such customer which exceeded $50,000, as well as the amount of any credit and/or payment made by the Company to such customer to settle such disputes.

(d)    The Company and the Subsidiary, with respect to Contracts in effect as of the date hereof and the Holdover Agreements, (i) have, in connection with any performance guarantee, customer service obligation and implementation deadline that is set forth in a customer Contract or otherwise (collectively, "Performance Obligations"), performed to the

reasonable satisfaction of the Company's customers, and no such customer has expressed an intention to terminate or materially reduce its work with the Company on the basis of the Company's performance with respect to the Performance Obligations, (ii) have met, in all material respects, all Performance Obligations, and (iii) will meet, or are capable of meeting, in all material respects, all Performance Obligations for the twenty-four (24) months following the date of this Agreement including Performance Obligations that will be effected by future increases in volume requirements.

2.15    Accounts Receivable. All accounts receivable of the Company and the Subsidiary reflected on the Most Recent Balance Sheet (other than those paid since such date) are valid receivables subject to no setoffs or counterclaims and are current and collectible (within 180 days after the date on which it first became due and payable), net of the applicable reserve for bad debts on the Most Recent Balance Sheet. A complete and accurate list of the accounts receivable reflected on the Most Recent Balance Sheet, showing the aging thereof, is included in Section 2.15 of the Disclosure Schedule. All accounts receivable of the Company and the Subsidiary that have arisen since the Most Recent Balance Sheet Date are valid receivables subject to no setoffs or counterclaims and are collectible (within 180 days after the date on which it first became due and payable), net of a reserve for bad debts in an amount proportionate to the reserve shown on the Most Recent Balance Sheet. Neither the Company nor the Subsidiary has received any written notice from an account debtor stating that any account receivable is subject to any contest, claim or setoff by such account debtor.

2.16    Powers of Attorney. Except as set forth in Section 2.16 of the Disclosure Schedule, there are no outstanding powers of attorney executed on behalf of the Company or the Subsidiary.

2.17    Insurance. Section 2.17 of the Disclosure Schedule lists each insurance policy (including fire, theft/crime, casualty, comprehensive general liability, workers compensation, business interruption, environmental, errors and omissions, directors and officers fiduciary liability, employment practices liability, product liability and automobile insurance policies and bond and surety arrangements) to which the Company or the Subsidiary is a party, all of which are in full force and effect including the name of the insurer and policy numbers. Such insurance policies are of the type and in amounts customarily carried by organizations conducting businesses or owning assets similar to those of the Company or the Subsidiary. Except as set forth in Section 2.17 of the Disclosure Schedule, there is no claim pending or, to the Knowledge of the Company or the Subsidiary, any existing facts which are reasonably likely to result in a claim under any such policy, and if any of the foregoing have been disclosed, no such claim or existing facts were questioned, denied or disputed by the underwriter of such policy. All premiums due and payable under all such policies have been paid, neither the Company nor the Subsidiary will be liable for retroactive premiums or similar payments except as set forth in Section 2.17 of the Disclosure Schedule, and each of the Company and the Subsidiary is otherwise in compliance in all material respects with the terms of such policies. Neither the Company nor the Subsidiary has been denied insurance coverage at any time during the past five years and no policies have been cancelled or have been refused to be renewed by the insurer in the past five years except as set forth in Section 2.17 of the Disclosure Schedule. Neither the Company nor the Subsidiary has any Knowledge of any threatened termination of, or premium increase with respect to, any such policy except as set forth in Section 2.17 of the Disclosure

Schedule. Each such policy will continue to be enforceable and in full force and effect immediately following the Closing in accordance with the terms thereof as in effect immediately prior to the Closing. Neither the Company nor the Subsidiary has failed to timely give any notice required or failed to satisfy any subjectivities under such insurance policies or binders of insurance.

2.18    Litigation. Except set forth in Section 2.18 of the Disclosure Schedule, there is no Legal Proceeding which is pending or, to the Knowledge of the Company and the Principal Stockholders, has been threatened against the Company or the Subsidiary, and to the Knowledge of the Company and the Principal Stockholders, no event has occurred or circumstance exists that would be reasonably likely to give rise to or serve as the basis for any Legal Proceeding. There are no judgments, orders or decrees outstanding against the Company or the Subsidiary.

2.19    Warranties. Except as set forth in Section 2.19 of the Disclosure Schedule, no Customer Deliverable is subject to any guaranty, warranty, right of credit or other indemnity. Section 2.19 of the Disclosure Schedule sets forth the aggregate expenses incurred by the Company and the Subsidiary in fulfilling its obligations under its guaranty, warranty, right of credit and other indemnity provisions during each of the fiscal years and the interim period covered by the Financial Statements; and the Company does not know of any reason why such expenses should significantly increase as a percentage of sales in the future.

2.20    Employees.

(a)    Section 2.20 of the Disclosure Schedule contains a list of all employees of the Company and the Subsidiary, along with the position and the annual rate of compensation of each such person. Each current employee of the Company or the Subsidiary has entered into a confidentiality/assignment of inventions agreement with the Company or the Subsidiary, a copy or form of which has previously been delivered to the Buyer. Each person who has been an employee of the Company or the Subsidiary within the last five (5) years has or had entered into a confidentiality/assignment of inventions agreement with the Company, substantially similar in content to the form of the agreement previously delivered to the Buyer. Section 2.20 of the Disclosure Schedule contains a list of all employees of the Company or the Subsidiary who are a party to a non-competition agreement with the Company or the Subsidiary; copies of such agreements have previously been delivered to the Buyer. The execution of this Agreement will not affect the legality, validity, binding effect or enforceability of the agreements referenced in the preceding three sentences. Section 2.20 of the Disclosure Schedule contains a list of all employees of the Company and the Subsidiary who are not citizens of the United States. Except as set forth in Section 2.20(a) of the Disclosure Schedule, to the Knowledge of the Company, no employee of the Company or the Subsidiary has announced any plans to terminate employment with the Company or the Subsidiary.

(b)    Neither the Company nor the Subsidiary is a party to or bound by any collective bargaining agreement, and has not experienced any strikes, grievances, claims of unfair labor practices or other collective bargaining disputes. The Company has no Knowledge of any organizational effort made or threatened, either currently or within the past two years, by or on behalf of any labor union with respect to employees of the Company or the Subsidiary.

- 29 -

2.21    Employee Benefits.

(a)    Section 2.21(a) of the Disclosure Schedule contains a complete and accurate list of all Company Plans. Complete and accurate copies of (i) all Company Plans which have been reduced to writing, (ii) written summaries of all unwritten Company Plans, (iii) all related trust agreements, insurance contracts and summary plan descriptions, and (iv) all annual reports filed on IRS Form 5500, 5500C or 5500R and (for all funded plans) all plan financial statements for the last five plan years for each Company Plan, have been delivered to the Buyer.

(b)    Each Company Plan has been administered in all material respects in accordance with its terms and each of the Company, the Subsidiary and the ERISA Affiliates has in all material respects met its obligations with respect to each Company Plan and has made all required contributions thereto. The Company, the Subsidiary, each ERISA Affiliate and each Company Plan are in compliance in all material respects with the currently applicable provisions of ERISA and the Code and the regulations thereunder (including Section 4980 B of the Code, Subtitle K, Chapter 100 of the Code and Sections 601 through 608 and Section 701 et seq. of ERISA). All filings and reports as to each Company Plan required to have been submitted to the Internal Revenue Service or to the United States Department of Labor have been duly submitted. No Company Plan has assets that include securities issued by the Company or any ERISA Affiliate.

(c)    There are no Legal Proceedings (except claims for benefits payable in the normal operation of the Company Plans and proceedings with respect to qualified domestic relations orders) against or involving any Company Plan or asserting any rights or claims to benefits under any Company Plan.

(d)    All the Company Plans that are intended to be qualified under Section 401(a) of the Code have received determination letters from the Internal Revenue Service to the effect that such Company Plans are qualified and the plans and the trusts related thereto are exempt from federal income taxes under Sections 401(a) and 501(a), respectively, of the Code, no such determination letter has been revoked and revocation has not been threatened, and no such Company Plan has been amended since the date of its most recent determination letter or application therefor in any respect, and no act or omission has occurred, that would adversely affect its qualification or materially increase its cost. Each Company Plan that is required to satisfy Section 401(k)(3) or Section 401(m)(2) of the Code has been tested for compliance with, and satisfies the requirements of Section 401(k)(3) and Section 401(m)(2) of the Code for each plan year ending prior to the Closing Date.

(e)    Neither the Company, the Subsidiary nor any ERISA Affiliate has ever maintained an Employee Benefit Plan subject to Section 412 of the Code or Title IV of ERISA.

(f)    At no time has the Company, the Subsidiary or any ERISA Affiliate been obligated to contribute to any "multiemployer plan" (as defined in Section 4001(a)(3) of ERISA).

(g)    There are no unfunded obligations under any Company Plan providing benefits after termination of employment to any employee of the Company or the Subsidiary (or

to any beneficiary of any such employee), including but not limited to retiree health coverage and deferred compensation, but excluding continuation of health coverage required to be continued under Section 4980B of the Code or other applicable law and insurance conversion privileges under state law. The assets of each Company Plan that is funded are reported at their fair market value on the books and records of such Company Plan.

(h)    No act or omission has occurred and no condition exists with respect to any Company Plan that would subject the Company or any ERISA Affiliate to (i) any material fine, penalty, tax or liability of any kind imposed under ERISA or the Code or (ii) any contractual indemnification or contribution obligation protecting any fiduciary, insurer or service provider with respect to any Company Plan.

(i)    No Company Plan is funded by, associated with or related to a "voluntary employee's beneficiary association" within the meaning of Section 501(c)(9) of the Code.

(j)    Each Company Plan is amendable and terminable unilaterally by the Company at any time without liability or expense to the Company or such Company Plan as a result thereof (other than for benefits accrued through the date of termination or amendment and reasonable administrative expenses related thereto) and no Company Plan, plan documentation or agreement, summary plan description or other written communication distributed generally to employees by its terms prohibits the Company from amending or terminating any such Company Plan.

(k)    Section 2.21(k) of the Disclosure Schedule discloses each: (i) agreement with any stockholder, director, executive officer or other key employee of the Company (A) the benefits of which are contingent, or the terms of which are altered, upon the occurrence of a transaction involving the Company or the Subsidiary of the nature of any of the transactions contemplated by this Agreement, (B) providing any term of employment or compensation guarantee or (C) providing severance benefits or other benefits after the termination of employment of such director, executive officer or key employee; (ii) agreement, plan or arrangement under which, absent the stockholder vote to be taken pursuant to Section 4.16, any person may receive payments from the Company or the Subsidiary that may be subject to the tax imposed by Section 4999 of the Code or included in the determination of such person's "parachute payment" under Section 280G of the Code (without regard to Sections 280G(b)(4) and 280G(b)(5) thereof); and (iii) agreement or plan binding the Company or the Subsidiary, including any stock option plan, stock appreciation right plan, restricted stock plan, stock purchase plan, severance benefit plan or Company Plan, any of the benefits of which will be increased, or the vesting of the benefits of which will be accelerated, by the occurrence of any of the transactions contemplated by this Agreement or the value of any of the benefits of which will be calculated on the basis of any of the transactions contemplated by this Agreement.

(l)    Section 2.21(l) of the Disclosure Schedule sets forth the policy of the Company or the Subsidiary with respect to accrued vacation, accrued sick time and earned time off and the amount of such liabilities as of the date of this Agreement. The information set forth in Section 2.21(l) of the Disclosure Schedule shall be updated by the Company as of the Closing Date.

- 31 -

(m)     The Company has classified all individuals who perform services for the Company correctly under the Company Plans, ERISA and the Code as common law employees, independent contractors, leased employees, and exempt or non-exempt employees.

2.22   Environmental Matters.

(a)     The Company and the Subsidiary have complied with all applicable Environmental Laws and Environmental Permits. There is no pending or, to the Knowledge of the Company or the Subsidiary, threatened civil or criminal litigation, written notice of violation, formal administrative proceeding, or investigation, inquiry or information request by any Governmental Entity, relating to any Environmental Law and Environmental Permits involving the Company or the Subsidiary or any properties owned or leased by them.

(b)     The Company or the Subsidiary are not aware of any material environmental liability of any solid or hazardous waste transporter or treatment, storage or disposal facility that has been used by the Company or the Subsidiary.

(c)     To the Knowledge of the Company or the Subsidiary, there has been no Release of any Hazardous Material on any of the Leased Real Property or, during the period of the Company's or the Subsidiary's ownership, lease, use or occupancy thereof, on any property formerly owned, leased, used or occupied by the Company or the Subsidiary.

(d)     There are no Environmental Claims pending or, to the Knowledge of the Company, threatened against the Company or the Subsidiary on any of the Leased Real Property, and to the Knowledge of the Company or the Subsidiary, there are no circumstances that can reasonably be expected to form the basis of any such Environmental Claim.

(e)     Neither the Company nor the Subsidiary is aware of any actual or, to the Knowledge of the Company or the Subsidiary, alleged liability, whether fixed or contingent, under any Environmental Law.

2.23   Legal Compliance.

(a)     The Company and the Subsidiary are currently conducting, and have at all times since January 1, 1997 conducted, its businesses in compliance with each applicable law (including rules and regulations thereunder) of any federal, state, local or foreign government, or any Governmental Entity. Neither the Company nor the Subsidiary has (including any Affiliates) received any notice or communication from any Governmental Entity alleging noncompliance with any applicable law, rule or regulation.

(b)     Subject to paragraph (c) below, the Company complies with and has implemented all such measures required for it to comply with its obligations as a Covered Entity for its "Health Plan" and as a Business Associate of its "Covered Entity" (as such capitalized terms are defined in HIPAA and the regulations promulgated thereunder), including without limitation, the privacy and security regulations (45 C.F.R. 160 and 164) and the transaction and code set regulations (45 C.F.R. 162) promulgated under HIPAA. With respect to any HIPPA regulatory requirements, including any contractual privacy and security commitments for "Protected Health Information" (as that term is defined in the HIPAA privacy and security

regulations), for which the Company's (including any Affiliates) compliance or its customers' compliance with HIPPA is required (collectively, the "HIPAA Commitments"),

(i)    the Company is in material compliance with the HIPAA Commitments;

(ii)    the transactions contemplated by this Agreement will not violate any of the HIPAA Commitments;

(iii)    the Company has not received written inquiries from the U.S. Department of Health and Human Services or any other Governmental Entity regarding the Company's compliance with the HIPAA Commitments; and

(iv)    the HIPAA Commitments have not been rejected by any applicable certification organization which has reviewed such HIPAA Commitments or to which any such HIPAA Commitment has been submitted.

(c)    The Company has either entered into or made reasonable and good faith efforts to enter into valid, written Business Associate agreements with all customers that are Covered Entities and with all contractors, agents, vendors, suppliers, and service providers that are Business Associates of the Company.

2.24    Customers and Suppliers. Section 2.24 of the Disclosure Schedule sets forth a list of (a) each customer of the Company during the last full fiscal year or the interim period through the Most Recent Balance Sheet Date and the amount of revenues accounted for by such customer during each such period and (b) each supplier that is the sole supplier of any significant product or service to the Company or the Subsidiary (each such customer or supplier, a "Significant Person"). Except as set forth on Section 2.24 of the Disclosure Schedule, neither the Company, the Subsidiary nor any Principal Stockholder has received any written notice from any Significant Person, nor to the Knowledge of the Company has any Significant Person threatened, that such Person will not continue its relationship with the Surviving Corporation or the Buyer after the Closing or that such Person intends to terminate or materially modify existing agreements with the Company or the Subsidiary, or materially reduce the amount paid to the Company for products or services; and to the Knowledge of the Company, no event or circumstances exist other than general economic conditions that may be reasonably likely to give rise to or serve as the basis therefor. Neither the Company, the Subsidiary nor any Principal Stockholder has received written notice from any Significant Person that it intends to file a petition under applicable bankruptcy laws or otherwise seek relief from or make an assignment for the benefit of its creditors, and to the Company's Knowledge, no such notice or action has been threatened.

2.25    Permits. Section 2.25 of the Disclosure Schedule sets forth a list of all Permits issued to or held by the Company or the Subsidiary. Such listed Permits are the only Permits that are required for the Company or the Subsidiary to conduct their respective businesses as presently conducted or as contemplated to be conducted by any business plans or projections delivered by the Company to the Buyer. Each such Permit is in full force and effect; the Company and the Subsidiary are in compliance with the terms of each such Permit; and, to the

- 33 -

Knowledge of the Company, no suspension or cancellation of such Permit is threatened and there is no basis for believing that such Permit will not be renewable upon expiration. Each such Permit will continue in full force and effect immediately following the Closing.

2.26    Certain Business Relationships With Affiliates. Except as set forth in Section 2.26 of the Disclosure Schedule, no Affiliate of the Company or the Subsidiary (a) owns any property or right, tangible or intangible, which is used in the business of the Company or the Subsidiary, (b) has any claim or cause of action against the Company or the Subsidiary, or (c) owes any money to, or is owed any money by, the Company or the Subsidiary. Section 2.26 of the Disclosure Schedule describes any transactions or relationships between the Company or the Subsidiary and any Affiliate thereof which occurred or have existed since the beginning of the time period covered by the Financial Statements.

2.27    Brokers' Fees. Except as set forth in Section 2.27 of the Disclosure Schedule, neither the Company, the Subsidiary nor any Company Stockholder has any liability or obligation to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement.

2.28    Books and Records. The minute books and other similar records of the Company or the Subsidiary contain complete and accurate records of all actions taken at any meetings of the Company's stockholders or the Subsidiary's stockholders, Board of Directors or any committee thereof and of all written consents executed in lieu of the holding of any such meeting. The books and records of the Company and the Subsidiary accurately reflect in all material respects the assets, liabilities, business, financial condition and results of operations of the Company or the Subsidiary and have been maintained in accordance with good business and bookkeeping practices. Section 2.28 of the Disclosure Schedule contains a list of all accounts and safe deposit boxes of the Company or the Subsidiary (including the name of each bank, trust company, savings institution, brokerage firm, mutual fund or other financial institution with which the Company or the Subsidiary has an account or safe deposit box) and the names of persons having signature authority with respect thereto or access thereto.

2.29    Stockholders Representations. Each of the Principal Stockholders and Additional Principal Stockholders has good and marketable title, free and clear of any and all liens or Security Interests, to all of the shares of capital stock of the Company owned by them, and each has the full right, power and authority to deliver the certificates representing such shares to the Buyer pursuant to the Merger.

2.30    Hart-Scott-Rodino Act. To the extent the Closing occurs prior to April 30, 2004, for the purposes of the Hart-Scott-Rodino Act, and in accordance with the rules promulgated thereunder, the Company hereby represents that it is its ultimate parent entity, is not engaged in manufacturing, and had and will have less than $10 million in total assets as stated on its last regularly prepared balance sheet prior to the date hereof and the Closing, as well as less than $100 million of annual net sales as stated on the last regularly prepared annual statement of income and expense prior to the date hereof and the Closing (as such terms are defined by 16 C.F.R. §801.11).

2.31    <u>Compliance with Healthcare Laws and Regulations.</u>

(a)    Without limiting the generality of Section 2.23 or any other representation or warranty made by the Company herein, the Company is conducting and has conducted its business and operations in compliance with, and neither the Company nor any of its officers, directors or employees has engaged in any activities prohibited under, all applicable civil or criminal statutes, laws, ordinances, rules and regulations of any federal, state, local or foreign Governmental Entity with respect to regulatory matters relating to the provision, administration, and/or payment for healthcare products or services (collectively, "<u>Healthcare Laws</u>"), including, without limitation, (i) rules and regulations governing the operation and administration of Medicare, Medicaid, or other federal health care programs; (ii) 42 U.S.C. § 1320a-7(b), commonly referred to as the "Federal Anti-Kickback Statute," (iii) 42 U.S.C. § 1395nn, commonly referred to as the "Stark Law," (iv) 31 U.S.C. §§ 3729-33, commonly referred to as the "False Claims Act" and (v) rules and regulations of the U.S. Food and Drug Administration.

(b)    The Company has not received any notice or communication from any Governmental Entity alleging noncompliance with any Healthcare Laws. There is no civil, criminal or administrative action, suit, demand, claim, complaint, hearing, investigation, notice, demand letter, warning letter, proceeding or request for information pending against the Company and the Company has no liability (whether actual or contingent) for failure to comply with any Healthcare Laws. There is no act, omission, event or circumstance that would reasonably be expected to give rise to any such action, suit, demand, claim, complaint, hearing, investigation, notice, demand letter, warning letter, proceeding or request for information or any such liability. There has not been any violation of any Healthcare Laws by the Company in its submissions or reports to any Governmental Entity that could reasonably be expected to require investigation, corrective action or enforcement action. There is no civil or criminal proceeding relating to the Company or any Company director, officer or employee that involves a matter within or related to Healthcare Laws.

(c)    Any remuneration (including, without limitation, a "discount or reduction in price," as referenced in 42 U.S.C. § 1320a-7b(b)(3)(A)) exchanged between the Company and its customers, contractors, or other entities with which it has a business relationship (together, "Trading Partners") has at all times been commercially reasonable and represents the fair market value for rendered services or purchased items. No remuneration exchanged between the Company and its Trading Partners has taken into account, either directly or indirectly, the volume or value of any referrals or any other federal health care program business generated between the Company and such Trading Partners.

(d)    Neither the Company nor any of its directors, officers, employees or Trading Partners has been debarred or subject to mandatory or permissive exclusion from participation in Medicare, Medicaid, or any other federal or state healthcare program.

(e)    The Company has maintained all records required under any Healthcare Laws.

2.32    <u>Disclosure.</u> No representation or warranty by the Company contained in this Agreement, and no statement contained in the Disclosure Schedule or any other document,

certificate or other instrument delivered or to be delivered by or on behalf of the Company pursuant to this Agreement, contains or will contain any untrue statement of a material fact or omits or will omit to state any material fact necessary, in light of the circumstances under which it was or will be made, in order to make the statements herein or therein not misleading. The Company has disclosed to the Buyer all material information relating to the business of the Company or the Subsidiary or the transactions contemplated by this Agreement. No representations or warranties have been made beyond, or in addition to, those expressly set forth herein and in any other agreements, documents or instruments executed and delivered in connection with the transactions contemplated hereunder.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE BUYER
## AND THE TRANSITORY SUBSIDIARY

Each of the Buyer and the Transitory Subsidiary represents and warrants to the Company that the statements contained in this Article III are true and correct as of the date of this Agreement and will be true and correct as of the Closing as though made as of the Closing.

3.1    Organization and Corporate Power. Each of the Buyer and the Transitory Subsidiary is a corporation duly organized, validly existing and in good standing under the laws of the state of its incorporation. The Buyer has all requisite corporate power and authority to carry on the businesses in which it is engaged and to own and use the properties owned and used by it.

3.2    Authorization of Transaction. Each of the Buyer and the Transitory Subsidiary has all requisite power and authority to execute and deliver this Agreement and to perform its obligations hereunder and thereunder. The execution and delivery by the Buyer and the Transitory Subsidiary of this Agreement and the consummation by the Buyer and the Transitory Subsidiary of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate action on the part of the Buyer and Transitory Subsidiary, respectively. This Agreement has been duly and validly executed and delivered by the Buyer and the Transitory Subsidiary and constitutes a valid and binding obligation of the Buyer and the Transitory Subsidiary, enforceable against them in accordance with its terms.

3.3    Noncontravention. Subject to compliance with the applicable requirements of the Hart-Scott-Rodino Act, if required, and the filing of the Articles of Merger as required by the MGCL, neither the execution and delivery by the Buyer or the Transitory Subsidiary of this Agreement, nor the consummation by the Buyer or the Transitory Subsidiary of the transactions contemplated hereby, will (a) conflict with or violate any provision of the charter or By-laws of the Buyer or the Transitory Subsidiary, (b) require on the part of the Buyer or the Transitory Subsidiary any filing with, or permit, authorization, consent or approval of, any Governmental Entity, (c) conflict with, result in breach of, constitute (with or without due notice or lapse of time or both) a default under, result in the acceleration of obligations under, create in any party any right to terminate, modify or cancel, or require any notice, consent or waiver under, any contract or instrument to which the Buyer or the Transitory Subsidiary is a party or by which either is bound or to which any of their assets are subject, except for (i) any conflict, breach, default, acceleration, termination, modification or cancellation which would not adversely affect

- 36 -

the consummation of the transactions contemplated hereby or (ii) any notice, consent or waiver the absence of which would not adversely affect the consummation of the transactions contemplated hereby, or (d) violate any order, writ, injunction, decree, statute, rule or regulation applicable to the Buyer or the Transitory Subsidiary or any of their properties or assets.

3.4    Litigation.  As of the date of this Agreement, there is no action, suit, investigation or proceeding pending against or, to the Buyer's or the Transitory Subsidiary's Knowledge, threatened against or affecting Buyer or Transitory Subsidiary or any of their respective officers or directors in their capacity as officers or directors of Buyer or Transitory Subsidiary before any court or arbitrator or any governmental body, agency or official, which in any manner challenges or seeks to prevent, enjoin, alter or materially delay any of the transactions contemplated hereby.

3.5    Investment Intent.  Buyer is acquiring the Shares for its own account and not with a view toward their distribution within the meaning of Section 2(11) of the Securities Act.  Buyer acknowledges that the Shares have not been registered under the Securities Act or any state securities laws and that the Shares were issued to the Company Stockholders in reliance upon exemptions from registration.

3.6    Financial Capacity.  Buyer currently has sufficient immediately available funds, in cash or cash equivalents, and will at the Closing have sufficient immediately available funds in cash, to effect the transactions contemplated by this Agreement.

## ARTICLE IV
## PRE-CLOSING AND POST-CLOSING COVENANTS

4.1    Closing Efforts.  Each of the Parties shall use its Reasonable Best Efforts to take all actions and to do all things necessary, proper or advisable to consummate the transactions contemplated by this Agreement, including using its Reasonable Best Efforts to ensure that (i) its representations and warranties remain true and correct in all material respects through the Closing Date and (ii) the conditions to the obligations of the other Parties to consummate the Merger are satisfied.

4.2    Governmental and Third-Party Notices and Consents.

(a)    Each Party shall use its Reasonable Best Efforts to obtain, at its expense, all waivers, permits, consents, approvals or other authorizations from Governmental Entities, and to effect all registrations, filings and notices with or to Governmental Entities, as may be required for such Party to consummate the transactions contemplated by this Agreement and to otherwise comply with all applicable laws and regulations in connection with the consummation of the transactions contemplated by this Agreement.  Without limiting the generality of the foregoing, if required, each of the Parties shall promptly file any Notification and Report Forms and related material that it may be required to file with the Federal Trade Commission and the Antitrust Division of the United States Department of Justice under the Hart-Scott-Rodino Act, shall use its Reasonable Best Efforts to obtain an early termination of the applicable waiting period, and shall make any further filings or information submissions pursuant thereto that may be necessary, proper or advisable; provided, however, that notwithstanding anything to the contrary in this Agreement, the Buyer shall not be obligated to sell or dispose of or hold

separately (through a trust or otherwise) any assets or businesses of the Buyer or its Affiliates, or otherwise restrict the conduct of the businesses of the Buyer or its Affiliates.

(b)    The Company shall use its Reasonable Best Efforts to obtain, at its expense, all such waivers, consents or approvals from third parties, and to give all such notices to third parties, as are required to be listed in the Disclosure Schedule.

4.3    Operation of Business. Except as contemplated by this Agreement, during the period from the date of this Agreement to the Closing, the Company shall (and shall cause the Subsidiary to) conduct its operations in the Ordinary Course of Business and in compliance with all applicable laws and regulations and, to the extent consistent therewith, use its Reasonable Best Efforts to preserve intact its current business organization, keep its physical assets in good working condition, keep available the services of its current officers and employees and preserve its relationships with customers, suppliers and others having business dealings with it to the end that its goodwill and ongoing business shall not be impaired in any material respect. Without limiting the generality of the foregoing, prior to the Closing, the Company shall not (and shall cause the Subsidiary not to), without the written consent of the Buyer:

(a)    except pursuant to the exercise of existing Options or Warrants, and in connection with the conversion and dividend rights of the Preferred Shares, issue or sell any stock or other securities of the Company or the Subsidiary or any options, warrants or rights to acquire any such stock or other securities, or amend any of the terms of (including the vesting of) any options, warrants or restricted stock agreements, or repurchase or redeem any stock or other securities of the Company;

(b)    split, combine or reclassify any shares of its capital stock; or declare, set aside or pay any dividend or other distribution (whether in cash, stock or property or any combination thereof) in respect of its capital stock;

(c)    create, incur or assume any indebtedness (including obligations in respect of capital leases); assume, guarantee, endorse or otherwise become liable or responsible (whether directly, contingently or otherwise) for the obligations of any other Person; or make any loans, advances or capital contributions to, or investments in, any other Person;

(d)    enter into, adopt or amend any Employee Benefit Plan or any employment or severance agreement or arrangement of the type described in Section 2.21(k) or increase in any manner the compensation or fringe benefits of, or materially modify the employment terms of, its directors, officers or employees, generally or individually, or pay any bonus or other benefit to its directors, officers or employees (except for existing payment obligations listed in Section 2.21 of the Disclosure Schedule) or hire any new officers or (except in the Ordinary Course of Business) any new employees;

(e)    acquire, sell, lease, license or dispose of any assets or property (including any shares or other equity interests in or securities of the Subsidiary or any corporation, partnership, association or other business organization or division thereof), other than purchases and sales of assets in the Ordinary Course of Business;

(f)     mortgage or pledge any of its property or assets or subject any such property or assets to any Security Interest;

(g)     discharge or satisfy any Security Interest or pay any obligation or liability other than in the Ordinary Course of Business;

(h)     amend its Articles of Incorporation, By-laws or other organizational documents;

(i)     change its accounting methods, principles or practices, except insofar as may be required by a generally applicable change in GAAP, or make any new elections, or changes to any current elections, with respect to Taxes;

(j)     enter into, amend, terminate, take or omit to take any action that would constitute a violation of or default under, or waive any rights under, any contract or agreement of a nature required to be listed in Section 2.12, Section 2.13 or Section 2.14 of the Disclosure Schedule (other than new customer agreements providing for the payment by the customer of not more than $25,000 per annum individually or $100,000 per annum for all such agreements in the aggregate);

(k)     make or commit to make any capital expenditure in excess of $10,000 per item or $100,000 in the aggregate;

(l)     institute or settle any Legal Proceeding;

(m)     take any action of a nature required to be listed in Section 2.7 of the Disclosure Schedule;

(n)     take any action or fail to take any action permitted by this Agreement with the knowledge that such action or failure to take action would result in (i) any of the representations and warranties of the Company set forth in this Agreement becoming untrue or (ii) any of the conditions to the Merger set forth in Article V not being satisfied; or

(o)     agree in writing or otherwise to take any of the foregoing actions.

4.4     Access to Information.

From the date of this Agreement until the Closing, the Company shall (and shall cause the Subsidiary to) permit representatives of the Buyer to have access (at reasonable times, and in a manner so as not to interfere with the normal business operations of the Company and the Subsidiary) to all premises, properties, financial, tax and accounting records (including the work papers of the Company's independent accountants), contracts, other records and documents, and personnel, of or pertaining to the Company and the Subsidiary.

4.5     Notice of Breaches.

(a)     From the date of this Agreement until the Closing, the Company shall promptly deliver to the Buyer supplemental information concerning events or circumstances

occurring subsequent to the date hereof which would render any representation, warranty or statement in this Agreement or the Disclosure Schedule inaccurate or incomplete at any time after the date of this Agreement until the Closing. No such supplemental information shall be deemed to avoid or cure any misrepresentation or breach of warranty or constitute an amendment of any representation, warranty or statement in this Agreement or the Disclosure Schedule unless Buyer expressly agrees in writing.

      (b)    From the date of this Agreement until the Closing, the Buyer shall promptly deliver to the Company supplemental information concerning events or circumstances occurring subsequent to the date hereof which would render any representation or warranty in this Agreement inaccurate or incomplete at any time after the date of this Agreement until the Closing. No such supplemental information shall be deemed to avoid or cure any misrepresentation or breach of warranty or constitute an amendment of any representation or warranty in this Agreement unless the Principal Stockholders expressly agree in writing.

    4.6    Exclusivity.

      (a)    From the date of this Agreement until the Closing, the Company, the Principal Stockholders and the Additional Principal Stockholders shall not, and the Company shall require each of its officers, directors, employees, representatives, stockholders and agents not to, directly or indirectly, (i) initiate, solicit, encourage or otherwise facilitate any inquiry, proposal, offer or discussion with any party (other than the Buyer) concerning any merger, reorganization, consolidation, recapitalization, business combination, liquidation, dissolution, share exchange, sale of stock, sale of material assets or similar business transaction involving the Company, the Subsidiary or any division of the Company, (ii) furnish any non-public information concerning the business, properties or assets of the Company, the Subsidiary or any division of the Company to any party (other than the Buyer or its representatives) or (iii) engage in discussions or negotiations with any party (other than the Buyer) concerning any such transaction.

      (b)    The Company shall immediately notify any party with which discussions or negotiations of the nature described in paragraph (a) above were pending that the Company is terminating such discussions or negotiations. If the Company, any Principal Stockholder or any Additional Principal Stockholder receives any inquiry, proposal or offer of the nature described in paragraph (a) above, the Company shall, within one Business Day after such receipt, notify the Buyer of such inquiry, proposal or offer, including the identity of the other party and the terms of such inquiry, proposal or offer.

    4.7    Expenses. Except as expressly set forth in Articles I, VI and VII and the Escrow Agreement, each of the Parties shall bear its own costs and expenses (including legal and accounting fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.

    4.8    Proprietary Information. From and after the Closing, no Company Stockholder shall disclose or make use of, and each Company Stockholder shall cause all of his Affiliates not to disclose or make use of, any knowledge, information or documents of a confidential nature or not generally known to the public with respect to the Company or the Subsidiary, or the Buyer

EFiled: May 9 2005 5:14PM EDT
Filing ID 5778731

and the Parent and their respective businesses (including the financial information, technical information or data relating to the Company's or the Subsidiary's services and names of customers of the Company or the Subsidiary), except to the extent that such knowledge, information or documents shall have become public knowledge other than through improper disclosure by any Company Stockholder or an Affiliate.

4.9    Solicitation and Hiring. Without the prior written consent of the Buyer, for a period of five years after the Closing Date, no Principal Stockholder shall, either directly or indirectly (including through an Affiliate), (a) solicit or attempt to induce any Restricted Employee to terminate his employment with the Parent, the Buyer, the Surviving Corporation or any Affiliate of the foregoing or (b) hire or attempt to hire any Restricted Employee.

4.10    Non-Competition.

(a)    For a period of five years after the Closing Date, no Principal Stockholder shall, either directly or indirectly as a stockholder, investor, partner, consultant, employee, officer, director, supplier, representative or otherwise, (i) design, develop, manufacture, market, sell or license any product or provide any service anywhere in the world which is competitive with any product designed, developed (or under development or planned for development), manufactured, sold or licensed or any service provided or planned by the Company during the three-year period prior to the Closing Date, (ii) engage anywhere in the world in any business competitive with the business of the Company as conducted or currently planned to be conducted during the three-year period prior to the Closing Date (a "Competitive Business"), (iii) give information or financial assistance to any Competitive Business, or (iv) use or authorize the use of his name or any part thereof to be used or employed in connection with any Competitive Business. Nothing in this Section 4.10(a) will prevent a Principal Stockholder from owning an interest of less than 1% in any publicly traded company engaged in a Competitive Business. For purposes of this Section 4.10(a) a product is "planned" for development, and a business is "planned" to be conducted, if the Company has taken affirmative actions and applied actual resources (financial or otherwise) towards the development of such product or conduct of such business.

(b)    Each Principal Stockholder agrees that the duration and geographic scope of the non-competition provision set forth in this Section 4.10 are reasonable. In the event that any court determines that the duration or the geographic scope, or both, are unreasonable and that such provision is to that extent unenforceable, the Parties agree that the provision shall remain in full force and effect for the greatest time period and in the greatest area that would not render it unenforceable. The Parties intend that this non-competition provision shall be deemed to be a series of separate covenants, one for each and every county of each and every state of the United States of America and each and every political subdivision of each and every country outside the United States of America where this provision is intended to be effective.

(c)    Each Principal Stockholder acknowledges and agrees that: (i) the covenants and the restrictions contained in this Section 4.10 are necessary, fundamental and required for the protection of the business of Company; (ii) the covenants and the restrictions contained in this Section 4.10 relate to matters that are of a special, unique and extraordinary value; (iii) a breach of any of the covenants and the restrictions contained in this Section 4.10

will result in irreparable harm and Damages that cannot be adequately compensated by a monetary award, and accordingly the Surviving Corporation and the Buyer will be entitled to injunctive or other equitable relief to prevent or redress any such breach; (iv) immediately prior to the date of this Agreement, the Principal Stockholders collectively were the holder of a majority of the equity interests in the Company and are selling all of their equity in the Company pursuant to this Agreement; (v) in connection with such sale of equity, the Buyer has required and each Principal Stockholder has agreed, as a condition to the purchase by the Buyer of such equity, that each Principal Stockholder enter into the covenants and the restrictions contained in this Section 4.10; (vi) each Principal Stockholder understands that Buyer would not enter into this Agreement and consummate the Merger if each Principal Stockholder did not enter into this Agreement and the covenants and the restrictions contained in this Section 4.10; and (vii) each Principal Stockholder is entering into the covenants and the restrictions contained in this Section 4.10 in connection with the transactions contemplated by this Agreement.

4.11    Options and Warrants.  The Company hereby agrees to take all actions reasonably necessary to (i) cause all holders of Options or Warrants to exercise such Options or Warrants, as the case may be, or (ii) terminate such Options or Warrants, in each case prior to the Effective Time and in accordance with the terms and conditions of the Option and Warrant Termination Agreements.

4.12    Audited Financial Statements.  As soon as reasonably practicable after the Closing, the Buyer shall prepare consolidated balance sheets and statements of income, changes in stockholders' equity and cash flows of the Company as of March 31, 2004 and for the year then ended, which shall be audited by the Baltimore Office of Ernst & Young.  Such financial statements shall be prepared at the expense of the Buyer.

4.13    Voting of Shares.

(a)    Each Principal Stockholder and Additional Principal Stockholder covenants and agrees that until the termination of this Agreement in accordance with the terms hereof, at any meeting of the Company Stockholders, however called, and in any action by written consent of the Company Stockholders, each such Principal Stockholder and Additional Principal Stockholder will vote, or cause to be voted, all of his, her or its respective Company Shares (i) in favor of adoption of this Agreement and approval of the Merger contemplated hereby, as this Agreement may be modified or amended from time to time in a manner not adverse to the Principal Stockholders and the Additional Principal Stockholders, and (ii) against any other acquisition or combination of the Company, whether by stock purchase, merger, consolidation or otherwise.

(b)    Each Principal Stockholder and Additional Principal Stockholder hereby irrevocably grants to, and appoints, Buyer, and any individual designated in writing by it, and each of them individually, as its proxy and attorney-in-fact (with full power of substitution), for and in its name, place and stead, to vote his, her or its Company Shares at any meeting of the Company Stockholders called with respect to any of the matters related to the Merger.  Each Principal Stockholder and Additional Principal Stockholder hereby affirms that the irrevocable proxy set forth in this Section 4.13(b) is given in connection with the execution of this Agreement hereunder, and that such irrevocable proxy is given to secure the performance of the

duties of such Principal Stockholder and Additional Principal Stockholder under this Agreement. Except as otherwise provided for herein, each Principal Stockholder and Additional Principal Stockholder hereby (i) affirms that the irrevocable proxy is coupled with an interest and may under no circumstances be revoked, (ii) ratifies and confirms all that the proxies appointed hereunder may lawfully do or cause to be done by virtue hereof and (iii) affirms that such irrevocable proxy is executed and intended to be irrevocable in accordance with the provisions of Section 2-507 of the MGCL. Notwithstanding any other provisions of this Agreement, the irrevocable proxy granted hereunder shall automatically terminate upon the termination of this Agreement.

(c)    This Section 4.13 is intended to bind the Principal Stockholders only with respect to the specific matters set forth herein, and shall not prohibit any of the Principal Stockholders from acting in accordance with his or her fiduciary duties as an officer or director of the Company.

4.14    Coverage in the Buyer Benefit Plans.  On, or soon as reasonably practicable after, the Closing Date, the Buyer will cause the Company's employees that become employees of the Buyer or its Affiliates after the Effective Time to be eligible for coverage under a group medical benefit plan and other employee benefit plans, programs, policies, which are the same as or comparable to those maintained for similarly situated employees of the Buyer.

4.15    Stockholder Approval.

(a)    The Company shall use its Reasonable Best Efforts to obtain, as promptly as practicable, the Requisite Stockholder Approval at a special meeting of Company Stockholders, all in accordance with the applicable requirements of the MGCL.  In connection with such special meeting of Company Stockholders, the Company shall provide to the Company Stockholders the Information Statement, which shall include (A) a summary of the Merger and this Agreement (which summary shall include a summary of the terms relating to the indemnification obligations of the Indemnifying Stockholders, the escrow arrangements and the authority of the Stockholder Representatives, and a statement that the adoption of this Agreement by the Company Stockholders shall constitute approval of such terms), and (B) a statement that appraisal rights are available for the Company Shares pursuant to Title 3, Subtitle 2 of the MCGL and a copy of such Title 3, Subtitle 2.  The Buyer agrees to cooperate with the Company in the preparation of the Information Statement.  The Company agrees not to distribute the Information Statement until the Buyer has had a reasonable opportunity to review and comment on the Information Statement and the Information Statement has been approved by the Buyer (which approval may not be unreasonably withheld, conditioned or delayed).

(b)    The Company shall ensure that the Information Statement does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading (provided that the Company shall not be responsible for the accuracy or completeness of any information concerning the Buyer or the Transitory Subsidiary furnished by the Buyer in writing for inclusion of the Information Statement).

- 43 -

4.16   280G Covenant. Prior to the Closing Date, the Company shall submit to a stockholder vote the right of any "disqualified individual" (as defined in Section 280G(c) of the Code) to receive any and all payments (or other benefits) that could be deemed "parachute payments" under Section 280G(b) of the Code, in a manner that satisfies the stockholder approval requirements for the small business exemption of Section 280G(b)(5) of the Code and any regulations (including proposed regulations) promulgated thereunder. Consistent with the requirements of Section 280G(b)(5) and the regulations, such vote shall establish the "disqualified individual's" right to the payment, benefit or other compensation, and before the Closing Date, the Company shall provide adequate disclosure to all Company Stockholders of all material facts concerning all payments that, but for such vote, could be deemed "parachute payments" to a "disqualified individual" under Section 280G of the Code in a manner that satisfies Section 280G(b)(5)(B)(ii) of the Code and any regulations (including proposed regulations) promulgated thereunder.

## ARTICLE V
## CONDITIONS TO CONSUMMATION OF MERGER

5.1   Conditions to Obligations of the Buyer and the Transitory Subsidiary. The obligation of each of the Buyer and the Transitory Subsidiary to consummate the Merger is subject to the satisfaction (or waiver by the Buyer) of the following additional conditions:

(a)   there shall be no Dissenting Shares;

(b)   the Company shall have obtained at its own expense (and shall have provided copies thereof to the Buyer) all of the waivers, permits, consents, approvals or other authorizations, and effected all of the registrations, filings and notices which are required on the part of the Company to consummate the transactions contemplated by this Agreement, including, but not limited to, the consents set forth on Section 2.4(c) of the Disclosure Schedule, and to otherwise comply with all applicable laws and regulations in connection with the consummation of the transactions contemplated by this Agreement; provided, that, if required, the Buyer shall pay the filing fees, and their own legal costs, associated with any filing under the Hart-Scott-Rodino Act.

(c)   the representations and warranties of the Company and the Principal Stockholders set forth in this Agreement shall be true and correct in all material respects as of the Closing;

(d)   the Company and each Principal Stockholder shall each have performed or complied with in all material respects its or his agreements and covenants required to be performed or complied with under this Agreement as of or prior to the Closing;

(e)   no Legal Proceeding shall be pending or threatened wherein an unfavorable judgment, order, decree, stipulation or injunction would (i) prevent consummation of the transactions contemplated by this Agreement, (ii) cause the transactions contemplated by this Agreement to be rescinded following consummation or (iii) have, individually or in the aggregate, a Company Material Adverse Effect, and no such judgment, order, decree, stipulation or injunction shall be in effect;