(f)     the Company and the Principal Stockholders shall have delivered to the Buyer and the Transitory Subsidiary the Company Certificate;

(g)     if applicable, all applicable waiting periods (and any extensions thereof) under the Hart-Scott-Rodino Act shall have expired or otherwise been terminated;

(h)     the Buyer shall have received the resignations, effective as of the Closing, of each director and officer of the Company specified by the Buyer;

(i)     the Buyer shall have received from counsel to the Company an opinion in substantially the form attached hereto as Exhibit A, addressed to the Buyer and dated as of the Closing Date;

(j)     Sandeep Goel shall have entered into an Employment Agreement (including noncompete and non-solicitation provisions) with the Surviving Corporation substantially in the form attached hereto as Exhibit B;

(k)     Pradeep Goel shall have entered into an Employment Agreement (including noncompete and non-solicitation provisions) with the Surviving Corporation substantially in the form attached hereto as Exhibit C;

(l)     the Company shall have terminated the 401(k) Plan; however, the Company shall pay the costs (up to $30,000) associated with such termination, including any early termination penalty or fee payable to Guardian Life Insurance Company;

(m)     the Buyer shall have received from each Company Stockholder prior to the Effective Time, an appropriate letter of transmittal (each, a "Stockholder Transmittal Letter") substantially in the form attached hereto as Exhibit D, which has been executed by Company Stockholders holding not less than 97.5% of the Common Shares (determined on an as-converted to common stock basis) held by such Company Stockholders, agreeing to the terms and conditions of the Merger as set forth herein;

(n)     all outstanding Options and Warrants shall have been exercised or terminated and all holders of Options or Warrants shall have delivered their respective Option and Warrant Termination Agreements and all Company Stock Plans shall have been terminated;

(o)     the Buyer shall have received unaudited consolidated balance sheets and statements of income, changes in stockholders' equity and cash flows of the Company as of March 31, 2004 and for the nine months then ended, which shall be accompanied by a certificate executed by the Company's Chief Financial Officer certifying to the Buyer that the representations and warranties set forth in Section 2.6 hereof are true and correct with respect to such unaudited consolidated balance sheets and statements of income, changes in stockholders' equity and cash flows;

(p)     the Company shall have obtained at its own expense (and shall have provided to the Buyer) Tax good standing certificates or other documentation satisfactory to the Buyer with respect to each jurisdiction in which the Company may be subject to Tax authority;

(q)    since the date of this Agreement, there will not have occurred and there will have been no change, event or development that has had or may reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect;

(r)    to the extent the Closing occurs after April 30, 2004, the Company shall have delivered an exemption certificate, substantially in the form attached hereto as Exhibit L (the "Exemption Certificate"), confirming that the representations and warranties made by the Company and the Principal Stockholders in Section 2.30 shall be true and correct as of the Closing Date;

(s)    the Buyer shall have received such other certificates and instruments (including certificates of good standing of the Company and the Subsidiary in its jurisdiction of organization and the various foreign jurisdictions in which it is qualified, certified charter documents, certificates as to the incumbency of officers and the adoption of authorizing resolutions) as it shall reasonably request in connection with the Closing.

5.2    Conditions to Obligations of the Company. The obligation of the Company to consummate the Merger is subject to the satisfaction of the following additional conditions:

(a)    the Buyer shall have obtained at its own expense (and shall have provided copies thereof to the Company) all of the waivers, permits, consents, approvals or other authorizations, and effected all of the registrations, filings and notices which are required on the part of the Buyer to consummate the transactions contemplated by this Agreement and to otherwise comply with all applicable laws and regulations in connection with the consummation of the transactions contemplated by this Agreement;

(b)    the representations and warranties of the Buyer and the Transitory Subsidiary set forth in this Agreement shall be true and correct in all material respects as of the Closing;

(c)    each of the Buyer and the Transitory Subsidiary shall have performed or complied with in all material respects its agreements and covenants required to be performed or complied with under this Agreement as of or prior to the Closing;

(d)    no Legal Proceeding shall be pending or threatened wherein an unfavorable judgment, order, decree, stipulation or injunction would (i) prevent consummation of the transactions contemplated by this Agreement or (ii) cause the transactions contemplated by this Agreement to be rescinded following consummation, and no such judgment, order, decree, stipulation or injunction shall be in effect;

(e)    the Buyer shall have delivered to the Company the Buyer Certificate;

(f)    if applicable, all applicable waiting periods (and any extensions thereof) under the Hart-Scott-Rodino Act shall have expired or otherwise been terminated;

(g)    the Company shall have received from counsel to the Buyer an opinion in substantially the form attached hereto as Exhibit E, addressed to the Company and dated as of the Closing Date; and

(h)    the Company shall have received such other certificates and instruments (including certificates of good standing of the Buyer and the Transitory Subsidiary in their jurisdiction of organization, certified charter documents, certificates as to the incumbency of officers and the adoption of authorizing resolutions) as it shall reasonably request in connection with the Closing.

## ARTICLE VI
## INDEMNIFICATION

6.1    <u>Indemnification by the Stockholders</u>. Except as otherwise set forth in this Article VI, the Indemnifying Stockholders, jointly and severally, shall indemnify the Buyer in respect of, and hold it harmless against, any and all Damages incurred or suffered by the Surviving Corporation or the Buyer or any Affiliate thereof resulting from, relating to or constituting:

(a)    any breach or alleged breach of any representation or warranty of the Company or any Principal Stockholders or, with respect to Section 2.29 only, any Additional Principal Stockholders, contained in this Agreement (other than any breach or alleged breach of Section 2.9 of this Agreement which shall be resolved pursuant to Article VII of this Agreement) or any other agreement or instrument furnished by the Company or any Company Stockholder to the Buyer pursuant to this Agreement;

(b)    any failure to perform any covenant or agreement of the Company or any Company Stockholder contained in this Agreement or any agreement or instrument furnished by the Company or any Company Stockholder to the Buyer pursuant to this Agreement (excluding the Employment Agreements described in Sections 5.1(j) and (k)); provided that the indemnification obligation in this Section 6.1(b) shall be several, and not joint, as to any Principal Stockholder who has breached the covenants set forth in Sections 4.9 and 4.10 hereof;

(c)    any failure of any Company Stockholder to have good, valid and marketable title to the issued and outstanding Company Shares, registered in such Company's Stockholders name, free and clear of all Security Interests (it being understood that the indemnification obligation in this Section 6.1(c) shall be several, and not joint, as to the Company Stockholder with respect to whom the failure has occurred); or

(d)    any claim by a Company Stockholder or former stockholder of the Company, or any other Person, seeking to assert, or based upon:  (i) ownership or rights to ownership of any shares of stock of the Company which differ from those set forth in the Disclosure Schedule; (ii) any rights of a stockholder (other than the right to receive the Aggregate Merger Consideration pursuant to this Agreement), including any option, preemptive rights or rights to notice or to vote; (iii) any rights under the Articles of Incorporation or By-laws of the Company; or (iv) any claim that his, her or its shares were wrongfully repurchased by the Company.

6.2    <u>Indemnification by the Buyer</u>. The Buyer shall indemnify the Indemnifying Stockholders in respect of, and hold them harmless against, any and all Damages incurred or suffered by the Stockholders resulting from, relating to or constituting:

(a)    any breach of any representation or warranty of the Buyer or the Transitory Subsidiary contained in this Agreement or any other agreement or instrument furnished by the Buyer or the Transitory Subsidiary to the Company pursuant to this Agreement; or

(b)    any failure to perform any covenant or agreement of the Buyer or the Transitory Subsidiary contained in this Agreement or any agreement or instrument furnished by the Buyer or the Transitory Subsidiary to the Company pursuant to this Agreement.

6.3    Indemnification Claims.

(a)    Notice of Third Party Actions. An Indemnified Party shall give written notification to the Indemnifying Party of the commencement of any Third Party Action. Such notification shall be given within 20 days after receipt by the Indemnified Party of notice of such Third Party Action, and shall describe in reasonable detail (to the extent known by the Indemnified Party) the facts constituting the basis for such Third Party Action and the amount of the claimed Damages; provided, however, that no delay or failure on the part of the Indemnified Party in so notifying the Indemnifying Party shall relieve the Indemnifying Party of any liability or obligation hereunder except to the extent of any damage or liability caused by or arising out of such failure.

(b)    Indemnification by the Indemnifying Stockholders of Third Party Actions. The obligations and liabilities of the Indemnifying Stockholders with respect to a Third Party Action for which the Buyer is entitled to indemnification pursuant to this Article VI will be subject to the following terms and conditions. The Buyer will have the right (including the selection of counsel) to defend against, direct the defense of, or settle any such Third Party Action and any related Legal Proceeding, but the Stockholder Representatives must reasonably cooperate in the defense thereof. In connection therewith, the Buyer agrees (i) to keep the Stockholder Representatives reasonably informed of its defense and resolution of the Third Party Action, (ii) to report to the Stockholder Representatives in writing, at least quarterly, as to the amount of Damages (including attorneys' fees and expenses) incurred as of the date of such report, together with a good faith estimate of the amount of any additional Damages that the Buyer expects may be incurred in the future based upon the status of such matters as of such date, and (iii) that it will make reasonable judgments with respect to incurring costs and expenses (including the selection of outside counsel) in a similar matter and based on similar factors as it does for similar third party claims for which it has no claim against the Indemnifying Stockholders for indemnification. No compromise, discharge or settlement of, or admission of liability in connection with, such claims may be effected by the Buyer without the written consent of the Stockholder Representatives (which consent will not be unreasonably withheld or delayed), unless the Buyer has waived any right to indemnification therefor by the Indemnifying Stockholders. So long as the Buyer is conducting the defense of the Third Party Action in accordance with clause (ii) of this Section 6.3(b), the Stockholder Representatives may retain separate co-counsel at their sole cost and expense and participate in the defense of the Third Party Action.

(c)    Indemnification by the Buyer of Third Party Actions. The obligations and liabilities of Buyer hereunder with respect to a Third Party Action for which any Indemnifying

Stockholder is entitled to indemnification pursuant to this Article VI will be subject to the following terms and conditions.

(i)      The Buyer will have the right, but not the obligation, to defend against and to direct the defense of any such Third Party Action and any related Legal Proceeding at the Buyer's sole cost and expense and with counsel of Buyer's choosing (subject to the approval of the Stockholder Representatives, which will not be unreasonably withheld or delayed) and the Stockholder Representatives will reasonably cooperate in the defense thereof. The Stockholder Representatives may participate in such defense with counsel of its own choosing, provided that the Buyer will not, following written notice of its election to defend against and direct the defense of any such Third Party Action, be liable to the Indemnifying Stockholders under this Article VI for any fees of other counsel or any other expenses with respect to the defense of such Legal Proceeding incurred by the Indemnifying Stockholders in connection with the defense of such Legal Proceeding unless the Indemnifying Stockholders are also a party to such Third Party Action and the Principal Stockholders determine in good faith that the Indemnifying Stockholders have available to them one or more defenses or counterclaims that are inconsistent with those of the Buyer. If the Buyer assumes the defense of a Third Party Action, no compromise, discharge or settlement of, or admission of liability in connection with, such claims may be effected by the Buyer without the written consent of the Stockholder Representatives (which consent will not be unreasonably withheld or delayed) unless (x) there is no finding or admission of any violation of law or any violation of the rights of any Person and no effect on any other claims that may be made against the Indemnifying Stockholders, and (y) the sole relief provided is monetary damages that are paid in full by the Buyer. The Buyer will have no liability with respect to any compromise or settlement of such claims effected without its written consent (which consent will not be unreasonably withheld or delayed).

(ii)      Notwithstanding the provisions of Section 6.3(c)(i) of this Agreement, it the Buyer fails or refuses to undertake the defense of such Third Party Action within 10 days after delivery of written notification to the Buyer of the commencement of such Third Party Action or if the Buyer later withdraws from such defense, the Stockholder Representatives will have the right to undertake the defense of such claim with counsel of their own choosing, with the Buyer responsible for the costs and expenses of such defense and bound by any determination made in such Third Party Action or any compromise or settlement effected by the Indemnifying Stockholders.

(d)      In order to seek indemnification under this Article VI, an Indemnified Party shall deliver a Claim Notice to the Indemnifying Party. If the Indemnified Party is the Buyer and is seeking to enforce such claim pursuant to the Escrow Agreement, the Indemnifying Party shall deliver a copy of the Claim Notice to the Escrow Agent.

(e)      Within 20 days after delivery of a Claim Notice, the Indemnifying Party shall deliver to the Indemnified Party a Response, in which the Indemnifying Party shall: (i) agree that the Indemnified Party is entitled to receive all of the Claimed Amount (in which case the Response shall be accompanied by a payment by the Indemnifying Party to the Indemnified Party of the Claimed Amount, by check or by wire transfer; provided that if the Indemnified Party is the Buyer and is seeking to enforce such claim pursuant to the Escrow

Agreement, the Indemnifying Party and the Indemnified Party shall deliver to the Escrow Agent, within three days following the delivery of the Response, a written notice executed by both parties instructing the Escrow Agent to disburse the Claimed Amount to the Buyer), (ii) agree that the Indemnified Party is entitled to receive the Agreed Amount (in which case the Response shall be accompanied by a payment by the Indemnifying Party to the Indemnified Party of the Agreed Amount, by check or by wire transfer; provided that if the Indemnified Party is the Buyer and is seeking to enforce such claim pursuant to the Escrow Agreement, the Indemnifying Party and the Indemnified Party shall deliver to the Escrow Agent, within three days following the delivery of the Response, a written notice executed by both parties instructing the Escrow Agent to disburse the Agreed Amount to the Buyer), or (iii) dispute that the Indemnified Party is entitled to receive any of the Claimed Amount.

(f)     During the 30-day period following the delivery of a Response that reflects a Dispute, the Indemnifying Party and the Indemnified Party shall use good faith efforts to resolve the Dispute. If the Dispute is not resolved within such 30-day period, such Dispute shall be resolved in a state or federal court sitting in Delaware. If the Indemnified Party is the Buyer and is seeking to enforce the claim that is the subject of the Dispute pursuant to the Escrow Agreement, the Indemnifying Party and the Indemnified Party shall deliver to the Escrow Agent, promptly following the resolution of the Dispute (whether by mutual agreement, judicial decision or otherwise), a written notice executed by both parties instructing the Escrow Agent as to what (if any) portion of the Escrow Fund shall be disbursed to the Buyer and/or the Indemnifying Stockholders (which notice shall be consistent with the terms of the resolution of the Dispute).

6.4     Survival of Representations and Warranties. All representations and warranties that are covered by the indemnification agreements in Section 6.1(a) and Section 6.2(a) of this Agreement shall (a) survive the Closing and (b) shall expire on the date eighteen (18) months following the Closing Date, except that (i) the representations and warranties set forth in Sections 2.1, 2.2, 2.3, 3.1 and 3.2 of this Agreement shall survive the Closing without limitation and (ii) the representations and warranties set forth in Sections 2.9, 2.21 and 2.22 of this Agreement shall survive until 30 days following expiration of all statutes of limitation applicable to the matters referred to therein. If an Indemnified Party delivers to an Indemnifying Party, before expiration of a representation or warranty, either a Claim Notice based upon a breach of such representation or warranty, or an Expected Claim Notice based upon a breach of such representation or warranty, then the applicable representation or warranty shall survive until, but only to the extent of, and for purposes of the resolution of, the specific matter covered by such notice. If the Legal Proceeding or written claim with respect to which an Expected Claim Notice has been given is definitively withdrawn or resolved, the Indemnified Party shall promptly so notify the Indemnifying Party and if the Indemnified Party has delivered a copy of the Expected Claim Notice to the Escrow Agent and funds have been retained in escrow after the Termination Date (as defined in the Escrow Agreement) with respect to such Expected Claim Notice, the Indemnifying Party and the Indemnified Party shall promptly deliver to the Escrow Agent a written notice executed by both parties instructing the Escrow Agent to disburse such retained funds in accordance with the resolution of such matter pursuant to the terms of the Escrow Agreement. The rights to indemnification set forth in this Article VI shall not be affected by (i) any investigation conducted by or on behalf of an Indemnified Party or any knowledge acquired (or capable of being acquired) by an Indemnified Party, whether before or after the date of this

Agreement or the Closing Date, with respect to the inaccuracy or noncompliance with any representation, warranty, covenant or obligation which is the subject of indemnification hereunder or (ii) any waiver by an Indemnified Party of any Closing condition relating to the accuracy of representations and warranties or the performance of or compliance with agreements and covenants.

6.5     Limitations.

(a)     Notwithstanding anything to the contrary herein, (i) the aggregate liability of the Indemnifying Stockholders, other than the Additional Indemnifying Stockholders, for Damages under Article VI and VII hereof shall not exceed their pro rata share of the Escrow Fund and any undistributed Earnout Payment up to an aggregate of $10,000,000, (ii) the aggregate liability of the Additional Indemnifying Stockholders for Damages under Section 6.1(a) shall not exceed their pro rata share of the Escrow Fund and any undistributed Earnout Payment up to an aggregate of $10,000,000 plus their pro rata share of $12,000,000 (the "Additional Indemnity") (determined on a pro rata basis with respect to the Common Shares (calculated to include Preferred Shares on an as-convertible to common stock basis) held by each Additional Indemnifying Stockholder relative to the Common Shares (calculated to include Preferred Shares on an as-convertible to common stock basis) held in the aggregate by all the Additional Indemnifying Stockholders); and (iii) the Indemnifying Stockholders shall not be liable under Section 6.1(a) unless and until the aggregate Damages for which they would otherwise be liable under Section 6.1(a) exceed $400,000 (at which point the Indemnifying Stockholders shall become liable for the aggregate Damages under Section 6.1(a), and not just amounts in excess of $400,000); provided that the limitations set forth in clauses (ii) and (iii) of this sentence shall not apply to a claim pursuant to Section 6.1(a) relating to a breach of the representations and warranties set forth in Sections 1.13, 2.1, 2.2, 2.3, 2.9, 2.27 or 2.29 of this Agreement or Section 2.4(c) and Section 2.14(b)(iii) of this Agreement in respect of the matters set forth on Section 6.5(a) of the Disclosure Schedule. In the event that the aggregate liability for indemnification obligations of the Indemnifying Stockholders exceeds the amounts set forth above, the Additional Indemnifying Stockholders hereby agree to be solely responsible for Damages in excess of such amounts arising out of any claims pursuant to Section 6.1(a) relating to a breach of the representations and warranties set forth in Sections 1.13, 2.1, 2.2, 2.3, 2.9, 2.27 or 2.29 of this Agreement or Section 2.4(c) and Section 2.14(b)(iii) of this Agreement in respect of the matters set forth on Section 6.5(a) of the Disclosure Schedule. For purposes solely of this Article VI, all representations and warranties of the Principal Stockholders in Article II (other than Sections 2.7 and 2.32) shall be construed as if the term "material" and any reference to "Company Material Adverse Effect" (and variations thereof) were omitted from such representations and warranties.

(b)     Notwithstanding anything to the contrary herein, (i) the aggregate liability of the Buyer for Damages under Section 6.2(a) shall not exceed $26,000,000 and (ii) the Buyer shall not be liable under Section 6.2(a) unless and until the aggregate Damages for which it would otherwise be liable under Section 6.2(a) exceed $400,000 (at which point the Buyer shall become liable for the aggregate Damages under Section 6.2(a), and not just amounts in excess of $400,000); provided that the limitation set forth in this sentence shall not apply to a claim pursuant to Section 6.2(a) relating to a breach of the representations and warranties set forth in Sections 3.1 or 3.2 of this Agreement. For purposes solely of this Article VI, all representations

and warranties of the Buyer in Article III shall be construed as if the term "material" were omitted from such representations and warranties.

(c)    The Buyer shall have the right to set off any amounts owed to it under this Agreement by the Indemnifying Stockholders and the Additional Indemnifying Stockholders against any amounts payable by it to the Indemnifying Stockholders and the Additional Indemnifying Stockholders hereunder, including, without limitation, the additional consideration payable under Section 1.6 and Section 1.7 of this Agreement.

(d)    The rights of the Buyer under this Article VI shall not be limited to the Escrow Fund nor shall the Escrow Agreement be the exclusive means for the Buyer to enforce such rights.

(e)    Neither the Indemnifying Stockholders nor the Additional Indemnifying Stockholders shall have any right of contribution against the Company or the Surviving Corporation with respect to any breach by the Company of any of its representations, warranties, covenants or agreements.

6.6    Treatment of Indemnity Payments. Any payments made to an Indemnified Party pursuant to this Article VI shall be treated as an adjustment to the Aggregate Merger Consideration for Tax purposes.

6.7    Insurance. The amount of any liability for Damages as to which indemnification exists under this Article VI (or amounts by which the Aggregate Merger Consideration shall have been reduced in accordance with this Article VI) shall be measured taking into account any insurance proceeds actually realized and any adverse insurance consequences incurred (such as premium adjustments) that affect the overall economic impact of the Damages on the party seeking indemnification.

6.8    Exclusive Remedy. The indemnification provided in this Article VI shall, except for fraud, and except for equitable remedies, constitute the exclusive legal remedy available to the Parties with respect to indemnification claims made pursuant to Sections 6.1(a) and 6.2(a) of this Agreement.

## ARTICLE VII
## TAX MATTERS

7.1     Tax Indemnification. The Indemnifying Stockholders shall indemnify and hold harmless the Buyer and the Company, and any successors thereto or Affiliates thereof in respect of and against Damages resulting from, relating to, or constituting (x) a breach of any representation contained in Section 2.9 of this Agreement, (y) the failure to perform any covenant or agreement set forth in this Article VII and Section 4.16, and (z) without duplication, the following Taxes, to the extent not reserved for on the Most Recent Balance Sheet:

(a)     Any Taxes for any Taxable period ending (or deemed pursuant to Section 7.2(b) of this Agreement to end) on or before the Closing Date due and payable by the Company or the Subsidiary;

(b)     Any Taxes for any Taxable period ending (or deemed pursuant to Section 7.2(b) of this Agreement to end) on or before the Closing Date for which the Company has any liability as a transferee or successor, or pursuant to any contractual obligation or otherwise; and

(c)     Any transfer, sales, use, stamp, conveyance, value added, recording, registration, documentary, filing and other non-income Taxes and administrative fees (including, without limitation, notary fees) arising in connection with the consummation of the transactions contemplated by this Agreement whether levied on the Buyer, the Company, the Transitory Subsidiary or any of the Constituents.

7.2     Allocation of Certain Taxes.

(a)     The Buyer and the Principal Stockholders agree that if the Company is permitted but not required under applicable foreign, state or local Tax laws to treat the Closing Date as the last day of a taxable period, the Buyer and the Company shall treat such day as the last day of a taxable period.

(b)     Any Taxes for a taxable period beginning before and ending after the Closing Date shall be paid by the Buyer or its Affiliates. The Constituents shall pay to the Buyer the portion of any such Taxes allocable to the portion of such period ending on the Closing Date which shall be deemed to equal (i) in the case of Taxes that (x) are based upon or related to income or receipts or (y) imposed in connection with any sale or other transfer or assignment of property, the amount which would be payable if the Taxable year ended with the Closing Date, and (ii) in the case of other Taxes imposed on a periodic basis (including property Taxes), the amount of such Taxes for the entire period multiplied by a fraction the numerator of which is the number of calendar days in the period ending with the Closing Date and the denominator of which is the number of calendar days in the entire period. For purposes of the provisions of Section 7.1 of this Agreement, each portion of such period shall be deemed to be a taxable period (whether or not it is in fact a taxable period).

7.3     Preparation and Filing of Tax Returns; Payment of Taxes.

(a)     The Buyer shall prepare and timely file or shall cause to be prepared and timely filed all Tax Returns for the Company that are required to be filed (taking into account

- 53 -

extensions) after the Closing Date. The Buyer shall make or cause to be made all payments required with respect to any such Tax Returns. The Indemnifying Stockholders shall pay to the Buyer all amounts due under this Section 7.3 for which the Indemnifying Stockholders are liable (as determined under Section 7.2 hereof) at least two (2) Business Days prior to the date such amounts are due and payable to the Taxing authority and the Buyer shall sign and timely file, or cause to be signed and timely filed, all such Returns together with the amount of Tax shown thereon to be due. If the amount of such Tax liability for which the Indemnifying Stockholders are liable is the subject of a dispute pursuant to this Section 7.3 on the due date, then the Indemnifying Stockholders shall pay to the Buyer the amount of such Tax, for which the Indemnifying Stockholders are liable, if any, that is not in dispute and will pay the Buyer that portion of any additional amount owed, including any interest or penalties thereon when such amount is finally resolved and the Buyer shall be required to pay to the relevant taxing authority only such amount of Taxes as are not in dispute.

(b)    Any Tax Return to be prepared and filed for taxable periods beginning before the Closing Date and ending after the Closing Date shall be prepared on a basis consistent with the last previous similar Tax Return to the extent permitted under applicable law. The Buyer shall permit the Stockholder Representatives to review and comment on any Tax Return described in the preceding sentence prior to filing to the extent that any item thereon may have an adverse effect on the Indemnifying Stockholders and for which the Indemnifying Stockholders are liable thereunder or under applicable law. The Buyer shall provide such Tax Returns to the Stockholder Representatives at least 45 days before such Tax Returns are required to be filed (together with such additional information regarding such Tax Returns as may reasonably be requested by the Stockholder Representatives). The Stockholder Representatives may comment on such Tax Returns within 10 days following receipt of the returns. The failure of the Stockholder Representatives to propose any changes to such Tax Returns within such 10 day period shall be deemed to constitute the Stockholder Representatives' approval thereof. If the Stockholder Representatives provide comments within the 10 day period, the Buyer shall either make such revisions as are requested by the Stockholder Representatives or notify the Stockholder Representatives within 5 days following receipt of the Stockholder Representatives' comments of the revisions which it disputes. Within a further period of 10 days from the delivery of such notice to the Stockholder Representatives, the accountants for each of the parties will attempt to resolve in good faith any disputed items. Failing such resolution, the unresolved disputed items will be resolved pursuant to Section 7.7 below.

(c)    The Indemnifying Stockholders shall be responsible for the payment of any transfer, sales, use, stamp, conveyance, value added, recording, registration, documentary, filing and other non-Income Taxes and administrative fees (including, without limitation, notary fees) arising in connection with the consummation of the transactions contemplated by this Agreement.

7.4    <u>Audits, Assessments, Etc.</u> Whenever any taxing authority sends a notice of an audit, initiates an examination of the Company or any Subsidiary, or otherwise asserts a claim, makes an assessment, or disputes the amount of Taxes for which the Indemnifying Shareholders are or may be liable under this Agreement, the Buyer shall promptly inform the Stockholder Representatives. The failure of the Buyer to notify the Stockholder Representatives promptly shall not relieve the Indemnifying Stockholders of any obligations under this Agreement except

- 54 -

to the extent such failure materially prejudices the Indemnifying Stockholders. The Buyer shall have the exclusive right to control any resulting proceedings. The Stockholder Representatives shall have the right to participate at their own expense, in such proceeding, or portion thereof, only to the extent such proceeding, or portion thereof, or determination, or portion thereof, affects the amount of Taxes for which the Indemnifying Stockholders are liable under this Agreement, and the Buyer may settle any such proceeding or determination, or portion thereof, to the extent such proceeding or determination affects the amount of Taxes for which the Indemnifying Stockholders are liable under this Agreement only with the prior written consent of the Stockholder Representatives, which consent shall not be unreasonably withheld.

7.5     Termination of Tax Sharing Agreements. All Tax sharing, Tax indemnity or Tax distribution agreements or similar arrangements with respect to or involving the Company shall be terminated prior to the Closing Date and, after the Closing Date, the Buyer, the Company, the Surviving Corporation and their Affiliates shall not be bound thereby or have any liability thereunder for amounts due in respect of periods ending on or before the Closing Date.

7.6     Indemnification Claims.

(a)     Scope of Article VII. Any claim by any Party relating to a breach by another Party of its obligations under this Article VII shall be pursued in accordance with the procedures for indemnification claims set forth in this Article VII, and shall not otherwise be subject to the terms and conditions, set forth in Article VI other than Sections 6.5(a) (insofar as such Section applies to the limitation on the indemnification obligations of the Indemnifying Stockholders, other than the Additional Indemnifying Stockholders), 6.6 and 6.7 thereof. To the extent there is any inconsistency between the terms of Article VI and this Article VII with respect to the allocation of responsibility between the Company, the Indemnifying Stockholders and the Buyer for Taxes relating to the business of the Company, the provisions of this Article VII shall govern.

(b)     Claim Procedure. For purposes of clarification, (i) claims for a breach of an obligation under this Article VII may be made by a Party at any time prior to the 30th day after the expiration of the statute of limitations applicable to the Tax matter to which the claim relates, (ii) in order to seek indemnification under this Article VII, the Buyer shall deliver a Claim Notice to the Stockholder Representatives and, if the Buyer is seeking to enforce such claim pursuant to the Escrow Agreement, the Buyer shall deliver a copy of the Claim Notice to the escrow agent in the form prescribed by the Escrow Agreement, (iii) upon delivery of any Claim Notice hereunder, the applicable representation or warranty shall survive until, but only to the extent of, and for purposes of the resolution of, the specific matter covered by such notice, (iv) if funds have been retained in Escrow after the Termination Date (as defined in the Escrow Agreement) with respect to such Claim Notice, the Buyer and the Stockholder Representatives shall promptly deliver to the Escrow Agent a written notice executed by both parties instructing the Escrow Agent to disburse such retained funds pursuant to the terms of the Escrow Agreement in accordance with the resolution of the matter, and (v) within 20 days after delivery of a Claim Notice, the Stockholder Representatives shall deliver to the Buyer a Response in which the Stockholder Representatives shall: (1) agree that the Buyer is entitled to receive all of the Claimed Amount (in which case the Response shall be accompanied by a payment by the Additional Indemnifying Stockholders to the Buyer of the Claimed Amount, by check or by wire

transfer; provided that if Escrow Fund has not been fully disbursed and the Buyer is seeking to enforce such claim pursuant to the Escrow Agreement, the Stockholder Representatives and the Buyer shall deliver to the Escrow Agent, within three days following the delivery of the Response, a written notice executed by the Stockholder Representatives and the Buyer instructing the Escrow Agent to disburse the Claimed Amount (or, if lesser, the remaining Escrow Fund) to the Buyer), (2) agree that the Buyer is entitled to receive the Agreed Amount (in which case the Response shall be accompanied by a payment by the Additional Indemnifying Stockholders to the Buyer of the Agreed Amount, by check or by wire transfer; provided that if the Escrow Fund has not been fully disbursed and the Buyer is seeking to enforce such claim pursuant to the Escrow Agreement, the Stockholder Representatives and the Buyer shall deliver to the Escrow Agent, within three days following the delivery of the Response, a written notice executed by the Stockholder Representatives and the Buyer instructing the Escrow Agent to disburse the Agreed Amount (or, if lesser, the remaining Escrow Fund) to the Buyer), or (3) dispute that the Buyer is entitled to receive any of the Claimed Amount. In the event the Buyer seeks to enforce a claim pursuant to the Escrow Agreement and the Escrow Fund is insufficient to pay the full amount of the amount required to be paid under this Article VII, the payment from the Escrow Fund shall be supplemented by a payment by the Additional Indemnifying Stockholders to the Buyer of the remaining balance of such amount by check or wire transfer.

7.7    Dispute Resolution. During the 30-day period following the delivery of a Response that reflects a Dispute, the Buyer and the Stockholder Representatives shall attempt in good faith to resolve the Dispute. If, at the end of the 30-period, the Buyer and the Stockholder Representatives have not resolved such Dispute, the Buyer and the Stockholder Representatives shall refer the Dispute for determination to the Independent Accountants who shall act as experts, not as arbitrators, and the parties will be reasonably available and work diligently to facilitate the Independent Accountants to render a determination within a 20-day period immediately following the referral to them. A determination by the Independent Accountants with respect to any item of Dispute submitted to them will be binding on the Buyer and the Constituents. The fees and expenses of the Independent Accountants shall be borne equally by the Indemnifying Stockholders on the one hand and the Buyer on the other hand.

7.8    Set-Off; Other Rights and Limitations. The Buyer shall have the right to set off any amounts owed to it under this Agreement by the Indemnifying Stockholders and the Additional Indemnifying Stockholders against any amounts payable by it to the Indemnifying Stockholders and the Additional Indemnifying Stockholders hereunder, including, without limitation, the additional consideration payable under Section 1.6 and Section 1.7 of this Agreement. The rights of the Buyer under this Article VII shall not be limited to the Escrow Fund nor shall the Escrow Agreement be the exclusive means for the Buyer to enforce such rights. Any such payment hereunder shall not be taken into account for purposes of determining the limitations under Section 6.5 (it being understood that all of the limitations set forth in Section 6.5(a) shall apply to Indemnifying Stockholders other than the Additional Indemnifying Stockholders). Neither the Indemnifying Stockholders nor the Additional Indemnifying Stockholders have any right of contribution against the Company or the Surviving Corporation with respect to any breach by the Company of any of its representations, warranties, covenants or agreements.

## ARTICLE VIII
## TERMINATION

8.1    <u>Termination of Agreement</u>. The Parties may terminate this Agreement prior to the Closing (whether before or after Requisite Stockholder Approval), as provided below:

(a)    the Parties may terminate this Agreement by mutual written consent;

(b)    the Buyer may terminate this Agreement by giving written notice to the Company in the event the Company or any Principal Stockholder or any Additional Principal Stockholder is in breach of any representation, warranty or covenant contained in this Agreement, and such breach (i) individually or in combination with any other such breach, would cause the conditions set forth in clauses (c) or (d) of Section 5.1 not to be satisfied and (ii) is not cured within 20 days following delivery by the Buyer to the Company of written notice of such breach;

(c)    the Company may terminate this Agreement by giving written notice to the Buyer in the event the Buyer or the Transitory Subsidiary is in breach of any representation, warranty or covenant contained in this Agreement, and such breach (i) individually or in combination with any other such breach, would cause the conditions set forth in clauses (b) and (c) of Section 5.2 not to be satisfied and (ii) is not cured within 20 days following delivery by the Company to the Buyer of written notice of such breach;

(d)    the Buyer may terminate this Agreement by giving written notice to the Company if the Closing shall not have occurred on or before June 30, 2004 by reason of the failure of any condition precedent under Section 5.1 (unless the failure results primarily from a breach by the Buyer or the Transitory Subsidiary of any representation, warranty or covenant contained in this Agreement); or

(e)    the Company may terminate this Agreement by giving written notice to the Buyer if the Closing shall not have occurred on or before June 30, 2004 by reason of the failure of any condition precedent under Section 5.2 (unless the failure results primarily from a breach by the Company of any representation, warranty or covenant contained in this Agreement).

8.2    <u>Effect of Termination</u>. If any Party terminates this Agreement pursuant to Section 8.1, all obligations of the Parties hereunder shall terminate without any liability of any Party to any other Party (except for any liability of any Party for willful breaches of this Agreement). The termination of this Agreement shall not affect the operation or effect of that certain Mutual Non-Disclosure Agreement, dated September 16, 2003, between the Buyer and the Company.

## ARTICLE IX
## DEFINITIONS

For purposes of this Agreement, each of the following terms shall have the meaning set forth below.

"AAA" shall have the meaning set forth in Section 1.7(c)(iii) of this Agreement.

"Accounting Policies" shall have the meaning set forth in Exhibit F to the Agreement.

"Acquired Person" shall mean any Person engaged in a business, line of business, or with a product substantially identical to the Business that is acquired by or otherwise combined with the Surviving Corporation or Buyer or any other Affiliate of Buyer after the Closing, regardless of the form or such acquisition or combination (e.g., by stock purchase, merger, consolidation or otherwise).

"Acquisition Notice" shall have the meaning set forth in Section 1.7(e) of this Agreement.

"Additional Indemnifying Stockholders" shall have the meaning set forth in the first paragraph of this Agreement.

"Additional Indemnity" shall have the meaning set forth in Section 6.5(a) of this Agreement.

"Additional Principal Stockholders" shall have the meaning set forth in the first paragraph of this Agreement.

"Adjusted Aggregate Payment Amount" shall have the meaning set forth in Exhibit I.

"Adjusted Common Shares Outstanding" shall have the meaning set forth in Exhibit I.

"Adjusted Earnout Payment" shall mean any Earnout Payment less the Consultant Contingent Payment payable with respect to such Earnout Payment less any amounts reimbursed to the Additional Indemnifying Stockholders out of such Earnout Payment in accordance with Section 1.7(a) hereof less any amounts offset against an Earnout Payment pursuant to Sections 1.6, 1.7, 1.9(c), 6.5(c) and 7.8.

"Affiliate" shall mean any affiliate, as defined in Rule 12b-2 under the Securities Exchange Act of 1934.

"Aggregate Exercise Price" shall have the meaning set forth in Exhibit I.

"Aggregate Merger Consideration" shall mean the sum of the Common Stock Closing Payment, any Closing Payment Adjustment payable to the Constituents in accordance with Section 1.6 hereof less any amounts offset against such Closing Payments pursuant to Sections 1.6, 1.7, 1.9(c), 6.5(c) and 7.8, all of the Adjusted Earnout Payments payable to the Constituents, and any amounts released from the Escrow Fund, both previously paid and then currently payable as of the applicable Payment Date.

"Agreed Amount" shall mean part, but not all, of the Claimed Amount.

"Agreement" shall have the meaning set forth in the first paragraph of this Agreement.

"<u>Articles of Merger</u>" shall mean the articles of merger or other appropriate documents prepared and executed in accordance with Section 3-110 of the MGCL in form and substance reasonably satisfactory to the Parties and which shall include, among other things, the appropriate provisions relating to the appointment of the Stockholder Representatives consistent with Section 1.14 hereof.

"<u>Bonus Plan</u>" shall have the meaning set forth in Section 1.3(b) of this Agreement.

"<u>Bonus Pool</u>" shall have the meaning set forth in Section 1.3(b) of this Agreement.

"<u>Bundled Offering Adjustment</u>" shall mean the following: in the event that Buyer sells to a healthcare payer the Company's data scrubbing software product(s) (which include HealthClaim Expert and other modules) as part of a single, bundled offering with Buyer's electronic claims transaction service, 50% of the Incremental Service Revenue (net of any vendor or provider allowances or rebates) that Buyer recognizes from such payer for such bundled offering.

"<u>Bundled Offering Agreement</u>" shall mean the agreement between the Buyer and the payer under which Bundled Offering Service Revenue is generated.

"<u>Bundled Offering Service Revenue</u>" shall mean the product of (A) the number of claim transactions billable at the Bundled Price, multiplied by (B) the Bundled Price.

"<u>Bundled Price</u>" shall mean the per claim price charged by Buyer to the payer for the bundled offering of Buyer's electronic claims transaction service and the Company's HealthClaim Expert product.

"<u>Business</u>" shall mean the following software and processing services provided by the Company on behalf of healthcare payers as of the Effective Date: (1) the conversion of Paper Documents from paper to electronic medium via imaging, mailroom automation, and automated and manual data entry/data capture; (2) rules based pre-adjudication claim data scrubbing on Converted Paper Documents; (3) rules based manual and automated work and exceptions routing workflow related to Converted Paper Documents; and (4) online archival management and retrieval of Converted Paper Documents. For purposes of this definition, (I) "Paper Documents" shall mean the following paper documents: physician claims, hospital and institutional claims, dental claims, claim attachments, enrollments, eligibility, referrals, EOBs, COBs, EOMBs, superbills, flu rosters and repricing claims; and (II) "Converted Paper Documents" shall mean Paper Documents that are converted from paper to electronic medium via the Company's services described in clause (1) of the definition of Business. For purposes of clarification, the following shall not be included in the definition of Business: (i) the Paid Claims Communication Services of Advanced Business Fulfillment, Inc., Buyer and any of their Affiliates; (ii) the printing and related services of ExpressBill, Buyer and any of their Affiliates; (iii) the rules-based pre-adjudication claim data scrubbing of electronic transactions provided by Buyer and its Affiliates; and (iv) claims management and communication services provided by Buyer and any of its Affiliates on behalf of healthcare providers such as lock-box services, electronic remittance advice/electronic funds transfer services, and other claims reimbursement services.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in the City of New York, New York are required or authorized by law to be closed.

"Buyer" shall have the meaning set forth in the first paragraph of this Agreement.

"Buyer Certificate" shall mean a certificate to the effect that each of the conditions specified in clauses (a) through (c) (insofar as clause (c) relates to Legal Proceedings involving the Buyer or the Transitory Subsidiary) of Section 5.2 of this Agreement is satisfied in all respects.

"Cash" shall mean all cash and cash equivalents of the Company as of the Closing (including liquid debt instruments held as assets of the Company with maturities of three months or less), calculated in accordance with GAAP and the Accounting Policies.

"CERCLA" shall mean the federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended.

"Claim Notice" shall mean written notification which contains (i) a description of the Damages incurred or reasonably expected to be incurred by the Indemnified Party and the Claimed Amount of such Damages, to the extent then known, (ii) a statement that the Indemnified Party is entitled to indemnification under Article VI for such Damages and a reasonable explanation of the basis therefor, and (iii) a demand for payment in the amount of such Damages.

"Claim Service Revenue" shall mean the product of (A) the sum of (i) the number of claim transactions submitted electronically to the payer and (ii) the number of claim transactions not submitted electronically to the payer because the Company's HealthClaim Expert product caused those claims to be rejected, multiplied by (B) the average per claim fee paid to Buyer by the payer during the ninety (90) days immediately preceding the effective date of the new Bundled Offering Agreement.

"Claimed Amount" shall mean the amount of any Damages incurred or reasonably expected to be incurred by the Indemnified Party.

"Closing" shall mean the closing of the transactions contemplated by this Agreement.

"Closing Date" shall mean the date on which the Closing occurs.

"Closing Date Working Capital" shall mean, as of the Closing Date and giving effect to the consummation of the Merger, the excess of the Company's total current assets (including accounts receivable, prepaid expenses and Net Cash), minus total current liabilities (excluding the current portion of any Debt and seventy percent (70%) of (i) any unearned income related to maintenance revenue and (ii) any unearned business process outsourcing revenue), determined in accordance with GAAP and the Accounting Policies. For purposes of determining Closing Date Working Capital, the Company's total current assets shall be increased by the Costa Rican Capital Expenditures.

"Closing Payment" shall mean Forty Million Dollars ($40,000,000) (I) less or increased by Estimated Net Debt Adjustment, if any, (II) less or increased by the Estimated Working Capital Adjustment, if any, (III) less the Escrow Amount, and (IV) less the Bonus Pool.

"Closing Payment Adjustment" shall have the meaning set forth in Section 1.6(a) of this Agreement.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Common Shares" shall mean the shares of common stock, $.01 par value per share, of the Company.

"Common Stock Closing Payment" shall mean the Closing Payment less the Preferred Stock Aggregate Preference.

"Company" shall have the meaning set forth in the first paragraph of this Agreement.

"Company Certificate" shall mean a certificate to the effect that each of the conditions specified in clauses (a) through (e), (h) and (j) through (o) (insofar as clause (e) relates to Legal Proceedings involving the Company or the Subsidiary) of Section 5.1 of this Agreement is satisfied in all respects.

"Company Closing Expenses" shall mean the expenses incurred by the Company in connection with the consummation of the transactions contemplated hereby, including, without limitation, transaction-related expenses of counsel and accountants (but not including regular audit fees), printing, filing, investment banking and financial advisory fees and commissions, to the extent not previously paid by the Constituents, and excluding (a) the Consultant Contingent Payments, and (b) Taxes payable pursuant to Section 7.2(b).

"Company Intellectual Property" shall mean the Intellectual Property owned or used by or licensed to the Company or the Subsidiary and covering, incorporated in, underlying or used in connection with the Customer Deliverables or the Internal Systems.

"Company Material Adverse Effect" shall mean any material adverse change, event, circumstance or development with respect to, or material adverse effect on, (i) the business, assets, liabilities, capitalization, prospects, condition (financial or other), or results of operations of the Company, or (ii) the ability of the Buyer to operate the business of the Company in the manner in which it is conducted at the time of the Closing or contemplated to be conducted in the future. For the avoidance of doubt, the parties agree that the terms "material", "materially" or "materiality" as used in this Agreement with an initial lower case "m" shall have their respective customary and ordinary meanings, without regard to the meaning ascribed to Company Material Adverse Effect. "Company Material Adverse Effect" shall not include any adverse conditions, occurring after the date hereof, affecting the U.S. or world economies as a whole, that do not disproportionately affect the Company.

"Company Plan" shall mean any Employee Benefit Plan maintained, or contributed to, by the Company, the Subsidiary or any ERISA Affiliate.

"Company Shares" shall mean the Common Shares and the Preferred Shares together.

"Company Stock Plan" shall mean any stock option plan or other stock or equity-related plan of the Company.

"Company Stockholders" shall mean the stockholders of record of the Company immediately prior to the Effective Time.

"Competitive Business" shall have the meaning set forth in Section 4.10(a) of this Agreement.

"Constituents" shall mean each of the Company Stockholders holding Common Shares (including those holders of Options and Warrants who exercised their Options and Warrants or holders of Preferred Shares who converted their Preferred Shares immediately prior to Closing) and those holders whose Options and Warrants are converted or exchanged at the Effective Time in accordance with Section 1.3(b)(ii) hereof.

"Consultant" shall mean C. W. England & Company, LLC.

"Consultant Contingent Payments" means payments to the Consultant which are payable to the Consultant after the Closing and are contingent upon the occurrence of future payments of Earnout Payments as set forth in Section 1.7(a) of this Agreement.

"Costa Rican Capital Expenditures" shall mean the aggregate amount of capital expenditures, that are incurred prior to the Closing, and made in connection with operation of the Subsidiary, not to exceed a maximum of $150,000.

"Customer Deliverables" shall mean (a) the products (including Software) that the Company or the Subsidiary (i) currently creates, implements, distributes, markets, sells or licenses, or (ii) has created, implemented, distributed, marketed, sold or licensed within the previous five years, or (iii) currently plans to create, implement, distribute, market, sell, support or license in the future and (b) the services that the Company or the Subsidiary (i) currently provides, or (ii) has provided within the previous five years, or (iii) currently plans to provide in the future.

"Damages" shall mean any and all debts, obligations and other liabilities (whether absolute, accrued, contingent, fixed or otherwise, or whether known or unknown, or due or to become due or otherwise), diminution in value, monetary damages, fines, fees, penalties, interest obligations, deficiencies, losses and expenses (including amounts paid in settlement, interest, court costs, costs of investigators, fees and expenses of attorneys, accountants, financial advisors and other experts, and other expenses of litigation).

"Debt" shall mean the sum of (A) all obligations of the Company for borrowed money, or with respect to deposits or advances of any kind to the Company, (B) all obligations of the Company evidenced by bonds, debentures, notes, preferred stock or similar instruments, (C) all obligations of the Company upon which interest charges are customarily paid, (D) all obligations of the Company under conditional sale or other title retention agreements relating to property purchased by the Company, (E) all obligations of the Company issued or assumed as the deferred

EFiled: May 9 2005 5:14PM EDT
Filing ID 5778731

purchase price of property or services (excluding obligations of the Company or creditors for materials, inventory, services and supplies incurred in the Ordinary Course of Business), (F) capitalized lease obligations of the Company in excess of $250,000, (G) all obligations of others secured by any lien on property or assets owned or acquired by the Company, whether or not the obligations secured thereby have been assumed, (H) all obligations of the Company under interest rate or currency hedging transactions (valued at the termination value thereof), (I) all letters of credit issued for the account of the Company, (J) all guarantees and arrangements having the economic effect of a guarantee by the Company of any indebtedness of any other person, and (K) the Company Closing Expenses. For the purposes of clarification, Debt includes any negative cash and cash overdraft and all accrued but unpaid interest on any of the obligations set forth herein, but does not include accounts payable to the extent taken into account in calculating Closing Date Working Capital as contemplated under Section 1.6 of this Agreement. For purposes hereof, Debt shall not include the Bonus Pool.

"Disclosure Schedule" shall mean the disclosure schedule provided by the Company to the Buyer on the date hereof and accepted in writing by the Buyer.

"Dispute" shall mean the dispute resulting if the Indemnifying Party in a Response disputes its liability for all or part of the Claimed Amount.

"Dissenting Share Consideration" shall have the meaning set forth in Section 1.9(a) of this Agreement

"Dissenting Shares" shall mean Company Shares held as of the Effective Time by a Company Stockholder who has not voted such Company Shares in favor of the adoption of this Agreement and with respect to which appraisal such Company Stockholder shall be entitled to demand and perfect in accordance with Section 3-202 of the MGCL following the Effective Time.

"Earnout Cap" shall have the meaning set forth in Section 1.7(a) of this Agreement.

"Earnout Certificate" shall have the meaning set forth in Section 1.7(a) of this Agreement.

"Earnout Payment" shall have the meaning set forth in Section 1.7(a).

"Earnout Period" shall have the meaning set forth in Section 1.7(a) of this Agreement.

"EBITDA" shall have the meaning set forth in Section 1.7(b) of this Agreement.

"Effective Time" shall mean the time at which the Surviving Corporation files the Articles of Merger with the Maryland State Department of Assessments and Taxation.

"Employee Benefit Plan" shall mean any "employee pension benefit plan" (as defined in Section 3(2) of ERISA), any "employee welfare benefit plan" (as defined in Section 3(1) of ERISA), and any other written or oral plan, agreement or arrangement involving direct or indirect compensation, including insurance coverage, severance benefits, disability benefits,

deferred compensation, bonuses, stock options, stock purchase, phantom stock, stock appreciation or other forms of incentive compensation or post-retirement compensation.

"Environmental Law" shall mean any federal, state or local law, statute, rule, order, directive, judgment, Permit or regulation or the common law relating to the environment, occupational health and safety, or exposure of persons or property to Materials of Environmental Concern, including any statute, regulation, administrative decision or order pertaining to: (i) the presence of or the treatment, storage, disposal, generation, transportation, handling, distribution, manufacture, processing, use, import, export, labeling, recycling, registration, investigation or remediation of Materials of Environmental Concern or documentation related to the foregoing; (ii) air, water and noise pollution; (iii) groundwater and soil contamination; (iv) the release, threatened release, or accidental release into the environment, the workplace or other areas of Materials of Environmental Concern, including emissions, discharges, injections, spills, escapes or dumping of Materials of Environmental Concern; (v) transfer of interests in or control of real property which may be contaminated; (vi) community or worker right-to-know disclosures with respect to Materials of Environmental Concern; (vii) the protection of wild life, marine life and wetlands, and endangered and threatened species; (viii) storage tanks, vessels, containers, abandoned or discarded barrels and other closed receptacles; and (ix) health and safety of employees and other persons. As used above, the term "release" shall have the meaning set forth in CERCLA.

"Environmental Permits" shall mean all permits, approvals, identification numbers, licenses and other authorizations required under or issued pursuant to any applicable Environmental Law.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" shall mean any entity which is, or at any applicable time was, a member of (1) a controlled group of corporations (as defined in Section 414(b) of the Code), (2) a group of trades or businesses under common control (as defined in Section 414(c) of the Code), or (3) an affiliated service group (as defined under Section 414(m) of the Code or the regulations under Section 414(o) of the Code), any of which includes or included the Company or the Subsidiary.

"Escrow Agreement" shall mean an escrow agreement in substantially the form attached hereto as Exhibit G.

"Escrow Agent" shall mean the escrow agent under the Escrow Agreement, which shall initially be the Wilmington Trust Company, a Delaware banking corporation.

"Escrow Amount" shall mean $4,000,000.

"Escrow Fund" shall mean the fund established pursuant to the Escrow Agreement, including the amount paid by the Buyer to the Escrow Agent at the Closing pursuant to Section 1.8.

"Estimated Net Debt Adjustment" shall mean the amount (which shall not be less than zero) of Net Debt estimated to exist as of the Closing Date ("Estimated Net Debt"), as set forth in a certificate delivered by the Company to the Buyer not fewer than two business days prior to the Closing. The amount of Debt will be broken down by creditor, with supporting detail, and the amount of Cash will specify cash on hand and each cash equivalent, with supporting detail.

"Estimated Working Capital Adjustment" shall mean the amount by which the Closing Date Working Capital estimated to exist as of the Closing Date ("Estimated Working Capital") is less or more than the Target Working Capital, as set forth in a certificate delivered by the Company to the Buyer not fewer than two business days prior to the Closing, with supporting detail.

"Expected Claim Notice" shall mean a notice that, as a result of a Legal Proceeding instituted by or written claim made by a third party, an Indemnified Party reasonably expects to incur Damages for which it is entitled to indemnification under Article VI.

"Final Balance Sheet" shall have the meaning set forth in Section 1.6(b) of this Agreement.

"Final Revised Cumulative Price" shall have the meaning set forth in Exhibit I.

"Financial Statements" shall mean:

(a)     the audited consolidated balance sheets and statements of income, changes in stockholders' equity and cash flows of the Company as of the end of and for each of the last three fiscal years, and

(b)     the Most Recent Balance Sheet and the unaudited consolidated statements of income, changes in stockholders' equity and cash flows for the nine-months ended as of the Most Recent Balance Sheet Date.

"First Year Baseline EBITDA" shall mean $4,034,000.

"GAAP" shall mean generally accepted accounting principles in the United States of America.

"Governmental Entity" shall mean any court, arbitrational tribunal, administrative agency or commission or other governmental or regulatory authority or agency.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Entity.

"Hart-Scott-Rodino Act" shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Hazardous Materials" shall mean (a) petroleum and petroleum products, radioactive materials, asbestos-containing materials, mold, urea formaldehyde foam insulation, transformers or other equipment that contain polychlorinated biphenyls and radon gas, (b) any other

chemicals, materials or substances defined as or included in the definition of "hazardous substances", "hazardous wastes", "hazardous materials", "extremely hazardous wastes", "restricted hazardous wastes", "toxic substances", "toxic pollutants", "contaminants" or "pollutants", or words of similar import, under any applicable Environmental Law, and (c) any other chemical, material or substance which is regulated by any Environmental Law.

"Healthcare Laws" shall have the meaning set forth in Section 2.31 of this Agreement.

"HIPAA" shall mean the Health Insurance Portability and Accountability Act of 1996, as it may be amended from time to time, and any rules or regulations promulgated pursuant thereto.

"HIPAA Commitments" shall have the meaning set forth in Section 2.23(b) of this Agreement.

"Holdover Agreements" shall have the meaning set forth in Section 2.14(c) of this Agreement.

"In-the-Money-Option" shall have the meaning set forth in Exhibit I.

"In-the-Money-Warrant" shall have the meaning set forth in Exhibit I.

"Incremental EBITDA" shall mean, for any Earnout Period, the amount by which EBITDA for such Earnout Period exceeds the Minimum EBITDA Hurdle for such Earnout Period.

"Incremental Service Revenue" shall mean the sum of (a) the amount by which the Bundled Offering Service Revenue exceeds the Claim Service Revenue, and (b) any non-transaction based license, implementation or periodic service fees attributable to the HealthClaim Expert product portion of the bundled offering.

"Indemnification Agreement" shall have the meaning set forth in Section 5.1(m) of this Agreement.

"Indemnified Party" shall mean a party entitled, or seeking to assert rights, to indemnification under Article VI.

"Indemnifying Party" shall mean the party from whom indemnification is sought by the Indemnified Party.

"Indemnifying Stockholders" shall mean collectively, the Company Stockholders holding Common Shares, holders of Options and holders of Warrants receiving any portion of Aggregate Merger Consideration pursuant to Section 1.5(a).

"Independent Accountants" shall have the meaning set forth in Section 1.6(b)(iii) of this Agreement.

"Information Statement" shall mean that certain Information Statement dated on or about the date of this Agreement furnished by the Company to the Company Stockholders in connection with the special meeting of such Company Stockholders.

"Initial Cumulative Price" shall have the meaning set forth in Exhibit I.

"Intellectual Property" shall mean all:

(a)     patents, patent applications, patent disclosures and all related continuation, continuation-in-part, divisional, reissue, reexamination, utility model, certificate of invention and design patents, patent applications, registrations and applications for registrations;

(b)     trademarks, service marks, trade dress, Internet domain names, logos, trade names and corporate names and registrations and applications for registration thereof;

(c)     copyrightable works, copyrights and registrations and applications for registration thereof;

(d)     mask works and registrations and applications for registration thereof;

(e)     copyright, confidential information and trade secrets embodied in computer software and documentation;

(f)     inventions, trade secrets and confidential business information, whether patentable or nonpatentable and whether or not reduced to practice, know-how, manufacturing and product processes and techniques, research and development information, financial, marketing and business data, pricing and cost information, business and marketing plans and customer and supplier lists and information;

(g)     other proprietary rights relating to any of the foregoing (including remedies against infringements thereof and rights of protection of interest therein under the laws of all jurisdictions); and

(h)     copies and tangible embodiments thereof.

"Internal Systems" shall mean the internal computer systems of the Company or the Subsidiary that are used in its and in connection with business or operations, including computer hardware systems, software applications and embedded systems.

"Knowledge" of the Company or the Subsidiary shall mean the actual knowledge of each Principal Stockholder and each of the Principal Stockholders, Ronald C. Diegelman and Susan Lawson, or information which any such individual should have known based on his primary or supervisory responsibility for the matter at issue with the Company after due inquiry. "Knowledge" of the Buyer or the Transitory Subsidiary shall mean the actual knowledge of Rob Draughon and David Amburgey, or information which any such individual should have known based on his primary or supervisory responsibility for the matter at issue with the Buyer or the Transitory Subsidiary after due inquiry.

"Law" means any federal, national, supranational, state, provincial, local or similar statute, law, ordinance, regulation, rule, code, order, requirement or rule of law (including common law).

"Lease" shall mean any lease or sublease pursuant to which the Company or the Subsidiary leases or subleases from another party any real property.

"Leased Real Property" means the real property leased by the Company or the Subsidiary as tenant, together with, to the extent leased by the Company or the Subsidiary, all buildings and other structures, facilities or improvements currently located thereon, all fixtures, systems, equipment and items of personal property of the Company or the Subsidiary attached or appurtenant thereto and all easements, licenses, rights and appurtenances relating to the foregoing.

"Legal Proceeding" shall mean any action, suit, proceeding, claim, arbitration or investigation before any Governmental Entity or before any arbitrator or mediator.

"Material Contract" shall have the meaning set forth in Section 2.14 of this Agreement.

"Materials of Environmental Concern" shall mean any: pollutants, contaminants or hazardous substances (as such terms are defined under CERCLA), pesticides (as such term is defined under the Federal Insecticide, Fungicide and Rodenticide Act), solid wastes and hazardous wastes (as such terms are defined under the Resource Conservation and Recovery Act), chemicals, other hazardous, radioactive or toxic materials, oil, petroleum and petroleum products (and fractions thereof), or any other material (or article containing such material) listed or subject to regulation under any law, statute, rule, regulation, order, Permit, or directive due to its potential, directly or indirectly, to harm the environment or the health of humans or other living beings.

"MCG" shall mean MCG Capital Corporation, a Delaware corporation.

"MCG Debt" shall mean the Debt owed to MCG by the Company, including, but not limited to, any amounts owed (including any early termination fees or penalties) under that certain Credit Facility Agreement and Term Loan Note dated June 27, 2002, as amended May 22, 2003, and the Amended and Restated Warrant Agreement.

"Merger" shall mean the merger of the Transitory Subsidiary with and into the Company in accordance with the terms of this Agreement.

"Minimum EBITDA Hurdle" means (i) with respect to the first Earnout Period (ending on March 31, 2005), 110% of the First Year Baseline EBITDA; (ii) with respect to the second Earnout Period (ending on March 31, 2006), the greater of (X) 121% of the First Year Baseline EBITDA; and (Y) EBITDA for the first Earnout Period, to the extent an Earnout Payment was made (which may be less than actual EBITDA for the first Earnout Period as a result of the Earnout Cap defined in Section 1.7(a)); and (iii) with respect to the third Earnout Period (ending on March 31, 2007), the greater of (X) 133.1% of the First Year Baseline EBITDA, (Y) EBITDA for the first Earnout Period, to the extent an Earnout Payment was made (which may be less than actual EBITDA for the first Earnout Period as a result of the Earnout Cap defined in Section

- 68 -

1.7(a)), and (Z) EBITDA for the second Earnout Period, to the extent an Earnout Payment was made (which may be less than actual EBITDA for the second Earnout Period as a result of the Earnout Cap defined in Section 1.7(a)).

"MGCL" shall have the meaning set forth in Section 1.1 of this Agreement.

"Most Recent Balance Sheet" shall mean the unaudited consolidated balance sheet of the Company as of the Most Recent Balance Sheet Date.

"Most Recent Balance Sheet Date" shall mean February 29, 2004.

"Net Cash" shall mean the amount, if any, by which the amount of Cash as of the Closing Date exceeds the amount of Debt as of the Closing Date.

"Net Debt" shall mean Debt minus any Cash as of the Closing.

"Option" shall mean each option to purchase or acquire Common Shares.

"Option and Warrant Termination Agreements" shall have the meaning set forth in Section 1.3(a)(v) of this Agreement.

"Ordinary Course of Business" shall mean the ordinary course of business consistent with past custom and practice (including with respect to frequency and amount).

"Parent" shall have the meaning set forth in the first paragraph of this Agreement.

"Parties" shall mean the Buyer, the Transitory Subsidiary, the Company and the Principal Stockholders.

"Payment Date" shall have the meaning set forth in Section 1.5 of this Agreement.

"Performance Obligations" shall have the meaning set forth in Section 2.14(d) of this Agreement.

"Permits" shall mean all permits, licenses, registrations, certificates, orders, approvals, franchises, variances and similar rights issued by or obtained from any Governmental Entity (including those issued or required under Environmental Laws and those relating to the occupancy or use of owned or leased real property).

"Person" shall mean any natural person, corporation, limited liability company, general or limited partnership, proprietorship, other business, non-profit or charitable organization, trust, union, association (whether or not incorporated in any jurisdiction), or any court, arbitration tribunal, administrative agency or commission or other governmental or regulatory authority or agency.

"Preferred Shares" shall mean the shares of preferred stock, $.01 par value per share, of the Company.

- 69 -

"Preferred Stock Aggregate Preference" shall mean (A) the Preferred Stock Per Share Preference, times (B) the number of Preferred Shares issued and outstanding immediately prior to the Effective Time.

"Preferred Stock Per Share Preference" shall mean the amount payable on each share of Redeemable Convertible Series B Preferred Stock of the Company as a result of the Merger, which shall equal $1,000.00 as set forth in Articles Supplementary to the Company's Articles of Incorporation, plus any accrued but unpaid dividends thereon.

"Principal Stockholder" and "Principal Stockholders" shall have the meaning set forth in the first paragraph of this Agreement.

"Reasonable Best Efforts" shall mean best efforts, to the extent commercially reasonable.

"Release" means disposing, discharging, injecting, spilling, leaking, leaching, dumping, emitting, escaping, emptying, seeping, placing, appearing and the like into or upon any land, building, surface, subsurface or water or air or otherwise entering into the Environment.

"Releasees" shall have the meaning set forth in Section 1.12(a) of this Agreement.

"Requisite Stockholder Approval" shall mean the adoption of this Agreement and the approval of the Merger by a two-thirds vote of all the holders of Common Shares and holders of Preferred Shares, on an as-converted to Common Shares basis, entitled to vote on this Agreement and the Merger as set forth in Section 3-105(e) of the MGCL.

"Response" shall mean a written response containing the information provided for in Section 6.3(e).

"Restricted Employee" shall mean any person, other than a Principal Stockholder, who was an employee of the Parent, the Buyer or the Company on the Closing Date.

"Revised Cumulative Price" shall have the meaning set forth in Exhibit I.

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Security Interest" shall mean any mortgage, pledge, security interest, encumbrance, charge or other lien (whether arising by contract or by operation of law), other than (i) mechanic's, materialmen's, and similar liens, (ii) liens arising under worker's compensation, unemployment insurance, social security, retirement, and similar legislation, (iii) liens for taxes not yet due and payable, and (iv) liens on goods in transit incurred pursuant to documentary letters of credit, in each case arising in the Ordinary Course of Business of the Company and not material to the Company.

"Significant Person" shall mean a Person listed on Section 2.24 of the Disclosure Schedule.