"Software" shall mean any of the software (including the documentation thereto) owned by the Company or the Subsidiary and any software included with any Customer Deliverable or the Internal Systems.

"Stockholder Representatives" shall have the meaning set forth in Section 1.14(a) of this Agreement.

"Stockholder Transmittal Letter" shall have the meaning set forth in Section 5.1(m) of this Agreement.

"Subsidiary" shall have the meaning set forth in Section 2.5 of this Agreement.

"Surviving Corporation" shall mean the Company, as the surviving corporation in the Merger.

"Target Working Capital" shall mean $1,500,000.

"Taxes" (including with correlative meaning "Tax" and "Taxable") shall mean (x) any and all taxes, and any and all other charges, fees, levies, duties, deficiencies, customs or other similar assessments or liabilities in the nature of a tax, including without limitation any income, gross receipts, ad valorem, net worth, premium, value-added, alternative or add-on minimum, excise, severance, stamp, occupation, windfall profits, real property, personal property, assets, sales, use, capital stock, capital gains, documentary, recapture, transfer, transfer gains, estimated, withholding, employment, unemployment insurance, unemployment compensation, social security, business license, business organization, environmental, workers compensation, payroll, profits, license, lease, service, service use, gains, franchise and other taxes imposed by any federal, state, local, or foreign Governmental Entity, (y) any interest, fines, penalties, assessments, or additions resulting from, attributable to, or incurred in connection with any items described in this paragraph or any contest or dispute thereof, and (z) any items described in this paragraph that are attributable to another person but that the Company is liable to pay by law, by contract, or otherwise.

"Tax Returns" shall mean any and all reports, returns, declarations, statements, forms, or other information required to be supplied to a Governmental Entity or to any individual or entity in connection with Taxes and any associated schedules, attachments, work papers or other information provided in connection with such items, including any amendments, thereof.

"Third Party Action" shall mean any suit or proceeding by a person or entity other than a Party for which indemnification may be sought by a Party under Article VI.

"Trading Partners" shall have the meaning set forth in Section 2.31(c).

"Transitory Subsidiary" shall have the meaning set forth in the first paragraph of this Agreement.

"Unpaid Earnout Payment" shall have the meaning set forth in Section 1.7(c) of this Agreement.

"Warrant" shall mean each warrant or other contractual right to purchase or acquire Company Shares, provided that Options and Preferred Shares shall not be considered Warrants.

## ARTICLE X
## MISCELLANEOUS

10.1    Press Releases and Announcements.   The Parties have agreed to the form of press release to be issued promptly after the execution and delivery of this Agreement. The Principal Stockholders and the Additional Principal Stockholders (and, prior to the Closing, the Company) agree that they shall not issue any other press release or public announcement or make any statement to third parties relating to the subject matter of this Agreement (including disclosure of any terms of this Agreement) without the prior written approval of the Buyer.

10.2    No Third Party Beneficiaries.  This Agreement shall not confer any rights or remedies upon any person other than the Parties, the Constituents and their respective successors and permitted assigns.

10.3    Entire Agreement.  This Agreement (including the documents referred to herein) constitutes the entire agreement among the Parties and supersedes any prior understandings, agreements or representations by or among the Parties, written or oral, with respect to the subject matter hereof.

10.4    Succession and Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties named herein, the Constituents and their respective successors and permitted assigns. No Party may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of the other Parties (provided that only one of the Stockholder Representatives shall need to so approve); provided that the Transitory Subsidiary may assign its rights, interests and obligations hereunder to an Affiliate of the Buyer.

10.5    Counterparts and Facsimile Signature.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement may be executed by facsimile signature.

10.6    Headings.  The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

10.7    Notices.  All notices, requests, demands, claims, and other communications hereunder shall be in writing. Any notice, request, demand, claim or other communication hereunder shall be deemed duly delivered four business days after it is sent by registered or certified mail, return receipt requested, postage prepaid, or one business day after it is sent for next business day delivery via a reputable nationwide overnight courier service, in each case to the intended recipient as set forth below:

<u>If to the Company</u>:

dakota imaging, inc.
7130 Minstrel Way
Suite 130
Columbia, MD 21045
Telecopy: (410) 381-3114
Telephone: (410) 381-3113

<u>Copy to</u>:

Whiteford, Taylor & Preston L.L.P.
Seven Saint Paul Street, Suite 1500
Baltimore, MD 21202
Attn: Eva H. Hill, Esquire
Telecopy: (410) 347-9414
Telephone: (410) 347-8700

<u>If to the Principal Stockholders</u>:

Sandeep Goel
7700 NE 8th Way
Boca Raton, FL 33487
Telecopy: (561) 989-8858
Telephone: (561) 989-8858

<u>If to the Buyer or the Transitory Subsidiary</u>:

Envoy Corporation
c/o WebMD Corporation
River Drive Center 2
669 River Drive
Elmwood Park, NJ 07407
Attn: General Counsel
Telecopy: (201) 703-3443

<u>Copy to</u>:

WebMD Corporation
River Drive Center 2
669 River Drive
Elmwood Park, NJ 07407
Attn: Chief Financial Officer
Telecopy: (201) 398-2615

Hale and Dorr LLP
60 State Street
Boston, MA 02109
Attn: Jeffrey A. Stein, Esq.
Telecopy: (617) 526-5000
Telephone: (617) 526-6000

Any Party may give any notice, request, demand, claim or other communication hereunder using any other means (including personal delivery, expedited courier, messenger service, telecopy or ordinary mail) other than electronic mail, but no such notice, request, demand, claim or other communication shall be deemed to have been duly given unless and until it actually is received by the party for whom it is intended. Any Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties notice in the manner herein set forth.

10.8    Governing Law; Consent to Jurisdiction and Venue.

(a)    This Agreement shall be governed by and construed in accordance with the MGCL as to matters within the scope thereof, and as to all other matters (including the validity and applicability of the arbitration provisions of this Agreement, the enforcement of any arbitral award made hereunder and any other questions of arbitration law or procedure arising hereunder) shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of laws of any jurisdictions other than those of the State of New York.

(b)    Subject to Section 1.7(c), which the Parties intend to be the sole and exclusive remedy with respect to disputes concerning Earnout Payments, all actions and proceedings arising out of or relating to this Agreement will be heard and determined in a Delaware court or a federal court sitting in Delaware, and the Parties hereby irrevocably submit to the exclusive jurisdiction of such courts in any such action or proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such action or proceeding. The Parties hereby consent to service of process by mail (in accordance with Section 10.7) or any other manner permitted by law.

10.9    Amendments and Waivers.  The Parties may mutually amend any provision of this Agreement at any time prior to the Closing.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by all of the Parties.  No waiver of any right or remedy hereunder shall be valid unless the same shall be in writing and signed by the Party giving such waiver.  No waiver by any Party with respect to any default, misrepresentation or breach of warranty or covenant hereunder shall be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

10.10    Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  If the final judgment of a court of competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, the Parties agree that the court making the determination of invalidity or unenforceability shall have the power to limit the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified.

10.11    Construction.

(a)    The language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any Party.

(b)     Any reference to any federal, state, local or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.

(c)     Any reference herein to "including" shall be interpreted as "including without limitation".

(d)     Any reference to any Article, Section or paragraph shall be deemed to refer to an Article, Section or paragraph of this Agreement, unless the context clearly indicates otherwise.

10.12  <u>Parent Guaranty</u>.  The Parent hereby unconditionally and irrevocably guarantees the full and timely payment by the Buyer of the Closing Payment under this Agreement.

**[Signature page follows]**

SIGNATURE PAGE TO AGREEMENT AND PLAN OF MERGER

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

WEBMD CORPORATION

By:_____
Name:_____
Title:_____

ENVOY CORPORATION

By:_____
Name:_____
Title:_____

RAVEN MERGER SUB, INC.

By:_____
Name:_____
Title:_____

DAKOTA IMAGING, INC.

By:_____
Name:_____
Title:  President

_____
Sandeep Goel

_____
Pradeep Goel

_____
Carol Gupta

THE EAC INVESTMENT LIMITED
PARTNERSHIP

By:  EAC Investment, Inc., its general partner

By:_____
    Name: Elizabeth Ann Coulter Morgenthau
    Title:  President

EFiled:  May  9 2005  5:14PM EDT
Filing ID 5778731

**EXHIBIT A**

## Form of Opinion of Counsel to the Company and the Stockholders

1.    The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Maryland. The Company is duly qualified to transact business and in good standing in each of the States of Georgia, Texas, Arizona, Arkansas, California, Colorado, Connecticut, New Jersey, North Dakota, and Tennessee.

2.    The Company has all requisite corporate power and authority to conduct the business in which, to our knowledge, it is currently engaged, to execute and deliver the Agreement and the other Transaction Documents *[NOTE:  To be defined]* and to consummate the transactions contemplated thereby.  The Principal Stockholders and the Additional Principal Stockholders have the power and authority to execute and deliver the Agreement and the other Transaction Documents and to consummate the transactions and obligations contemplated thereby.

3.    The authorized capital stock of the Company consists of (i) 19,600,000 shares of common stock, $.01 par value per share, of which, as of immediately prior to the Effective Time, (A) **[9,501,460.50]** shares were issued and outstanding, (B) no shares were held in the treasury of the Company, (C) _____ shares were reserved for issuance upon conversion of outstanding shares of Series A Preferred Stock, (D) _____ shares were reserved for issuance upon conversion of outstanding shares of Redeemable Convertible Series B Preferred Stock, (E) _____ shares were reserved for issuance upon exercise of outstanding Options, and (F) _____ shares were reserved for issuance upon exercise of outstanding Warrants; and (ii) 10,000 shares of Series A Preferred Stock, $.01 par value per share, of which, as of immediately prior to the Effective Time, no shares were outstanding and no shares were held in the treasury of the Company; and (iii) 6,000 shares of Redeemable Convertible Series B Preferred Stock, $.01 par value per share, of which, as of immediately prior to the Effective Time, **[5,101]** shares were outstanding and no shares were held in the treasury of the Company.  All of the issued and outstanding shares of capital stock of the Company are duly authorized, validly issued, fully paid, nonassessable and free of all preemptive rights.  Except as set forth on the Disclosure Schedule, to our knowledge there are no outstanding or authorized options, warrants, rights, contracts, calls, puts, rights to subscribe, conversion rights or other agreements or commitments to which the Company is a party or which are binding upon the Company providing for the issuance or redemption of any of its capital stock. To our knowledge, all of the issued and outstanding shares of capital stock of the Company were issued in compliance with the registration requirements (or valid exemptions therefrom) under the Securities Act of 1933, as amended.

4.    The execution and delivery of the Agreement and the other Transaction Documents by the Company, the Principal Stockholders and the Additional Principal Stockholders, and the consummation by the Company, the Principal Stockholders and Additional Principal Stockholders of the transactions contemplated thereby have been duly and validly authorized by all necessary corporate and stockholder action on the part of the Company. The Agreement and the other Transaction Documents have been duly and validly executed and delivered by the Company, the Principal Stockholders and the Additional Principal Stockholders,

and constitute the valid and binding obligations of the Company, the Principal Stockholders and the Additional Principal Stockholders, enforceable against each of the Company, and the Principal Stockholders and the Additional Principal Stockholders in accordance with their respective terms.

5.    Except as set forth in Section 2.4 of the Disclosure Schedule, neither the execution and delivery by the Company, the Principal Stockholders, and the Additional Principal Stockholders of the Agreement or the other Transaction Documents, nor the consummation by the Company, the Principal Stockholders, and the Additional Principal Stockholders of the transactions contemplated thereby: (a) violates the provisions of any law, rule or regulation applicable to the Company or any Subsidiary; (b) violates any provision of the Articles of Incorporation or By-laws of the Company; (c) to our knowledge, conflicts with, violates or requires any notice, consent or waiver under, any contract or instrument of the Company or any Subsidiary listed in the Disclosure Schedule; (d) to our knowledge, results in the imposition of any Security Interest upon any assets of the Company or any Subsidiary; or (e) violates any judgment, decree, order or award of any Governmental Entity specifically naming the Company or any Subsidiary of which we are aware.

6.    To our knowledge, except as set forth in Section 2.18 of the Disclosure Schedule, there is no Legal Proceeding which is pending or has been threatened in writing against the Company or any Subsidiary which (a) seeks either damages or equitable relief, or (b) in any manner challenges or seeks to prevent, enjoin, alter or delay the transactions contemplated by the Agreement or the other Transaction Documents.

7.    The Company has taken all corporate action necessary on its part to cancel in accordance with the terms thereof, immediately upon the consummation of the Merger, any Company Stock Plan. The Company has either taken all corporate action necessary on its part or received Option and Warrant Termination Agreements from the holders of Options and Warrants in order to cancel, immediately upon the consummation of the Merger, the Options and Warrants listed on Exhibit A to this opinion.

8.    Upon the filing by the Surviving Corporation of the Articles of Merger with the Maryland State Department of Assessments and Taxation, the Merger will be effective in accordance with the terms of the Agreement under the Maryland General Corporation Law. By operation of the Merger, all of the terms of the Escrow Agreement and the Agreement relating to the retention, offset and payment of Aggregate Merger Consideration following the Effective Time, including, without limitation, the terms of Section 1.5, 1.6, 1.7, 1.9, Article VI and Article VII, and Section 1.14 appointing the Stockholder Representatives and granting each of them the authority provided therein, will be binding and enforceable against those Constituents who have executed and delivered Stockholder Transmittal Letters or Option and Warrant Termination Agreements, as the case may be, in accordance with their terms.

# EXHIBIT B

**Form of Employment Agreement with Sandeep Goel**

## EXHIBIT C

**Form of Employment Agreement with Pradeep Goel**

## EXHIBIT D

**Form of Stockholder Transmittal Letter**

## EXHIBIT E

### Form of Opinion of Counsel to the Buyer and Transitory Subsidiary

1. The Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. The Transitory Subsidiary is a corporation duly organized, validly existing and in good standing under the laws of the State of Maryland.

2. Each of the Buyer and the Transitory Subsidiary has all requisite corporate power and authority to execute and deliver the Agreement and (in the case of the Buyer) the Escrow Agreement and to consummate the transactions contemplated thereby.

3. The execution and delivery by the Buyer and the Transitory Subsidiary of the Agreement and (in the case of the Buyer) the Escrow Agreement and the consummation by the Buyer and the Transitory Subsidiary of the transactions contemplated thereby have been duly and validly authorized by all necessary corporate and stockholder action on the part of the Buyer and the Transitory Subsidiary, respectively. The Agreement and (in the case of the Buyer) the Escrow Agreement have been duly and validly executed and delivered by the Buyer and the Transitory Subsidiary and constitute valid and binding obligations of the Buyer and the Transitory Subsidiary, enforceable against the Buyer and the Transitory Subsidiary in accordance with their respective terms.

4. Neither the execution and delivery by the Buyer and the Transitory Subsidiary of the Agreement or (in the case of the Buyer) the Escrow Agreement, nor the consummation by the Buyer and the Transitory Subsidiary of the transactions contemplated thereby: (a) violates the provisions of any law, rule or regulation applicable to the Buyer or the Transitory Subsidiary; (b) violates any provision of (i) the Certificate of Incorporation or By-laws of the Buyer, or (ii) the Articles of Incorporation or By-laws of the Transitory Subsidiary; or (c) violates any judgment, decree, order or award of any Governmental Entity specifically naming the Buyer or any the Transitory Subsidiary of which we are aware.

5. To our knowledge, there is no Legal Proceeding which is pending or has been threatened in writing against the Buyer or the Transitory Subsidiary which in any manner challenges or seeks to prevent, enjoin, alter or delay the transactions contemplated by the Agreement or the other Transaction Documents.

**EXHIBIT F**

**Accounting Policies**

<u>Allocation of Overhead and Other Expenses</u>

The Buyer does not charge or allocate to its subsidiaries currently, and, therefore, does not anticipate charging or allocating to the Surviving Corporation, the costs of general corporate overhead such as corporate legal, accounting, human resources, finance, business development and strategic planning services, unless the costs of such services are attributable or identifiable to such subsidiaries (*e.g.*, insurance costs, outside legal and other professional fees, supplies). In this regard, the salaries, benefits and other compensation expenses for employees of the Buyer or any of its Affiliates (other than the Surviving Corporation) who work on matters involving the Surviving Corporation would not be allocated to the Surviving Corporation unless such employees spend all or substantially all of their professional time (as employees of the Buyer or any of its Affiliates (other than the Surviving Corporation)) on such Surviving Corporation matters. For example, the Parties intend that certain sales employees of Advanced Business Fulfillment, Inc. ("ABF"), an Affiliate of the Buyer, may spend all or substantially all of their professional time selling products and services of the Surviving Corporation. These employees might continue to work out of the offices of ABF in St. Louis, Missouri and work closely with ABF's EVP Sales who does not spend a significant amount of his professional time on matters involving the Surviving Corporation. In this case, the salaries, benefits and other compensation expenses of such employees would be charged and allocated to the Surviving Corporation, but the salary, benefits and compensation expenses of the EVP Sales would not be charged or allocated to the Surviving Corporation. In the event that the Buyer changes its policy with respect to corporate overhead allocation, the policies in existence as of the date of this Agreement shall apply for the purpose of calculating the Earnout Payment.

<u>Employee Benefits</u>

Certain benefit costs, including, but not limited to, medical and dental insurance benefits, will be determined by Buyer on a per month, per FTE basis and charged to the Surviving Corporation. The manner in which Buyer determines the amount allocated to Surviving Corporation for such benefit costs (and the frequency of such determination) will not be less favorable to the Surviving Corporation than the manner (and timing) in which buyer determines the amount to allocate or charge such benefit costs to other subsidiaries of Buyer; provided, however, that any retroactive adjustments that may be applied to amounts allocated or charged to other subsidiaries of Buyer for periods prior to the Closing Date will not also be applied to Surviving Corporation.

<u>Property, Equipment and Leasehold Improvements</u>

The Surviving Corporation will utilize a $1,500 threshold (applied on an individual item basis) for capitalization purposes for all property, equipment, and leasehold improvements. Repair and maintenance charges which do not increase the useful lives of the assets will be charged to expense as incurred.

### Bundled Offering Agreements

Salary, bonuses and related employment expenses for any personnel of Buyer and/or its Affiliates (other than the Surviving Corporation) incurred in selling products and/or services covered by the Bundled Offering Agreements shall not be included among the selling expenses of the Surviving Corporation.

### S2 Side Letter

For purposes of calculating EBITDA, the Surviving Corporation shall be credited with the amounts payable by the Buyer pursuant to the letter agreement dated April 4, 2004 between Envoy Corporation and the Company.

## EXHIBIT G

**Form of Escrow Agreement**

**EXHIBIT H-1**

**Form of Option Termination Agreement**

**EXHIBIT H-2**

**Form of Warrant Termination Agreement**

## EXHIBIT I

### Calculation of Distribution to Constituents

#### Definitions

"Adjusted Aggregate Payment Amount" shall mean the sum of the Aggregate Merger Consideration, which has accumulated through and including the applicable Payment Date, plus the Aggregate Exercise Price for In-the-Money-Options and/or In-the-Money-Warrants at the applicable Payment Date.

"Adjusted Common Shares Outstanding" shall mean the sum of the Common Shares outstanding as of the Effective Time plus the number of Common Shares for which each In-the-Money-Option or In-the-Money-Warrant would have been entitled had such In-the-Money-Option or In-the-Money-Warrant been exercised immediately prior to the Effective Time.

"Aggregate Exercise Price" shall mean the product of (x) the exercise price for each In-the-Money-Option or In-the-Money-Warrant multiplied by (y) the number of Common Shares for which such In-the-Money-Option or In-the-Money-Warrant would have been entitled had such In-the-Money-Option or In-the-Money-Warrant been exercised immediately prior to the Effective Time.

"Initial Cumulative Price" shall mean the amount determined by dividing the Aggregate Merger Consideration, which has accumulated through and including the applicable Payment Date, by the number of Common Shares outstanding as of the Effective Time.

#### Determination of In-the-Money Options and In-the-Money Warrants

On each Payment Date,

(i)     If the Initial Cumulative Price or the Revised Cumulative Price, as the case may be, is greater than the exercise price for any Option or Warrant which was unexercised as of the Effective Time, then such Option(s) or Warrant(s), as the case may be, with the lowest exercise price will be considered to be an "In-the-Money-Option" or "In-the-Money-Warrant", as the case may be.  The Aggregate Exercise Price for such In-the-Money Option and/or In-the-Money Warrant shall be added to the Aggregate Merger Consideration to determine the Adjusted Aggregate Payment Amount.

(ii)     Then, the Initial Cumulative Price or the Revised Cumulative Price, as the case may be, will be revised by dividing the Adjusted Aggregate Payment Amount by the Adjusted Common Shares Outstanding (the "Revised Cumulative Price").

(iii)     If, as a result of the calculation in clause (ii) the Revised Cumulative Price is greater than the exercise price for any other Option or Warrant which was unexercised as of the Effective Time, then such Option(s) or Warrant(s), as the case may be, with the next lowest exercise price

will be considered to be "In-the-Money Options" or "In-the-Money-Warrants", as the case may be, and the steps of clauses (i) and (ii) shall be repeated as to it or them.

The operations in clauses (i), (ii) and (iii) will be repeated until no unexercised Option or Warrant, as the case may be, has an exercise price of less than the Revised Cumulative Price. After such operations are complete, the Revised Cumulative Price then in effect shall be referred to as the "Final Revised Cumulative Price".

## Example

For illustrative purposes only, the following is an example of a payment made in accordance with the foregoing formula:

## Assumptions

10,000,000 Common Shares outstanding as of the Effective Time

1,000,000 Options with an exercise price of $2.00

1,000,000 Warrants with an exercise price of $2.50

1,000,000 Options with an exercise price of $3.50

Aggregate Merger Consideration of $30,000,000 (which includes a Common Stock Closing Payment of $26,000,000 and the release of $4,000,000 from the Escrow Fund)

## Calculations

Based on the foregoing, the Initial Cumulative Price equals $3.00 ($30,000,000 divided by 10 million Common Shares outstanding as of the Effective Time). For purposes of this calculation, Dissenting Shares, if any, shall be treated as Common Shares outstanding as of the Effective Time.

Pursuant to clause (i) above, Options with an exercise price of $2.00 will be deemed to be In-the-Money-Options. The Aggregate Exercise Price for such In-the-Money-Options ($2,000,000) will then be added to the Aggregate Merger Consideration. As a result, the Adjusted Aggregate Payment Amount is $32,000,000. In addition, the Adjusted Common Shares Outstanding equals 11,000,000 (10,000,000 Common Shares outstanding as of the Effective plus 1,000,000 In-the-Money-Options).

Then, pursuant to clause (ii) above, the Revised Cumulative Price is determined to equal $2.9090909 ($32,000,000 divided by 11,000,000 Adjusted Common Shares Outstanding).

The resulting Revised Cumulative Price still exceeds the exercise price of certain Options. As a result, pursuant to clause (iii) above, the steps in clauses (i) and (ii) are repeated.

Taking into account the Revised Cumulative Price, the next lowest priced Options or Warrants will be deemed to be In-the-Money-Options or In-the-Money-Warrants. In this example, such

Warrants have an exercise price of $2.50. The Aggregate Exercise Price for such In-the-Money-Warrants ($2,500,000) will then be added to the Adjusted Aggregate Payment Amount. As a result, the Adjusted Aggregate Payment Amount now becomes $34,500,000. In addition, the Adjusted Common Shares Outstanding now equals 12,000,000 (11,000,000 Adjusted Common Shares Outstanding plus 1,000,000 additional In-the-Money-Warrants).

Then, pursuant to clause (ii) above, the Revised Cumulative Price is determined to equal $2.875 ($34,500,000 divided by 12,000,000 Adjusted Common Shares Outstanding).

The resulting Revised Cumulative Price no longer exceeds the exercise price of outstanding Options or Warrants. Therefore, $2.875 becomes the Final Revised Cumulative Price for this Payment Date. Accordingly, the holders of Options with an exercise price of $3.50 will not receive any payment at this Payment Date.

In this example, the aggregate amount of payments to the holders of Common Shares as of the Effective Time, In-the-Money-Options and In-the-Money-Warrants immediately after this Payment Date will be as follows:

(i)     $2.875 for each Common Share outstanding as of the Effective Time (10,000,000) for an aggregate payment of $28,750,000;

(ii)    $0.875 ($2.875 less the exercise price of $2.00) for each In-the-Money-Option with an exercise price of $2.00 (1,000,000) for an aggregate payment of $875,000; and

(iii)   $0.375 ($2.875 less the exercise price of $2.50) for each In-the-Money-Warrant with an exercise price of $2.50 (1,000,000) for an aggregate payment of $375,000.

The sum of clauses (i), (ii) and (iii) total $30,000,000, which is the aggregate amount distributable at the Payment Date in this example.

The amounts set forth in clauses (i), (ii) and (iii) above shall be reduced by the portion of the Aggregate Merger Consideration paid to such holders on previous Payment Dates.

**EXHIBIT J**

**Calculation of Assumed Distribution to Constituents**

## EXHIBIT K

### Example of Bundled Offering Adjustment

1.   Example of Calculation of Bundled Offering Adjustment:
   a. Assumptions:
      i.   1,000,000 claims for the payer are submitted to Buyer and Buyer pays no allowances or rebates to receive such claims.
      ii.  30,000 claims are rejected because of Buyer's clearinghouse edits.
      iii. 120,000 claims are rejected because of the Company's HealthClaim Expert product.
      iv.  850,000 claims are submitted to the payer and billable at the Bundled Price.
      v.   $0.40 = Bundled Price
      vi.  $0.30 = average per claim fee paid to Buyer by the payer during the ninety days immediately preceding the date Buyer and the payer entered into the new bundled offering agreement.
      vii. Under this arrangement, the payer is charged a $1,000 implementation fee for the HealthClaim Expert product in addition to the $500 annual service fee for Buyer's electronic claims transaction service.

   b. Calculation:
      i.   Claim Service Revenue = $291,000, which is the product of (A) the sum of 850,000 claims submitted to the payer and 120,000 claims rejected by the Company's HealthClaim Expert, multiplied by (B) $0.30.
      ii.  Bundled Offering Service Revenue = $340,000, which is the product of (A) 850,000 claims, multiplied by (B) $0.40.
      iii. Incremental Service Revenue is $50,000, which is the sum of (A) $49,000 (or $340,000 minus $291,000) and (B) the $1,000 implementation fee.
      iv.  Bundled Offering Adjustment = $25,000, or 50% of the Incremental Service Revenue.

**EXHIBIT L**

**Form of Exemption Certificate**

EFiled: May 9 2005 5:14PM EDT
Filing ID 5778731

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Defendants' Answer and Counterclaim, along with

related exhibits and this certificate of service, was served on May 9, 2005 by LEXIS NEXIS File

and Serve on the following plaintiff's counsel of record:

> Jesse A. Finkelstein
> Michael R. Robinson
> RICHARDS, LAYTON & FINGER, P.A.
> One Rodney Square
> 920 North King Street
> Wilmington, Delaware  19801

Michael P. Stafford, Esquire (No. 4461)

19

WP3:1110523 1                                                    64142 1001