UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DAKOTA IMAGING, INC., | ) |
|                 Plaintiff, | ) Civil Action No. 1:05-CV-296 (SLR) |
| v. | ) JURY TRIAL DEMANDED |
| SANDEEP GOEL and PRADEEP GOEL, | ) |
|                 Defendants/Counterclaim-Plaintiffs, | ) |
| v. | ) |
| DAKOTA IMAGING, INC., ENVOY CORPORATION, and WEB MD CORPORATION, | ) |
|                 Counterclaim-Defendants | ) |

**MEMORANDUM IN SUPPORT OF MOTION BY ENVOY CORPORATION AND WEBMD CORPORATION TO DISMISS COUNTERCLAIM**

## INTRODUCTION

Counterclaim Defendants Envoy Corporation ("Envoy") and WebMD Corporation ("WebMD") hereby move to dismiss the Counterclaim of Defendants/Counterclaim Plaintiffs Sandeep Goel ("Sandeep") and Pradeep Goel ("Pradeep") (collectively, the "Goels"). To the extent the Counterclaim alleges breaches of Sandeep's and Pradeep's employment agreements with Plaintiff/Counterclaim Defendant Dakota Imaging Inc. ("Dakota"), the Counterclaim should be dismissed because Envoy and WebMD are not parties to, and have no liability under, those agreements. To the extent the Counterclaim alleges interference with Sandeep's and Pradeep's opportunities for an "earnout" pursuant to the merger agreement by which Envoy acquired

Dakota, the Counterclaim should be dismissed because, among other things, that agreement requires disputes with respect to any earnout to be determined by binding arbitration rather than litigation. In short, since the Counterclaim seeks relief only with respect to the employment agreements and the earnout, the Counterclaim should be dismissed in its entirety as to Envoy and WebMD.

## **STATEMENT OF FACTS**[1]

On April 5, 2004, the Goels and two other Dakota shareholders, Carol Gupta and the EAC Investment Limited Partnership, along with Dakota, executed an Agreement and Plan of Merger ("Merger Agreement") with Envoy and WebMD.[2] [Counterclaim ¶11, Exhibit 2] Under the terms of the Merger Agreement, Envoy purchased Dakota for $40,000,000, with certain adjustments, plus up to an additional potential payment of $25,000,000 (the "Earnout") based on the achievement of increases in Dakota's pre-merger earnings over a three-year period. [Id.] The Merger Agreement provides that all disputes with respect to the Earnout are to be resolved by an independent accounting firm and/or a single arbitrator. [Merger Agreement, §1.7] The Merger Agreement makes no provision for litigation of Earnout-related disputes, except for the potential enforcement of arbitration awards respecting the Earnout. [Id.] The Merger Agreement provides for litigation in the state or federal courts of Delaware as to all other (non-Earnout) disputes arising out of the Merger Agreement. [Id. §10.8(b)]

On the same day as the Merger Agreement was executed, Sandeep and Pradeep each signed Employment Agreements (the "Employment Agreements") with Dakota. [Complaint,

---

[1] The Statement of Facts is based on allegations in the Counterclaim and documents attached to or referenced in the Counterclaim. Federal courts are uniform in holding that exhibits attached to pleadings and documents referenced therein are properly considered on a motion to dismiss. See e.g., Lovelace v. Software Spectrum, Inc., 78 F.3d 1015, 1017-18 (5th Cir. 1996) (on motion to dismiss, courts will consider both exhibits to the complaint or documents referenced in the complaint); Steinhardt Group, Inc. v. Citicorp, 126 F.3d 144, 145 (3d Cir. 1997) (court properly considered documents attached to motion to dismiss when said documents formed the basis for the plaintiff's claims).

[2] The Merger Agreement also included a subsidiary of Envoy as a nominal party.

Exhibits A and B] The Employment Agreements afforded Dakota the right to terminate Sandeep or Pradeep for cause during the Earnout period [Employment Agreements § 4 1] Specifically, each Employment Agreement provided Dakota (also identified therein as the "Company"), multiple "with cause" grounds for terminating the Goels, including:

i    Engagement in an intentional act or intentional failure to act which was performed in bad faith and which is injurious to, or contrary to, the best interest of Dakota, monetarily or otherwise;

ii    Material breach of a policy of the Dakota or any of its Affiliates, which breach is not remedied (if susceptible to remedy) following written notice by the Company detailing the specific breach and a thirty (30) day period of time to remedy such breach;

iii    Conduct which constitutes illegal, fraudulent, dishonest, unethical or disloyal dealings with the Dakota, its clients, customers and/or vendors or a crime of moral turpitude involving the Dakota or any of its Affiliates, or which could reasonably be considered to reflect negatively upon the Company or any of its Affiliates or otherwise impair or impede its operations;

iv    Employee's failure to achieve agreed upon performance goals, or materially incompetent performance or substantial and continuing inattention to or neglect of duties and responsibilities assigned to the Goels, and which are not cured within 30 days of written notice of such incompetence, inattention or neglect to the Goels by Company;

v    The Goels' willful failure to communicate with the Dakota Board or its designee regarding the business of the Company, or the willful failure to properly respond to and comply (to the best of his ability) with express and lawful directives of the Dakota Board or its designee;

vi    The existence of any conflict between the interests of the Goels and Dakota or any of its Affiliates that is not disclosed in writing by the Goels to WebMD and approved in writing by the authority of WebMD; or

vii    Any other breach or breaches of this Agreement by the Goels, or acts or omissions, which breaches, acts or omissions are, singularly or in the aggregate, material, and which are not cured within 30 days of written notice of such breach or breaches to Goels from Dakota or WebMD

Id

The Counterclaim alleges that WebMD, including its senior management, took a series of actions which seriously undermined the Goels' ability to achieve the earnings target necessary to achieve the Earnout. These actions allegedly included:

- Ordering the Dakota sales team to stop selling software to new prospects [Counterclaim ¶17];

- Calling Dakota's largest customer, Noridian Mutual Insurance Co. ("Noridian"), to disparage the service Dakota was providing to customers [Id. ¶20];

- Imposing a series of objections on the date of signing of the contract with the intent to delay or prevent the sale of Noridian [Id. ¶21];

- Requiring Dakota to provide its software to Envoy for HIPAA compliance without getting proper credit for the software [Id. ¶24];

- Disparaging Dakota in order to interfere with customer relations [Id. ¶25];

- Delaying the approval of the Noridian contract for contrived reasons [Id. ¶25]; and

- Terminating the Goels and other members of senior management [Id. ¶30].

On April 6, 2005, Dakota discharged Sandeep and Pradeep. [Counterclaim ¶27] Dakota delivered a formal termination letter to each of the Goels. [Id.] The reasons for termination stated in the above-described letters included:

- Instructing Dakota employees to copy for the Goels' own use and then destroy certain financial information in the computer hard drives of Ronald Diegelman, the former SVP and Chief Financial Officer of Dakota, and Susan Lawson, the former controller of Dakota, so that Envoy and WebMD could not obtain such information;

- Directing Dakota's purchasing personnel to violate Company policy by purchasing almost $150,000 in equipment for a potential software customer without prior execution of a customer contract and without Envoy approval, and specifically instructing Dakota purchasing personnel to withhold information regarding this purchase from Envoy and WebMD;

- Instructing a Dakota employee to copy Dakota's confidential source code for a software product soon to be released, without a valid business reason to do so;

- Repeatedly undermining the authority and/or directives of the Dakota Board of Directors and Envoy's President as to Dakota by, among other things, criticizing

Envoy's business decisions, refusing to carry out Envoy's reassignment of certain employees and failing to carry out Envoy's sales directives;

- Concealing from Envoy and the Dakota Board that backup protection for Dakota's software and BPO products had been discontinued, with the consequence that, when Dakota experienced a computer crash in March 2005, it also suffered a resulting loss of customer data which cost substantial loss of good will with customers, as well as substantial and continuing out-of-pocket and indirect costs; and

- Making misrepresentations to key customers regarding the existence of a backup security system for Dakota's software and BPO products.

[Complaint, Exhibits C and D][3]

The Counterclaim further alleges that the reasons for the Goels' terminations, as described in the termination letters they received, were false, and that Dakota knew they were false. [Counterclaim ¶¶27-28] Finally, the Counterclaim asserts that Sandeep and Pradeep did not violate any of the terms of their Employment Agreements. [Id. ¶29]

## PRIOR PROCEEDINGS

On April 6, 2005, the day Dakota terminated the Goels for cause, the Company brought suit against them in the Delaware Court of the Chancery.[4] The suit seeks monetary damages and injunctive relief against the Goals for breach of the Employment Agreements and related causes of action. On May 9, 2005, the Goels filed their Answer and Counterclaim. The Counterclaim purports to assert causes of action against Envoy and WebMD, as well as Dakota, related to breach of the Employment Agreements and interference with the Goels' ability to achieve the earnings target necessary to achieve the Earnout. [Complaint, ¶22] Dakota has answered the allegations in the Counterclaim related to the Employment Agreements and moved to dismiss those portions related to the Earnout. The grounds for Dakota's motion to dismiss are that

---

[3] Because the termination letters are referenced in the Counterclaim, Envoy and WebMD draw the Court's attention to the specific language of the letters. See footnote 1, supra, p. 2.

[4] On May 16, 2005, the Goels petitioned to remove this action to the United States District Court for the District of Delaware based upon allegations of diversity. Concurrently with the filing of this memorandum of law, Dakota, Envoy and WebMD have jointly filed a motion to remand this action to Chancery Court because the Notice of Removal fails to establish diversity of citizenship.

Dakota has no obligation under the Merger Agreement for Earnout payments and that Earnout disputes are required by the Merger Agreement to be submitted to binding arbitration [Merger Agreement, §§ 1 7 and 10 8] For the reasons stated below, Envoy and WebMD hereby move jointly to dismiss those portions of the Counterclaim relating to them in their entirety

## ARGUMENT

### I. THE GOELS' AMBIGUOUS AND CONFUSING COUNTERCLAIM FAIL TO STATE ANY CLAIM AGAINST ENVOY OR WEBMD FOR WHICH RELIEF CAN BE GRANTED.

The Counterclaim is exceedingly confusing as to which causes of action the Goels are asserting against which defendant. In its introductory clause, the Goels refer to Dakota, WebMD and Envoy collectively as "Dakota " [Counterclaim ¶6] However, the numbered paragraphs of the Counterclaim often refer to "Dakota" in a manner that could only mean Dakota itself [See e.g., Counterclaim ¶¶26-29] Furthermore, in paragraphs 41, 49 and 53, the Counterclaim refers separately to Dakota, Envoy and WebMD Then, the final paragraph of the Counterclaim seeks judgment in the Goels' favor against "Dakota " The Goels also are vague as to which defendants are the intended targets of the specific counts of the Counterclaim No specific defendant is identified in the headings of any of the three counts and it is not clear whether the vague and ambiguous terminology throughout the Counterclaim is intentional

As a result, the Goels have made it necessary for the Court to navigate the Counterclaim's confusing nomenclature and language as to the various counterclaim defendants in addressing this motion to dismiss Nevertheless, once the Court does so, it will become apparent, as set forth below, that the April 5, 2004 agreements among the parties require dismissal of all claims against Envoy and WebMD

RLF1-2884439-1

## II. COUNT I RELATED TO THE EMPLOYMENT AGREEMENTS SHOULD BE DISMISSED AS TO WEBMD AND ENVOY BECAUSE THEY ARE NOT PARTIES TO THE EMPLOYMENT AGREEMENTS.

### A. Of the Three Defendants, Only Dakota is a Signatory to the Employment Agreements.

Although not entirely clear, the Goels appear to have alleged Employment Agreement-related claims against not only Dakota – which signed the Employment Agreements with the Goels and later terminated them for cause – but also against WebMD and Envoy. Any such claims against WebMD and Envoy should be dismissed because they were not parties to the Employment Agreements and did not terminate them.

It is elemental to the notion of contract law that a person or entity cannot be liable pursuant to an agreement to which it is not a party. Crane Ice Cream Co. v. Terminal Freezing & Heating Co., 128 A. 280, 281 (Md. 1925).[5] Absent a showing that a non-party expressed an "unequivocally inten[t]" to be bound by the terms of the contract in question, no liability under the contract flows to the non-party, regardless of any benefit received thereof, and he or she is properly dismissed from any action or suit on said contract. See e.g., Residential Warranty Corp. v. Bancroft Homes Greenspring Valley, Inc., 728 A.2d 783, 792, 794-95 (Md. App. 1999) (granting summary judgment in favor of contractor in dispute arising from a series of agreements between a developer and condominium owners, as the contractor was not a signatory to said agreement – even though the contractor allegedly "reaped the benefits" of said agreements).

Count I of the Counterclaim is entitled "Breach of the Employment Agreements" and alleges that Dakota summarily terminated the Goels based on false allegations. [Counterclaim ¶38] To the extent "Dakota" is intended, as the opening paragraph of the Counterclaim suggests,

---

[5] The Employment Agreements are "construed in accordance with and governed for all purposes by the laws and public policy [] of the State of Maryland." [Employment Agreements, § 7.6]

to refer to and include all three defendants in Count I, Envoy and WebMD should be dismissed because they were not parties to the Employment Agreements

While Envoy and WebMD are parties to the Merger Agreement and the Merger Agreement in turn references the Employment Agreements, Dakota is the only corporate party to the Employment Agreements. Simultaneous with the motion to dismiss by Envoy and WebMD, Dakota has answered the allegations as to Count I of the Counterclaim. Dakota acknowledges that it both executed and terminated the Employment Agreements [Dakota's Answer ("Dak. Ans."), ¶¶ 7, 27], and Dakota intends to defend Count I on the grounds that it properly discharged Sandeep and Pradeep for cause based on their misconduct. [Dak. Ans. ¶ 53, Fifth Affirmative Defense]

As stated above, the Counterclaim is unclear as to whether it intends to sweep Envoy and WebMD into Count I. The facts alleged in the Counterclaim neither convert WebMD and Envoy into parties to, nor entities liable pursuant to, the Employment Agreements. There is no allegation that the Goels ever worked for Envoy or WebMD. Neither Envoy nor WebMD signed or guaranteed the Employment Agreements.[6] If, indeed, Count I can be read so as to encompass WebMD and Envoy, it must be dismissed as to them.

### B. Envoy and WebMD Are Not Responsible for Dakota's Termination of the Goels Because There Are No Allegations to Support a Piercing of their Respective Corporate Veils.

As set forth above, Envoy and WedMD have no liability pursuant to the Employment Agreements because they are neither signatories to nor guarantors of Dakota's obligations.[7] The Goels seek to blur the distinction among the corporate defendants in order to bootstrap liability

---

[6] WebMD guaranteed Envoy's obligations to make the payment to Dakota shareholders at the closing of the Merger Agreement (Merger Agreement § 10.12) but made no such promise with respect to the Employment Agreements. See pages 11-12 infra.
[7] Likewise, WebMD carries no liability under the Merger Agreements to the Goels with respect to Earnout payments. See infra, Section III.

against Envoy and WebMD where there is none. However, because the Counterclaim neither suggests nor supports the proposition that the Court should pierce the corporate veils of the three defendants, there can be no liability for breach of the Employment Agreements by any defendant other than the one actually in privity with the Goels on each contract, i.e., Dakota

In theory, Maryland courts will pierce the corporate veil and disregard the corporate entity "where it is necessary to prevent fraud or enforce a paramount equity." Bart Arconti & Sons, Inc. v. Ames-Ennis, Inc., 340 A.2d 225, 234 (Md. 1975). In practice, however, fraud is the primary, if not sole, basis upon which Maryland courts will disregard the corporate entity. See Residential Warranty Corp., 728 A.2d at 790 and n.13 (Maryland courts "simply have not found an equitable interest more important than the state's interest [in recognizing the corporate form]" and will only pierce the corporate veil in instances of fraud) (internal citations omitted). Moreover, the requisite "fraud" or "paramount equity" required to pierce the corporate veil does not relate to the issues in the underlying litigation, but relate the defendant's very use of the corporate form as a "sham" or a device designed to perpetrate the fraud or injustice. See Bart Arconti & Sons, Inc., 340 A.2d at 310; Bethlehem Steel Co. v. Raymond Concrete Pile Co., 118 A. 279, 284 (Md. 1922).

The Counterclaim neither states nor implies allegations supporting or permitting a piercing of the corporate veil, and the absence of such allegations precludes liability on the part of Envoy and WebMD in connection with the Employment Agreements.

### C. To the Extent that any Portion of Count I Seeks any Compensation related to the Earnout, Those Portions should be Dismissed Because the Merger Agreement Requires Disputes Involving the Earnout to be Arbitrated.

While Count I of the Counterclaim is entitled "Breach of Employment Agreement," it is unclear whether the Goels intend to bootstrap Count I into a recovery of alleged damages related to the Earnout. To the extent that portions of Count I seeks any Earnout related damages, those

portions should be dismissed because the Merger Agreement is the operative document in regard to any Earnout payments and, as discussed infra, Section III, such disputes must be arbitrated, not litigated.

### III. COUNT II SHOULD BE DISMISSED BECAUSE, AMONG OTHER REASONS, ENVOY AND WEBMD HAVE NO LIABILITY UNDER THE EMPLOYMENT AGREEMENTS AND THE ALLEGATIONS WITH RESPECT TO THE MERGER AGREEMENT ARE SUBJECT TO ARBITRATION.

#### A. The Portion of Count II Related to the Employment Agreements Is Defective as to Envoy and WebMD Because They Did Not Sign Those Agreements.

Count II is also unclear as to the targeted defendants. In paragraph 41, the Goels refer to both the Employment Agreements and the Merger Agreement and then allege that "those contacts provide for various rights, benefits and obligations to be performed by . Dakota Envoy and WebMD." As set forth in Section I above, however, neither Envoy nor WebMD is a party to the Employment Agreements. In paragraph 46 of Count II, the Goels allege that in violating the Employment Agreements and the Merger Agreement, "Dakota" has breached its implied covenant of good faith and fair dealing with regard to the Goels. It is not clear whether the Goals are referring in paragraph 46 to the universal "Dakota" defined as all three corporate defendants in the opening paragraph of the Counterclaim or simply the Dakota for which they worked as officers and which terminated their employment for cause.

To the extent Count II seeks to recover for an alleged breach of the duty of good faith inherent in the Employment Agreements, Envoy and WebMD should be dismissed because they

are not parties to the Employment Agreements. [See Section I, supra.] Maryland courts[8] recognize that the duty of good faith is intended to "prohibit one party to a contract from acting in such a manner as to prevent the other party from performing [its] obligations under the contract." Parker v. Columbia Bank, 604 A.2d 521, 531 (Md. App. 1992). This basic tenet that the duty of good faith runs only to the parties to a contract is the law in virtually all federal and state jurisdictions. See e.g., See Bui v. St. Paul Mercury Ins. Co., 981 F.2d 209, 210 (5th Cir. 1993) (claims service agency was not a party to the insurance contract and owed no duty of good faith to the insured); First Nat'l Bank of Louisville v. Lustig, 809 F. Supp 444, 447 (E.D. La. 1992) ("[I]t is generally held that there is no common law bad faith cause of action against one who is not a party to the contract."), Aves v. Shah, 906 P.2d 642 (Kan. 1995) (a contract must have existed for there to be a bad faith breach of contract action); Hudock v. Donegal Mut. Ins. Co., 264 A.2d 668, 672 (Pa. 1970) (no contractual duties for those not a party to the contract).

**B.   The Portion of Count II Relying on the Merger Agreement Should Be Dismissed As to Envoy and WebMD Based upon Specific Provisions in that Agreement.**

**1.   The "No Bad Faith" Clause Only Covers Earnout Payment Obligations of Envoy, Not WebMD.**

Count II appears to be based on the provision in the Merger Agreement stating that Envoy would "not take any action in bad faith in order to reduce the amount or delay the payments, if any, to the [Goels and other shareholders and option holders] pursuant [to] Subsection (a) of this Section [1.7(a)]." [Counterclaim ¶43, Merger Agreement § 1.7(d)(i)]

---

[8] The Merger Agreement states that it "shall be governed by and construed in accordance with the MGCL as to matters within the scope thereof, and as to all other matters (including the validity and applicability of the arbitration provisions of this Agreement, the enforcement of any arbitral award made hereunder and any other questions of arbitration law or procedures arising hereunder) shall be governed and construed in accordance with the internal laws of the State of New York . . . ." [Merger Agreement, 10.8(a)] (emphasis added) The Goels' explicitly base their counterclaim for breach of the implied covenant of good faith and fair dealing [Count II] on Maryland law [Counterclaim ¶42], although such a cause of action does not fall within the scope of the MGCL, which generally deals with corporate formation and governance. As such, Count II is defective and properly should be dismissed. Nevertheless, assuming *arguendo*, that Maryland law does apply to Count II, the Goels still cannot state a claim for which relief can be granted for the reasons stated herein.

- 11 -

RLF1-2884439-1

By its terms, this "no bad faith" provision applies only to Envoy, not WebMD. The Goels do not allege that WebMD is covered by the "no bad faith" provision in the Merger Agreement. Nor is WebMD even responsible to make Earnout payments pursuant to the Merger Agreement. Indeed, WebMD's sole substantive obligation relating to the Merger Agreement was to <u>guarantee</u> the payments due at closing by its subsidiary, Envoy. [Merger Agreement, § 10.12] There is no similar guarantee by WebMD of Envoy's potential obligation for Earnout payments. [<u>Id.</u> §1.7] <u>See</u> <u>Gen. Motors Acceptance Corp. v. Daniels</u>, 492 A.2d 1306, 1309 (Md. App. 1985) (guarantee of payment is "collateral to and independent of" the underlying obligation and, as such, the guarantor is not a party to the principal obligations).

Notwithstanding WebMD's clear lack of contractual responsibility for Earnout obligations (or anything else other than to guarantee the April 30, 2004 closing payments), the Goels have alleged various actions which WebMD supposedly took to prevent Earnout payments to the Goels. [<u>See</u> e.g., Counterclaim ¶¶24-26] This effort is facially deficient. The Merger Agreement absolves Envoy and its "Affiliates" from any liability "with respect to the management and operation of [Dakota], including any impact thereof or the payment, if any, to the [Goels] pursuant to [subsection 1.7(a)]." [Merger Agreement, §1.7(d)(i)] WebMD, as Envoy's parent, is considered an "Affiliate," pursuant to the Rule 12b-2 under the Securities Exchange Act of 1934 and therefore under the Merger Agreement. [Merger Agreement, p. 58, Article x] <u>See</u> <u>TSC Indus., Inc. v. Northway Inc.</u>, 426 U.S. 438, 452 n.13 (1976) (discussing definition of "Affiliate" pursuant to 17 C.F.R. 240.12(b)-2). The "no bad faith" provision immediately follows this language, but, by its explicit terms, only applies to Envoy, not WebMD.

Consequently, if the Goels intend Count II to be directed at WebMD in connection with the Merger Agreement, it should be dismissed for failure to state a claim upon which relief can be granted against WebMD.

### 2. The Merger Agreement Requires Disputes Between Envoy and the Goels Related to the Earnout to be Arbitrated.

To the extent Count II of the Counterclaim purports to assert claims against Envoy under the "no bad faith" clause, it should be dismissed because various provisions of the Merger Agreement make clear that the Goels agreed to arbitrate, not litigate, any legal disputes with Envoy related to the Earnout.

Section 1.7 of the Merger Agreement is a comprehensive three-page compendium governing the rights of the Goels and others to an Earnout based on the financial performance of Dakota during the first three years of the merger.[9] Subsections 1.7(a) and (b) describe in detail how the potential Earnout is to be computed, depending upon whether increases in earnings occur. Section 1.7(c), entitled "Dispute Resolution," contains a two-page explanation of the bifurcated arbitration procedures by which disputes related to the Earnout are to be resolved.

First, disagreements as to whether Envoy's calculation of the Earnout complies with the formulas in § 1.7 are to be set forth in writing, discussed between the parties and then submitted for a determination by the independent accounting firm, BDO Seidman, in Washington, D.C. ("Independent Accountants"). Other disputes related to the Earnout are to be submitted to arbitration in Delaware as follows:

> If . . [Envoy and the Goels] have not resolved all disagreements not resolved by the determination of the Independent Accountants with respect to whether the calculation of the Earnout Payment is in accordance with the terms of [] this Agreement, *any such remaining disagreement, regardless of the legal theory upon which*

---

[9] The three-year period actually ends just short of three years after the merger because it includes approximately one month of pre-merger financial activity.

- 13 -

RLF1-2884439-1

> *it is based, will be settled by final, binding arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 et. seq.*, in accordance with the applicable rules of the American Arbitration Association[] in effect at such time, which will be the sole and exclusive procedures for any such disagreement

Id. § 1.7(c)(iii) (emphasis added).

It is a cardinal rule of contract construction that a court should "avoid an interpretation that would leave contractual clauses meaningless." 150 Broadway N.Y. Assocs., L.P. v. Bodner, 14 A.D.3d 1, 6 (N.Y. App. Div. 2004) (internal citations omitted). Stated otherwise, courts are obligated to interpret a contract so as to give meaning to all of its terms. See id. Here, § 1.7(c)(iii) of the Merger Agreement requires a resolution of "any [Earnout] disagreements" not resolved by the Independent Accountants "regardless of the legal theory upon which it is based" to be resolved by binding arbitration.

Clearly, the language of § 1.7(c)(iii) demonstrates that parties intended final binding arbitration to encompass disputes beyond accounting principals and calculations used by the Independent Accountants, and to include causes of action sounding in contract which might affect Earnout payments, otherwise, the language "regardless of legal theory" would be essentially reduced to a nullity. Indeed, it would torture the text of § 1.7 to construe disputes over arithmetic and GAAP as disputes based upon "legal theor[ies]." Moreover, it is illogical that the parties intended the conclusions of the accounting firm BDO Seidman regarding accounting principals and revenue recognition to be second guessed by an arbitrator with no guarantee that said arbitrator would have <u>any</u> expertise in accounting.

In short, there is no reasonable interpretation of § 1.7(c) other than the parties intended Earnout disputes over accounting principals to be resolved by the Independent Accountants, and Earnout disputes based upon legal theories such as breach of the implied covenant of good faith and fair dealing [Counterclaim, Count II] to be resolved by "binding arbitration pursuant to the

Federal Arbitration Act, 9 U S C § 1 et seq., in accordance with the applicable rules of the American Arbitration Association." Id.

If § 1.7(c)(iii) were not clear enough that all Earnout-related disputes must be arbitrated, § 10.8(b) of the Merger Agreement removes any doubt. Section 10.8, states, in pertinent part:

> Subject to Section 1.7(c), *which the Parties intend to be the sole and exclusive remedy with respect to disputes concerning Earnout Payments,* all [other] actions and proceedings arising out of or relating to this Agreement will be heard and determined in a Delaware court or a federal court sitting in Delaware

(emphasis added)

The Goels should not now be permitted to bring claims in this Court that Envoy interfered with their right to achieve Earnout payments, where they have previously agreed that final binding arbitration would be the sole and exclusive remedy with respect to legal disputes concerning Earnout payments.

Moreover, the Federal Arbitration Act, referenced in § 1.7(c)(iii) of the Merger Agreement, evinces a strong legislative policy favoring the enforcement of arbitration agreements. See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 23 n.27 (1983) (the Federal Arbitration Act "requires a liberal reading of arbitration agreements"). In addition, both federal and New York state courts[10] have articulated similar, strong policy preferences for encouraging and enforcing arbitration agreements. See, e.g., BAE Sys. Aircraft Controls, Inc. v. Eclipse Aviation Corp., 224 F.R.D. 581, 585 (D. Del. 2004) (federal courts "operate under a pronounced presumption of arbitrability."); Curtis, Mallet-Prevost, Colt & Mosle, LLP v. Garza-Morales, 308 A.D.2d 261, 269 (N.Y. App. Div. 2003) (New York State's policy in favor of arbitration "overrides all but a very few other public policies."). "Any doubts

---

[10] The applicability of the arbitration clause in the Merger Agreement is governed by both the Federal Arbitration Act (Merger Agreement, § 1.7(c)(ii)) and New York state law (Merger Agreement, § 10.8(a))

concerning the scope of arbitrable issues should be resolved in favor of arbitration." <u>In re Arbitration between Ayco Co. and Walton</u>, 3 A.D.3d 635, 637 (N.Y. App. Div., 2004) (citing <u>Cone Mem'l Hosp.</u>, 460 U.S. at 24-25).

Here, the Goels' Counterclaim is, on its face, plainly within the scope of an arbitration clause. The Merger Agreement, states, in pertinent part: "[A]<u>ny</u> such disagreement [regarding the Earnout], <u>regardless of the legal theory</u> upon which it is based, will be settled by final, binding arbitration" [Merger Agreement, § 1.7(c)(iii)], and "the Parties intend [the arbitration proceeding described in Section 1.7] to be the <u>sole and exclusive remedy</u> with respect to disputes concerning Earnout Payments." [<u>Id.</u> § 10.8(b)] (emphasis added). Indeed, the parties iterated and reiterated that <u>all</u> Earnout related disputes, in whatever form and pursuant to any legal theory, are to be arbitrated. Thus, pursuant to both federal and state law, and the public policy they embody, the Counterclaim should be dismissed insofar as it purports to seek relief regarding the Earnout payments.

The Goels may not avoid the arbitration provisions by arguing now that the "no bad faith" provision somehow entitles them to obtain damages other than Earnout-related relief. The counterclaim makes clear that the Goels are asking this Court award to them the maximum amount they could conceivably achieve under the Earnout provision: the final paragraph of Count II [Counterclaim, ¶55] specifically references the three year $25,000,000 cap contained in the Earnout section of the Merger Agreement. [Merger Agreement, Section 1.7(a)]

Consequently, the Court should dismiss Count II insofar as it relates to the Earnout and compel submission of that controversy between the Goels and Envoy to the dispute resolution mechanism in § 1.7(c) of the Merger Agreement.

## IV. COUNT III SHOULD BE DISMISSED AS TO ENVOY AND WEBMD BECAUSE EARNOUT-RELATED DISPUTES ARE TO BE ARBITRATED.

Count III purports to seek recovery of the $25,000,000, or the exact amount of the potential aggregate Earnout payment pursuant to the Merger Agreement. [Merger Agreement § 1.7(a)] In sum and substance, the Goels are attempting to litigate a dispute over their alleged entitlement to Earnout payment based upon the legal theory that the Envoy and WebMD committed an anticipatory breach of the Merger Agreement. As with Counts II, Count III should be dismissed as to WebMD because under the operative document, the Merger Agreement, the Earnout obligation is the responsibility of Envoy, not WebMD. See Section III, B-2, supra.

Moreover, Count III should be dismissed as to both Envoy and WebMD because the Goels have raised a legal theory [anticipatory breach of the Merger Agreement] in order to assert their rights to an Earnout payment. As such, Count III falls squarely within the arbitration clause in the merger agreement calling for:

> any such disagreement, regardless of the legal theory upon which it is based, will be settled by final, binding arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 et. seq., in accordance with the applicable rules of the American Arbitration Association[] in effect at such time, which will be the sole and exclusive procedures for any such disagreement.

Merger Agreement § 1.7(c)(iii), discussed supra, Section III, B-2.

In sum, the Court should dismiss Count III in its entirety against Envoy and WebMD because as it relates to a dispute over the Earnout payments and compel submission of that controversy to the dispute resolution mechanism in § 1.7(c) of the Merger Agreement.

## CONCLUSION

For the reasons set forth above, the Court should dismiss the counterclaim in its entirety against both Envoy and WebMD.

                                       /s/
Jesse A. Finkelstein (DSBA 1090)
Michael R. Robinson (DSBA 4452)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
(302) 651-7700
finkelstein@rlf.com
robinson@rlf.com

*Attorneys for Counterclaim-Defendants Envoy Corporation and WebMD Corporation*

Of Counsel:

Harry T. Daniels
Richard A. Johnston
Mark A. Delaney
Cytheria D. Jernigan
WILMER CUTLER PICKERING
HALE AND DORR LLC
60 State Street
Boston, MA 02109
(617) 526-6000


Date:  June 7, 2005

- 18 -

# CERTIFICATE OF SERVICE

I hereby certify that on June 7, 2005, I electronically filed the foregoing document with the Clerk of Court using CM/ECF which will send notification of such filing(s) and Hand Delivered copies of the foregoing document to the following:

>Michael P. Stafford, Esquire
>YOUNG CONAWAY STARGATT & TAYLOR, LLP
>The Brandywine Building
>1000 West Street, 17th Floor
>P.O. Box 391
>Wilmington, DE 19879-0391

I further hereby certify that on June 7, 2005, I have mailed by Federal Express, the document(s) to the following non-registered participants:

>Ward B. Coe III, Esquire
>Kevin C. McCormick, Esquire
>WHITEFORD, TAYLOR & PRESTON
>Seven Saint Paul Street, Suite 1400
>Baltimore, MD 21202

>  /s/ Michael R. Robinson
>Michael R. Robinson (#4452)
>Richards, Layton & Finger, P.A.
>One Rodney Square
>920 N. King Street
>Wilmington, DE 19801
>(302) 651-7700
>robinson@rlf.com

RLF1-2884580-1