UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DAKOTA IMAGING, INC., | ) |
| Plaintiff, | ) Civil Action No. 1:05-CV-296 (SLR) |
| v. | ) |
| SANDEEP GOEL and PRADEEP GOEL, | ) JURY TRIAL DEMANDED |
| Defendants/Counterclaim-Plaintiffs, | ) |
| v. | ) |
| DAKOTA IMAGING, INC., ENVOY CORPORATION, and WEB MD CORPORATION, | ) |
| Counterclaim-Defendants | ) |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION BY DAKOTA IMAGING, INC. FOR PARTIAL DISMISSAL OF COUNTERCLAIM**

Plaintiff/Counterclaim Defendant Dakota Imaging Inc. ("Dakota") hereby moves to dismiss those portions of the Counterclaim related to an "earnout" provision in the merger agreement by which Envoy Corporation acquired Dakota from Sandeep Goel ("Sandeep"), Pradeep Goel ("Pradeep) (collectively, the "Goels") and other former Dakota shareholders. The earnout-related portions of the Counterclaim should be dismissed because: i) Dakota assumed no obligation to make earnout payments to the Goels in the merger agreement; and ii) the merger agreement expressly requires that disputes related to earnout payments be arbitrated rather than litigated.

RLF1-2884512-1

# STATEMENT OF FACTS[1]

On April 5, 2004, the Goels and two other Dakota shareholders, Carol Gupta and the EAC Investment Limited Partnership, along with Dakota, executed an Agreement and Plan of Merger ("Merger Agreement") with Envoy and WebMD [2] [Counterclaim ¶11, Exhibit 1] Under the terms of the Merger Agreement, Envoy purchased Dakota for $40,000,000, with certain adjustments, plus up to an additional potential $25,000,000 (the "Earnout") based on the achievement of increases in Dakota's pre-merger earnings over a three-year period [Merger Agreement § 1] The Merger Agreement provides that all disputes with respect to the Earnout are to be resolved by an independent accounting firm and/or a single arbitrator [Id] The Merger Agreement makes no provision for litigation of Earnout-related disputes, except for the potential enforcement of arbitration awards respecting the Earnout [Id] The Merger Agreement provides for litigation in the state or federal courts of Delaware as to all other (non-Earnout) disputes arising out of the Merger Agreement [Id, §10.8(b)]

On the same day as the Merger Agreement, Sandeep and Pradeep each signed Employment Agreements with Dakota [Counterclaim ¶ 7, Complaint Exhibits A and B] The Employment Agreements afforded Dakota the right to terminate Sandeep or Pradeep for cause during the Earnout period [Employment Agreements §4.1] Specifically, the Employment Agreements provided Dakota multiple "with cause" grounds, including:

> i   Engagement in an intentional act or intentional failure to act which was performed in bad faith and which is injurious to, or contrary to, the best interest of the Company, monetarily or otherwise;

---

[1] The Statement of Facts is based on allegations in the Counterclaim and documents attached to or referenced in the Counterclaim. Federal courts are uniform in holding that exhibits attached to pleadings and documents referenced therein are properly considered on a motion to dismiss See e.g., Lovelace v. Software Spectrum, Inc., 78 F.3d 1015, 1017-18 (5th Cir 1996) (on motion to dismiss, courts will consider both exhibits to the complaint or documents referenced in the complaint); Steinhardt Group, Inc. v. Citicorp, 126 F.3d 144, 145 (3d Cir. 1997) (court properly considered documents attached to motion to dismiss when said documents formed the basis for the plaintiff's claims)

[2] The Merger Agreement also included a subsidiary of Envoy as a nominal party

2

RLF1-2884512-1

    ii    Material breach of a policy of the Company or any of its Affiliates, which breach is not remedied (if susceptible to remedy) following written notice by the Company detailing the specific breach and a thirty (30) day period of time to remedy such breach;

    iii    Conduct which constitutes illegal, fraudulent, dishonest, unethical or disloyal dealings with the Company, its clients, customers and/or vendors or a crime of moral turpitude involving the Company or any of its Affiliates, or which could reasonably be considered to reflect negatively upon the company or any of its Affiliates or otherwise impair or impede its operations;

    iv    Employee's failure to achieve agreed upon performance goals, or materially incompetent performance or substantial and continuing inattention to or neglect of duties and responsibilities assigned to Employee, and which are not cured within 30 days of written notice of such incompetence, inattention or neglect to Employee by Company;

    v    Employee's willful failure to communicate with the Board or its designee regarding the business of the Company, or the willful failure to properly respond to and comply (to the best of his ability) with express and lawful directives of the Board or its designee;

    vi    The existence of any conflict between the interests of the Employee and the Company or any of its Affiliates that is not disclosed in writing by Employee to WebMD and approved in writing by the authority of WebMD; or

    vii    Any other breach or breaches of this Agreement by Employee, or acts or omissions, which breaches, acts or omissions are, singularly or n the aggregate, material, and which are not cured within 30 days of written notice of such breach or breaches to Employee from the Company or WebMD

[Id.]

According to the Counterclaim, WebMD, including its senior management, took a series of actions which seriously undermined the Goels' ability to achieve the earnings target necessary to achieve the Earnout These actions allegedly included:

- Ordering the Dakota sales team to stop selling software to new prospects [Counterclaim ¶17];

- Calling Dakota's largest customer Noridian Mutual Insurance Co. ("Noridian") to disparage the service Dakota was providing to customers [Id ¶20];

3

RLF1-2884512-1

- Imposing a series of objections on the date of signing of the contract with the intent to delay or prevent the sale of Noridian [Id. ¶21];

- Requiring Dakota to provide its software to Envoy for HIPAA compliance without getting credit for the software [Id. ¶24];

- Disparaging Dakota's order to interfere with customer relations [Id. ¶25];

- Delaying the approval of the Noridian contract for contrived reasons [Id. ¶25], and

- Terminating the Goels and other members of senior management [Id. ¶30]

On April 6, 2005 Dakota discharged Sandeep and Pradeep [Counterclaim ¶27] Dakota delivered a formal termination letter to each of the Goels [Id.] The reasons for termination stated in the above-described letters include:

- Instructing Dakota employees to copy for the Goels' own use and then destroy of certain financial information in the computer hard drives of Ronald Diegelman, the former SVP and Chief Financial Officer of Dakota, and Susan Lawson, the former controller of Dakota, so that WebMD could not obtain such information;

- Instructing a Dakota employee to copy Dakota's confidential source code for a software product soon to be released, without a valid business reason to do so;

- Directing Dakota's purchasing personnel to violate Company policy by purchasing almost $150,000 in equipment for a potential software customer without prior execution of a customer contract and without Envoy approval and specifically instructing Dakota purchasing personnel to withhold information regarding this purchase from Envoy and WebMD;

- Repeatedly undermining the authority and/or directives of the Dakota Board of Directors and Envoy's President as to Dakota by, among other things, criticizing Envoy's business decisions, refusing to carry out Envoy's reassignment of certain employees and failing to carry out Envoy's sales directives;

- Concealing from Envoy or the Board that backup protection for Dakota's software and BPO products had been discontinued, with the consequence that, when Dakota experienced a computer crash in March 2005, it also suffered a resulting loss of customer data which cost substantial loss of good will with customers, as well as substantial and continuing out-of-pocket and indirect costs; and

- Making misrepresentations to key customers regarding the existence of a backup security system for Dakota's software and BPO products

[Complaint, Exhibits C and D][3]

According to the Counterclaim, the reasons for the Goels' terminations, as described in the termination letters they received, were false, and Dakota knew they were false. [Counterclaim ¶¶27-28] According to the Counterclaim, Sandeep and Pradeep did not break any of the terms of their Employment Agreements. [Id. ¶29]

## PRIOR PROCEEDINGS

On the same day Dakota terminated the Goels for cause, the company brought suit against them in the Delaware Court of the Chancery.[4] The suit seeks monetary damages and injunctive relief against the Goels for breach of the Employment Agreements and other related causes of action. On May 9, 2005, the Goels filed an Answer and Counterclaim. The Counterclaim purports to bring claims against Envoy and WebMD as well as Dakota. Dakota has answered the Counterclaim and intends to defend allegations that it breached the Employment Agreements by demonstrating that the company properly terminated the Goels' employment for cause. In addition, Dakota is hereby moving to dismiss those portions of the counterclaim related to the Earnout. Envoy and WebMD have jointly moved to dismiss the Counterclaim in its entirety as to them.

---

[3]   Because the termination letters are referenced in the Counterclaim, Dakota draws the Court's attention to the specific language of the letters. See footnote 1, supra, p. 2.

[4]   On May 16, 2005, the Goels petitioned to remove this action to the United States District Court for the District of Delaware based upon allegations of diversity. Concurrently with the filing of this memorandum of law, Dakota, Envoy and WebMD have jointly filed a motion to remand this action to Chancery Court because the Notice of Removal fails to establish diversity of citizenship.

## ARGUMENT

### I. THE GOELS HAVE CAST THEIR COUNTERCLAIM IN AN AMBIGUOUS BUT ULTIMATELY FUTILE FASHION.

The Counterclaim is exceedingly confusing as to which causes of action the Goels are asserting against which defendant. In the introductory clause of the Counterclaim, the Goels refer to Dakota, WebMD and Envoy collectively as "Dakota." [Counterclaim ¶6] However, the numbered paragraphs of the Counterclaim often refer to "Dakota" in a manner that could only mean Dakota itself. [See e.g., Counterclaim ¶¶26-29] Furthermore, in Paragraphs 41, 49 and 53, the Counterclaim refers separately to Dakota, Envoy and WebMD. Then, the final paragraph of the Counterclaim seeks judgment in the Goels' favor against "Dakota." In the specific counts of the Counterclaim, the Goels also are vague as to which defendants are intended as targets. No specific defendants are identified in the headings of any of the three counts. It is not clear whether the Goels' choice of terminology throughout the Counterclaim is deliberate or sloppy.

For the Court to address this motion to dismiss, it is necessary to navigate the confusing nomenclature as to the various defendant-in-counterclaim. Nevertheless, once the Court does so, it will become apparent, as set forth below, that the April 5, 2004 agreements among the parties require dismissal of all claims against Dakota related to the Earnout. While Dakota is prepared to defend, on the merits, against Count I of the Counterclaim and that portion of Count II related exclusively to the Employment Agreements, Dakota should not be required to defend any remaining portions of the Counterclaim which relate to the Earnout.

6

II. **THE PORTIONS OF COUNTS I, II AND III RELATED TO THE EARNOUT PROVISION IN THE MERGER AGREEMENT SHOULD BE DISMISSED AGAINST DAKOTA BECAUSE DAKOTA IS NOT OBLIGATED TO MAKE EARNOUT PAYMENTS TO THE GOELS.**

A. **To the Extent that any Portion of Count I Seeks Compensation related to the Earnout, Those Portions should be Dismissed Because it is the Merger Agreement Which Controls the Rights and Obligations of the Parties with Regard to Earnout Payments.**

While Count I of the Counterclaim is entitled "Breach of Employment Agreement," it is unclear whether the Goels intend to bootstrap Count I into a recovery of alleged damages related to the Earnout. To the extent that portions of Count I seeks any Earnout-related damages, those portions should be dismissed because the Merger Agreement is the operative document in regard to any Earnout payments [Merger Agreement § 1.7], and there is no such obligation under the Employment Agreements. Moreover, even assuming some such obligation exists regarding Earnout payments (which it does not), it was clearly the intent of the parties that any dispute over such Earnout payments must be arbitrated pursuant to terms of the Merger Agreement. [See infra, Section III]

B. **The "No Bad Faith" Clause in Count II Only Covers Earnout Payment Obligations of Envoy, Not Dakota.**

Count II seeks to enforce a provision in the Merger Agreement that Envoy would "not take any action in bad faith in order to reduce the amount or delay the payments, if any, to the [Goels and other shareholders and option holders] pursuant [to] Subsection (a) of this Section 1.7" [Counterclaim ¶43, Merger Agreement Section ¶ 1.7(d)(i)] In paragraph 46 of Count II, the Goels allege that, in violating the Employment Agreements and the Merger Agreements, "Dakota" breached its implied covenant of good faith and fair dealing with respect to the Goels. It is not clear whether the Goels are referring to the universal "Dakota" defined as all three corporate defendants in the opening paragraphs of the Counterclaim or simply the Dakota for

7

whom they worked as officers and which terminated their employment for cause To the extent that the Goels are alleging in Count II that Dakota has liability for Earnout payments, rather than simply the Employment Agreements, such claims must be dismissed. Dakota, while a nominal party to the Merger Agreement, has no responsibility for Earnout payments under that agreement

The Goels do not allege that Dakota is covered by the "no bad faith" provision in the Merger Agreement. Nor is Dakota responsible to make Earnout payments pursuant to the Merger Agreement. Indeed, Dakota's obligations pursuant to the Merger Agreement deal principally with representations, warranties and covenants during the pre-merger phase when Dakota was aligned with the Goels as the corporations' selling shareholders [Merger Agreement, Article I, ¶ 44.]

Notwithstanding Dakota's lack of contractual responsibility for Earnout obligations, the Goels have alleged various things which Dakota supposedly did to thwart Earnout payments to the Goels. [See e.g., Counterclaim ¶¶ 24-26.] However, Envoy's "Affiliates" are expressly absolved in the Merger Agreement from any liability "with respect to the management and operation of [Dakota], including any impact thereof or the payment, if any, to the [Dakota shareholders] pursuant to [subsection 1.7(a)]." (Merger Agreement, §1.7(d)(i)) Since the merger, Dakota is considered an "Affiliate" of Envoy and is therefore insulated against Earnout related claims by the Goels[5] Consequently, if the Goels intend Count II to be directed at Dakota in connection with the Merger Agreement, it should be dismissed

---

[5] Dakota, as a wholly owned subsidiary of Envoy, is considered an "Affiliate," pursuant to Rule 12b-2 under the Securities Exchange Act of 1934 and therefore under the Merger Agreement. [Merger Agreement, p. 58, Article x] See e.g., TSC Indus., Inc. v. Northway Inc., 426 U.S. 438 (1976) (discussing 17 C.F.R. 240.12(b)-2).

8

    **C.**    **Dakota Cannot Be Liable for Anticipatory Breach in Count III as to Earnout Payments Which It Was Not Obligated to Make.**

It is not evident whether the Goels are alleging in Count III that Dakota is liable to them for anticipatory breach of the Merger Agreement. The allegations appear aimed principally at Envoy and WebMD. [See Counterclaims ¶¶52-55] However, under the omnibus definition of "Dakota" in introductory paragraph of the counterclaim, the Goels may indeed be targeting Dakota as well. If so, Count III should be dismissed against Dakota because Dakota has no responsibility for Earnout payments. [See Section II-A and B, supra.]

**III.**    **THE MERGER AGREEMENT REQUIRES THAT ALL EARNOUT-RELATED DISPUTES BE ARBITRATED RATHER THAN LITIGATED.**

Even if the Court were able to conclude that Dakota somehow could be liable for Earnout payouts to the Goels pursuant to Counts I, II and III, the dispute over the Earnout must be dismissed and referred to arbitration pursuant to the arbitration provision in the Merger Agreement.

Section 1.7 of the Merger Agreement is a comprehensive three-page compendium governing the rights of the Goels and others to an Earnout based on the financial performance of Dakota during the first three years of the merger.[6] Subsections 1.7(a) and (b) describe in detail how the potential Earnout is to be computed, based upon whether increases in earnings occur. Section 1.7(c), entitled "Dispute Resolution", contains a two-page explanation of the bifurcated arbitration procedures to be used for deciding controversies related to the Earnout.

First, disputes as to whether Envoy's calculation of the Earnout complies with the formulas in Section 1.7 are to be set forth in writing, discussed between the parties and then submitted for a determination by the independent accounting firm of BDO Seidman in

---

[6] The three-year period actually ends just short of three years after the merger because it includes approximately one month of pre-merger financial activity.

9

Washington, D.C. ("Independent Accountants"). Other types of disputes related to the Earnout are to be submitted to arbitration in Delaware as follows:

> If... [Envoy and the Goels] have not resolved all disagreements not resolved by the determination of the Independent Accountants with respect to whether the calculation of the Earnout Payment is in accordance with the terms of [] this Agreement, *any such remaining disagreement, regardless of the legal theory upon which it is based, will be settled by final, binding arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 et. seq.*, in accordance with the applicable rules of the American Arbitration Association[] in effect at such time, which will be the sole and exclusive procedures for any such disagreement.

Id. § 1.7(c)(iii) (emphasis added).

It is a cardinal rule of contract construction that a court should "avoid an interpretation that would leave contractual clauses meaningless." 150 Broadway N.Y. Associates, L.P. v. Bodner, 14 A.D.3d 1, 6 (N.Y. App. Div. 2004) (internal citations omitted). Stated otherwise, courts are obligated to interpret a contract so as to give meaning to all of its terms. See id. Here, § 1.7(c)(iii) of the Merger Agreement requires a resolution of "any [Earnout] disagreements" not resolved by the Independent Accountants "regardless of the legal theory upon which it is based" to be resolved by binding arbitration.

Clearly, the language of § 1.7(c)(iii) demonstrates that parties intended final binding arbitration to encompass disputes beyond accounting principals and calculations used by the Independent Accountants, and to include causes of action sounding in contract which might affect Earnout payments; otherwise, the language "regardless of legal theory" would be essentially reduced to a nullity. Indeed, it would torture the text of § 1.7 to construe disputes over arithmetic and GAAP as disputes based upon "legal theor[ies]." Moreover, it is illogical that the parties intended the conclusions of the accounting firm BDO Seidman regarding

10

accounting principals and revenue recognition to be second guessed by an arbitrator with no guarantee that said arbitrator would have any expertise in accounting

In short, there is no reasonable interpretation of § 1.7(c) other than the parties intended Earnout disputes over accounting principals to be resolved by the Independent Accountants, and Earnout disputes based upon legal theories such as breach of the implied covenant of good faith and fair dealing [Counterclaim, Count II] and anticipatory breach of the Merger Agreement [Counterclaim, Count III] to be resolved by "binding arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 et seq., in accordance with the applicable rules of the American Arbitration Association." Id.

If Section 1.7(c)(iii) were not clear enough that all Earnout-related disputes must be arbitrated, Section 10.8 of the Merger Agreement removes any doubt. Section 10.8(b) states, in pertinent part:

> Subject to Section 1.7(c), *which the Parties intend to be the sole and exclusive remedy with respect to disputes concerning Earnout Payments,* all [other] actions and proceedings arising out of or relating to this Agreement will be heard and determined in a Delaware court or a federal court sitting in Delaware.

(Emphasis added)

The Goels should not be permitted to assert claims here that Dakota interfered with their right to achieve an Earnout where they have agreed to arbitrate, rather than litigate, disputes concerning Earnout payments

The Federal Arbitration Act, which the parties referenced in the arbitration clause of the Earnout provision, evinces a strong legislative policy favoring arbitration agreements See Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 23 n 27 (1983) (the Federal Arbitration Act "requires a liberal reading of arbitration agreements") In addition, both federal

11

and New York state courts[7] have articulated similar, strong policy preferences for encouraging and enforcing arbitration agreements. See e.g., BAE Sys. Aircraft Controls, Inc. v. Eclipse Aviation Corp., 224 F.R.D. 581, 585 (D. Del. 2004) (federal courts operate under a "pronounced presumption of arbitrability."); Curtis, Mallet-Prevost, Colt & Mosle, LLP v. Garza-Morales, 308 A.d.2d 261, 269 (N.Y. App. Div. 2003) (New York State's policy in favor of arbitration "overrides all but a very few other public policies."). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." In re Arbitration between Ayco Co. and Walton, 3 A.D. 3d 635, 637 (N.Y. App. Div., 2004) (citing Cone Mem. Hosp., 460 U.S. at 24-25).

Counts II and III of the Goels' Counterclaim are, on their face, within the purview of the arbitration clause in the Merger Agreement. The Goels may not avoid the arbitration clause in §§ 1.7(c) and 10.8 of the Merger Agreement by simply disguising Earnout disputes as breaches of good faith and fair dealing [Count II] or anticipatory breach of the Merger Agreement [Count III]. It is evident that, despite the pretense of independent claims sounding in contract, the Goels are seeking to litigate a dispute over Earnout payments in direct contravention of § 1.7 of the Merger Agreement. This could not be more obvious, as the Goels seek to have this Court award them the maximum amount which they could conceivably achieve under the Earnout provision of the Merger Agreement, asking in Count II [Counterclaim ¶47] and Count III [Counterclaim ¶55] for the $25,000,000 Earnout cap described in §1.7 of the Merger Agreement.

Consequently, the Court should dismiss Counts I, II and III insofar as they relate to the Earnout and compel submission of the Earnout controversy between the Goels and Dakota to the dispute resolution mechanism in Section 1.7(c) of the Merger Agreement.

---

[7] The applicability of the arbitration clause in the Merger Agreement is governed by both the Federal Arbitration Act (Merger Agreement, § 1.7(c)(ii)) and New York state law (Merger Agreement, § 10.8(a).

## CONCLUSION

For the above reasons, those portions of the Counterclaim related to the Earnout in the Merger Agreement should be dismissed as to Dakota

/s/ Michael Robinson
Jesse A. Finkelstein (DSBA 1090)
Michael R. Robinson (DSBA 4452)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
(302) 651-7700
finkelstein@rlf.com
robinson@rlf.com

*Attorneys for Plaintiff and Counterclaim-Defendants Dakota Imaging, Inc.*

Of Counsel:

Harry T. Daniels
Richard A. Johnston
Mark A. Delaney
Cytheria D. Jernigan
WILMER CUTLER PICKERING
HALE AND DORR LLC
60 State Street
Boston, MA 02109
(617) 526-6000

Dated: June 7, 2005

## CERTIFICATE OF SERVICE

I hereby certify that on June 7, 2005, I electronically filed the foregoing document with the Clerk of Court using CM/ECF which will send notification of such filing(s) and Hand Delivered copies of the foregoing document to the following:

>Michael P. Stafford, Esquire
>YOUNG CONAWAY STARGATT & TAYLOR, LLP
>The Brandywine Building
>1000 West Street, 17th Floor
>P.O. Box 391
>Wilmington, DE 19879-0391

I further hereby certify that on June 7, 2005, I have mailed by Federal Express, the document(s) to the following non-registered participants:

>Ward B. Coe III, Esquire
>Kevin C. McCormick, Esquire
>WHITEFORD, TAYLOR & PRESTON
>Seven Saint Paul Street, Suite 1400
>Baltimore, MD 21202

_____
Michael R. Robinson (#4452)
Richards, Layton & Finger, P.A.
One Rodney Square
920 N. King Street
Wilmington, DE 19801
(302) 651-7700
robinson@rlf.com

RLF1-2884580-1