IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DAKOTA IMAGING, INC., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>SANDEEP GOEL AND )<br>PRADEEP GOEL )<br>)<br>Defendants/Counterclaim- )<br>Plaintiffs, )<br>)<br>v. )<br>)<br>DAKOTA IMAGING, INC., )<br>ENVOY CORPORATION, AND )<br>WEB MD CORPORATION, )<br>)<br>Counterclaim-Defendants )<br>) | Civil Action No:   1:05-CV-296 (SLR) |

### DEFENDANTS/COUNTERCLAIM-PLAINTIFFS' OPPOSITION TO PLAINTIFF/COUNTERCLAIM-DEFENDANT DAKOTA IMAGING, INC.'S MOTION FOR PARTIAL DISMISSAL OF DEFENDANTS/COUNTERCLAIM-PLAINTIFF'S COUNTERCLAIMS AGAINST IT

Defendants/Counterclaim-Plaintiffs, Sandeep Goel and Pradeep Goel (the "Goels"), through undersigned counsel, oppose Plaintiff/Counterclaim-Defendant Dakota Imaging, Inc.'s ("Dakota") Motion for Partial Dismissal of Defendants/Counterclaim-Plaintiffs' Counterclaims Against It. Dakota seeks to dismiss the Earnout related portions of the Goels' Counterclaim because Dakota assumed no obligation to make Earnout payments to the Goels under the Merger Agreement. Moreover, Dakota seeks to dismiss the counterclaims on the grounds that the Earnout provision pursuant to the Merger Agreement requires arbitration of all disputes.

Dakota's Motion to Dismiss must be summarily denied as it has not set forth any ground to merit dismissal of the Counterclaim. As Delaware law mandates that any counterclaim arising

out of the same transaction or occurrence must be adjudicated with the initial pleading, the Goels' counterclaims arising out of the Merger Agreement and its attached Employment Agreements, which are subject of the Complaint, must be heard. Moreover, while Dakota may not be obliged to make the Earnout payment to the Goels, it is bound by the implied covenant of good faith and fair dealing not to prohibit the Goels, or any other party, from performing its obligations under the Merger Agreement, to which Dakota is a signatory. Finally, the Goels' counterclaims related to the Earnout provision of the Merger Agreement are not subject to arbitration, as the limited scope of the arbitration clause only provides for arbitration of disputes involving calculation of the Earnout amount and not breaches of implied covenant of good faith and fair dealing or anticipatory breach of the Merger Agreement, as alleged in the Goels' Counterclaim.

## I.  BACKGROUND FACTS

Plaintiff's Complaint and Defendants' Counterclaim arise from a series of interrelated transactions, which culminated in the purchase of Dakota Imaging, Inc. by WebMD and Envoy, formalized in the Merger Agreement on April 5, 2004. *See Merger Agreement, attached as Exhibit 1 of Defendants' Counterclaim.* The Merger Agreement involved multiple parties, including WebMD, Envoy, Dakota, and the Goels, and multiple subagreements, including the Employment Agreements of Sandeep Goel and Pradeep Goel.

The predecessor Dakota Imaging, Inc. was formed by Sandeep Goel in 1989. He was joined by his brother, Pradeep Goel, in 1991. Dakota Imaging developed the software now called Transform, which has been Dakota's primary revenue producing product throughout its existence. Transform is an automated document processing software that has exceptional utility in the medical insurance market for processing medical claims. Dakota focused on the

healthcare insurance claims processing market and over the years built a reputation in the Blue Cross Blue Shield market for innovation and personal service. By 2004, Dakota was clearly the industry leader, with approximately $20 million in revenue and over one hundred employees.

WebMD, attracted by Dakota's success, the strong relationship Dakota had with Blue Cross Blue Shield plans and similar customers, and the potential for expansion of the market for Dakota's products, approached Dakota to begin acquisition discussions in September of 2003. Those discussions culminated with the Merger Agreement, executed in April of 2004.

On April 5, 2004, the Goels signed Employment Agreements with Dakota; such Agreements were integrated into the Merger Agreement as Exhibits B and C. *See Exhibit 1 of Defendants' Counterclaim; see also Exhibits A & B of Plaintiff's Complaint.* Under the express terms of those Employment Agreements, both Sandeep Goel and Pradeep Goel were to be employed for an initial employment period of five years. The Employment Agreements also contained specific provisions delineating under what circumstances the Goels could be terminated by Dakota for cause (*see Paragraphs 4.1 and 4.4 of Exhibits A & B*) and without cause, following the expiration of the "Earnout period" described in the Merger Agreement. By its express terms, the Employment Agreements did not permit Dakota to terminate either Sandeep Goel or Pradeep Goel without cause until the Earnout period had expired, which was to continue for three years following the closing date or until March 31, 2007.

At the same time the Goels executed their Employment Agreements with Dakota, the Goels and two other Dakota shareholders executed the Merger Agreement. Under the terms of the Merger Agreement, Dakota was sold by the Goels and the other shareholders to WebMD and Envoy Corporation for $40,000,000, with certain adjustments, plus up to an additional $25,000,000 based on increases in Dakota's earnings during a three-year "Earnout" period

following the closing. The Merger Agreement and the Employment Agreements provide that the Goels would continue to serve as officers of Dakota after the merger, Sandeep Goel as President and Pradeep Goel as Chief Operating Officer and Chief Technology Officer, respectively. *See Exhibit 1, Sec. 5.1(j), (k)*.

In accordance with the Merger Agreement, Section 1.7(a), the acquiring companies promised to pay the Goels and other Dakota shareholders an Earnout payment equal to the product of (i) five times (ii) incremental EBITDA; provided, however, the cumulative amount of Earnout payments paid would not exceed $8,333,333 on account of the first Earnout period (ended March 31, 2005); $16,666,666 on account of the first two Earnout periods; or $25,000,000 on account of all of the Earnout periods. Under that same provision in the Merger Agreement, Envoy, Dakota's parent company, was required, "as soon as reasonably practicable" following Envoy's determination of the Earnout payments, to deliver a statement that includes each element of the calculation of the Earnout payment and a certificate by Envoy's Chief Financial Officer certifying that the calculations of the Earnout payment were made in accordance with the terms of the Merger Agreement.

However, shortly after the merger was completed, WebMD management started taking a series of actions that seriously undermined the ability of the Goels to achieve the EBITDA targets necessary to achieve the "Earnout." During the "due diligence" process and at all times thereafter, WebMD management acknowledged and commented on the excellent customer relationships that existed between Dakota and its software customers. Despite acknowledging that software sales and services were the backbone of revenue and EBITDA, WebMD management ordered the Dakota sales team to stop selling software to new prospects. Since the April 5, 2004 merger, the Goels continued working diligently to make Dakota a success despite

the active interference of WebMD. WebMD wanted Dakota to miss its Earnout targets so that Envoy could avoid paying the Earnout.

Moreover, during the final stages of negotiations of a very large software sale to Noridian, WebMD senior management orchestrated at least one phone call to this customer where they disparaged the service Dakota was providing to its customers. Subsequently, WebMD senior management engineered a series of objections on the date of the signing of the contract with the intent to delay or prevent the sale of software license to Noridian. Although the senior officers at WebMD took several steps to attempt to delay the execution of this contract with Noridian, the contracts with Noridian were executed on March 29 and 30, 2005, and the software that was the subject of the contracts was delivered that same day. Thus the contracts were signed and finalized prior to March 31, 2005.

Beginning in the summer of 2004, WebMD began taking actions that undermined the ability of the Goels to perform their duties for Dakota. WebMD dismantled Dakota's management team. In January 2005, WebMD caused Dakota to summarily terminate Ronald Diegleman, who had served as Senior Vice President and Chief Financial Officer for Dakota prior to the acquisition and continuing as Senior Vice President up to his termination. Diegleman was replaced by John McCrae, who reported directly to WebMD personnel, but who knew virtually nothing about Dakota's business. Other management changes were also instituted, including the making of Jenny Morgan as Executive Vice President of a division of WebMD and the termination of Edward Odjaghian, Vice President for Product Development and Customer Service.

WebMD interfered with Dakota's business in ways that were intended to affect Dakota's performance so that the Earnout would not have to be paid to Dakota's former stockholders. For

example, WebMD required Dakota to provide its software to WebMD Business Services (Envoy) for HIPPA Compliance, at considerable time, effort and cost to Dakota. However, when Dakota completed the project, WebMD informed the Goels that Dakota would get no credit for the software (which was worth $6.5 to $8 million) and threatened the Goels to drop the issue because WebMD had more resources and attorneys than the Goels would have if the matter were litigated.

On April 6, 2005, the Goels were requested to attend what was described as a meeting of Dakota's Board of Directors. When they arrived, they were both summarily discharged and handed almost identical termination letters, copies of which are attached to Plaintiff's Complaint, *Exhibits C and D*. The reasons for the Goels' termination, as described in the termination letters, are false and Dakota knew that they were false when it terminated the Goels. At no time during their employment with Dakota did the Goels breach any of the terms of their Employment Agreements with Dakota, their obligations in the Merger Agreement, or their common law responsibilities as employees of Dakota. Nor did the Goels commit any intentional acts or intentionally fail to act or otherwise perform their duties in bad faith, which were injurious or contrary to the best interests of Dakota. Moreover, at no time during their employment with Dakota did the Goels ever fraudulently, dishonestly, unethically or disloyally deal with Dakota or otherwise willfully fail to communicate with Dakota's Board of Directors regarding Dakota's business.

Dakota, under the direction of WebMD and Envoy, summarily removed Ronald Diegleman, Edward Odjaghian and the Goels, undercut the Goels' authority at Dakota and ultimately terminated them for false reasons as part of a scheme to remove the Goels from

Dakota; and further, to preclude, the Goels from recovering their Earnout payments of up to $25,000,000, in violation of the Merger Agreement and Employment Agreements.

## II. STANDARD FOR EVALUATING A RULE 12(B)(6) MOTION TO DISMISS

In reviewing a complaint upon a Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court must accept all well-pled allegations of the complaint (counterclaim) as true and must construe the facts and all reasonable inferences derived there from in favor of the non-moving party. *Ibarra v. United States*, 120 F.3d 472, 473 (4th Cir. 1997). A (12)(b)(6) motion to dismiss "tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *See Economides v. Gay*, 155 F. Supp. 2d 485, 487-488 (D. Md. 2000)(quoting *Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)). Such challenges to the merits of the claim and defenses are reserved for the summary judgment proceedings, once discovery has been completed and all parties have had an opportunity to develop the facts that may be applicable to their case. In the instant matter, the Goels have not had any opportunity to discover the extent and the intricacy of the relationships between Envoy, WebMD, and Dakota Imaging. In fact, all three Counterclaim-Defendants have filed Motions to Stay Discovery, to prevent the Goels from preparing their case. A motion to dismiss for failure to state a claim should not be granted unless it appears beyond a doubt that the plaintiff can prove no set of facts which would support its claim and would entitle it to relief. *See Claypool v. U.S.*, 103 F. Supp. 2d 899, 902 (S.D. W.Va. 2000)(citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)). As the Goels' Counterclaim sets forth sufficient facts to sustain its claim, Dakota's Motion to Dismiss must be denied.

## III. DAKOTA'S MOTION TO DISMISS THE GOELS' COUNTERCLAIMS RELATED TO THE EARNOUT PROVISION MUST BE DENIED AS DAKOTA IS A SIGNATORY TO THE MERGER AGREEMENT AND IS

**BOUND BY THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.**

Dakota's argument that it cannot be held liable for acting in bad faith, as related to the Earnout Provision, because the "No Bad Faith" clause only identifies Envoy's duty to act in good faith, must be rejected. As a signatory to the Merger Agreement, of which the Earnout Provision at Section 1.7 is a crucial and integral element, Dakota had an obligation to act in good faith and deal fairly with the parties to the Merger Agreement, such that its actions did not prohibit the Goels or Envoy from performing any of its obligations under the contract.

Under Maryland law, there is an implied covenant of good faith and fair dealing in all negotiated contracts. *See Eastern Shore Markets, Inc. v. J.D. Assoc. Ltd. Partnership*, 213 F.3d 175, 182 (4th Cir. 2000); *see also Food Fair Stores, Inc. v. Blumberg*, 234 Md. 521, 534, 200 A.2d 166, 173-74 (Md. 1964). This implied covenant "simply prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract." *Eastern Shore Markets*, 213 F.3d at 182 (citing *Parker v. Columbia Bank*, 91 Md. App. 346, 604 A.2d 521, 531 (Md. App. 1992)). Dakota, as a signatory to the Merger Agreement, had an implied duty not to prevent the Goels or Envoy from performing their contractual obligations under the Merger Agreement. The covenant of good faith and fair dealing cannot be undercut by the contractual provision identifying Envoy's duty to act in good faith, as it related to Section 1.7, as the duty applies to the entire Merger Agreement.

Moreover, the covenant of good faith and fear dealing includes a duty to refrain from destructive competition. *See id.* at 183. The implied covenant prohibiting destructive competition generally applies to contracts involving profit sharing:

> In any commercial agreement in which the compensation promised by one to the other is a percentage of profits or receipts, or is royalty on goods sold, manufactured or mined, there will nearly always be found an implied

> promise of diligent and careful performance in good faith and of forbearance to make performance impossible by going out of business or otherwise.

See *Automatic Laundry Service, Inc. v. Demas*, 216 Md. 544, 550, 141 A. 2d 497, 500 (Md. 1958). In *Automatic Laundry*, a dispute arose from a contract in which plaintiff agreed to provide laundry service to a trailer park and plaintiff and defendants would share in the profits from the machines. While the laundry service agreement was signed by only one of the defendants, the court found that the principal defendant was obliged "not to render valueless his contract with Automatic by permitting destructive competition" where the signatory defendant had full knowledge of the contract and was a knowing participant in the breach by the principal defendant. The principal defendant was found liable for any profits which he may have derived from the improper competition. See *id.* at 216 Md. at 551, 141 A.2d at 501.

Similarly, Dakota, whose net income singularly determines the Earnout payment, and a signatory to the Merger Agreement, should be held liable for its breach of the implied covenant of good faith and fair dealing that hindered the Goels and Envoy from performing contractual obligations under the Merger Agreement, so that the Goels' would be entitled to the Earnout payment. Dakota, through directives from WebMD management, took a series of actions that seriously undermined the Goels' ability to achieve the Earnout, including stopping the sale of software, which was the backbone of revenue; and dismantling Dakota's management team. Dakota summarily terminated Ron Diegleman, who had served as Senior Vice President and Chief Financial Officer, and Edward Odjaghian, Vice President for Product Development and Customer Service, despite the Goels' objections. Moreover, Dakota terminated the Goels for false reasons in an effort to permit Envoy from performing its contractual obligations. Dakota cannot escape liability for its actions, taken in bad faith, simply because one section of the

Merger Agreement specifically identified Envoy's duty not to act in bad faith. The language of the Merger Agreement does not vitiate Dakota's, or any other contracting party's, obligation of good faith and fair dealing. For the same reasons, Dakota can be liable for anticipatory breach of the Merger Agreement. Accordingly, Dakota's Partial Motion to Dismiss should not be granted.

### IV. DAKOTA'S MOTION TO DISMISS MUST BE DENIED AS RELATED TO THE EARNOUT PROVISIONS BECAUSE THE GOELS' COUNTERCLAIMS ARE NOT SUBJECT TO ARBITRATION.

Dakota incorrectly asserts that the "Merger Agreement requires that all Earnout-related disputes be arbitrated rather than litigated." The agreement to arbitrate Earnout disputes is specifically and narrowly tailored. Section 1.7(c) of the Merger Agreement, entitled "Dispute Resolution," limits the scope of arbitration of disputes arising from the Earnout provision, by stating that "the **only basis** of such disagreement shall be that the **calculation of the Earnout Payment** is not in accordance with the terms of Section 1.7 of this Agreement." (Emphasis added). Accordingly, any dispute related to the Earnout that is distinct and separate from the calculation of the amount is not subject to arbitration, but rather must be litigated in Delaware state or federal courts pursuant to Section 10.8 of the Merger Agreement.

Section 1.7(c) inherently assumes that the Goels would be in receipt of an Earnout Payment and an Earnout Certificate and that the sole dispute to be arbitrated would be a dispute to the amount of the payment. Counts II and III of the Goels' counterclaims clearly surpass the limited scope of the arbitration provision, as they do not seek to dispute the amount of the Earnout Payment; rather the claims allege that Dakota acted in bad faith to prohibit the Goels' from earning any payment by engaging in a carefully orchestrated scheme to undermine the ability of the Goels to fully perform their duties for Dakota in clear violation of the Merger Agreement. Accordingly, as Counts II and III allege that Dakota's actions prevented the Goels'

from earning any amount of the Earnout provision, arbitration of such dispute is not mandated by Section 1.7(c).

>   To determine the scope of arbitration the court must consider two competing aims:

> > A court must resolve any doubts concerning the scope of arbitrable issues in favor of arbitration, reflecting a strong public policy in favor of arbitration. In doing so, however, the contract nature of arbitration must be respected, so as not to require a party to submit a dispute to arbitration that it has not agreed to arbitrate.

*Nowak v. NAHB Research Center, Inc.*, 157 Md. App. 24, 35, 848 A.2d 705 (Md. App. 2004)(citing *Redemptorists v. Coulthard Services, Inc.*, 145 Md. App. 116, 135, 801 A.2d 1104 (2002)). Where there is an arbitration agreement, but the issue in dispute plainly falls outside its scope, arbitration cannot be compelled. *See id.* (citing *Gold Coast Mall, Inc. v. Larmar Corp.*, 298 Md. 96, 104, 468 A.2d 91 (1983)). An accurate reading of the Dispute Resolution provision clearly indicates that the Goels' counterclaims fall outside the scope of arbitration.

Dakota has misconstrued the language of the Merger Agreement to imply that there is a bifurcated dispute resolution system in place. The language of the contract clearly establishes a four-step process to resolve the sole issue of disputes regarding the calculation of the Earnout payment and does not consider a separate requirement for arbitration for any other disputes as Dakota misleadingly alleges. Section 1.7(c)(i) clearly defines the scope of arbitration, as discussed above and delineates the first step of dispute resolution:

> The Buyer and Stockholder Representatives shall attempt in good faith during the 30 days immediately following the Buyer's receipt of the Stockholder Representatives' timely notice of disagreement to resolve any disagreement with respect to such Earnout Payment.

Section 1.7(c)(ii) continues by stating:

> **If**, at the end of the 30 day period reference in subsection (i) above, Buyer and Stockholder Representatives have not resolved all disagreements **with respect to whether the calculation of the Earnout Payment is in**

> **accordance with the terms of Section 1.7 of this Agreement,** Buyer and the Stockholder Representatives will refer the items of disagreement for determination to the Independent Accountants.

(Emphasis added). And Section 1.7(c)(iii) establishes the final two steps of the dispute resolution system by holding:

> **If,** at the end of the 30-day period referenced in subsection (i) above or within 30 days after the date of the Independent Accountants' determination pursuant to subsection (ii) above, as applicable, Buyer and the Stockholder Representatives have not resolved all disagreements not resolved by the determination of the Independent Accountants **with respect to whether the calculation of the Earnout Payment is in accordance with the terms of Subsection 1.7** of this Agreement, any such remaining disagreement, regardless of the legal theory, will be settled by final, binding arbitration pursuant to the Federal Arbitration Act...
>
> Should it become necessary to resort or respond to court proceedings to enforce a Party's compliance with this Section 1.7(c), such proceedings will be brought only in the federal or state courts located in Wilmington, Delaware.

(Emphasis added).

As signaled by the use of the conjunction "**If**" at the beginning of subsections (ii) and (iii) and the reference to subsection (i), which limited the scope of disagreements subject to arbitration, in each subsequent subsection, it is clear that Section 1.7(c) refers only to the arbitration of disputes of the calculation of the Earnout Payment and does not establish a bifurcated process for any legal disputes related to the Earnout. Dakota's implication that it does otherwise, exceeds the unambiguous language of the Merger Agreement. Moreover, such an interpretation of the arbitration clause renders the provision ineffective, as it would require an Independent Accountant, who is charged with calculating numbers and auditing figures, to arbitrate the complex facts of Dakota's actions taken to prevent the Goels' from achieving the Earnout. Accordingly, Dakota's Partial Motion to Dismiss must be denied as it has failed to set

forth any merit to its argument that all claims related to the Earnout provision are subject to mandatory arbitration and the Goels' counterclaims should be litigated pursuant to Section 10.8 of the Merger Agreement.

## V. CONCLUSION

For the reasons set forth above, Defendants Sandeep Goel and Pradeep Goel respectfully request that Plaintiff/Counterclaim-Defendant Dakota Imaging, Inc.'s Motion to Dismiss be denied in its entirety and that Defendants' Counterclaim be adjudicated on its merit.

Respectfully submitted,

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____
Michael P. Stafford, Esquire (No. 4461)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6553
Facsimile: (302) 576-3461
Email: mstafford@ycst.com

*Attorneys for Defendants and Counterclaim Plaintiffs Sandeep Goel and Pradeep Goel*

OF COUNSEL:
Ward B. Coe, III, Esquire
Kevin C. McCormick, Esquire
Whiteford, Taylor & Preston L.L.P.
Seven Saint Paul Street, Suite 1300
Baltimore, Maryland 21202-1626
(410) 347-8700
wcoe@wtplaw.com
kmccormick@wtplaw.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 28, 2005, I electronically filed a true and correct copy of the foregoing Defendants/Counterclaim-Plaintiffs' Opposition to Plaintiff/Counterclaim Defendant's Motion for Partial Dismissal and proposed Order with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Jesse A. Finkelstein
> Michael R. Robinson
> RICHARDS LAYTON & FINGER, P.A.
> One Rodney Square
> 920 North King Street
> Wilmington, Delaware  19801

I further certify that on June 28, 2005, I caused a copy of the foregoing Defendants/Counterclaim-Plaintiffs' Opposition to Plaintiff/Counterclaim Defendant's Motion for Partial Dismissal and proposed Order to be served by hand-delivery on the following counsel of record:

> Jesse A. Finkelstein
> Michael R. Robinson
> RICHARDS, LAYTON & FINGER, P.A.
> One Rodney Square
> 920 North King Street
> Wilmington, Delaware  19801

I further certify that on June 28, 2005, I served the foregoing Defendants/Counterclaim-Plaintiffs' Opposition to Plaintiff/Counterclaim Defendant's Motion for Partial Dismissal and proposed Order on the following non-registered participants by first-class United States mail:

> Harry T. Daniels, Esquire
> Richard A. Johnson, Esquire
> Cytheria D. Jernigan, Esquire
> WILMER CUTLER PICKERING HALE AND DORR
> 60 State Street
> Boston, Massachusetts 02109

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_/s/ Michael P. Stafford_
Michael P. Stafford, Esquire (No. 4461)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware  19899-0391
Telephone:  (302) 571-6553
Facsimile:  (302) 576-3461
Email:  mstafford@ycst.com

Dated:  June 28, 2005.