## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| DAKOTA IMAGING, INC. | ) |
| | ) |
| Plaintiff, | ) C.A. No. 1:05-cv-296 (SLR) |
| | ) |
| v. | ) JURY TRIAL DEMANDED |
| | ) |
| SANDEEP GOEL and PRADEEP GOEL, | ) |
| | ) |
| Defendants/Counterclaim | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| DAKOTA IMAGING, INC. | ) |
| ENVOY CORPORATION and | ) |
| WEBMD CORPORATION | ) |
| | ) |
| Counterclaim Defendants. | ) |
| | ) |
| | ) |

## REPLY MEMORANDUM OF ENVOY CORPORATION AND
## WEBMD CORPORATION IN SUPPORT OF THEIR
## MOTION TO DISMISS COUNTERCLAIM

Counterclaim Defendants Envoy Corporation ("Envoy") and WebMD

Corporation ("WebMD") submit this Reply Brief in support of their joint motion to

dismiss the Counterclaim asserted by Sandeep Goel and Pradeep Goel (collectively, the

"Goels"). The Goels' Brief in Opposition ("Opposition") misidentifies Envoy and

WebMD as parties to the Employment Agreement and ignores specific language in the

Merger Agreement which shields WebMD from liability for potential Earnout payments.

Moreover, the Goels' argument that they are not required to arbitrate disputes regarding

Earnout payments is without merit  Therefore, the Goels' Counterclaim should be dismissed in its entirety as to Envoy and WebMD

## ARGUMENT

I.   **COUNT I AND THE PORTIONS OF COUNT II RELATED TO THE EMPLOYMENT AGREEMENT SHOULD BE DISMISSED AS TO ENVOY AND WEBMD BECAUSE THEY ARE NOT PARTIES TO THE EMPLOYMENT AGREEMENTS.**

The Goels argue that Count I and the portions of Count II relating to the Employment Agreements between the Goels and Dakota Imaging, Inc ("Dakota") should not be dismissed against Envoy or WebMD, even though neither was a signatory to said Employment Agreements  To support their contention, the Goels present a patchwork of rationales stating, alternatively, that: (a) the Employment Agreements are somehow integrated into the Merger Agreement (to which they argue that both Envoy and WebMD are parties) [Opposition, p  9]; (b) if the Employment Agreements were not integrated into the Merger Agreement, Envoy and WebMD somehow "adopted them" [id., p  9-10]; or (c) the "relationships created by the Merger Agreement" are just too complicated to identify who actually employed the Goels [id , p  9]  As described below, all of the Goels arguments are without merit  Therefore, Count I and the portions of Count II relating to the Employment Agreements should be dismissed as to both Envoy and WebMD

### A.   **The Merger Agreement And The Employment Agreements Are Separate Agreements, And The Goels' Arguments To The Contrary Are Unsupported By Either Facts Or Law.**

In support of their contention that the Merger Agreement and Employment Agreements are somehow "integrated" into a single agreement, the Goels' offer a handful of dubious factual propositions and no case law  First, the Opposition notes that the

Employment Agreements are mentioned in and attached to the Merger Agreement [Opposition, p 9]. Next, the Opposition notes that the Merger Agreement was signed by all three Counterclaim Defendants, i.e Envoy, WebMD and Dakota Imaging, Inc ("Dakota").[1] From these thin points, the Opposition leaps to the conclusion that:

> Envoy's and WebMD's conduct in executing the Merger Agreement and attempting to enforce the Agreement[2] in the instant action clearly indicates that they intended to be bound by the Merger Agreement, and consequently the Employment Agreements  Accordingly, the Merger Agreement and its integrated Employment Agreements are equally enforceable against Dakota Imaging, Inc , Envoy and WebMD

Id.

The weakness of this conclusory statement is apparent from the fact that the Opposition does not cite a single case either explaining the legal standard for integration of contracts or supporting the propositions that employment agreements related to or predicated on corporate mergers or acquisitions are properly integrated into a single

---

[1]    The apparent purpose of this observation is to show some commonality of corporate parties to both the Merger Agreement and the Employment Agreements, as Dakota was a signatory to all three. But even this proposition is dubious, as the Opposition fails to mention that, as set forth in Section 3-114 of the Maryland General Corporation Law, the "Dakota Imaging, Inc " which signed the Merger Agreement (and which was controlled by the Goels at the time) ceased to exist upon closing of the Merger Agreement, and the "Dakota Imaging, Inc" to which the Goels owed their contractual and common law employment duties was the "Successor Corporation" or the post-merger "Dakota Imaging, Inc.," which became wholly owned by Envoy. The notice provision in the Merger Agreement makes clear that at the time of the signing of the Merger Agreement Dakota was aligned on the Goel side of the transaction, opposite from Envoy and WebMD  [Merger Agreement ¶ 10 7 (listing Whiteford Taylor & Preston – the Goels' law firm – as recipient of notice for Dakota)].

[2]    It is unclear what the Goels reference when they cite Envoy and WebMD's "attempts to enforce" the Merger Agreement  [Opposition, p 9]  Among the Counterclaim Defendants, only Dakota has brought an action in this case against the Goels, and that action is based solely upon the Employment Agreements. Envoy and WebMD have, to date, filed no action against the Goels, or anyone else, with regard to either the Employment Agreements or the Merger Agreement. Although Envoy has indicated in its motion for remand that it intends to bring counterclaims against the Goels and others pursuant to the Merger Agreement if the Counterclaim against it is not dismissed, no such action has occurred, contrary to the assertion in the Goels' Opposition.

contract or that a commonality of parties ensues  In fact, despite the Goels' conclusory statements, the law *presumes* that separately executed contracts manifest separate intents to be bound and should be treated as separate agreements  See Nat'l Union Fire Ins. Co. of Pittsburg v. Clairmont, 231 A D 2d 239, 241 (N Y  App  Div  1st Dept  1997). Moreover, one agreement may follow from and even have "as its *raison d'etre* another" agreement and yet, in the absence of some clear indication that the parties had a contrary intention, the agreements cannot be integrated and stand alone  Id  at 241-42; see also 11 Williston on Contracts, § 30 26 (4th ed  1999) (separate instruments should not be arbitrarily construed together without regard to the circumstances of the situation and the intention of the parties)

In short, the Goels' Opposition fails to allege any facts or cite any law that would lead to an inference that the Merger Agreement and the Employment Agreements are, indeed, a single agreement, making Envoy and WebMD unwitting and unwilling parties to the Employment Agreements through a legal theory of integration

**B.    Neither Envoy Nor WebMD Adopted The Employment Agreements And, Thus, Neither is Bound By Them.**

Perhaps sensing the weakness of their positions, the Goels blur their above-described argument on integration into one of "adoption." Springing from their conclusory statements that the Merger Agreement and the Employment Agreements are integrated, the Goels assert that this alleged integration resulted in Envoy's and WebMD's adoption of the Employment Agreements and, thus, becoming bound by them However, adoption of a contract requires evidence of an "unequivocal inten[t]" to be

4

bound by said contract, and is not something done accidentally or casually.  See

Residential Warranty Corp. v. Bancroft Homes Greenspring Valley, Inc., 728 A.2d 783,

794 (Md. App. 1999)[3]  Again, the Goels have not alleged any facts or evidence that

would support an inference that Envoy and/or WebMD intended to adopt the

Employment Agreements as their own obligations.

Finally, the Goels' Opposition feigns bafflement at garden-variety corporate

governance among related entities and the "web of relationships created by the Merger

Agreement." [Opposition, p. 10]  The Goels also note with some chagrin that they were

required, pursuant to the Employment Agreements, to "perform such duties and services

for [Dakota] and its subsidiaries and affiliates as may be designated from time to time by

the **President of Envoy** or such other officer as may be designated by [Dakota]."

[Opposition, p. 10, emphasis in Opposition]  Despite the Goels' suggestions, the

existence of common officers, line reporting between affiliated corporations and the

sharing of services among affiliated corporations is hardly an unusual business practice

and is not grounds for disregarding corporate forms or piercing the corporate veil.  See

e.g., Hukill v. Auto Care, Inc., 192 F.3d 437, 443-44 (4th Cir. 1999); Desjardins v. Van

Buren Cmty. Hosp., 37 F.3d 21, 24 (1st Cir. 1994); Scott-Douglas Corp. v. Greyhound

Corp., 304 A.2d 309, 314 (Del. Super. 1973).

---

[3]    Interestingly, Residential Warranty, the lead case cited by the Goels to support their
theory of adoption, was primarily a decision analyzing an attempt to pierce the corporate veil of
the defendant.  The adoption discussion in Residential Warranty was in the context of an effort by
the plaintiff to circumvent Maryland's onerous standards for piercing the corporate veil, which
has been described by one Maryland court as a "herculean task."  See Dixon v. Process Corp.,
382 A.2d 893, 894-95 (Md. App. 1978).  To this extent, Envoy and WebMD agree that
Residential Warranty is analogous to the current action insofar as the Goels are raising novel
legal theories in the hope that they will be allowed to disregard Envoy's, WebMD's and Dakota's
corporate forms, in contravention of Maryland public policy and law.

In sum, the Goels' Opposition utterly fails to allege any persuasive facts or supporting case law which would allow them to disregard the explicit language of the Employment Agreements and make Envoy and WebMD involuntary parties to those agreements. Thus, Count I and the portions of Count II relating to the Employment Agreements should be dismissed as to both Envoy and WebMD

## II.    THE PORTIONS OF COUNTERCLAIM COUNTS II AND III RELYING ON THE MERGER AGREEMENT SHOULD BE DISMISSED AS TO WEBMD BASED UPON SPECIFIC PROVISIONS IN THAT AGREEMENT.

### A.    By The Terms Of The Merger Agreement, WebMD Is Not Liable To The Goels For Earnout Payments.

The Merger Agreement specifically absolves WebMD from any liability arising from potential Earnout payments. As discussed in WebMD's Supporting Memorandum, Envoy's affiliates are expressly insulated in the Merger Agreement from any liability "with respect to the management and operation of the [Dakota], including any impact thereof on the [Earnout] payment, if any, to the [shareholders] pursuant to [Section 1 7(a)].[4] By negotiating and executing an agreement containing language so clearly absolving WebMD from any liability with regard to disputes over the Earnout payments, the Goels have waived any right to proceed against WebMD based upon such disputes See e.g., Am. Home Ins. Co. v. Monsanto Enviro-Chem Sys., Inc., 2001 WL 878323 at *5 (4th Cir. Aug 3, 2001)[5] (holding that limitation of liability clause in agreement manifested "unmistakable intent" by plaintiff to waive all claims, including those arising

---

[4]        WebMD, as Envoy's parent, is considered an "Affiliate," pursuant to the Rule 12b-2 under the Securities Exchange Act of 1934 and therefore under the Merger Agreement. [Merger Agreement, p. 58, Article x] See TSC Indus., Inc. v. Northway Inc., 426 U.S. 438, 451 n.13 (1976) (discussing the definition of "Affiliate" pursuant to federal securities law)

[5]        Unreported decisions are attached hereto under Tab A in alphabetical order

from negligence or theories of strict liability); <u>Seigneur v. Nat'l Fitness Institute, Inc.</u>, 752 A 2d 631, 636 (Md App 2000) (courts recognize that contractual clauses limiting liability are part of and parcel of the right to contract and are reluctant to interfere with the parties' negotiated limitations on liability)

The Goels' Opposition totally ignores this contractual insulation against WebMD liability with regard to Earnout payments  Instead, the Goels simply refer the Court to the recognition in Maryland law of an implied duty of good faith and fair dealing in contracts  The fact that such an implied duty exists in Maryland is inapposite, as Maryland courts also recognize that parties to a negotiated contract can limit their liability under such instruments through contractual terms  See <u>Id</u>  In sum, because the very terms of the Merger Agreement preclude any finding that WebMD is liable under any legal theory for disputes relating to the Earnout payment, those claims against WebMD should be dismissed

**B.     WebMD's Obligations And Liabilities With Regard To The Merger Agreement Are Limited To Its Guarantee Of Payment To The Dakota Shareholders Upon Closing.**

While WebMD is a signatory to the Merger Agreement, its sole obligation under that agreement was to guarantee payment to the Dakota Shareholders upon closing  Maryland courts shield guarantors from general liability stemming from the contracts so guaranteed  See <u>Gen. Motors Acceptance Corp. v. Daniels</u>, 492 A 2d 1306, 1309 (Md 1985) (guarantee of payment is "collateral to and independent of" the underlying obligation and, as such, the guarantor is not a party to the principal obligations); <u>see also</u>

Int'l Customs Associates v. Ford Motor Co., 893 F Supp. 1251, 1256 (S.D.N.Y 1995)

(rejecting argument that defendant could be liable for any breach of contract merely

because the contract imposed other obligations on defendant that were not alleged to have

been breached)  Thus, WebMD is not a party to the Merger Agreement in the traditional

sense[6] and has no general liability pursuant to the Merger Agreement on any contractual

claim asserted against it, aside from a claim (now moot) that it failed to fulfill its

guarantee at closing  As there has been no allegation that WebMD breached its

contractual duties as a guarantor, all portions of the Counterclaim related to Earnout

payments should be dismissed as to WebMD

## III.    ANY PORTION OF THE GOELS COUNTERCLAIM WHICH STEMS FROM DISPUTES OVER EARNOUT PAYMENTS SHOULD BE DISMISSED AS TO BOTH ENVOY AND WEBMD BECAUSE SUCH DISPUTES MUST BE ARBITRATED.

To the extent any portion of the Goels' Counterclaim purports to assert claims

against either Envoy or WebMD related to the Earnout payment,[7] those claims should be

dismissed because various provisions of the Merger Agreement make clear that the Goels

agreed to arbitrate, not litigate, any legal disputes related to the Earnout

Section 1.7 of the Merger Agreement is a comprehensive three-page compendium

governing the rights of the Goels and others to an Earnout based on the financial

---

[6]    The Merger Agreement defines the "parties" to the Merger Agreement as "the Buyer [Envoy], the Transitory Subsidiary [Raven Merger Sub, Inc.], the "Company" [Dakota Imaging, Inc.] and the "Principal Stockholders" [the Goels, Carol Gupta and the EAC Investment Limited Partnership].  [Article IX p. 69]  WebMD is conspicuously absent from this group.

[7]    The Merger Agreement and Earnout Issue appear principally in Counts II and III of the Counterclaim  However, the Goels' rather confusing Counterclaim and their novel legal theory of integration of agreements expressed in their Opposition leave open the possibility that they are seeking to bootstrap Count I, entitled "Breach of Employment Agreement," into an action against Envoy and WebMD for recovery of alleged damages relating to the Merger Agreement and Earnout payments.

performance of Dakota during the first three years of the merger.[8] Section 1.7(c),

entitled "Dispute Resolution," contains a two-page explanation of the bifurcated

arbitration procedures by which disputes related to the Earnout are to be resolved.

Disagreements as to whether Envoy's calculation of the Earnout complies with the

formulas in § 1.7 are initially to be set forth in writing, discussed between the parties and

then submitted for a determination by the independent accounting firm, BDO Seidman, in

Washington, D.C. ("Independent Accountants"). All other disputes related to the Earnout

are to be submitted to arbitration in Delaware pursuant to Section 1.7(c)(iii) of the

Merger Agreement.

The Opposition argues that the arbitration clause is limited strictly to accounting

issues related to the calculation of the Earnout, and in support of this proposition, cites

Section 1.7(c)(iii) with the following emphasis:

> If . . [Envoy and the Goels] have not resolved all
> disagreements not resolved by the determination of the
> Independent Accountants **with respect to whether the
> calculation of the Earnout Payment is in accordance
> with the terms of [] this Agreement**, any such
> disagreement, regardless of the legal theory upon which it
> is based, will be settled by final, binding arbitration
> pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 et.
> seq., in accordance with the applicable rules of the
> American Arbitration Association[] in effect at such time,
> which will be the sole and exclusive procedures for any
> such disagreement.

[Emphasis in Opposition]

---

[8]       The three-year period actually ends just short of three years after the merger because it
includes approximately one month of pre-merger financial activity.

The Opposition fails to note or discuss the language immediately preceding or following those portions of Section 1 7(c)(iii) which the Goels highlighted for the Court. It is this surrounding language, however, that makes the meaning of this section of the Merger Agreement clear and unambiguous. First, immediately preceding the Goels' emphasized language is the phrase:

> If . [Envoy and the Goels] have not resolved all disagreements not resolved by the determination of the Independent Accountants[]

Even a casual reading of this language shows that the parties to the Merger Agreement anticipated that: (a) the Independent Accountants have the ability to "resolve" certain disputes; and (b) there could be other disputes, not resolved by the Independent Accountants.

When the Goels' emphasized language is combined with the phrase immediately preceding it, it is evident what the Independent Accountants have the authority to resolve:

> If . . [Envoy and the Goels] have not resolved all disagreements not resolved by the determination of the Independent Accountants with respect to whether the calculation of the Earnout Payment is in accordance with the terms of [] this Agreement

The plain meaning of the above portion of 1 7(c)(iii) is now clearer. The Independent Accountants have the ability to resolve disagreements "with respect to whether the calculation of the Earnout Payment is in accordance with the terms of [] this Agreement . . ." However, Section 1 7(c)(iii) plainly anticipates certain disputes that cannot or will not be resolved by the Independent Accounts. The mystery (to the Goels, if no one else) as to what these other disputes might entail is solved by looking at the language

immediately following the text emphasized by the Goels: **"regardless of the legal theory**

**upon which it is based."**

Thus, all such disputes, regardless of the legal theory, are to be:

> settled by final, binding arbitration pursuant to the Federal
> Arbitration Act, 9 U S C  § 1 et. seq , in accordance with
> the applicable rules of the American Arbitration
> Association[] in effect at such time, which will be the sole
> and exclusive procedures for any such disagreement

This overall language makes it clear that the parties anticipated the potential for

some disputes involving legal theories, as well as the desire to resolve them through

arbitration after the completion of the Independent Accountant's earnout calculations   To

read Section 1 7(c)(iii) otherwise would reduce the phrase "regardless of the legal theory

upon which it is based" to a nullity [9]

Courts "avoid an interpretation that would leave contractual clauses meaningless "

150 Broadway N.Y. Assoc., L.P. v. Bodner, 14 A D 3d 1, 6 (N Y  App  Div  2004)

(internal citations omitted)   Stated otherwise, courts are obligated to interpret a contract

so as to give meaning to all of its terms   See id   Here, § 1 7(c)(iii) of the Merger

Agreement requires a resolution of "any [] disagreements not resolved by the

Independent Accountants [] regardless of the legal theory upon which it is based" to be

resolved by binding arbitration

The Opposition, however, ignores the clear meaning of the arbitration clause in

the Merger Agreement, cites selectively from the clause and fails to even address

---

[9]      Moreover, it is illogical that the parties intended the conclusion of the Independent
Accountants regarding accounting calculations and revenue recognition to be second guessed by
an arbitrator with no guarantee that the arbitrator would have any accounting experience

Envoy's and WebMD's position that the Goels' interpretation of the arbitration clause renders the contractual clause "regardless of legal theory" a meaningless nullity

Moreover, as contracts must be construed in light of the entire agreement, review of language in one section of a contract may shed light upon the meaning of another section. See Levy v. Southbrook Int'l Investments, Ltd., 263 F.3d 10, 17 (2nd Cir 2001); Corbin on Contracts, § 24 21 (1998), Williston on Contracts, §§ 32 5, 32 6 (4th ed 1999) In this regard, the meaning of the arbitration clause in Section 1 7 of the Merger agreement is informed by the similar but not identical arbitration clause contained in Section 7 7, which deals exclusively with the tax liabilities Section 7 7 states:

> During the 30-day period following the delivery of a Response that reflects a dispute [with regard to tax liabilities], the Buyer and the Stockholder Representatives shall attempt in good faith to resolve the Dispute If at the end of the 30-day period, the Buyer and the Stockholder Representative have not resolved such Dispute, the Buyer and the Stockholder Representatives shall refer the Dispute for determination to the Independent Accountants who shall act as experts, not as arbitrators, and the parties will be reasonably available and work diligently to facilitate the Independent Accountants to render a determination within a 20-day period immediately following the referral to them **A determination by the Independent Accounts with respect to any item of Dispute submitted to them will be binding on the buyer and the Constituents.**

[Emphasis added]

Noticeably absent from Section 7 7 is any referral of unresolved tax disputes, "regardless of legal theory," to binding arbitration Section 7 7 demonstrates that, where the parties foresaw possible disputes related solely to tax issues which are normally within the expertise of accountants, they gave the Independent Accountants the final say

in resolution of such disputes   Conversely, where the parties foresaw possible disputes over the Earnout, which could relate to either accounting issues or claims based upon legal theories of contractual and tort liability, or both, they added a mechanism for binding arbitration of legal disputes, as the Independent Accountants would have no particular expertise deciding such issues

Given the clarity of the arbitration clause in the Merger Agreement and the federal and New York state policy[10] of deferring to arbitration clauses, the Court should dismiss all Earnout related claims against Envoy and WebMD in favor of arbitration   See e.g., In re Arbitration Between Ayco Co., L.P. and Walton, 3 A D 3d 635, 637 (N Y App. Div. 3 Dept. 2004) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration "), citing Moses H. Cone Mem'l. Hosp. v. Mercury Constr. Corp., 460 U S  1, 24 (1983)

---

[10]     The applicability of the arbitration clause in the Merger Agreement is governed by both the Federal Arbitration Act (Merger Agreement, § 1 7(c)(ii)) and New York state law (Merger Agreement, § 10 8(a)

RLF1-2898220-1

## CONCLUSION

For the reasons set forth above, the Court should dismiss the counterclaim in its

entirety against both Envoy and WebMD.

Jesse A. Finkelstein (DSBA 1090)
Michael R. Robinson (DSBA 4452)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
(302) 651-7700
finkelstein@rlf.com
robinson@rlf.com

*Counsel for Counterclaim-Defendants*
*WebMD Corporation and Envoy*
*Corporation*

Of Counsel:

Harry T. Daniels
Richard A. Johnston
Mark A. Delaney
Cytheria D. Jernigan
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

Date:  July 11, 2005

14

# TAB

# A

Westlaw.

16 Fed.Appx. 172                                                                                      Page 1
16 Fed.Appx. 172, 2001 WL 878323 (4th Cir. (N C ))
**(Cite as: 16 Fed.Appx. 172,  2001 WL 878323 (4th Cir.(N.C.)))**

**Briefs and Other Related Documents**

This case was not selected for publication in the
Federal Reporter

UNPUBLISHED

Please use FIND to look at the applicable circuit
court rule before citing this opinion  Fourth Circuit
Rule 36(c)  (FIND CTA4 Rule 36(c) )

United States Court of Appeals,
Fourth Circuit
AMERICAN HOME INSURANCE COMPANY;
Zurich Insurance Company;  St  Paul Fire and
Marine Insurance Company;  Commonwealth
Insurance Company;  Interested
Underwriters at Lloyds of London;  Gerling Global
Insurance Company, as
Subrogees of PCS Phosphate Company,
Incorporated, Plaintiffs-Appellants,
v.
MONSANTO ENVIRO-CHEM SYSTEMS,
INCORPORATED, Defendant-Appellee
No. 00-1590.

Argued Dec  6, 2000
Decided Aug  3, 2001

Insurers of chemical plant sued company that
designed and built plant's heat recovery system for
negligent failure to warn after implosion at plant
caused system's tower to collapse, seeking to exercise
their subrogation rights to recover amounts paid to
insured  The United States District Court for the
Eastern District of North Carolina, Malcolm J
Howard, J , granted summary judgment for company
Insurers appealed  The Court of Appeals, Garwood,
Senior Circuit Judge, sitting by designation, held that:
(1) pursuant to waiver of subrogation rights, insurers
lacked standing to bring negligent failure to warn
claim against company, and (2) plant's owner waived
any and all rights that might have enabled recovery in
negligence against company

Affirmed

West Headnotes

**[1] Insurance** 🔑 **3522**
217k3522 Most Cited Cases
Subrogation waiver provision in contract between
chemical plant owner and company that designed and
built plant's heat recovery system, encompassing
"loss and damage to the Plant and the Work, however
caused," was not ambiguous, and therefore owner's
insurers, which in turn had waived any right of
subrogation against any party to whom owner
provided written contractual waiver, lacked standing
to bring negligent failure to warn claim against
company to recover amounts paid to owner after
implosion at plant caused heat recovery system's
tower to collapse

**[2] Subrogation** 🔑 **35**
366k35 Most Cited Cases
Waivers of subrogation should not be enforced
outside of their context

**[3] Insurance** 🔑 **3522**
217k3522 Most Cited Cases
Common-law negligent failure to warn claim that
insurers for chemical plant owner sought to assert
against company that designed and built plant's heat
recovery system, after implosion at plant caused
system's tower to collapse, was not so remote from
subject matter of contract between owner and
company for design and construction of system as to
preclude enforcement of contract's broad subrogation
waiver provision, inasmuch as alleged failure to warn
concerned operation of heat recovery system

**[4] Contracts** 🔑 **189**
95k189 Most Cited Cases
Chemical plant owner waived any and all rights that
might have enabled recovery in negligence against
company that designed and built plant's heat recovery
system, precluding action for negligent failure to
warn by owner's insurers against company following
collapse of system's tower, pursuant to provisions in
construction contract demonstrating parties'
unmistakable intent that company would not be liable
to owner in event of accident such as tower's
collapse, even if accident resulted from negligent act
or omission on company's part relating to or arising
out of construction or operation of plant or its heat
recovery system
*173 Appeal from the United States District Court
for the Eastern District of North Carolina, at New
Bern  Malcolm J  Howard, District Judge  (CA-99-

© 2005 Thomson/West  No Claim to Orig  U S  Govt  Works

16 Fed.Appx. 172                                                                                          Page 2
16 Fed.Appx. 172, 2001 WL 878323 (4th Cir.(N.C.))
**(Cite as: 16 Fed.Appx. 172, 2001 WL 878323 (4th Cir.(N.C.)))**

28-4-H)

**\*174 ARGUED**: <u>Jay M. Goldstein</u>, Cozen & O'Connor, Charlotte, NC, for appellants <u>Scott J. Szala</u>, Winston & Strawn, Chicago, IL, for appellee **ON BRIEF:** <u>James L. Gale</u>, Smith, Helms, Mulliss & Moore, L.L.P., Raleigh, NC, for appellee

Before <u>WILKINSON</u>, Chief Judge, <u>WIDENER</u>, Circuit Judge, and GARWOOD, Senior Circuit Judge of the United States Court of Appeals for the Fifth Circuit, sitting by designation.

### OPINION

GARWOOD, Senior Circuit Judge

**\*\*1** In this negligent failure to warn suit, plaintiffs-appellants American Home Insurance Co., Zurich Insurance Co., St. Paul Fire and Marine Insurance Co., Commonwealth Insurance Co., Interested Underwriters at Lloyd's of London and Gerling Global Insurance Co. (collectively, American) appeal the district court's grant of summary judgment in favor of defendant-appellee Monsanto Enviro-Chem Systems, Inc. (Enviro-Chem). We affirm.

*FACTS AND PROCEEDINGS BELOW*

In 1984-85, Enviro-Chem designed and built chemical plant number 6 for a company now known as PCS Phosphate Co. (PCS). [FN1] In 1992-93, Enviro-Chem designed and built a heat recovery system for plant number 6. On October 12, 1997, an implosion at plant number 6 caused the tower of the heat recovery system to collapse. A similar accident occurred in 1986 at another chemical plant (not owned by PCS) that had been designed and constructed by Enviro-Chem. After investigating the 1986 accident, Enviro-Chem recommended to that plant's owner a change in the way it was operated.

> FN1. The corporation was known as Texasgulf at the time of the agreement to construct the heat recovery system. In 1995, PCS's parent company purchased Texasgulf's stock from Texasgulf's corporate parent.

American insured PCS's plant number 6. American paid PCS $5.6 million for the damage caused by the implosion. American claims that the cause of both accidents was a vacuum created by steam from a boiler leak, that Enviro-Chem knew of this risk and of procedures to minimize the risk, and failed to warn PCS of proper operating procedures. Accordingly,

American seeks to exercise subrogation rights against Enviro-Chem to recover the amount it paid to PCS.

Enviro-Chem argues that American has waived its subrogation rights. Advancing this theory, Enviro-Chem moved for summary judgment against American. This motion was granted on April 6, 2000. American appeals.

*DISCUSSION*

I. *Standard of Review*

This Court reviews the district court's grant of summary judgment *de novo*. <u>Deans v. CSX</u> <u>Transportation, Inc., 152 F.3d 326, 330 (4th</u> <u>Cir.1998).</u>

II *Waiver of Subrogation Rights*

Paragraph 34 of plaintiff-appellant Gerling Global Insurance Co.'s policy with PCS provides, in relevant part:

> Any release from liability entered into by the Insured prior to loss shall not affect the right of the Insured to recover nor shall the Insurers have any right of subrogation against:

> (f) Any other party for whom the Insured has agreed in writing to obtain such a waiver

Similarly, paragraph 38 of the policy between PCS and all of the other plaintiffs-appellants provides, in relevant part:

> **\*175** Insurers on paying a loss hereby waive their right of subrogation against:

> (c) any other company and/or person and/or organization where the Insured has provided a waiver contractually

The question, then, is whether PCS has agreed, in a written contract, to provide a waiver of subrogation in favor of Enviro-Chem. Article 8(B) of Enviro-Chem's contract with PCS to design and construct the heat recovery unit provides:

> Owner [PCS] shall carry Builder's Risk Insurance "all risk" type coverage fully protecting Owner, Enviro-Chem, Leonard and their contractors and subcontractors as their interests may appear, against all physical loss or damage to the Plant, the Work, or any part thereof, and to all labor, material, equipment and other items incorporated into or intended for incorporation into any part of the Plant, or to be used in the course of the Work, while in transit to the site of the Plant, while at the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

16 Fed. Appx. 172                                                                                         Page 3
16 Fed. Appx. 172, 2001 WL 878323 (4th Cir (N C ))
(Cite as: 16 Fed.Appx. 172,  2001 WL 878323 (4th Cir.(N.C.)))

site of the Plant, during erection and until
completion and acceptance of the Work by the
Owner pursuant to Paragraph A of Exhibit B hereto
or until termination of this Agreement, whichever
shall first occur    After such Builder's Risk
Insurance shall have terminated, Owner shall
maintain insurance covering, or assume the risk of,
loss and damage to the Plant and the Work,
however caused, and shall provide a waiver of
subrogation in favor of Enviro-Chem and Leonard
under such insurance

**\*\*2** The district court found that the subrogation
waiver, encompassing "loss and damage to the Plant
and the Work, however caused" was sufficiently
broad to prevent American from having standing to
assert its negligent failure to warn claim   American
argues that:    1) the term "however caused" is
ambiguous (and thus a trial is needed);  2) the district
court erred in applying the familiar rule that
ambiguities in a contract will be resolved against an
insurance company to the waiver provision in the
PCS Enviro-Chem contract;  3) to construe "however
caused" to bar an assertion of subrogation rights in
this case would result in the subrogation waiver
exceeding the scope of the "Work";  and 4) in any
case, the subrogation waiver was only operative
during the twelve month "shakedown" period
immediately following completion of the heat
recovery unit

[1] First, we find no ambiguity in the phrase
"however caused"    American may now be
displeased that, through its policies with PCS and
PCS's contract with Enviro-Chem, it has agreed to an
unequivocal waiver of such breadth, but that it is so
bound cannot now be called into question    Second,
American is correct that the district court, in adopting
Enviro-Chem's construction of the phrase "however
caused", invoked the rule of _Lanning v. Allstate
Insurance Co., 332 N.C. 309, 420 S.E.2d 180, 185
(N.C.1992)_, wherein the North Carolina Supreme
Court observed that if a term in an insurance policy is
subject to more than one reasonable interpretation,
any doubt about the meaning of that term will be
resolved against the insurance company in favor of
the policyholder  Specifically, the district court held
that "[w]hen viewed under the standard articulated in
_Lanning,_ the court finds that 'however caused' is
capable of but one interpretation, that of an all
encompassing term that includes failure to warn "
American argues that this rule should not be applied
when the term in question appears in a contract
negotiated by the counsel of two sophisticated
corporations    _See Joyner v. Adams,_ 87 N.C.App.
570, 361 S.E.2d 902, 905-906 (N.C.App.1987)    We

have already explained that we find no ambiguity in
the phrase "however caused", and thus have no
occasion to consider the propriety of the district
court's application *176 of _Lanning._  In other words,
because there is no doubt as to the correct
interpretation of the phrase "however caused", it is
not necessary to pass on the district court's reliance
upon _Lanning's_ ambiguity rule   The judgment of the
district court is clearly proper notwithstanding
whether or not it was mistaken in the view that
application of _Lanning_ was appropriate

[2][3] Third, American is correct that waivers of
subrogation should not be enforced outside of their
context    American forcefully asserts that:  1) the
subject of the Enviro-Chem-PCS contract was the
design and construction of a heat recovery unit; 2) its
common law negligent failure to warn claim does not
arise from this contract and has nothing to do with
the design or construction of the heat recovery unit;
and 3) therefore, to bar American's exercise of
subrogation rights here would be to enforce the
waiver of subrogation outside of its context

**\*\*3** American opines that to apply the subrogation
waiver here would require applying it if a truck
operated by Enviro-Chem, not engaged in PCS-
related business, crashed into PCS's plant    We
disagree    Here, the alleged failure to warn
concerned the operation of the heat recovery system
that was the subject of the PCS-Enviro-Chem
contract    This is quite different than the truck
accident scenario presented by American    As
mentioned, American is correct that, at some point,
remoteness from the subject matter of the contract
will prevent even an extremely broad subrogation
waiver from operating    But American is incorrect
that the alleged failure to warn here is so remote
The cases American cites for support are easily
distinguished and, therefore, do not support its
contention that its negligent failure to warn claim is
outside the context of the PCS-Enviro-Chem
contract

_Continental Insurance Co. v. Faron Engraving Co.,
179 A.D.2d 360, 361, 577 N.Y.S.2d 835
(N.Y.App.Div.1992)_, aptly observed that "a waiver of
subrogation clause cannot be enforced beyond the
scope of the specified context in which it appears"
In _Continental,_ the contract between the insured
contained two relevant provisions    Paragraph Nine
contained a subrogation waiver concerning damage
to the premises which rendered the premises
unusable    Paragraph Eight specifically held the
landlord responsible for damage to the tenant's

16 Fed.Appx. 172                                                                    Page 4
16 Fed.Appx. 172, 2001 WL 878323 (4th Cir.(N.C.))
**(Cite as: 16 Fed.Appx. 172, 2001 WL 878323 (4th Cir.(N.C.)))**

property resulting from the landlord's negligence. Because the insurer was alleging that the landlord's negligence had resulted in damage to the insured's property, the subrogation waiver concerning destruction of the premises did not apply. *Id.* Here, the subrogation waiver is broader and there is no competing provision that specifically holds Enviro-Chem responsible for damage resulting from its negligence.

*Town of Silverton v. Phoenix Heat Source System, Inc.*, 948 P.2d 9, 11 (Colo.Ct.App.1997), involved narrow interpretation of a subrogation waiver found within a form contract drafted by the American Institute of Architects (AIA). In *Silverton*, the town contracted with the defendants for a new roof on the town hall. After the roof was completed, the town hall was damaged in a fire that the town contends was caused by the snow melting system which was designed, manufactured and supplied by one of the defendants. *Id.* at 11. The trial court granted the defendants' motion for summary judgment. The town made three arguments on appeal: 1) the waiver was limited spatially, i.e. to the new roof only; 2) the waiver was limited temporally, to the period during construction; and 3) the waiver does not extend to breach of warranty or products liability causes of action. The *Silverton* court agreed only with the first argument. Like other courts interpreting the AIA form contract, it found that the subrogation waiver applied only to the construction *177 work being performed under the contract. [FN2] This resulted in the subrogation waiver only applying to damage to the roof of the town hall. The PCS-Enviro-Chem subrogation clause explicitly applies to any damage to the *Plant* or the *Work* (which is the entire heat recovery system). Moreover, in disposing of the town's third contention, *Silverton* rejected the very argument that American now advances, namely that an unqualified subrogation waiver only applies to certain causes of action or types of claims. *Id.* at 13.

> FN2. The subrogation waiver provision in the AIA form contract provided that the parties waived all rights against each other, including subrogation, "for damages caused by fire or other perils to the extent covered by property insurance obtained pursuant this Paragraph 11.3 or other property insurance applicable to the Work." *Id.*

**4 In *Interested Underwriters at Lloyds v. Ducor's, Inc.*, 103 A.D.2d 76, 77, 478 N.Y.S.2d 285 (N.Y.App.Div.1984), the court refused to enforce a broad waiver of subrogation clause when "the dereliction of duty with which the defendant is charged is completely extraneous to any duty or obligation encompassed by the parties' agreement and the relationship created thereunder." In *Ducor's*, the tenant's premises sustained fire damage as a result of a fire in a vacant, adjoining premises that just happened to be owned by the landlord. This fire was deemed an act unrelated to the landlord-tenant relationship and, therefore, the subrogation clause would not serve to shield the landlord. *Id.* at 79, 478 N.Y.S.2d 285. Three things must be noted: 1) Judge Silverman's dissent is persuasive; 2) the court properly construed any ambiguity against the landlord, who supplied the form lease in question; and, most importantly, 3) the negligent failure to warn cause of action is not "completely extraneous" or "wholly unrelated" to the relationship between the parties that is contemplated by the PCS-Enviro-Chem agreement. Thus, even under *Ducor's*, subrogation is not proper here.

Finally, *S.S.D.W. Co. v. Brisk Waterproofing Co., Inc.*, 76 N.Y.2d 228, 557 N.Y.S.2d 290, 556 N.E.2d 1097 (1990), is another case involving interpretation of an American Institute of Architects form contract. Significantly, in *Brisk* the insurer's right of subrogation, i.e. its right to assert any claims its insured could assert, was not at issue. Rather, the issue was whether the insured had waived the claims against the defendant that the insurer was asserting. [FN3] The court held that the owner's waiver only applied to damages to the Work. *Id.* at 1098. Unlike the PCS-Enviro-Chem contract, the *Brisk* contract contained provisions requiring both the owner and the contractor to insure against certain risks of pre-completion loss. *Id.* at 1098-99. The contractor had to insure against damage its activities caused to parts of the building not constituting the Work. The owner had to insure the Work itself. *Id.* The contractor and owner waived all rights against each other for damages "to the extent covered by insurance obtained pursuant to this Article or any other property insurance applicable to the Work." *Id.* at 1098. The court interpreted this waiver as applying only to damages that the party was responsible for insuring against. *Id.* at 1100-01. In other words, the owner had waived only claims against contractor for damages the contractor caused to the Work. *Brisk* was relying on an insurance burden-sharing arrangement that is not present here. The PCS-Enviro-Chem contract places *all* of *178 the risk of post-completion loss to the Plant and the Work with PCS or PCS's insurer. Thus, *Brisk* poses no barrier to affirmance.

16 Fed Appx  172                                                                                       Page 5
16 Fed Appx. 172, 2001 WL 878323 (4th Cir (N C ))
**(Cite as: 16 Fed.Appx. 172,  2001 WL 878323 (4th Cir.(N.C.)))**

FN3. For this reason, this case is much more relevant to our alternative holding in Part II, *infra*  We discuss *Brisk* here only to point out the error of American's reliance upon it as regards the subrogation issue

Finally, American points to nothing in the PCS-Enviro-Chem contract that supports its contention that the subrogation waiver applied only during the twelve month "shakedown" period  A plain reading of Article 8(B) reveals that the waiver is operative after the Builder's Risk insurance terminates  The "shakedown" period is simply a twelve month period during which Enviro-Chem made certain workmanship and design guarantees  As mentioned, the issues of Enviro-Chem's potential liability to PCS and whether American has standing to assert any claims based thereon are separate and distinct  The workmanship and design guarantees set forth in Article 6(C) of the contract relate only to the former. Because American waived its right to subrogation, it lacked standing to assert any claims against Enviro-Chem on PCS's behalf

### III  Enviro-chem's Lack of Liability to PCS

**\*\*5 [4]** In the alternative, even if American had standing to assert claims against Enviro-Chem on PCS's behalf, summary judgment for Enviro-Chem would still have been proper.  This is because, in addition to agreeing in Article 8(B) to provide a waiver of subrogation on Enviro-Chem's behalf, PCS waived any claims, including negligence claims, against Enviro-Chem for damage to the Plant and the Work  Article 7(B) provides, in relevant part:

Enviro-Chem and Leonard shall not be liable to Owner under this Agreement or otherwise for:

3  After Enviro-Chem has either fulfilled or been relieved of its obligations hereunder, or after this Agreement shall have been terminated, and Enviro-Chem and its subcontractors have left the site of the Plant, Enviro-Chem and Leonard shall not thereafter be obligated or liable to Owner because of any loss or damage occurring to the Plant, the Work, or Owner's other facilities or property at, or adjacent to, the site of the Work
Similarly, Article 14 provides, in relevant part:
B  Except to the extent covered by any insurance carried by Enviro-Chem pursuant to Article 8 hereof, Enviro-Chem and Leonard shall not be obligated or liable to Owner under this Agreement (including, without limitation, any guarantee or remedy hereunder) or otherwise for loss of use,

loss of profits, business interruption or other consequential, indirect, special, incidental or punitive damages, however the same may be caused, including, without limitation, damages related to patent infringement, breach of contract, breach of warranty, misrepresentation or the negligent acts or omissions, strict liability or other tort of Enviro-Chem or Leonard
C  Limitations of liability expressed in this Agreement shall apply even in the event of the fault, negligence or strict liability of Enviro-Chem or Leonard
These provisions manifest the unmistakable intent of the parties that Enviro-Chem not be liable to PCS in the event of an accident such as occurred here, even if the accident results from a negligent act or omission on the part of Enviro-Chem related to or arising out of the construction or operation of the plant or the heat recovery system  Thus, even if American had standing to assert PCS's rights against Enviro-Chem, American could not recover because PCS had waived any and all rights that might have enabled recovery.

### \*179 CONCLUSION
In its policies with PCS, American waived its right to subrogation against any party that PCS had agreed to provide such a waiver for  In its contract with Enviro-Chem, PCS agreed to provide a subrogation waiver on Enviro-Chem's behalf for "loss and damage to the Plant and the Work, however caused"  Accordingly, American does not have standing to assert claims against Enviro-Chem on PCS's behalf  Alternatively, even if American did have such standing, PCS has waived any right to recovery it may have had   The judgment of the district court is

*AFFIRMED*

**Briefs and Other Related Documents** (Back to top)

• 2000 WL 33990815  (Appellate Brief) Reply Brief of Appellants (Aug  16, 2000)Original Image of this Document (PDF)

• 2000 WL 33990816  (Appellate Brief) Brief of Appellee (Jul. 31, 2000)Original Image of this Document with Appendix (PDF)

• 2000 WL 33990817  (Appellate Brief) Brief of Appellants (Jun  26, 2000)Original Image of this Document (PDF)

•                    00-1590                    (Docket)

© 2005 Thomson/West  No Claim to Orig  U S Govt  Works

16 Fed Appx  172                                                                    Page 6
16 Fed Appx. 172, 2001 WL 878323 (4th Cir (N C ))
**(Cite as: 16 Fed.Appx. 172,  2001 WL 878323 (4th Cir.(N.C.)))**

(May  15, 2000)

END OF DOCUMENT

© 2005 Thomson/West  No Claim to Orig  U S  Govt  Works

## CERTIFICATE OF SERVICE

I hereby certify that on July 11, 2005, I electronically filed the foregoing document with the Clerk of Court using CM/ECF which will send notification of such filing(s) and Hand Delivered copies of the foregoing document to the following:

>Michael P. Stafford, Esquire
>YOUNG CONAWAY STARGATT & TAYLOR, LLP
>The Brandywine Building
>1000 West Street, 17th Floor
>P.O. Box 391
>Wilmington, DE 19879-0391

I further hereby certify that on July 11, 2005, I have mailed by Federal Express, the document(s) to the following non-registered participants:

>Ward B. Coe III, Esquire
>Kevin C. McCormick, Esquire
>WHITEFORD, TAYLOR & PRESTON
>Seven Saint Paul Street, Suite 1400
>Baltimore, MD 21202

Michael R. Robinson (#4452)
Richards, Layton & Finger, P.A.
One Rodney Square
920 N. King Street
Wilmington, DE 19801
(302) 651-7700
robinson@rlf.com