IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DAKOTA IMAGING, INC. <br><br> Plaintiff, <br><br> v. <br><br> SANDEEP GOEL and PRADEEP GOEL, <br><br> Defendants/Counterclaim Plaintiffs, <br><br> v. <br><br> DAKOTA IMAGING, INC. ENVOY CORPORATION and WEBMD CORPORATION <br><br> Counterclaim Defendants. | C.A. No. 1:05-cv-296 (SLR) <br><br> JURY TRIAL DEMANDED |

## REPLY MEMORANDUM OF PLAINTIFF AND COUNTERCLAIM DEFENDANT DAKOTA IMAGING, INC. IN SUPPORT OF ITS MOTION FOR PARTIAL DISMISSAL OF COUNTERCLAIM

Plaintiff and Counterclaim Defendant Dakota Imaging, Inc. ("Dakota") submits this Reply Memorandum in support of its motion for partial dismissal of the Counterclaim asserted by Sandeep Goel and Pradeep Goel (collectively, the "Goels"). The Goels' Brief in Opposition ("Opposition") misstates Dakota's obligations pursuant to the Merger Agreement and ignores specific language in the Merger Agreement which shields Dakota from liability for potential Earnout payments. Moreover, the Goels' argument that they are not required to arbitrate disputes regarding Earnout payments is

without merit. Therefore, all portions of the Goels' Counterclaim related to the Merger Agreement and any alleged rights to Earnout payments should be dismissed.[1]

## ARGUMENT

I. **ALL PORTIONS OF THE COUNTERCLAIM RELATED TO THE EARNOUT PROVISION IN THE MERGER AGREEMENT SHOULD BE DISMISSED BECAUSE DAKOTA HAS NO CONTRACTUAL OR LEGAL OBLIGATIONS RELATED TO EARNOUT PAYMENTS.**

The Goels argue that Dakota, through the mere act of signing the Merger Agreement, is subject to contractual liability related to Earnout payments. [Opposition, p. 8]. Nowhere in their Opposition do the Goels discuss the structure of the Merger Agreement and how this instrument assigned different obligations and responsibilities to different signatories. In fact, as a simple reading of the Merger Agreement makes clear, the obligations imposed upon Dakota pursuant to the Merger Agreement were limited principally to representations, warranties and covenants during the pre-merger phase when Dakota and the Goels as its selling representatives were aligned on the same side of the transaction.[2] The Merger Agreement imposed no contractual responsibility whatsoever upon Dakota for Earnout payments.

---

[1] The Merger Agreement and Earnout Issue appear principally in Counts II and III of the Counterclaim. Dakota has answered the Counterclaim as it relates to the Employment Agreements; however, the Goels' rather confusing Counterclaim and their novel legal theory of integration of agreements expressed in their Opposition leave open the possibility that they are seeking to bootstrap Count I, entitled "Breach of Employment Agreement," into recovery of alleged damages relating to the Merger Agreement and Earnout payments. To the extent portions of Count I seek Earnout related damages, those portions should be dismissed along with the entirety of Counts II and III.

[2] The notice provision in the Merger Agreement makes clear that at the time of the signing of the Merger Agreement Dakota was affiliated with the Goels' side of the transaction, opposite from Envoy and WebMD. [Merger Agreement ¶ 10.7 (listing Whiteford Taylor & Preston – the Goels' law firm – as recipient of notice for Dakota.)]

It is "fundamental that no person or entity may be subjected by law to contractual obligations, unless the character of the obligation is definitively fixed by an express or implied agreement . . ." Coastland Corp. v. Third Nat. Mortg. Co., 611 F.2d 969, 976 (4th Cir. 1979); see also Kiley v. First Nat'l Bank of Maryland, 649 A.2d 1145, 1152 (Md. Ct. Spec. App. 1994); Express Indus. and Terminal Corp. v. New York State Dep't of Transportation, 715 N.E.2d 1050, 1053 (N.Y. 1999). The Goels' argument that Dakota's signature on the Merger Agreement exposes it to liability for Earnout payments violate one of the most basic concepts of contract law: parties must *assent* to obligations in order to be bound by them. In effect, the Goels argue that Dakota should be held to a bargain that it never made and be liable for obligations it never undertook.

Moreover, the terms of the Merger Agreement expressly shield Dakota from responsibility for Earnout payments and related legal liability. The Merger Agreement provides that Envoy Corporation's ("Envoy") affiliates are insulated from any liability "with respect to the management and operation of [Dakota], including any impact thereof on the [Earnout] payment, if any, to the [shareholders] pursuant to [Section 1.7(a)]³ By negotiating and executing an agreement containing language so clearly absolving Dakota from any liability with regard to disputes over the Earnout payments, the Goels have waived any right to proceed against Dakota based upon such disputes. See e.g., Am. Home Ins. Co. v. Monsanto Enviro-Chem Sys., Inc., 2001 WL 878323, at *5 (4th Cir

---

³ Dakota, which became a wholly-owned subsidiary of Envoy pursuant to the Merger Agreement, is considered an "Affiliate," pursuant to the Rule 12b-2 under the Securities Exchange Act of 1934 and therefore under the Merger Agreement. [Merger Agreement, p. 58, Article x] See TSC Indus., Inc. v. Northway Inc., 426 U.S. 438 (1976) (discussing the definition of "Affiliate" pursuant to federal securities law).

3

Aug. 3, 2001)[4] (holding that limitation of liability clause in agreement manifested "unmistakable intent" by plaintiff to waive all claims, including those arising from negligence or theories of strict liability); Seigneur v. Nat'l Fitness Institute, Inc., 752 A.2d 631, 636 (Md. App. 2000) (courts recognize that contractual clauses limiting liability are part of and parcel of the right to contract and are reluctant to interfere with the parties' negotiated limitations on liability).

The Goels' Opposition totally ignores this contractual insulation against Dakota liability with regard to Earnout payments. Instead, the Goels simply refer the Court to the recognition in Maryland law of an implied duty of good faith and fair dealing in contracts. The fact that such an implied duty exists in Maryland is inapposite, as Maryland courts also recognize that parties to a negotiated contract can limit their liability under such instruments through contractual terms. See id. In sum, because the very terms of the Merger Agreement preclude any finding that Dakota is liable under any legal theory for disputes relating to the Earnout payment, such claims against Dakota should be dismissed.

## II. THE MERGER AGREEMENT REQUIRES THAT ALL EARNOUT RELATED DISPUTES BE ARBITRATED RATHER THAN LITIGATED.

To the extent any portion of the Goels' Counterclaim purports to assert claims against Dakota related to the Earnout payment, these claims should be dismissed because various provisions of the Merger Agreement make clear that the Goels agreed to arbitrate, not litigate, any legal disputes related to the Earnout.

---

[4] Unreported decisions are attached hereto under Tab A in alphabetical order.

Section 1.7 of the Merger Agreement is a comprehensive three-page compendium governing the rights of the Goels and others to an Earnout based on the financial performance of Dakota during the first three years of the merger.[5] Section 1.7(c), entitled "Dispute Resolution," contains a two-page explanation of the bifurcated arbitration procedures by which disputes related to the Earnout are to be resolved. Disagreements as to whether the calculation of the Earnout complies with the formulas in § 1.7 are initially to be set forth in writing, discussed between the parties and then submitted for a determination by the independent accounting firm, BDO Seidman, in Washington, D.C. ("Independent Accountants"). All other disputes related to the Earnout are to be submitted to arbitration in Delaware pursuant to Section 1.7(c)(iii) of the Merger Agreement.

The Opposition argues that the arbitration clause is limited strictly to accounting issues related to the calculation of the Earnout, and in support of this proposition, cites Section 1.7(c)(iii) with the following emphasis:

> If ... [Envoy and the Goels] have not resolved all disagreements not resolved by the determination of the Independent Accountants **with respect to whether the calculation of the Earnout Payment is in accordance with the terms of [] this Agreement**, any such disagreement, regardless of the legal theory upon which it is based, will be settled by final, binding arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 et. seq., in accordance with the applicable rules of the American Arbitration Association[] in effect at such time, which will be the sole and exclusive procedures for any such disagreement.

[Emphasis in Opposition]

---

[5] The three-year period actually ends just short of three years after the merger because it includes approximately one month of pre-merger financial activity.

5

RLF1-2898211-1

The Opposition fails to note or discuss the language immediately preceding or following those portions of Section 1.7(c)(iii) which the Goels highlighted for the Court. It is this surrounding language, however, that makes the meaning of this section of the Merger Agreement clear and unambiguous. First, immediately preceding the Goels' emphasized language is the phrase:

> If ... [Envoy and the Goels] have not resolved all disagreements not resolved by the determination of the Independent Accountants[]

Even a casual reading of this language shows that the parties to the Merger Agreement anticipated that: (a) the Independent Accountants have the ability to "resolve" certain disputes; and (b) there could be other disputes, not resolved by the Independent Accountants.

When the Goels' emphasized language is combined with the phrase immediately preceding it, it is evident what the Independent Accountants have the authority to resolve:

> If ... [Envoy and the Goels] have not resolved all disagreements not resolved by the determination of the Independent Accountants with respect to whether the calculation of the Earnout Payment is in accordance with the terms of [] this Agreement

The plain meaning of the above portion of 1.7(c)(iii) is now clearer. The Independent Accountants have the ability to resolve disagreements "with respect to whether the calculation of the Earnout Payment is in accordance with the terms of [] this Agreement ." However, Section 1.7(c)(iii) plainly anticipates certain disputes that cannot or will not be resolved by the Independent Accounts. The mystery (to the Goels, if no one else)

6

as to what these other disputes might entail is solved by looking at the language immediately following the text emphasized by the Goels: **"regardless of the legal theory upon which it is based."**

Thus, all such disputes, regardless of the legal theory, are to be:

> settled by final, binding arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 et. seq., in accordance with the applicable rules of the American Arbitration Association[] in effect at such time, which will be the sole and exclusive procedures for any such disagreement

This overall language makes it clear that the parties anticipated the potential for some disputes involving legal theories, as well as the desire to resolve them through arbitration after the completion of the Independent Accountant's Earnout calculations. To read Section 1.7(c)(iii) otherwise would reduce the phrase "regardless of the legal theory upon which it is based" to a nullity.[6]

Courts "avoid an interpretation that would leave contractual clauses meaningless." 150 Broadway N.Y. Assoc., L.P. v. Bodner, 14 A.D.3d 1, 6 (N.Y. App. Div. 2004) (internal citations omitted). Stated otherwise, courts are obligated to interpret a contract so as to give meaning to all of its terms. See id. Here, § 1.7(c)(iii) of the Merger Agreement requires a resolution of "any [] disagreements not resolved by the Independent Accountants [] regardless of the legal theory upon which it is based" to be resolved by binding arbitration.

The Opposition, however, ignores the clear meaning of the arbitration clause in the Merger Agreement, cites selectively from the clause and fails to even address

---

[6] Moreover, it is illogical that the parties intended the conclusion of the Independent Accountants regarding accounting calculations and revenue recognition to be second guessed by an arbitrator with no guarantee that the arbitrator would have <u>any</u> accounting experience.

7

Dakota's position that the Goels' interpretation of the arbitration clause renders the contractual clause "regardless of legal theory" a meaningless nullity

Moreover, as contracts must be construed in light of the entire agreement, review of language in one section of a contract may shed light upon the meaning of another section. See Levy v. Southbrook Int'l Investments, Ltd., 263 F 3d 10, 17 (2nd Cir. 2001); Corbin on Contracts, § 24 21 (1998); Williston on Contracts, §§ 32 5, 32 6 (4th ed 1999) In this regard, the meaning of the arbitration clause in Section 1 7 of the Merger agreement is informed by the similar but not identical arbitration clause contained in Section 7 7, which deals exclusively with the tax liabilities. Section 7 7 states:

> During the 30-day period following the delivery of a Response that reflects a dispute [with regard to tax liabilities], the Buyer and the Stockholder Representatives shall attempt in good faith to resolve the Dispute. If at the end of the 30-day period, the Buyer and the Stockholder Representative have not resolved such Dispute, the Buyer and the Stockholder Representatives shall refer the Dispute for determination to the Independent Accountants who shall act as experts, not as arbitrators, and the parties will be reasonably available and work diligently to facilitate the Independent Accountants to render a determination within a 20-day period immediately following the referral to them **A determination by the Independent Accounts with respect to any item of Dispute submitted to them will be binding on the buyer and the Constituents.**

[Emphasis added]

Noticeably absent from Section 7 7 is any referral of unresolved tax disputes, "regardless of legal theory," to binding arbitration  Section 7 7 demonstrates that, where the parties foresaw possible disputes related solely to tax issues which are normally

8

within the expertise of accountants, they gave the Independent Accountants the final say in resolution of such disputes. Conversely, where the parties foresaw possible disputes over the Earnout, which could relate to either accounting issues or claims based upon legal theories of contractual and tort liability, or both, they added a mechanism for binding arbitration of legal disputes, as the Independent Accountants would have no particular expertise in deciding such issues.

Given the clarity of the arbitration clause in the Merger Agreement and the federal and New York state policy[7] of deferring to arbitration clauses, the Court should dismiss all Earnout related claims against Dakota in favor of arbitration. See e.g., In re Arbitration Between Ayco Co., L.P. and Walton, 3 A.D.3d 635, 637 (N.Y. App. Div. 3 Dept. 2004) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."), citing Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983).

---

[7] The applicability of the arbitration clause in the Merger Agreement is governed by both the Federal Arbitration Act (Merger Agreement, § 17(c)(ii)) and New York state law (Merger Agreement, § 10.8(a).

9

## CONCLUSION

For the foregoing reasons, the Court should dismiss as to Dakota both Counts II and III of the Counterclaim in their entirety, as well as any portion of Count I which seeks Earnout related damages.

/s/ Michael R. Robinson
Jesse A. Finkelstein (DSBA 1090)
Michael R. Robinson (DSBA 4452)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
(302) 651-7700
finkelstein@rlf.com
robinson@rlf.com

*Counsel for Plaintiff and Counterclaim-Defendant Dakota Imaging, Inc.*

Of Counsel:

Harry T. Daniels
Richard A. Johnston
Mark A. Delaney
Cytheria D. Jernigan
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

Date: July 11, 2005

10

RLF1-2898211-1

# TAB A

**Westlaw.**

16 Fed.Appx. 172                                                                                                              Page 1
16 Fed.Appx. 172, 2001 WL 878323 (4th Cir.(N.C.))
(Cite as: 16 Fed.Appx. 172, 2001 WL 878323 (4th Cir.(N.C.)))

**Briefs and Other Related Documents**

This case was not selected for publication in the Federal Reporter

UNPUBLISHED

Please use FIND to look at the applicable circuit court rule before citing this opinion. Fourth Circuit Rule 36(c). (FIND CTA4 Rule 36(c).)

United States Court of Appeals,
Fourth Circuit.
AMERICAN HOME INSURANCE COMPANY;
Zurich Insurance Company; St. Paul Fire and
Marine Insurance Company; Commonwealth
Insurance Company; Interested
Underwriters at Lloyds of London; Gerling Global
Insurance Company, as
Subrogees of PCS Phosphate Company,
Incorporated, Plaintiffs-Appellants,
v.
MONSANTO ENVIRO-CHEM SYSTEMS,
INCORPORATED, Defendant-Appellee.
No. 00-1590.

Argued Dec. 6, 2000
Decided Aug. 3, 2001.

Insurers of chemical plant sued company that designed and built plant's heat recovery system for negligent failure to warn after implosion at plant caused system's tower to collapse, seeking to exercise their subrogation rights to recover amounts paid to insured. The United States District Court for the Eastern District of North Carolina, Malcolm J. Howard, J., granted summary judgment for company. Insurers appealed. The Court of Appeals, Garwood, Senior Circuit Judge, sitting by designation, held that: (1) pursuant to waiver of subrogation rights, insurers lacked standing to bring negligent failure to warn claim against company, and (2) plant's owner waived any and all rights that might have enabled recovery in negligence against company.

Affirmed.

West Headnotes

[1] Insurance 3522
217k3522 Most Cited Cases
Subrogation waiver provision in contract between chemical plant owner and company that designed and built plant's heat recovery system, encompassing "loss and damage to the Plant and the Work, however caused," was not ambiguous, and therefore owner's insurers, which in turn had waived any right of subrogation against any party to whom owner provided written contractual waiver, lacked standing to bring negligent failure to warn claim against company to recover amounts paid to owner after implosion at plant caused heat recovery system's tower to collapse.

[2] Subrogation 35
366k35 Most Cited Cases
Waivers of subrogation should not be enforced outside of their context.

[3] Insurance 3522
217k3522 Most Cited Cases
Common-law negligent failure to warn claim that insurers for chemical plant owner sought to assert against company that designed and built plant's heat recovery system, after implosion at plant caused system's tower to collapse, was not so remote from subject matter of contract between owner and company for design and construction of system as to preclude enforcement of contract's broad subrogation waiver provision, inasmuch as alleged failure to warn concerned operation of heat recovery system.

[4] Contracts 189
95k189 Most Cited Cases
Chemical plant owner waived any and all rights that might have enabled recovery in negligence against company that designed and built plant's heat recovery system, precluding action for negligent failure to warn by owner's insurers against company following collapse of system's tower, pursuant to provisions in construction contract demonstrating parties' unmistakable intent that company would not be liable to owner in event of accident such as tower's collapse, even if accident resulted from negligent act or omission on company's part relating to or arising out of construction or operation of plant or its heat recovery system.
*173 Appeal from the United States District Court for the Eastern District of North Carolina, at New Bern. Malcolm J. Howard, District Judge (CA-99-

16 Fed.Appx. 172                                                                                                Page 2
16 Fed.Appx. 172, 2001 WL 878323 (4th Cir.(N.C.))
**(Cite as: 16 Fed.Appx. 172, 2001 WL 878323 (4th Cir.(N.C.)))**

28-4-H)

*174 **ARGUED**: Jay M. Goldstein, Cozen & O'Connor, Charlotte, NC, for appellants Scott J. Szala, Winston & Strawn, Chicago, IL., for appellee **ON BRIEF**: James L. Gale, Smith, Helms, Mulliss & Moore, L.L.P., Raleigh, NC, for appellee.

Before WILKINSON, Chief Judge, WIDENER, Circuit Judge, and GARWOOD, Senior Circuit Judge of the United States Court of Appeals for the Fifth Circuit, sitting by designation.

### OPINION

GARWOOD, Senior Circuit Judge

**\*\*1** In this negligent failure to warn suit, plaintiffs-appellants American Home Insurance Co., Zurich Insurance Co., St. Paul Fire and Marine Insurance Co., Commonwealth Insurance Co., Interested Underwriters at Lloyd's of London and Gerling Global Insurance Co. (collectively, American) appeal the district court's grant of summary judgment in favor of defendant-appellee Monsanto Enviro-Chem Systems, Inc. (Enviro-Chem). We affirm.

### FACTS AND PROCEEDINGS BELOW

In 1984-85, Enviro-Chem designed and built chemical plant number 6 for a company now known as PCS Phosphate Co. (PCS) [FN1] In 1992-93, Enviro-Chem designed and built a heat recovery system for plant number 6. On October 12, 1997, an implosion at plant number 6 caused the tower of the heat recovery system to collapse. A similar accident occurred in 1986 at another chemical plant (not owned by PCS) that had been designed and constructed by Enviro-Chem. After investigating the 1986 accident, Enviro-Chem recommended to that plant's owner a change in the way it was operated.

> FN1. The corporation was known as Texasgulf at the time of the agreement to construct the heat recovery system. In 1995, PCS's parent company purchased Texasgulf's stock from Texasgulf's corporate parent.

American insured PCS's plant number 6. American paid PCS $5.6 million for the damage caused by the implosion. American claims that the cause of both accidents was a vacuum created by steam from a boiler leak, that Enviro-Chem knew of this risk and of procedures to minimize the risk, and failed to warn PCS of proper operating procedures. Accordingly, American seeks to exercise subrogation rights against Enviro-Chem to recover the amount it paid to PCS.

Enviro-Chem argues that American has waived its subrogation rights. Advancing this theory, Enviro-Chem moved for summary judgment against American. This motion was granted on April 6, 2000. American appeals.

### DISCUSSION
I. *Standard of Review*

This Court reviews the district court's grant of summary judgment *de novo*. *Deans v. CSX Transportation, Inc.*, 152 F.3d 326, 330 (4th Cir.1998).

II. *Waiver of Subrogation Rights*

Paragraph 34 of plaintiff-appellant Gerling Global Insurance Co.'s policy with PCS provides, in relevant part:
> Any release from liability entered into by the Insured prior to loss shall not affect the right of the Insured to recover nor shall the Insurers have any right of subrogation against:
>
> (f) Any other party for whom the Insured has agreed in writing to obtain such a waiver.

Similarly, paragraph 38 of the policy between PCS and all of the other plaintiffs-appellants provides, in relevant part:
> *175 Insurers on paying a loss hereby waive their right of subrogation against:
>
> (c) any other company and/or person and/or organization where the Insured has provided a waiver contractually.

The question, then, is whether PCS has agreed, in a written contract, to provide a waiver of subrogation in favor of Enviro-Chem. Article 8(B) of Enviro-Chem's contract with PCS to design and construct the heat recovery unit provides:
> Owner [PCS] shall carry Builder's Risk Insurance "all risk" type coverage fully protecting Owner, Enviro-Chem, Leonard and their contractors and subcontractors as their interests may appear, against all physical loss or damage to the Plant, the Work, or any part thereof, and to all labor, material, equipment and other items incorporated into or intended for incorporation into any part of the Plant, or to be used in the course of the Work, while in transit to the site of the Plant, while at the

16 Fed.Appx. 172                                                                                                       Page 3
16 Fed.Appx. 172, 2001 WL 878323 (4th Cir.(N.C.))
**(Cite as: 16 Fed.Appx. 172, 2001 WL 878323 (4th Cir.(N.C.)))**

site of the Plant, during erection and until completion and acceptance of the Work by the Owner pursuant to Paragraph A of Exhibit B hereto or until termination of this Agreement, whichever shall first occur.  After such Builder's Risk Insurance shall have terminated, Owner shall maintain insurance covering, or assume the risk of, loss and damage to the Plant and the Work, however caused, and shall provide a waiver of subrogation in favor of Enviro-Chem and Leonard under such insurance.

**\*\*2** The district court found that the subrogation waiver, encompassing "loss and damage to the Plant and the Work, however caused" was sufficiently broad to prevent American from having standing to assert its negligent failure to warn claim.  American argues that: 1) the term "however caused" is ambiguous (and thus a trial is needed); 2) the district court erred in applying the familiar rule that ambiguities in a contract will be resolved against an insurance company to the waiver provision in the PCS Enviro-Chem contract; 3) to construe "however caused" to bar an assertion of subrogation rights in this case would result in the subrogation waiver exceeding the scope of the "Work"; and 4) in any case, the subrogation waiver was only operative during the twelve month "shakedown" period immediately following completion of the heat recovery unit.

[1] First, we find no ambiguity in the phrase "however caused".  American may now be displeased that, through its policies with PCS and PCS's contract with Enviro-Chem, it has agreed to an unequivocal waiver of such breadth, but that it is so bound cannot now be called into question.  Second, American is correct that the district court, in adopting Enviro-Chem's construction of the phrase "however caused", invoked the rule of *Lanning v. Allstate Insurance Co.*, 332 N.C. 309, 420 S.E.2d 180, 185 (N.C.1992), wherein the North Carolina Supreme Court observed that if a term in an insurance policy is subject to more than one reasonable interpretation, any doubt about the meaning of that term will be resolved against the insurance company in favor of the policyholder. Specifically, the district court held that "[w]hen viewed under the standard articulated in *Lanning*, the court finds that 'however caused' is capable of but one interpretation, that of an all encompassing term that includes failure to warn." American argues that this rule should not be applied when the term in question appears in a contract negotiated by the counsel of two sophisticated corporations.  *See Joyner v. Adams*, 87 N.C.App. 570, 361 S.E.2d 902, 905-906 (N.C.App.1987).  We have already explained that we find no ambiguity in the phrase "however caused", and thus have no occasion to consider the propriety of the district court's application **\*176** of *Lanning*.  In other words, because there is no doubt as to the correct interpretation of the phrase "however caused", it is not necessary to pass on the district court's reliance upon *Lanning*'s ambiguity rule.  The judgment of the district court is clearly proper notwithstanding whether or not it was mistaken in the view that application of *Lanning* was appropriate.

[2][3] Third, American is correct that waivers of subrogation should not be enforced outside of their context.  American forcefully asserts that: 1) the subject of the Enviro-Chem-PCS contract was the design and construction of a heat recovery unit; 2) its common law negligent failure to warn claim does not arise from this contract and has nothing to do with the design or construction of the heat recovery unit; and 3) therefore, to bar American's exercise of subrogation rights here would be to enforce the waiver of subrogation outside of its context.

**\*\*3** American opines that to apply the subrogation waiver here would require applying it if a truck operated by Enviro-Chem, not engaged in PCS-related business, crashed into PCS's plant.  We disagree.  Here, the alleged failure to warn concerned the operation of the heat recovery system that was the subject of the PCS-Enviro-Chem contract.  This is quite different than the truck accident scenario presented by American.  As mentioned, American is correct that, at some point, remoteness from the subject matter of the contract will prevent even an extremely broad subrogation waiver from operating.  But American is incorrect that the alleged failure to warn here is so remote.  The cases American cites for support are easily distinguished and, therefore, do not support its contention that its negligent failure to warn claim is outside the context of the PCS-Enviro-Chem contract.

*Continental Insurance Co. v. Faron Engraving Co.*, 179 A.D.2d 360, 361, 577 N.Y.S.2d 835 (N.Y.App.Div.1992), aptly observed that "a waiver of subrogation clause cannot be enforced beyond the scope of the specified context in which it appears". In *Continental,* the contract between the insured contained two relevant provisions.  Paragraph Nine contained a subrogation waiver concerning damage to the premises which rendered the premises unusable.  Paragraph Eight specifically held the landlord responsible for damage to the tenant's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00296-SLR    Document 43    Filed 07/11/2005    Page 15 of 18

16 Fed.Appx. 172                                                                                                    Page 4
16 Fed.Appx. 172, 2001 WL 878323 (4th Cir.(N.C.))
(Cite as: 16 Fed.Appx. 172, 2001 WL 878323 (4th Cir.(N.C.)))

property resulting from the landlord's negligence. Because the insurer was alleging that the landlord's negligence had resulted in damage to the insured's property, the subrogation waiver concerning destruction of the premises did not apply. *Id.* Here, the subrogation waiver is broader and there is no competing provision that specifically holds Enviro-Chem responsible for damage resulting from its negligence.

*Town of Silverton v. Phoenix Heat Source System, Inc.*, 948 P.2d 9, 11 (Colo.Ct.App.1997), involved narrow interpretation of a subrogation waiver found within a form contract drafted by the American Institute of Architects (AIA). In *Silverton*, the town contracted with the defendants for a new roof on the town hall. After the roof was completed, the town hall was damaged in a fire that the town contends was caused by the snow melting system which was designed, manufactured and supplied by one of the defendants. *Id.* at 11. The trial court granted the defendants' motion for summary judgment. The town made three arguments on appeal: 1) the waiver was limited spatially, i.e. to the new roof only; 2) the waiver was limited temporally, to the period during construction; and 3) the waiver does not extend to breach of warranty or products liability causes of action. The *Silverton* court agreed only with the first argument. Like other courts interpreting the AIA form contract, it found that the subrogation waiver applied only to the construction *177 work being performed under the contract. [FN2] This resulted in the subrogation waiver only applying to damage to the roof of the town hall. The PCS-Enviro-Chem subrogation clause explicitly applies to any damage to the *Plant* or the *Work* (which is the entire heat recovery system). Moreover, in disposing of the town's third contention, *Silverton* rejected the very argument that American now advances, namely that an unqualified subrogation waiver only applies to certain causes of action or types of claims. *Id.* at 13.

> FN2. The subrogation waiver provision in the AIA form contract provided that the parties waived all rights against each other, including subrogation, "for damages caused by fire or other perils to the extent covered by property insurance obtained pursuant this Paragraph 11.3 or other property insurance applicable to the Work." *Id.*

**4 In *Interested Underwriters at Lloyds v. Ducor's, Inc.*, 103 A.D.2d 76, 77, 478 N.Y.S.2d 285 (N.Y.App.Div.1984), the court refused to enforce a broad waiver of subrogation clause when "the dereliction of duty with which the defendant is charged is completely extraneous to any duty or obligation encompassed by the parties' agreement and the relationship created thereunder." In *Ducor's*, the tenant's premises sustained fire damage as a result of a fire in a vacant, adjoining premises that just happened to be owned by the landlord. This fire was deemed an act unrelated to the landlord-tenant relationship and, therefore, the subrogation clause would not serve to shield the landlord. *Id.* at 79, 478 N.Y.S.2d 285. Three things must be noted: 1) Judge Silverman's dissent is persuasive; 2) the court properly construed any ambiguity against the landlord, who supplied the form lease in question; and, most importantly, 3) the negligent failure to warn cause of action is not "completely extraneous" or "wholly unrelated" to the relationship between the parties that is contemplated by the PCS-Enviro-Chem agreement. Thus, even under *Ducor's*, subrogation is not proper here.

Finally, *S.S.D.W. Co. v. Brisk Waterproofing Co., Inc.*, 76 N.Y.2d 228, 557 N.Y.S.2d 290, 556 N.E.2d 1097 (1990), is another case involving interpretation of an American Institute of Architects form contract. Significantly, in *Brisk* the insurer's right of subrogation, i.e. its right to assert any claims its insured could assert, was not at issue. Rather, the issue was whether the insured had waived the claims against the defendant that the insurer was asserting. [FN3] The court held that the owner's waiver only applied to damages to the Work. *Id.* at 1098. Unlike the PCS-Enviro-Chem contract, the *Brisk* contract contained provisions requiring both the owner and the contractor to insure against certain risks of pre-completion loss. *Id.* at 1098-99. The contractor had to insure against damage its activities caused to parts of the building not constituting the Work. The owner had to insure the Work itself. *Id.* The contractor and owner waived all rights against each other for damages "to the extent covered by insurance obtained pursuant to this Article or any other property insurance applicable to the Work." *Id.* at 1098. The court interpreted this waiver as applying only to damages that the party was responsible for insuring against. *Id.* at 1100-01. In other words, the owner had waived only claims against contractor for damages the contractor caused to the Work. *Brisk* was relying on an insurance burden-sharing arrangement that is not present here. The PCS-Enviro-Chem contract places *all* of *178 the risk of post-completion loss to the Plant and the Work with PCS or PCS's insurer. Thus, *Brisk* poses no barrier to affirmance.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

16 Fed.Appx. 172                                                                                                    Page 5
16 Fed.Appx. 172, 2001 WL 878323 (4th Cir.(N.C.))
**(Cite as: 16 Fed.Appx. 172, 2001 WL 878323 (4th Cir.(N.C.)))**

FN3. For this reason, this case is much more relevant to our alternative holding in Part II, *infra.* We discuss *Brisk* here only to point out the error of American's reliance upon it as regards the subrogation issue.

Finally, American points to nothing in the PCS-Enviro-Chem contract that supports its contention that the subrogation waiver applied only during the twelve month "shakedown" period. A plain reading of Article 8(B) reveals that the waiver is operative after the Builder's Risk insurance terminates. The "shakedown" period is simply a twelve month period during which Enviro-Chem made certain workmanship and design guarantees. As mentioned, the issues of Enviro-Chem's potential liability to PCS and whether American has standing to assert any claims based thereon are separate and distinct. The workmanship and design guarantees set forth in Article 6(C) of the contract relate only to the former. Because American waived its right to subrogation, it lacked standing to assert any claims against Enviro-Chem on PCS's behalf.

III. *Enviro-chem's Lack of Liability to PCS*

**\*\*5** [4] In the alternative, even if American had standing to assert claims against Enviro-Chem on PCS's behalf, summary judgment for Enviro-Chem would still have been proper. This is because, in addition to agreeing in Article 8(B) to provide a waiver of subrogation on Enviro-Chem's behalf, PCS waived any claims, including negligence claims, against Enviro-Chem for damage to the Plant and the Work. Article 7(B) provides, in relevant part:

Enviro-Chem and Leonard shall not be liable to Owner under this Agreement or otherwise for:

3. After Enviro-Chem has either fulfilled or been relieved of its obligations hereunder, or after this Agreement shall have been terminated, and Enviro-Chem and its subcontractors have left the site of the Plant, Enviro-Chem and Leonard shall not thereafter be obligated or liable to Owner because of any loss or damage occurring to the Plant, the Work, or Owner's other facilities or property at, or adjacent to, the site of the Work.

Similarly, Article 14 provides, in relevant part:

B. Except to the extent covered by any insurance carried by Enviro-Chem pursuant to Article 8 hereof, Enviro-Chem and Leonard shall not be obligated or liable to Owner under this Agreement (including, without limitation, any guarantee or remedy hereunder) or otherwise for loss of use, loss of profits, business interruption or other consequential, indirect, special, incidental or punitive damages, however the same may be caused, including, without limitation, damages related to patent infringement, breach of contract, breach of warranty, misrepresentation or the negligent acts or omissions, strict liability or other tort of Enviro-Chem or Leonard.

C. Limitations of liability expressed in this Agreement shall apply even in the event of the fault, negligence or strict liability of Enviro-Chem or Leonard.

These provisions manifest the unmistakable intent of the parties that Enviro-Chem not be liable to PCS in the event of an accident such as occurred here, even if the accident results from a negligent act or omission on the part of Enviro-Chem related to or arising out of the construction or operation of the plant or the heat recovery system. Thus, even if American had standing to assert PCS's rights against Enviro-Chem, American could not recover because PCS had waived any and all rights that might have enabled recovery.

**\*179** *CONCLUSION*

In its policies with PCS, American waived its right to subrogation against any party that PCS had agreed to provide such a waiver for. In its contract with Enviro-Chem, PCS agreed to provide a subrogation waiver on Enviro-Chem's behalf for "loss and damage to the Plant and the Work, however caused". Accordingly, American does not have standing to assert claims against Enviro-Chem on PCS's behalf. Alternatively, even if American did have such standing, PCS has waived any right to recovery it may have had. The judgment of the district court is

*AFFIRMED*

**Briefs and Other Related Documents** (Back to top)

• 2000 WL 33990815 (Appellate Brief) Reply Brief of Appellants (Aug. 16, 2000)Original Image of this Document (PDF)

• 2000 WL 33990816 (Appellate Brief) Brief of Appellee (Jul. 31, 2000)Original Image of this Document with Appendix (PDF)

• 2000 WL 33990817 (Appellate Brief) Brief of Appellants (Jun. 26, 2000)Original Image of this Document (PDF)

•             00-1590            (Docket)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

16 Fed.Appx. 172                                                                                                    Page 6
16 Fed.Appx. 172, 2001 WL 878323 (4th Cir.(N.C.))
**(Cite as: 16 Fed.Appx. 172, 2001 WL 878323 (4th Cir.(N.C.)))**

(May 15, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I hereby certify that on July 11, 2005, I electronically filed the foregoing document with the Clerk of Court using CM/ECF which will send notification of such filing(s) and Hand Delivered copies of the foregoing document to the following:

>Michael P. Stafford, Esquire
>YOUNG CONAWAY STARGATT & TAYLOR, LLP
>The Brandywine Building
>1000 West Street, 17th Floor
>P.O. Box 391
>Wilmington, DE 19879-0391

I further hereby certify that on July 11, 2005, I have mailed by Federal Express, the document(s) to the following non-registered participants:

>Ward B. Coe III, Esquire
>Kevin C. McCormick, Esquire
>WHITEFORD, TAYLOR & PRESTON
>Seven Saint Paul Street, Suite 1400
>Baltimore, MD 21202

>_/s/ Michael R. Robinson_
>Michael R. Robinson (#4452)
>Richards, Layton & Finger, P.A.
>One Rodney Square
>920 N. King Street
>Wilmington, DE 19801
>(302) 651-7700
>robinson@rlf.com

RLF1-2884580-1